UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-25648-WILLIAMS/LETT

CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES, LTD.
d/b/a ROYAL CARIBBEAN GROUP,

      Plaintiff,

v.

ANGEL CHRISTOPHER GOMEZ,

      Defendant.

_____/

## DEFENDANT'S (CORRECTED) RESPONSE IN OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR TEMPORARY <u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Defendant, Angel Christopher Gomez ("Mr. Gomez"), through his undersigned counsel and pursuant to Fed. R. Civ. P. 65, Fla. Stat. §542.335, Local Rule 7.1, and other applicable Rules and laws responds to Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") filed by Plaintiffs, Plaintiffs, Celebrity Cruises, Inc. ("Celebrity") and Royal Caribbean Cruises, Ltd. ("RCCL"), on December 4, 2025 [ECF No. 4], and requests that the Court deny their Motion based on the following:

# I. INTRODUCTION

Plaintiffs are not entitled to obtain a temporary restraining order or preliminary injunction against Mr. Gomez under Rule 65 for numerous reasons. Instead of immediately seeking to enforce the restrictive covenants upon learning that Mr. Gomez was working for AmaWaterways, LLC ("Ama") on July 31, 2025, Plaintiffs waited nearly three (3) months before filing suit against him (without providing any explanation for their delay). [ECF No. 1-1 at ¶83]. Plaintiffs' unexplained pre-suit delay does not entitle them to now obtain an expedited injunction against Mr. Gomez, and certainly not on such short notice. *Compare All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1538 (11th Cir. 1989) ("A two-day notice, coupled with thirty minutes for oral presentations can hardly be said to constitute a meaningful opportunity to oppose appellees' motion for preliminary injunction.") Plaintiffs knew that Mr. Gomez was leaving to work for Ama, had no issue with his doing so at or before his last day of work, they have since lost no employee, customer, vendor, revenue stream, or strategic initiative since he resigned and then started working for Ama. Plaintiffs identify no disruption to any business unit, no diverted opportunity, and no competitive impact during this time. Plaintiffs' request for the issuance of a preliminary injunction (or TRO) is illusory and based on phantom suppositions.

Plaintiffs' Motion relies on a distorted factual narrative and a flawed legal theory. Mr. Gomez, a respected executive who worked for Plaintiffs, has meticulously avoided any misconduct during or after his employment. While employed by Plaintiffs, he accessed the information necessary to perform his job duties, including at his superiors' request, without downloading, copying, or misappropriating any trade secret, non-public, or confidential information. Plaintiffs identify actions he took for his work, on his work computer, and during work hours. After leaving to work in a different industry, Mr. Gomez has not solicited Plaintiffs' customers or trade partners. Mr. Gomez admits that he has met and spoken with former colleagues in purely social settings and that he responded to those who reached out to him about employment at Ama by directing them to contact human resources. However, he never solicited or invited anyone to apply at Ama or leave their current employment. When Mr. Santelices reached out to Mr. Gomez about his dissatisfaction at work and inquired about opportunities at Ama, Mr. Gomez responded as he was permitted to do, but never initiated contact with him.

Each of the Agreements involved in this case contains restrictive covenants that activate

only upon the "termination" of Mr. Gomez's employment. Since Mr. Gomez resigned from his employment, the restrictive covenants effective on "termination" were never triggered. Therefore, Mr. Gomez could not have violated restrictions that never applied to him. Plaintiffs drafted the documents and could have specified that covenants activate upon "separation" or "regardless of by whom" but did not.

If the Agreements apply upon resignation, then Fla. Stat. §542.335(1)(a) precludes enforcement of restrictive covenants unless they are (i) in writing and (ii) signed by Mr. Gomez. ("<u>A court shall not enforce a restrictive covenant unless it is</u> set forth in a writing <u>signed by the person against whom enforcement is sought</u>.") Mr. Gomez appears to have signed Exhibits A and B to the Verified Complaint, limiting the Court's consideration to enforcing the restrictive covenants contained therein. [ECF No. 1-1 at 32-33 and 37-41]. Since Mr. Gomez is entitled to advance notice of the restrictive covenants Plaintiffs seek to enforce and the basis for those restrictive covenants, they cannot legitimately rely on the RSU Agreements appended to the Verified Complaint as Exhibits C through K as a basis for preliminary injunctive relief because his signature does not appear on Exhibits C through K. *Id.*, at 42-94.

Plaintiffs cannot prevent Mr. Gomez from working in the river cruise industry because they rely on covenants that do not extend to prevent him from working for Ama. The Agreements preclude Mr. Gomez from working for an entity with a minimum fleet size of 500 or 1,000 berths, depending on the Agreement (and how the Court construes this undefined phraseology). None of Ama's ships have 500 berths, as it operates exclusively river cruise vessels ranging from approximately 70 to 196 berths per ship on inland waterways, with an average capacity of roughly 156 berths. Plaintiff's Motion mischaracterizes Ama's fleet by aggregating total fleet capacity rather than berth count per ship, contrary to the contractual language and every industry-standard definition of "berth."

In addition, Plaintiffs had no legitimate business interest in the river cruise industry during his employment and did not expose him to any non-public information about their plans for entering that market or once in that market. The river cruise industry is a distinct line of business from the ocean cruise industry, and the Plaintiffs have publicly recognized this difference. Plaintiffs recently entered the river cruise market and will not commence a river cruise until 2027. Plaintiffs entered the river cruise market only after deciding not to purchase Ama.  On the other hand, Mr.

Gomez's current employer, Ama, is a well-established market leader in the river cruise industry with a track record spanning over 20 years. It is unreasonable to claim that a market leader in the river cruise industry would gain an unfair advantage from hiring someone with no prior experience in the sector. In reality, Plaintiffs sued Mr. Gomez to interrupt the operations of Ama so they could more easily enter the river cruise industry and compete with a leader in the field. During Mr. Gomez's employment, Plaintiffs had no river product to market or sell, no river itineraries to share, no channel for river sales, no river cruise vessels, no destinations, no river cruise revenue, no external marketing, no marketing budget or strategy, no entry to market strategy, and no operational river division. If it had any of these, Mr. Gomez was not privy to them, despite his position. In light of the foregoing, Plaintiffs did not have a "legitimate business interest" in a line of business that did not exist, that they had not yet entered, and to which Mr. Gomez had no access.

Lastly, Plaintiffs cannot legitimately claim to have suffered any harm, financial or otherwise, from Mr. Gomez's resignation and subsequent employment at Ama. They have consistently boasted during investor calls about how their 2025 revenues for Q2 and Q3 have exceed even their own expectations, that they sold out of spots that will give customers the preferential early booking for future river cruises, and that their operations remain intact.

Plaintiffs cannot establish that Mr. Gomez breached any restrictive covenant, whether by competing, taking confidential information, or soliciting customers or employees. Mr. Gomez does not work for a company with ships exceeding 500 berths, and he did not violate any restrictive covenant contained in the agreements he signed. He never improperly accessed non-public information during his employment, did not take (and later use such information, and did not solicit by initiating contact with any employees, customers, or trade partners to induce them to leave Plaintiffs. Plaintiffs identify no confidential document, file, email device, access, or information in Ama's possession. Moreover, Plaintiffs cannot enforce the restrictive covenants against Mr. Gomez because the discriminatory work environment became so severe and pervasive that, despite his complaints, he felt compelled to resign. Additionally, their prior breaches and the need to balance equities prevent enforcement.

## II. FACTUAL AND PROCEDURAL HISTORY[1]

**A.**     **The Plaintiffs**

Plaintiffs were, throughout Mr. Gomez's employment, foreign companies involved in the ocean cruise industry. Their international ocean cruise business involved staffing large vessels, typically carrying more than 1,000 guests.[2] Fourteen of Celebrity's fifteen ships hold over 2,000 passengers, with only one (that explores the Galapagos Islands) holding only 100 passengers.

Cruise ships that travel internationally, which include each of the Plaintiffs' ships, are subject to the International Convention for the Safety of Life at Sea (SOLAS). "The main objective of the SOLAS Convention is to specify minimum standards for the construction, equipment and operation of ships, compatible with their safety."[3] Ocean cruise lines, including Plaintiffs, are voluntary members of Cruise Lines International Association (CLIA), a voluntary trade association. Plaintiffs hire crew members from around the world, most of whom have no ties to any of the countries on their assigned vessel's itinerary.[4]

The Plaintiffs have only recently begun preparations to engage in river cruising. They first announced their "entry into the river cruise market" on January 28, 2025, with sailings expected to begin in 2027. (Exhibit "1"). During the Q2 investor call held on July 29, 2025, Plaintiffs described river cruises as "new experiences" that would begin in 2027, but which were "still a ways away…." (Exhibit "2" at 3 and 23).[5]

---

[1] Plaintiffs improperly seek to circumvent the twenty-page limitations on motions imposed by S.D. Fla. Local Rule 7.1(c)(2) by "incorporate[ing] by reference the verified allegations contained in Paragraphs 16-98 of the Verified Complaint filed in the State Court Action." This Court does not permit parties to avoid the page limitations by incorporating facts or arguments from other documents filed of record and, instead, refuses to consider matters incorporated by reference. *See Regions Bank v. NBV Loan Acq. Member, LLC*, 2022 U.S. Dist. LEXIS 216743, at *3 (S.D. Fla. Dec. 1, 2022) (*citing Happy Tax Franchising, LLC v. Hill*, 2021 U.S. Dist. LEXIS 107354, at *3 (S.D. Fla. June 7, 2021), report and recommendation adopted sub nom. *Happy Tax Franchising LLC v. JL Hill Grp., LLC*, 2021 U.S. Dist. LEXIS 161518, (S.D. Fla. Aug. 26, 2021) (refusing to consider arguments incorporated by reference because such arguments attempt to avoid the page limits set by the courts); and *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004) (denouncing incorporation of other matters).

[2] Lisa Poirot, *Royal Caribbean Ships by Age – Meet the Royal Caribbean Fleet*, ROYAL CARIBBEAN (Nov. 4, 2025) https://www.royalcaribbean.com/guides/ships-by-age.

[3] *International Convention for the Safety of Life at Sea (SOLAS), 1974*, INTERNATIONAL MARITIME ORGANIZATION, https://www.imo.org/en/about/conventions/pages/international-convention-for-the-safety-of-life-at-sea-(solas),-1974.aspx (last visited Dec. 9, 2025).

[4] *Workforce Development*, CRUISE LINES INTERNATIONAL ASSOCIATION, https://cruising.org/workforce-development (last visited Dec. 9, 2025).

[5] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (discussing reliability of statements made during investor call); and *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

On August 19, 2025, Plaintiffs announced that they would begin taking deposits for early access to book a 2027 river cruise on September 3, 2025. (Exhibit "4").

Then, during the Q3 investor call held on October 28, 2025, Plaintiffs indicated that the majority of people who booked "are Royal Caribbean Group loyalty members…." (Exhibit "5" at 5). During that same call, Plaintiffs did not report having suffered any detrimental effects on their sales from Mr. Gomez leaving to work for Ama, considering that Plaintiffs' river cruise offerings "didn't sell out in a few hours. It sold out in a few minutes," according to CEO, Jason Liberty. *Id.*, at 17. Since Mr. Gomez stopped working for Plaintiffs, they reported better than expected earnings in the second quarter of 2025 in the earnings report released July 29, 2025:

> "The strong demand we are seeing across our new ships and land-based destinations reinforces that our strategy is working and resonating with today's traveler," said Jason Liberty, president and CEO, Royal Caribbean Group.

(Exhibit "3" at 4). Plaintiffs again reported better than forecasted revenues during the third quarter of 2025 in the earnings report released shortly after they filed the lawsuit, on October 28, 2025, they touted "the overwhelming response to Celebrity River" as part of their goal to "expand the reach of our growing vacation ecosystem." (Exhibit "6" at 2). Plaintiffs' public comments establish that they have not suffered at all from Mr. Gomez's departure and subsequent employment at Ama. These admissions of business strength directly contradict Plaintiffs' claims of imminent and irreparable harm. Since Plaintiffs publicly stated that, "more than half of consumers tell us they are booking closer to their departure date than they used to" and that "And for the people who intend to travel over the next 12 months, the majority have not yet booked." (Exhibit "2" Q2 Call Transcript at 4.) Since Plaintiffs do not commence river cruising until 2027, Mr. Gomez's departure to Ama in 2025 could have no impact on their 2027 river cruise operations. *Id.*, at 7.

**B.    <u>Ama</u>**

River cruise lines are typically members of the European River Cruise Association (IGRiverCruise). Its members include Ama, but notably the Plaintiffs are not members.[6] CLIA considers the "river cruise industry" a distinct segment of the overall cruise market.[7] CLIA identifies distinguishing factors of the river cruise industry as not spending full days cruising

---

[6] *Meet Our Members*, IG RiverCruise, https://www.igrivercruise.com/about (last visited Dec. 9, 2025).
[7] *River Cruising*, Cruise Lines International Association, https://cruising.org/about-cruise-industry/river-cruising (last visited Dec. 9, 2025).

between ports, including food, beverages, and excursions in the price, using smaller, more luxurious ships, and providing more immersive experiences. *Id.* Ama has been an established leader in the river industry for over twenty years.[8] It operates a fleet of relatively small river cruise vessels that sleep an average of 156 passengers. [9] Ama has not marketed, sold, owned, or operated ocean cruises. Ama's distribution channels, customer demographic, pricing model, deployment strategies, and operational profile differ fundamentally from ocean river cruising. Ama sells immersive, land-integrated itineraries with low-capacity ships that never enter open ocean waters, do not require SOLAS compliance, and serve an entirely distinct customer segment. Plaintiffs identify no operational, strategic, or competitive overlap between their existing ocean cruise business and Ama's existing river cruise business.

**C.** **Mr. Gomez.**

Mr. Gomez's role for Celebrity focused exclusively on domestic consumer operations, service performance, KPIs, and contact center oversight. During his employment for Plaintiffs, Mr. Gomez had no involvement in the river cruise product, strategy, pricing, deployment, or distribution. Mr. Gomez received no information or materials while working for Plaintiffs regarding its entry into the river cruise market that were not or would not be publicly known.

Plaintiffs issued Mr. Gomez a Western Digital MyPassport device, which he used for work. (Exhibit "7"). Mr. Gomez's access was limited to the domestic contact-center environment and related performance, staffing, and consumer-operations materials. He had no access to revenue-management systems, fleet strategy, or any river cruise planning documents. Plaintiffs produce no document or evidence indicating otherwise.

Mr. Gomez worked for the Plaintiffs until May 26, 2025, after giving notice of his intent to resign on April 28, 2025. [ECF No. 1-1 at ¶¶3, 16, 77]. Mr. Gomez continued working after he giving notice of his resignation, during which he updated the CO slides (identifed by Plaintiffs in the Verified Complaint) during regular work hours and as part of his regular work, reporting his progress to his direct supervisor, Michell Johnson Sharma, VP Global Contact Centers. (Exhibit "8"). Mr. Gomez also worked to facilitate a smooth transition of his position after giving notice of

---

[8]       *Our Story*, AMA, https://www.Ama.com/explore/our-story (last visited Dec. 9, 2025).
[9]       *8 Reasons Why Our Innovative River Cruise Ships are the Highest Rated in Europe*, AMA, https://www.Ama.com/connections/meet-our-fleet (last visited Dec. 9, 2025).

intent to resign. To accomplish this transition, Mr. Gomez continued performing his job duties and updating his superiors. Mr. Gomez's direct supervisor, Ms. Johnson Sharma, asked to review his shared files before his departure. She raised no concerns after reviewing them and confirmed that everything was in order before he returned all devices without downloading, transferring, or retaining any confidential information. Mr. Gomez understood that he was to return the work laptop clean, and so removed his personal information and logins, but without damaging the integrity of the laptop.

More recently, Jason Santileces approached Mr. Gomez in person in September 2025 in Naples, Florida, complaining about being frustrated with RCCL after being denied a promotion. Mr. Santilices then initiated another conversation with Mr. Gomez afterwards, while both were aboard a ship. As the complete text message conversation reflects, Mr. Santileces approached Mr. Gomez, inquired about opportunities, and Mr. Gomez merely responded.

## D. **Procedural History**

Plaintiffs filed their Verified Complaint for Injunctive Relief and Damages ("Verified Complaint") in the Circuit Court for Miami-Dade County, Florida ("State Court"), on October 16, 2025, and it was served on Mr. Gomez in Calabasas, California, on November 3, 2025. [ECF Nos. 1-1, 1-2]. Plaintiffs attest to Mr. Gomez signing the 2018 offer letter that contained a non-compete agreement (¶25 and Exhibit A) and then a 2022 Non-Compete Agreement on January 5, 2023 (¶36 and Exhibit B), as the basis for their breach of contract claim at Count I, the 2017-2017 RSU Agreements (¶¶46, 47 and Exhibits C and D), and the 2019-2025 RSU Agreements (¶¶51-57 and Exhibits E through K) as the basis for their breach of contract claim at Count III. [ECF No. 1-1]. Each of the restrictive covenants contained in Exhibits A through K of the Verified Complaint is triggered by Plaintiffs' termination of Mr. Gomez's employment. *Id.* Plaintiffs attest in the Verified Complaint that Mr. Gomez resigned from his employment, not that his employment was terminated. [ECF No. 1-1 at ¶¶3, 16, 77]. Therefore, because Mr. Gomez resigned, none of the restrictive covenants effective on termination were triggered.

Mr. Gomez filed his Answer and Affirmative Defenses to the Verified Complaint in the State Court on November 24, 2025. [ECF No. 1-3]. Then, on December 2, 2025, the State Court scheduled an in-person hearing on Plaintiffs' Emergency Motion for Temporary Injunction for December 8, 2025. [ECF No. 1-4]. Mr. Gomez next removed the case to this Court due to diversity

of citizenship. [ECF No. 1]. Plaintiffs then filed their Motion after 10:00 p.m. on December 4, 2025 [ECF No. 4], seeking the issuance of a temporary restraining order and preliminary injunction based on the Verified Complaint [ECF No. 1-1] and Declaration of Jason Santelices [ECF No. 4-1]. Herein, Plaintiffs seek relief based on the contents of the Verified Complaint (including the Exhibits appended to it) [ECF No. 1-1] and the Motion (including the Exhibit appended to it [ECF No. 4].

The Court initially entered a Paperless Order requiring Mr. Gomez to respond to the Motion by 5:00 p.m. on Monday, December 8, 2025, and then extended that deadline at Mr. Gomez's unopposed request to 5:00 p.m. on Wednesday, December 10, 2025, setting a hearing on Plaintiffs' Motion for 10:00 a.m. on Friday, December 12, 2025. [ECF Nos. 10, 12, 13].

## III. THE PRELIMINARY INJUNCTION STANDARD

The Eleventh Circuit Court of Appeals considers "preliminary injunctions 'extraordinary' and 'drastic' remedies that should not be issued unless the moving party clearly establishes each of the four prerequisites." *TransUnion Risk & Alt. Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 405 (11th Cir. 2015) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant <u>clearly establishes</u> the burden of persuasion as to the four requisites." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) [*emphasis added*]. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020).

Plaintiffs cannot satisfy their heavy burden to obtain either a temporary restraining order or preliminary injunction, because they cannot "clearly establish" establish each of the four requisite elements: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of irreparable injury if the relief is not granted; (iii) the threatened injury outweighs the harm the relief would inflict on the non-movant; and (iv) the injunction would serve the public interest. *Nationsbenefits, LLC v. Brady*, 2025 U.S. Dist. LEXIS 152108, at *6 (S.D. Fla. Aug. 8, 2025) (citing *Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005)). Failing to establish just one element precludes the granting a preliminary injunction. *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) ("A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.")

The Court is guided by Florida law in its evaluation and enforcement of restrictive covenants. *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230-31 (11th Cir. 2009); and Fla. Stat. §542.335. "For a restrictive covenant to be valid, the person seeking enforcement of the restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." *Proudfoot*, 576 F.3d at 1226. But unlike in a Florida state court, which can presume irreparable injury upon the violation of an enforceable restrictive covenant, federal courts exercising diversity jurisdiction must apply "traditional equitable principles" and consider whether the threatened injury to Plaintiffs outweighs the damage the injunction may cause to Mr. Gomez, "giving full consideration to the hardship [the defendant] would suffer should the injunction issue." *TransUnion*, 625 F. App'x at 407; *see also Vital Pharms. Inc. v. Alfieri*, 23 F.4th 1282, 1293-99 (11th Cir. 2022) ("[U]nder *Erie*, the Florida standard for obtaining a preliminary injunction is a matter of procedure, not of substance. Federal courts must apply the federal standard in cases involving Florida law. And under the federal standard, a plaintiff must prove irreparable harm without the presumption afforded by Florida law.") (Pryor, C.J., concurring).

Federal courts in this Circuit therefore strictly apply the federal preliminary-injunction standard in restrictive covenant disputes. A plaintiff cannot obtain injunctive relief simply by alleging a contract violation or invoking Florida's statutory presumption; it must come forward with competent evidence of both concrete breach and actual, imminent harm that cannot be remedied by money damages. Presumptions of irreparable harm are contrary to traditional federal equitable principles. *See Id.* at 1292.

Under Florida law, "contracts in restraint of trade are generally unlawful." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 785 (Fla. 2017) (citing Fla. Stat. § 542.18) ("[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful"). Florida Statute §542.335 creates a limited exception to this general rule. Florida Statutes provides that "enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited. Fla. Stat. § 542.335(1) (2024). "The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." Fla. Stat. § 542.335(1)(b). Section 542.335 commands courts to modify, or blue pencil, a non-competition agreement that is 'overbroad, overlong, or

otherwise not reasonably necessary to protect the legitimate business interest,' instructing courts to 'grant only the relief reasonably necessary to protect such interest.'" *White*, 226 So. 3d at 785.

## IV. ARGUMENT

Plaintiffs are not entitled to expedited relief on their Motion for numerous reasons. Plaintiffs are not entitled to restrict Mr. Gomez from working for Ama in a different line of business following his resignation from employment based on vague and ambiguous terms that are contained in unsigned Agreements. Mr. Gomez did not engage in any clandestine activities during the weeks before his resignation or solicit any of the Plaintiffs' employees, customers, or trade partners from the ocean cruise industry to work with him at Ama in the river cruise industry. Although Plaintiffs contend that Mr. Gomez utilized an external hard drive at work and accessed certain files during work hours on his work computer, before returning a "clean computer" as he believed was required, they do not even intimate that he did so improperly or used any of the non-public information from his prior employment while working at Ama. Succinctly, Plaintiffs are not likely to succeed on their claims, they have not suffered irreparable harm, the harm to Mr. Gomez would far exceed any potential harm to Plaintiffs, and restricting Mr. Gomez in his employment would disserve the public interest. If the Court were to nonetheless restrict Mr. Gomez in his employment, it should limit that restriction to prevent him from working in the ocean cruise "line of business" for a company that has vessels exceeding 500 berths and from initiating contact with Plaintiffs' employees for the purpose of leaving their employment for the remainder of any portion of the restrictive period determined by the Court.

Plaintiff's narrative relies on speculation and insinuation rather than evidence. They claim Mr. Gomez accessed information which was housed on company systems, from his work laptop, at his supervisor's direction, and during normal work hours. Although Plaintiffs contend that Mr. Gomez accessed the information identified in the Verified Complaint, they "fail to articulate exactly how the information is unique or proprietary or to explain how [Mr. Gomez] could unfairly utilize that information to compete against" them. *Lucky Cousins Trucking, Inc. v. QC Energy Res. Tex., LLC*, 223 F. Supp. 3d 1221, 1226 (M.D. Fla. 2016). They identify no download, no transfer, no retention, and no post-employment use of any confidential, trade secret, privileged, or non-publicly available information. If Plaintiffs cannot identify a single document misused, a single customer approached, or a single competitive act by Mr. Gomez, they cannot meet the "clear" and

"affirmative" proof demanded at the preliminary-injunction stage.

**A.**     **<u>Plaintiffs Are Not Substantially Likely To Succeed.</u>**

The Court does not need to proceed any further once it determines that Plaintiffs have not "clearly established" established a substantial likelihood of success on the merits. *Fla. Preborn Rescue, Inc. v. City of Clearwater*, 2025 U.S. App. LEXIS 31666, at *7 (11th Cir. Dec. 4, 2025) ("The first factor is the most important, and '[w]here a court concludes that the movant fails to establish a substantial likelihood of success on the merits,' it needn't reach the remaining considerations.") (*quoting Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023)).

> [W]hen a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction.

*Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001) (collecting cases).

Plaintiffs' attempt to enforce their restrictive covenants are futile because each of the Agreements contains restrictive covenants that are triggered on the "termination" of his employment, yet Mr. Gomez resigned. [ECF No. 1-1 at Exhibits A through K.] "Termination of employment" is considered an "adverse employment action," where an employer "by acts or words, shows a clear intention to dispense with the services of an employee." *Thomas v. Dillard Dep't Stores*, 116 F.3d 1432, 1434 (11th Cir. 1997) (*quoting Payne v. Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977)). Unlike an involuntary termination, resignation from employment is a voluntary act. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1562 (11th Cir. 1995). Plaintiffs attest in the Verified Complaint that Mr. Gomez resigned [ECF No. 1-1 at ¶¶3, 16, 77].

Plaintiffs are not likely to succeed on their claims at Counts II and III that Mr. Gomez is bound by the RSU Agreements because Mr. Gomez's signature does not appear on Exhibits C through K. [ECF No. 1-1]; b*ut see* Fla. Stat. §542.335(a) ("A court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought.") The Court cannot enforce the unsigned RSU Agreements appended to the Verified Complaint as a matter of Florida substantive law, precluding relief under Counts II and III. *Id.*

Plaintiffs are not likely to succeed on their claim that Mr. Gomez engaged in unfair competition by leaving an ocean cruise company to work for a river cruise company, either. When measured through May 2025, both employers engaged in distinct lines of business, precluding a finding that Mr. Gomez breached any restrictive covenant. Plaintiffs did not ow, operate, or sell

any river cruise product during Mr. Gomez's employment, did not expose him to any non-public information relating to river cruise operations or strategy, and publicly announced that their first river sailings will not commence until 2027. Their own investor communications described river cruising as a "new experience," "still a ways away," and they reported no negative business impact following Mr. Gomez's resignation. These undisputed facts foreclose any claim that Mr. Gomez joined a competitor in the same line of business or that he possessed or used any river-related confidential information.

Courts evaluating restrictive covenants consistently require proof that the employer was actually operating in the asserted line of business at the time of the employe's departure, not merely contemplating, researching, or planning a future market entry. A business does not "enter" a new line of business by holding internal strategy meetings, conducting exploratory analyses, or announcing prospective offerings; entry occurs only when the company begins real commercial activity – such as offering the service, generating customers, or deploying a product in the marketplace. The Eleventh Circuit has made clear that Fla. Stat. § 542.335 requires a demonstrable, existing legitimate business tied to present operations, not hypothetical or anticipated ventures, and that an employer must identify specific customers and actual competitive activity before restraint may be enforced. *See Vital Pharms Inc.*, 23 F. 4th at 1291-92 (holding enforcement requires a concrete business interest). Likewise, courts applying Fla. Stat. §542.335 refuse to extend restrictive covenants to markets where the employer lacks active customers, revenue, deployed operations, or protectable confidential information. *See Lucky Cousins Trucking, Inc.*, F. Supp. 3d at 1225-26 (holding that speculative or aspirational business plans cannot justify enforcement). Because Plaintiffs had not yet entered the river-cruise "line of business" in any enforceable sense, the restrictive covenants cannot be stretched to cover an industry the Plaintiffs had not yet joined or line of business they had not yet conducted during Mr. Gomez's employment.

Fatal to the Plaintiffs' claim that its restrictions applied to river and ocean cruise companies alike is any information explaining how or why the river and ocean cruise markets are the same. Ocean cruise vessels carry thousands or passengers, require SOLAS compliance, and operate globally with large-scale onboard revenue structures; river vessels carry roughly 150 passengers, ever enter open ocean waters do not require SOLAS compliance, and sell destination-immersive itineraries with fundamentally different customer demographics, pricing models, and distribution

channels. Plaintiffs themselves recognize this segmentation through membership of ocean-cruise industry associations, and not the river-cruise associations to which Ama belongs. Because the business practices differ according to variations in customers and markets, as between river and ocean cruises, Plaintiffs are not likely to prevail on their claims against Mr. Gomez:

> In this case, witnesses for the Plaintiff have affirmed that the business practices of Southern Wine vary from state to state; the markets are different, the customers are different, and each market's critical information is different. Southern Wine has not offered any evidence of a singular nationwide advertising effort or that it sees the thirty states that it serves as one large singular market. Therefore, based on the above analysis it is not substantially likely that Southern Wine will succeed in showing that the restrictive covenant is reasonable as time, area, and line of business.

*S. Wine & Spirits of Am., Inc. v. Simpkins*, 2011 U.S. Dist. LEXIS 5762, at *18 (S.D. Fla. Jan. 14, 2011).

Here the disconnect is far more pronounced: the Plaintiffs were not in the river cruise market at all. Florida law does not permit a restrictive covenant to reach a market the employer did not operate in, had no customers in, and never entrusted to the employee, Mr. Gomez. Therefore, the Plaintiffs cannot "clearly establish" a substantial likelihood of success on their breach-of-contract or unfair-practices theories.

**B.**     **Plaintiffs Have Not And Will Not Suffer Irreparable Injury.**

A preliminary injunction can only be granted to address actual, imminent, and irreparable injury. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Plaintiffs cannot establish that they have suffered and will suffer any irreparable injury that money damages could not address. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Adams v. Bordeau Metals Se., Ltd. Liab. Co.*, 2025 U.S. App. LEXIS 8806, at *11 (11th Cir. Apr. 15, 2025). "Without a finding of a substantial likelihood of an 'actual and imminent' irreparable injury, preliminary injunctive relief is improper." *Cap., L.P. v. Heyden Enters., LLC*, 2024 U.S. Dist. LEXIS 127628, at *42 (S.D. Fla. July 19, 2024).

> The  key word in this consideration is "irreparable." Mere injuries, however substantial, in terms of money, time, and injury necessarily expended in the absences of a stay are not enough. The possibility of adequate compensatory or [that] other corrective relief will be available at a later date, in the course of litigation, weighs heavily against a claim of irreparable harm.

*Loans of Am. FL, Ltd. Liab. Co. v. Rapid Auto Loans, Ltd. Liab. Co.*, 2010 U.S. Dist. LEXIS 78466, at *13 (S.D. Fla. July 12, 2010) (quoting *U.S. v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983)).

1.      <u>Plaintiffs' Covenants Do Not Protect Any Legitimate Business Interest.</u>

While Fla. Stat. §542.335(1)(j) provides for "a presumption of irreparable injury," they must first establish a breach of a tailored restrictive covenant to be entitled to the presumption, and cannot rely on overly broad language in the Agreements to justify precluding Mr. Gomez from working in the cruise industry. *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, 2011 U.S. Dist. LEXIS 127336, at *26 (M.D. Fla. Sep. 26, 2011) (refusing to enforce restrictive covenant that "could virtually limit his ability to perform work in the hair care business in any capacity" as overly broad and "left to guess what exactly the non-compete clause prohibits"). "Legitimate business interests" are limited to "A specific marketing or trade area". Fla. Stat. §542.335(1)(b)4.c.

Plaintiffs cannot legitimately dispute that the river cruise industry serves one market and the ocean cruise industry targets another, based on their own press release(s) in which they acknowledge their entry into the **river cruise market** as a distinct line of business:

> "We're thrilled to announce our entry into the river cruise market through our Celebrity Cruises premium travel brand.  Our guests and travel partners should expect us to do what we do best – innovate and elevate the river cruise experience as we meet the growing demand for intimate, culturally enriching travel experiences," said Jason Liberty, president and CEO, Royal Caribbean Group.

(Exhibit "1"). Until then, they were known for ocean cruising. (Exhibit "9" at 2).

Recognizing that their agreements are problematic, Plaintiffs state that as of December 4, 2025, "Celebrity sells both ocean and river cruises". *Id.* This is demonstrably inaccurate: Plaintiffs did not sell or market any river cruises as of May 29, 2025. Plaintiffs only began allowing select loyalty members to place deposits for future 2027 river voyages on September 3, 2025. Plaintiffs has no river inventory, no deployed river itineraries, and no operational river division during Mr. Gomez's employment. (Exhibit "1"). Plus, the claim that Mr. Gomez was part of a strategic "river cruise" task force is unsupported and untrue. No exhibit, document, email, or declaration reflects his involvement in any river-related planning, and Plaintiff's own earnings calls confirm he lacked exposure to any confidential river strategy because none existed. Because Plaintiffs cannot show that their restrictions protect a legitimate business interest, they cannot show irreparable injury or harm.

2.      <u>Plaintiffs' Delay Precludes The Grant Of Preliminary Relief.</u>

Critical to the success of a preliminary injunction is a consideration of the delay between

when Plaintiffs learned of the conduct at issue and when they took action. The Eleventh Circuit Court of Appeals directs that, "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) (denying preliminary injunction due to delay in seeking a preliminary injunction). Expanding on this point, the Court in *Customplay v. Amazon, Inc.*, denied a preliminary injunction due to the delay between learning of the alleged violation and seeking relief. 2017 U.S. Dist. LEXIS 231337, at *5-6 (S.D. Fla. Nov. 21, 2017) ("It is the delay from the time the movant becomes aware of the alleged injury to the time injunctive relief is sought that is controlling, not the time between initiating litigation and seeking injunctive relief in the ongoing litigation.") Plaintiffs' nearly 3-month delay in seeking to enforce the restrictive covenants militates against a finding that they are entitled to any injunctive or restrictive relief.

Plaintiffs attest in the Verified Complaint that Mr. Gomez was publicly announced as the SVP Global Sales and Service for Ama on July 31, 2025. [ECF No. 1-1 at ¶83]. Plaintiffs identify in the Verified Complaint actions they contend Mr. Gomez took with respect to specific computer files, information, and his laptop computer in April and May 2025. [ECF No. 1-1]. Yet, they waited until October 16, 2025, to file the Verified Complaint in the Circuit Court for Miami-Dade County, a nearly 3-month delay. *Id*. This delay consumed approximately half of the six-month restrictive period they now claim requires "emergency" relief.

Plaintiffs were not diligent in enforcing their restrictive covenants, precluding the Court from finding they have or will suffer irreparable injury in the near future. *Hernandez v. Stingray Grp. Inc.*, 2025 U.S. Dist. LEXIS 170783, at *29 (S.D. Fla. Mar. 10, 2025) ("Plaintiffs' dilatory prosecution of their legal rights… fully negates any showing of irreparable harm.") This Court should, therefore, follow the others who "typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Poker Unicorns LLC v. Lively*, 2024 U.S. Dist. LEXIS 37924, at *6 (M.D. Fla. Mar. 5, 2024) (*quoting Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 U.S. Dist. LEXIS 18567, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (citations and internal quotation marks omitted).

3.    <u>Plaintiffs Suffered No Irreparable Injury Or Damage Money Could Not Address.</u>

"An injury is irreparable only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). Plaintiffs rely on the presumption of

irreparable harm afforded by Fla. Stat. §542.335(1)(j) because the reality is that they have not and will not suffer by allowing Mr. Gomez to continue working for Ama. Plaintiffs cannot point to "specific evidence to establish an extensive loss of goodwill or loss of customers." *Cap., L.P.*, 2024 U.S. Dist. LEXIS 127628, at *39. They do not claim – and cannot demonstrate – having lost any goodwill, market position, customers, or employees attributable to Mr. Gomez. On the contrary, Plaintiffs' revenues repeatedly exceeded their expectations since Mr. Gomez departed; they sold out of deposit spots for future river cruises "within minutes"; and they have identified any customers, employees, or trade partners they lost due to Mr. Gomez departure to Ama. Nowhere in the Verified Complaint or Motion do Plaintiffs identify any customers or vendors they claim Mr. Gomez solicited. Consequently, Mr. Gomez did not breach any restriction against soliciting customers or vendors. *See Vital Pharms., Inc.*, 23 F.4th at 1291 (failure to identify customers and relationships precluded enforcement). Mr. Gomez does not concede to soliciting any of Plaintiffs' employees, customers, or trade partners, which distinguishes him from the defendants in *Mainsail Parent, LLC v. Jewell*, 2024 U.S. Dist. LEXIS 152480, at *13 n.3 (S.D. Fla. Aug. 26, 2024). Because Plaintiffs cannot demonstrate any non-speculative, non-hypothetical, imminent harm – let alone one that cannot be remedied by damages – the irreparable-injury requirement is not satisfied.

**C.** **The Harm To Mr. Gomez Would Dwarf Any Injury To Plaintiffs.**

Restricting Mr. Gomez from working for Ama would impose severe and immediate hardship. Mr. Gomez is the primarily responsible for supporting his household, including his partner and daughter. Preventing him from working for Ama for any length of time would jeopardize their ability to pay for housing, basic living expenses, medical care, and education, and would destabilize their family at a level no monetary remedy could later cure. Courts consistently recognize that depriving a person of the ability to work in their chosen profession constitutes an extreme hardship that weighs heavily against injunctive relief. *See Unisource Worldwide, Inc. v. S. Cent. Ala. Supply, LLC*, 199 F. Supp. 2d 1194, 1201-01 (M.D. Ala. 2001) (finding undue hardship where restriction impairs employee's ability to work in his trade and support dependents and recognizing hardship on the employee as a major factor in the injunction analysis).

The imbalance of hardships is pronounced. Plaintiffs are a multibillion-dollar global conglomerate with massive financial resources, diversified operations, thousands of employees, substantial cash flow, and the ability to absorb any alleged competitive harm through internal

realignment, marketing adjustments, or substitution of personnel. Certainly, any harm or injury they claim to have suffered was so negligible, it likely would not amount to anything more than a rounding error. Any claimed injury to Plaintiffs would be, at most, incremental, theoretical, and remediable through damages if proven. By contrast, Mr. Gomez's livelihood cannot be "shifted," "absorbed," or "reallocated." The consequences for him are personal, immediate, and irreparable. Injunctive relief here would function as a de facto suspension of his career and income – an impact vastly disproportionate to any purported harm suffered by Plaintiffs.

Courts routinely reject injunctions where the requested restraint would devastate an individual's economic stability. *See Greenwood Utils. Com. v. Hodel*, 764 F.2d 1459 (11th Cir. 1985) (injunctive relief "cannot issue if the hardship thereby imposed upon the defendant would outweigh the benefits to be derived by the plaintiff," requiring courts to consider relative burdens and equitable consequences); *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1087–90 (11th Cir. 1990) (enforcement of restrictive covenants requires examination of whether the restraint would impose undue hardship on the employee, including where it threatens the individual's ability to support himself and his dependents). Plaintiff's speculative concerns about competitive positioning cannot justify imposing life-altering consequences on Mr. Gomez's ability to work and support his family, especially when his new area of employment is objectively not in the same line of business and specialty as Plaintiff's. The equities therefore weigh overwhelmingly against injunctive relief.

**D.** **Enjoining Mr. Gomez Would Disserve The Public Interest.**

The Court properly considers whether the public interest would be best served by enjoining or restricting Mr. Gomez under the circumstances presented. As an initial matter, the Plaintiffs have recognized that restrictive covenants do not need to be draconically enforced. Plaintiffs have excepted other former employees from complying with the full term of their restrictive covenants after they who began working for companies engaged in the ocean cruise industry shortly after their employment ended. Examples include the public interest strongly disfavors imposing a broad restraint on Mr. Gomez's ability to work. Federal courts evaluating restrictive-covenant injunctions regularly consider the broader consequences of injunctive relief, including impacts on labor mobility, market competition, and fairness in employment practices. The public interest weighs against enforcing restraints that exceed what is necessary to protect legitimate business interests or that function punitively rather than protectively. This is particularly true where, as here, the

employer is a multibillion-dollar global corporation with ample means to safeguard its competitive position without disabling a single individual's ability to earn a living. Restrictive covenants are not intended to be instruments of economic oppression or market exclusion, and courts caution against granting injunctions that would substantially limit competition or impair employee mobility beyond what legitimate business interest require. *See Blue-Grace Logistics LLC v. Fahey*, 653 F. Supp. 3d 1172, 1179 (M.D. Fla. 2023) (explaining that restrictive covenants are presumptively unlawful restraints of trade and that covenants aimed at merely preventing competition are void against public policy – reflecting Florida's strong public interest in avoiding overbroad restraints on employee mobility).

The Plaintiff's own conduct further undermines any claim that the public interest supports injunctive enforcement. They have selectively chosen not to enforce restrictive covenants against other former employees who moved into the ocean cruise industry shortly after leaving their employment. By carving out exceptions when convenient, Plaintiffs demonstrate that strict enforcement is not necessary to protect their asserted interests and that any claimed competitive harm can be tolerated within their normal business operations. Selective enforcement undermines their public-interest argument and indicates that what they seek here is not protection, but punishment.

Additionally, granting an injunction against Mr. Gomez would disserve public interest in promoting labor mobility, innovation, and healthy competition. The public does not benefit when a skilled professional is sidelined from an entire industry segment where he did not manager Plaintiff's business plans and possessed no strategic role in their new river-cruise venture. Nor does the public benefit when large corporations weaponize restrictive covenants to chill employee movement, particularly in an industry where competition enhances pricing, service quality, and consumer choice. *See Proudfoot*, 576 F.3d at 1231–32 (11th Cir. 2009) (recognizing that restrictive covenants may restrain only what is reasonably necessary to protect a legitimate business interest and must not operate as overbroad restraints on ordinary competition, noting that covenants must be limited to prevent unfair – nor ordinary – competition).

The public interest therefore aligns squarely with allowing Mr. Gomez to continue working in his chosen field, without expanding Plaintiffs' restrictive covenants beyond their legitimate scope. An injunction would impair competition, reduce workforce mobility, and impose

unnecessary hardship on an individual employee while providing no corresponding public benefit.

**E.**     <u>**Any Restriction Imposed Must Be Limited To The Ocean Cruise Industry.**</u>

If the Court determines that Mr. Gomez must be restricted in his work for any period, then the restriction(s) should be limited to the legitimate business interest the Plaintiffs aimed to protect. *See* Fla. Stat. §542.335(1)(c). Plaintiffs did not involve Mr. Gomez in their upcoming entry into the river cruise market. It would exceed the bounds of this Court's authority under Rule 65 and Fla. Stat. §542.335 to restrict Mr. Gomez from working in an entire industry when his work for the Plaintiffs only addressed one segment (river) of the cruise line industry. The Court encountered an analogous situation in *Lincare, Inc. v. Tinklenberg*, 2020 U.S. Dist. LEXIS 257078, at *11 (M.D. Fla. June 26, 2020), in which it determined that the "Prohibited Businesses" were "too broad and basically would preclude Defendant from working in the health care supply field at all—having little to do with protecting Plaintiff's legitimate business. This overbroad list exceeds Plaintiff's legitimate business interests in protecting itself from unfair advantage by its former manager." The Court modified (or "blue-penciled") the restraint by limiting it to the "specific lines of business for which she had management authority." *Id.*

In the same way, any restraint here must be confined to the specific segment of Plaintiff's business in which Mr. Gomez actually worked and cannot be expanded to an entire industry in which he was not involved. *See Proudfoot*, 576 F. 3d at 1231-32 (restrictive covenants must be reasonably necessary to protect legitimate business interests and may no operate as overbroad restraints on ordinary competition). Federal courts likewise require that injunctions be tied to actual competitive risk rather than speculative harm. *See See TransUnion Risk & Alternative Data Sols.*, Inc. v. Challa, 676 F. App'x 822, 825–27 (11th Cir. 2017) (rejecting injunction where the employee's new role did not threaten the employer's legitimate interests). Florida courts also refuse to enforce restraints aimed merely at suppressing competition rather than protecting a cognizable business interest. *See Blue-Grace Logistics*, 653 F. Supp. 3d at 1179.

**F.**     <u>**Not Much Remains Of Any Potentially Enforceable Restrictive Period.**</u>

The Employee Nondisclosure and Noncompetition Agreement appended to the Verified Complaint at Exhibit B is the only agreement that could be enforced against Mr. Gomez. [ECF No. 1-1 at 37-41]. It contains restrictive covenants and bears Mr. Gomez's signature. *Id.; see also*

Fla. Stat. §542.335(1)(1). Exhibit B to the Verified Complaint contains a "merger" or "entire agreement" clause that states as follows:

> Entire Agreement. This Agreement constitutes the entire agreement and understanding between the Company and me relating to the subject matter of this Agreement. No modification of this Agreement or amendment to it, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.

[ECF No. 1-1 at 40, ¶7]. This provision also prevents Plaintiffs from relying on the unsigned RSU Agreement. It also operates to supersede all previously signed agreements between Mr. Gomez and the Plaintiffs, including any RSU Agreements they may claim he signed before January 3, 2023. This is consistent with Florida law, which enforces merger clauses as written and bars reliance on extrinsic agreements not incorporated into the operative contract:

> The RISC's merger clause does not specifically mention prior written agreements, but it explicitly provides that "this contract" is the "entire agreement" between the parties. As a result, it is immaterial whether any prior representations sought to be excluded are oral or written; anything that does not constitute part of "this contract" is not part of the parties' agreement related to the contract.

*Duval Motors Co. v. Rogers*, 73 So. 3d 261, 266 (Fla. 1st DCA 2011). Thus, Plaintiffs cannot expand the restrictive period by importing limitations from any other documents, nor can they rely on implied or unwritten extensions of restrictive covenants.

If the Court were to enforce the restrictions contained in this Agreement, it would entail prohibiting Mr. Gomez from working for a competitor, employing Plaintiffs' employees, or soliciting their employees, customers, or trade partners for nine months from May 26, 2025 (through February 26, 2026), because it makes no provision for tolling or extending the restrictive period. [ECF No. 1-1 at 39]. Similarly, the 2018 Agreement appended to the Verified Complaint as Exhibit A, which contains Mr. Gomez's signature, does not provide for any extension of the 9-month restrictive period. [ECF No. 1-1 at 33]. If the Court were to enforce the restrictive covenants in it and find that it applies to prevent him from working for Ama, notwithstanding the above, then the restriction would only apply through February 26, 2026.

 "[A] 'legitimate business interest' is a business asset that, if misappropriated, would give its new owner  an unfair competitive advantage over its former owner." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 784-85 (Fla. 2017). The limited duration remaining under either agreement further underscores the absence of any ongoing competitive threat:

Plaintiffs identify no conduct by Mr. Gomez that misappropriates any such business asset as defined in *White*. Their speculation about "suspicious" computer activity is unsupported and, critically, reflects no misuse of information. The Eleventh Circuit has repeatedly held that speculative or hypothetical cannot satisfy the irreparable-injury requirement. *See TransUnion Risk.*, 676 F. App'x at 826-27. (rejecting injunction where employer failed to show actual or imminent harm despite possession of alleged proprietary knowledge).

In short, Plaintiffs cannot meet their burden for injunctive relief. They cannot show a likelihood of success on the merits because the restrictive covenants do not reach Mr. Gomez's lawful post-employment conduct. They cannot establish irreparable harm where no ongoing breach exists. And the balance of equities and public interest favor Mr. Gomez, who seeks only to continue his career without unlawful restraint, not Plaintiffs, who seek to impede his livelihood. For these reasons, the Motion should be denied in its entirety.

## V. CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion is due to be denied, with no injunction or restraining order entered.

Respectfully submitted this 10th day of December 2025,

s/ Brian H. Pollock, Esq
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue, Suite 770
Coral Gables, Florida 33146
Telephone: (305) 230-4884
*Counsel for Defendant*
