UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:25-cv-25648-KMW-EAL

**CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES LTD.,
d/b/a ROYAL CARIBBEAN GROUP**,

      Plaintiffs,

v.

**ANGEL CHRISTOPHER GOMEZ**,

      Defendant.

_____/

## PLAINTIFFS' REPLY IN SUPPORT OF EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiffs Celebrity Cruises Inc. ("Celebrity") and Royal Caribbean Cruises Ltd. ("RCCL") timely submit this reply in further support of their motion for a temporary restraining order.

Defendant's response demonstrates total disregard for the serious nature of his actions and only reinforces the need for injunctive relief. Defendant can pursue whatever creative arguments he wants in the ordinary course of litigation. However, for purposes of Plaintiffs' Expedited Motion for Temporary Restraining Order, here are the pertinent facts in the simplest of terms:

1. Defendant worked for Plaintiffs for almost 18 years;
2. During his employment, Defendant was promoted, received raises, and was awarded equity;
3. In consideration for continued employment, raises, promotions, and equity grants, Defendant signed several agreements with post-employment non-compete and non-solicit obligations;
4. Defendant was an Assistant Vice President in the area of sales and, in such a senior role, cannot credibly claim that he did not have access to Plaintiffs' sensitive and confidential information;
5. The plain language of the non-compete restrictions prohibits Defendant from working for a cruise company with a fleet size of at least 500 berths for a period of nine-months;

6. Defendant's new employer AmaWaterways ("Ama") has a fleet size far greater than 500 berths;

7. Defendant is currently working for Ama in a Senior Vice President role;

8. The non-solicit restrictions also prohibit Defendant from soliciting Defendants' employees; and

9. Plaintiffs have presented a declaration by a current employee who has been employed with Royal Caribbean for almost 20 years and was personally solicited by Defendant to go and work with Ama.

The facts are straightforward and fully support the need for a temporary restraining order. Faced with this reality, Defendant goes to great lengths in his response to divert the Court's attention, including by attempting to distinguish between the general term "cruising" and the various types of "cruising" (e.g., river and ocean cruising). The agreements clearly do not distinguish between types of cruising. The reality is that during the restricted period of his agreements, Defendant, a former senior executive of a cruise company, left for a senior executive role at another cruise company with a fleet size greater than 500 berths, and then solicited an employee of his former employer, all in clear breach of his contractual commitments.

**I.      Defendant Cannot Retroactively Redraft the Agreements to Justify His Blatant Breaches of His Restrictive Covenants.**

The Agreements at issue in this case are appropriately limited in scope. Under the 2022 Non-Compete Agreement, Defendant is prohibited from providing services of the type he provided to Plaintiffs to any "entity engaged in cruises, with a minimum fleet size of 500 berths." Under the 2025 RSU Agreement, Defendant is precluded from working as an employee of an "entity engaged in (or preparing to engage in) cruises with a minimum fleet size of 500 berths…" The restricted period is 9 months following the termination of Defendant's employment "for any reason."[1]

Defendant attempts to argue: (1) he is not in breach because he is working in a "different industry"; (2) he is not in breach because Ama's individual ships (as opposed to Ama's fleet) have fewer than 500 berths; and (3) the non-compete is not valid because he resigned (instead of being terminated). Each argument fails under the plain language of the Agreements.

---

[1] The 2025 RSU Agreement uses equivalent wording: "for the nine (9) months immediately following the termination of Employee's employment under any circumstance…"

2

"When interpreting a contract, the court must first examine the plain language of the contract for evidence of the parties' intent." *Heiny v. Heiny*, 113 So.3d 897, 900 (Fla. 2d DCA 2013) (internal quotation omitted). Indeed, under Florida law:

> "[U]nambiguous [contractual] language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words," *Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. 4th DCA 2003), and the contractual language should be "read in the context of the document as a whole." *Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc.*, 929 So. 2d 729, 732 (Fla. 4th DCA 2006). ***The words in a contract "are the best possible evidence of the intent and meaning of the contracting parties.***" *Jacobs v. Petrino*, 351 So. 2d 1036, 1039 (Fla. 4th DCA 1976) (quoting *Wilcox v. Atkins*, 213 So. 2d 879 (Fla. 2d DCA 1968)).

*Woodward v. Morell*, 319 So. 3d 47, 54 (Fla. 4th DCA 2021) (emphasis added). "Words used in an agreement should be given a natural meaning or the meaning most commonly understood in relation to the subject matter and circumstances . . . . In cases where a term in a contract is indefinite, courts often consult dictionaries for clarification of the term's meaning." *Arthrex, Inc. v. Hilton*, No. 2:21-cv-850-JLB-NPM, 2022 U.S. Dist. LEXIS 40994, at *15 (M.D. Fla. Mar. 8, 2022) (collecting cases regarding use of Merriam-Webster Dictionary). "When the terms of a noncompete agreement are clear and unambiguous, the contracting parties are bound by its terms." *GFA Int'l, Inc. v. Trillas*, 327 So. 3d 872, 878 (Fla. 3d DCA 2021) (internal citation omitted) (holding the plain language of agreement clearly prohibited conduct at issue).

A dictionary review flatly contradicts Defendant's self-serving (and incorrect) interpretations of the Agreements.

First, Defendant's assertion that he is working in a "different industry" is disingenuous at best. Plaintiffs and Ama are undeniably operating in the cruise industry. The dictionary defines "cruise" as "to sail about touching at a series of ports." Cruise, <u>Merriam-Webster</u> Dictionary, www.merriam-webster.com/dictionary/cruise (last accessed Dec. 10, 2025). Nothing in the definition limits "cruise" to ocean, and the first example of the usage of "cruise" is "We cruised for a week down the Yangtze River." *Id.* Undoubtedly, the Parties could have limited the Agreements to ocean cruises but elected not to do so. Instead, the Agreements prohibited employment with any entity engaged in cruises during the Restricted Period, a definition that inherently includes both ocean and river cruises.

Second, the Defendant's gamesmanship with the word "fleet" is absurd. The non-compete restrictions are specifically tied to fleet size – cruise companies with a minimum **<u>fleet</u>** size of 500

3

berths. Defendant argues that the Court should replace "fleet" with "ship" and conclude that his employment with Ama is not prohibited under the Agreements because Ama's **individual ships** have fewer than 500 berths. However, as Defendant is well aware, the term "fleet" expressly contemplates a group of ships. *See* Fleet, Merriam-Webster Dictionary www.merriam-webster.com/dictionary/fleet (last accessed Dec. 10, 2025) ("a number of warships under a single command, *specifically* **:** an organization of ships and aircraft under the command of a flag officer; or group *especially* **:** a group (as of ships, planes, or trucks) operated under unified control"). A fleet is a group of ships – and the only reasonable reading of the Agreements is that the total number of berths in a company's fleet is the relevant calculation for determining the scope of the non-compete provision.[2]

Defendant does not – and cannot – dispute that Ama's **fleet** contains more than 500 berths.[3] Because Ama engages in cruising and meets the fleet size threshold, Defendant is precluded from employment with Ama. Defendant cannot simply substitute the word "ship" for the word "fleet." The Agreements say "fleet," which means Defendant's employment with Ama is prohibited.

Third, Defendant's attempt to draw a distinction between resignation and termination[4] is similarly without merit. Courts have repeatedly rejected the "stilted" reading proposed by Defendant when interpreting restrictive covenants. *See Gold Coast Media, Inc. v. Meltzer*, 751 So. 2d 645, 646 (Fla. 3d DCA 1999) (holding that language "'upon my termination from employment,' should be construed as applying to both involuntary and voluntary terminations of employment…. The logical interpretation of the contract is that it contemplated termination under any circumstances, including voluntary termination by the employee."); *see also Wright & Seaton, Inc.*

---

[2] Plaintiffs' position is further confirmed by the parenthetical in the non-compete language contained in the 2025 RSU Agreement, which states, "including ships under construction or publicly announced to be built". Ex. K to Ver. Comp. This reference to "*including ships"* – in the plural – eliminates any room for ambiguity: the berth total is calculated by the fleet, not the size or berth capacity of any individual ship.

[3] Ama uses the term "Fleet" to describe all of its ships, inviting guests to "Meet our Fleet" https://www.amawaterways.com/ships#europe (last accessed December 11, 2025).

[4] The term "termination" does not inherently draw a distinction between voluntary or involuntary. *See* Termination, Merriam-Webster Dictionary www.merriam-webster.com/dictionary/termination (last accessed Dec. 10, 2025) (termination is "end in time or existence").

*v. Prescott*, 420 So. 2d 623, 629 (Fla. 4th DCA 1982) ("logic and reason" dictated that non-compete covenant was triggered both upon resignation of employee and termination by company, when agreement specified that it became operative upon termination of employment). Here, the restrictive covenants were triggered upon the termination of Defendant's employment, regardless of the fact that Defendant voluntarily terminated (or ended) his employment relationship with Plaintiffs.[5]

There is no merit to Defendant's arguments. Defendant – after receiving years of training, high compensation, and valuable equity shares, cannot ignore the clear terms of his multiple agreements with Plaintiffs. Defendant admittedly is working for a company engaged in cruises that has a fleet size of more than 500 berths. He is in breach of his non-compete obligations in his multiple agreements with Plaintiffs.[6]

## II. Plaintiffs Continue To Suffer and Remain at Risk of Irreparable Injury.

With each day, concerns about Defendant's actions continue to grow, supporting the request for injunctive relief.

### A. Defendant's Unfair Competition Is Irreparable Injury.

Defendant argues that because Plaintiffs have not articulated actual financial loss to date, they cannot show irreparable injury. However, under Florida law, Defendant must be enjoined precisely because this type of unfair competition is irreparable in nature, and not calculable by a financial amount.

A "violation of an enforceable restrictive covenant creates a presumption of irreparable injury." Fla. Stat. § 542.335(1)(j); *see TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) (explaining that Fla. Stat. § 542.335(1)(j) is "the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake"); *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009) (applying presumption of Fla. Stat. § 542.335(1)(j)).

Plaintiffs have established that they have enforceable restrictive covenants, supported by

---

[5] Moreover, Fla. Stat. 542.335(1)(h) requires courts to "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement."

[6] The non-compete breaches are exacerbated by the non-solicitation breaches in connection with attempting to recruit Jason Santelices to leave Royal Caribbean and join Ama.

legitimate business interests, including confidential information and trade secrets, as well as extensive training and growth opportunities they provided to Defendant over his 18 years with the Company. Defendant's citations to Plaintiffs' financial statements are a classic red herring and completely irrelevant to the Court's analysis; the harm here is felt from Ama having an unfair leg up in the marketplace due to Defendant's unlawful competition. After receiving years of confidential information, trade secrets, and training, Defendant went to a competitor. This fact pattern of a high-level employee having access to confidential information and trade secrets, including details about the company's "policies, practices, and business methods" demonstrates irreparable harm when the employee goes to a direct competitor. *See AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004). Defendant's subsequent solicitation of at least one of Plaintiffs' employees—and stated intent to solicit other employees—is further proof of the ongoing irreparable harm.

      **B.    Filing A Lawsuit in Two Months is Not Undue Delay**

Courts look at both the delay between discovery of a breach of an agreement and when the plaintiff files suit, as well as the delay between filing suit and a motion seeking injunctive relief. As to the first test—the period between discovery of a breach and filing of a complaint—courts routinely find delays much longer than the timeline here insufficient to rebut irreparable injury. *See Sexual MD Sols., LLC v. Wolff*, No. 20-20824-CIV- O'SULLIVAN, 2020 U.S. Dist. LEXIS 79581, at *67 (S.D. Fla. May 6, 2020) (seven-month delay not unreasonable prior to filing suit asserting breach of contract and trade secret misappropriation claims); *see also Bellsouth Advert. & Pub. Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991) ("Plaintiff's delay of seven to eight months is not an unreasonable amount of delay, and does not necessitate the preclusion of a finding of irreparable injury") (citing *Ameritech, Inc. v. American Inf. Technologies Corp.*, 811 F.2d 960, 963 (6th Cir. 1987) ("Plaintiff is entitled to some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue").

Here, Defendant claims that the period between his public announcement of employment with Ama on July 31, 2025, to the filing of suit on October 16, 2025, constitutes undue delay. This period was used to investigate and analyze the legal claims at issue, allow time for forensic review to determine the scope of Defendant's misconduct, and prepare and submit verified pleadings, and is eminently reasonable. Furthermore, after serving Defendant and satisfying the local requirement

to confer with Defendant, Plaintiffs promptly (less than a month after filing suit) sought emergency injunctive relief in state court, and then did so again once the matter was removed to Federal Court by Defendant.[7] There has been no significant delay that rebuts the strong presumption of irreparable harm.

The case law cited by Defendant is distinguishable. *Hernandez v. Stingray Grp. Inc.*, No. 24-cv-21226, 2025 U.S. Dist. LEXIS 170783, at *16 (S.D. Fla. Mar. 10, 2025) (plaintiff waited **ten years** from discovery of the misappropriation of trade secrets to file suit); *Customplay v. Amazon, Inc.*, No. 17-80884-CIV-MARRA/MATTHEWMAN, 2017 U.S. Dist. LEXIS 231337, at *4 (S.D. Fla. Nov. 21, 2017) (plaintiff waited more than 4 years after initial patent infringement, and more than 18 months after last infringing patent to seek injunctive relief). Defendant also attempts to blur the cases about lengthy delays in filing suit with cases where parties delayed seeking injunctive relief after they had filed a complaint. *Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244, 1247 (11th Cir. 2016) (plaintiff waited five months **after filing suit** to move for a preliminary injunction); *Poker Unicorns LLC v. Lively*, No. 8:23-cv-2816-VMC-AAS, 2024 U.S. Dist. LEXIS 37924, at *6 (M.D. Fla. Mar. 5, 2024) (plaintiff waited three months **after filing suit** to file a motion for a temporary restraining order). None of Defendant's cited authority stands for the proposition that filing a verified complaint two months following discovery of a breach of a restrictive covenant and promptly seeking injunctive relief constitutes undue delay.

**III.     Defendant Signed the RSU Agreements.**

Defendant's argument that he did not sign the RSU Agreements is also without merit. Defendant—through Plaintiffs' relevant computer systems—admittedly logged in and accepted each of the RSU grants at issue. A copy of Company Records reflecting the date of Defendant's acceptance of the RSU Agreements is attached as Exhibit 1. Defendant's electronic signature constitutes his signature for all legal purposes.

"Under Florida's Electronic Signature Act, 'an electronic signature may be used to sign a writing and shall have the same force and effect as a written signature.' *BrewFab, LLC v. 3 Delta, Inc.*, No. 22-11003, 2022 WL 7214223, 2022 U.S. App. LEXIS 28429 at *5 (11th Cir. Oct. 13, 2022) (citing Fla. Stat. § 668.004). "The Electronic Signature Act defines an 'electronic signature'

---

[7] Defendant's claim of undue delay is ironic. Defendant elected to wait to remove this case to federal court until the evening of the day the state court set Plaintiffs' motion for a temporary injunction for hearing, thereby delaying any hearing on the motion.

as 'any letters, characters, or symbols, manifested by electronic or similar means, executed or adopted by a party with an intent to authenticate a writing . . . . And the Act provides that '[a] writing is electronically signed if an electronic signature is logically associated with such writing.'" *Id*. (citing Fla. Stat. § 668.003). Courts routinely hold that click to accept is a valid signature under Florida law. *See Simon v. Nat'l Passenger Corp.*, No. 8:24-cv-2586-TPB-CPT, 2025 U.S. Dist. LEXIS 15392, at *6 (M.D. Fla. Jan. 29, 2025); *Tucker v. Nat'l R.R. Passenger Corp.,* No. 25-CV-80300-ROSENBERG, 2025 U.S. Dist. LEXIS 151957, at *10 (S.D. Fla. Aug. 7, 2025). Additionally, courts have interpreted the requirement that restrictive covenants be signed to be akin to the statute of frauds, meaning that the signed requirement can be satisfied by any writing adopting the contract. *See K3 Enters. v. Sasowski*, No. 20-24441-CIV-CAN, 2022 U.S. Dist. LEXIS 140000, at *21 (S.D. Fla. Aug. 7, 2022).

Here, Defendant admits he was "offered" the RSU Agreements. *See* Amended Answer, ¶¶ 51-57. Defendant does not dispute that he received the benefit of the RSU Agreements, nor does he deny that he accepted the terms of the RSU Agreements. Instead, he focuses on a lack of a wet ink signature on the RSU Agreements attached to the Verified Complaint. Defendant signed the RSU Agreements electronically, accepted the benefits of the RSU Agreements, and is bound by the terms of the RSU Agreements, including the restrictive covenants contained in Schedule A therein.

### IV.     **Defendant Had Confidential Information About Plaintiffs' River Strategies.**

Defendant claims Plaintiffs "never exposed Defendant to any non-public information about their plans for entering that market." Response p. 3. Defendant further claims that he never had access to "any river cruise planning documents," Response p. 7, and that Plaintiffs did not "expose him to any non-public information relating to river cruise operations or strategy." Response p. 13. These arguments are demonstrably false.

Defendant was the AVP of Consumer Outreach and was undeniably privy to information about sales strategies, including for ocean and river cruises. He also participated in meetings and strategies related to river sales. For example, on February 7 and 8, 2025, Defendant provided insight on analytics relating to calls about river sales. Exhibit 2. On March 4 and 5, 2025, Defendant worked with a third-party consulting group to prepare Plaintiffs' frequently asked questions for the river cruise offerings. Exhibit 3. Defendant regularly attended meetings on Plaintiffs' river cruise offerings. A selection of those calendar invites is attached hereto as

Composite Exhibit 4. Defendant cannot deny that he had access to non-public information relating to Plaintiffs' upcoming river cruise operation, specifically as it relates to consumer outreach.

Defendant attempts to argue that because Plaintiffs had not actually begun sailing river cruises before, they have no protectable legal interests in river cruises. That is without any legal merit—and Defendant cites no legal authority for this proposition that a company has to actually provide services in a market to have a protectible legal interest. Such a requirement would bar any start-up or new entrant into a market from protecting their confidential information and legitimate business interests during the phase in which they were actively preparing to enter a market. Such a requirement is absent from Florida law.

Instead, Florida law broadly prevents individuals from violating restrictive covenants when supported by legitimate business interests, including in areas where the employer intends to operate. *See e.g. Vital Pharm., Inc. v. Alfieri*, No. 20-61307-CIV, 2022 U.S. Dist. LEXIS 83700, at *10 (S.D. Fla. May 9, 2022) (business strategy and business plans could be legitimate business interests); *Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 312 F. Supp. 3d 1325, 1338 (S.D. Fla. 2018) ("interest in re-entering the market" was a legitimate business reason for non-compete). Here, Plaintiffs are selling river cruises and were actively developing their river cruise business during Defendant's employment. Defendant, who was involved as a senior leader in the development of the river cruise strategy as it related to consumer sales, cannot be permitted to use his knowledge of Plaintiff's confidential information and go to a competitor in the same role. Plaintiffs' active and concrete efforts relating to river cruises constitute legitimate business interests relating to river cruises.

Defendant's cited authority is inapposite. In *Lucky Cousins Trucking, Inc. v. QC Energy Res. Tex., LLC*, 223 F. Supp. 3d 1221, 1226 (M.D. Fla. 2016), the plaintiff was a company that provided third-party logistics services to the defendant and failed to prove the existence of any confidential business information. Based on the lack of establishment of confidential information, the court denied the TRO. In contrast, in this case, Defendant was a long-tenured, senior leader with Plaintiffs, who was trained from an inbound call specialist role to an Assistant Vice President role.  Defendant cannot—and does not—dispute that he received specialized training regarding all aspects of Plaintiffs' sales strategies, nor does he dispute that he was given access to confidential information regarding these sales strategies. Defendant, after having high-level access to Plaintiffs' proprietary information for years, left and immediately joined another cruise company.

9

The Parties defined the relevant market as cruises without any distinction between river and ocean cruises. As Defendant pointed out in his response, the majority of people who booked Plaintiffs' river cruises "are Royal Caribbean Group loyalty members…." indicating that these are not two wholly separate markets. Plaintiffs therefore have legitimate business interests relating to the prevention of unfair competition with its cruising business, including Defendant working at Ama.

Even if the Court were to examine whether river cruises and ocean cruises are distinct, Plaintiffs have legitimate business interests that require the enforcement of the restrictive covenants. Plaintiffs clearly and publicly announced the plan to offer river cruises during Defendant's employment, and Defendant was involved in those efforts. Therefore, any argument that Plaintiffs cannot protect these efforts as it could protect any other legitimate business interests in the cruise industry are wholly without merit.

## V.   CONCLUSION

Plaintiffs have established that they are entitled to a temporary restraining order. Defendant has not provided any serious factual or legal challenges to the enforcement of the Agreements. Therefore, the Court should grant Plaintiffs' Motion for a Temporary Restraining Order.

| | |
|---|---|
| Dated: December 11, 2025 | Respectfully submitted, |
| | LITTLER MENDELSON P.C. |
| | |
| | */s/ West A. Holden* |
| | Tyler A. Sims |
| | Florida Bar No. 1048908 |
| | tsims@littler.com |
| | West A. Holden |
| | Florida Bar No. 0113569 |
| | wholden@littler.com |
| | 111 North Orange Avenue, Suite 1750 |
| | Orlando, FL 32801.2366 |
| | Tel:    407.393.2900 |
| | Fax:   407.393.2929 |
| | |
| | Paul J. Kennedy (*pro hac vice* to be filed) |
| | Virginia Bar No. 29802 |
| | pkennedy@littler.com |
| | 815 Connecticut Avenue, N.W. |
| | Suite 400 |
| | Washington, DC 20006 |
| | Tel:    202.414.6855 |
| | |
| | *Attorneys for Plaintiffs* |

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 11th day of December 2025, a true and correct copy of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on Defendant's counsel, Brian H. Pollock at brian@fairlawattorney.com.

*/s/ West A. Holden*
Tyler A. Sims