IN THE ELEVENTH JUDICIAL CIRCUIT COURT
IN AND FOR MIAM-DADE COUNTY, FLORIDA

CELEBRITY CRUISES, INC. and      CIRCUIT CIVIL DIVISION
ROYAL CARIBBEAN CRUISES, LTD.
d/b/a ROYAL CARIBBEAN GROUP,      CASE NO.:  2025-020399-CA-01 (CA 43)

         Plaintiffs,

v.

ANGEL CHRISTOPHER GOMEZ,

         Defendant.

_____/

## NOTICE OF FILING NOTICE OF REMOVAL

Defendant, Angel Christopher Gomez, pursuant to 28 U.S.C. §§1331, 1441, and 1446, notices the Court and all parties of the filing of the Notice of Removal to remove the pending civil action filed in the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida ("11th Judicial Circuit"), to the United States District Court for the Southern District of Florida.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was eFiled on this 2nd day of December 2025, which will serve Tyler Sims, Esq., and West A. Holden, Esq., tsimms@littler.com, and wholden@littler.com, 111 North Orange Avenue, Suite 1750, Orlando, FL 32801.2366, and Paul Kennedy, Esq., pkennedy@littler.com, 815 Connecticut Avenue, N.W., Suite 400, Washington, DC 20006, LITTLER MENDELSON P.C., as *Counsel for Plaintiffs*, and all others who appeared in this action.

s/Brian H. Pollock, Esq.
Brian H. Pollock, Esq.
Fla. Bar No. 174742
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
Tel:    305.230.4884
*Counsel for Defendant*

1

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884  FAX 305.230.4844
*www.fairlawattorney.com*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-25648

CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES, LTD.
d/b/a ROYAL CARIBBEAN GROUP,

      Plaintiff,
v.

ANGEL CHRISTOPHER GOMEZ,

      Defendant.
_____/

## **NOTICE OF REMOVAL**

Defendant, Angel Christopher Gomez, pursuant to 28 U.S.C. §§1332(a), 1441, and 1446, and the Local Rules of the United States District Court for the Southern District of Florida, Miami Division, hereby remove this case, pending as Case No. 2025-020399-CA-01 (CA 43), in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, and as grounds for removal, state as follows:

1.      Plaintiffs, Celebrity Cruises, Inc. and Royal Caribbean Cruises, LTD., d/b/a Royal Caribbean Group, filed a lawsuit against Defendant, Angel Christopher Gomez, on October 16, 2025, presently pending in the Circuit Court for the Eleventh Judicial Circuit Court in and for Miami-Dade County, Florida (the "State Court Action"), alleging the following causes of action:

    a.  Count I: Breach of Contract – 2018 Non-Compete Agreement
    b.  Count II: Breach of Contract – 2022 Non-Compete Agreement
    c.  Count III: Breach of Contract – The RSU Agreements
    d.  Count IV: Misappropriation of Confidential Information and Trade Secrets – Violation of the Florida Uniform Trade Secrets Act

(Exhibit "A").

1

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884  FAX 305.230.4844
*www.fairlawattorney.com*

2.      The Plaintiffs filed the lawsuit in Miami-Dade County pursuant to the forum-selection and choice-of-law provisions in the various agreements Mr. Gomez signed. *Id.*

3.      The Plaintiffs allege in Counts I through III that Mr. Gomez worked for them in their ocean cruise business until he resigned in May 2025, that he signed various agreements containing restrictive covenants during his employment, and that after his resignation, he began working for a competitor, which the Plaintiffs claim breached the restrictive covenants in the agreements he signed (Counts I through III). *Id.*

4.      The Plaintiffs also allege in Count IV that, while employed by them, Mr. Gomez had access to confidential and trade secret information, which they claim he wrongfully accessed, acquired, and retained, and that he misappropriated this information after leaving the Plaintiffs' employment. *Id.*

5.      The Plaintiffs served Mr. Gomez with the Summons and Verified Complaint in the State Court Action in California on November 3, 2025. (Exhibit "B").

6.      Mr. Gomez responded to the Complaint with his Answer and Affirmative Defenses. (Exhibit "A").

7.      The Court recently entered an Order setting an evidentiary hearing on December 8, 2025. (Exhibit "C").

8.      This Notice of Removal is timely and proper pursuant to 28 U.S.C. §1446, as it is filed within 30 days from Mr. Gomez being served with the Summons and Complaint on November 3, 2025. (*See* Exhibit "B").

9.      Mr. Gomez removes this case based on diversity jurisdiction pursuant to 28 U.S.C. §§1331 and 1441.

2

## BASIS FOR REMOVAL: DIVERSITY JURISDICTION

10.     Pursuant to 28 U.S.C. §1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

11.     Further, 28 U.S.C. §1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

12.     This Court has diversity jurisdiction over Plaintiff's FLSA claim under 28 U.S.C. §1441(b) based on the complete diversity of jurisdiction between the Plaintiffs and the Defendant. *See* 28 U.S.C. §§1331, 1441(a).

13.     Under 28 U.S.C. § 1441(a), a defendant may remove a civil action filed in state court to a federal district court if the action is one over which the federal court has original jurisdiction.

14.     Federal courts have original diversity jurisdiction over civil actions where (a) the amount in controversy exceeds $75,000 and (b) involves citizens of different states. 28 U.S.C. § 1332(a)(1).

15.     This case involves damages that the Plaintiffs alleged exceed $750,000, and citizens of different states.

**(a)     The Amount in Controversy Exceeds $75,000.**

16.     The Plaintiffs alleged in the Complaint that they seek damages in excess of $750,000 from the Defendant. (Exhibit "A" at ¶11).

---

3

17.     The Plaintiffs also allege that Mr. Gomez had a salary of $227,900 as of December 2022. (*Id.*, at ¶35).

18.     Any bond to secure the damages Mr. Gomez would sustain if a temporary injunction were improvidently entered would exceed the $75,000 jurisdictional threshold, even if the injunction bond were based only on his annual salary from the Plaintiffs. *Head Kandy LLC v. McNeill*, 2023 U.S. Dist. LEXIS 199641, at *19 (S.D. Fla. Nov. 7, 2023) (discussing nature and basis for injunctive bond to account for a year net income, such as salary and bonuses). *See also* Fed. R. Civ. P. 65(c).

19.     While Mr. Gomez denied that he is liable to the Plaintiffs, caused the Plaintiffs damages, or that their damages approach the amount alleged (Exhibit "B"), the Plaintiffs' allegation about their damages and why they estimated them at $750,000, satisfies the amount in controversy requirement.

20.     The Plaintiffs also seek recovery of their attorney's fees throughout the Verified Complaint based on the prevailing party attorney's fees provisions in the 2022 Non-Compete Agreement appended to the Verified Complaint and, presumably, Fla. Stat. §§ 542.335, for which they seek an award in the *ad damnun* clause of the Verified Complaint. (Exhibit "A" at pp. 14 ¶75, 29, and 40).

21.     Considering the nature of this litigation, which involves the Plaintiffs' attempt to enforce restrictive covenants through multiple experienced attorneys, the amount in controversy will exceed $75,000 based on the damages sought and fees to be incurred. *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1079 (11th Cir. 2000) ("when a statutory cause of action entitles a party to recover

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
*www.fairlawattorney.com*

reasonable attorney fees, the amount in controversy includes consideration of the amount of those fees.")

22.     Aggregating these factors satisfies the jurisdictional threshold of $75,000 after considering the damages sought by the Plaintiffs, the attorney's fees at issue in this litigation, and the amount of any injunctive bond likely to be required if a preliminary injunction were to issue.

**(b)     Diversity of Citizenship Exists.**

23.     The Plaintiffs attest in the Verified Complaint that each is a "foreign corporation" with its principal place of business in, but not a citizen of, Florida. (Exhibit "A" at ¶¶8-9).

24.     The Plaintiffs further allege that "upon information and belief," Mr. Gomez is a "resident of Coral Springs, Florida." (*Id.*, at ¶10.) Mr. Gomez denied this allegation. (DE 16 at ¶10).

25.     Citizenship, not residency, is the determinative factor in determining whether complete diversity exists. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) (diversity focuses on "Citizenship, not residence… to establish diversity for a natural person.").

> Several rules guide courts in determining parties' citizenship. First and foremost, a natural person is a citizen of the state in which he is "domiciled." *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002). "A person's domicile is the place of 'his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom[.]'" *Id.* at 1257-58 (quoting *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974)). To put it another way, domicile (or citizenship) consists of two elements: residency in a state and intent to remain in that state. S*ee Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989). Residency is necessary, but insufficient, to establish citizenship in a state. *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013). Courts look to various factors in determining a person's intent to remain in a state, including: the location of real and personal property, business ownership, employment records, the location of bank accounts, payment of taxes, voter registration, vehicle registration, driver's license, membership in local organizations, and sworn statements of intent. *See, e.g.*, *Sunseri v. Macro Cellular Partners, Ltd.*, 412 F.3d 1247, 1249 (11th Cir. 2005); McCormick, 293 F.3d at 1258; 13E Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3612 (3d ed. 2019).

5

*Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1149 (11th Cir. 2021).

26.     To establish this Court's diversity jurisdiction, Mr. Gomez is not constrained to rely on the allegations in the Verified Complaint or limited in "the types of evidence that may be used to satisfy the preponderance of the evidence standard," such that he can rely on affidavits, declarations, or other documentation." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 755 (11th Cir. 2010).

27.     Mr. Gomez moved to California before the Plaintiffs filed the Verified Complaint, such that the Plaintiffs served the Defendant with the Summons and Verified Complaint in California. (Exhibits "C" and "D").

28.     Diversity jurisdiction is analyzed to determine whether the parties were when the case was filed in the Circuit Court for Miami-Dade County, Florida, and again, on removal. *Brewer v. Tinney*, No. 2025 U.S. Dist. LEXIS 174572, at *4 (M.D. Fla. Sep. 8, 2025) (collecting cases).

29.     Mr. Gomez was a citizen of California when the Plaintiffs instituted the state court action and he remains a citizen of California, as evidenced by following facts to which Mr. Gomez attests:

  a.   He has been a resident and citizen of the State of California since July 2025;

  b.   He has lived in California since July 2025;

  c.   He has lived in a townhome in Calabassas, California, pursuant to a one-year lease since July 2025;

  d.   He has maintained his personal property in California July 2025;

  e.   He pays for utilities for the townhome since moving into it;

  f.   He is employed in California and has been since July 2025;

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
*www.fairlawattorney.com*

    g.   He has had social memberships (gym and country club) in California since July 2025;

    h.   He does not intend to live in any state other than California in the present or immediate future; and

    i.   He intends to live in California permanently.

(Exhibit "E").

30.    Based on the foregoing, Mr. Gomez met his burden of establishing diversity of citizenship through his California citizenship for the times relevant to the Court's analysis.

## **DEFENDANT COMPLIED WITH 28 U.S.C. § 1446**

31.    The State Court Action was commenced within the judicial district of the United States District Court for the Southern District of Florida, Miami Division.

32.    In Compliance with 28 U.S.C. §1446(a), Mr. Gomez attaches the following, as filed in the State Court Action:

    a.   The Verified Complaint as Exhibit "A";

    b.   The Affidavit of Service as Exhibit "B";

    c.   The Answer and Affirmative Defenses as Exhibit "C"; and

    d.   The Order entered on December 1, 2025, as Exhibit "D".

33.    This Notice of Removal is being filed with this Court within 30 days after the named Defendant's receipt of the Summons and Complaint in the State Court Action, in compliance with 28 U.S.C. §1446(b).

34.    Promptly after filing this Notice of Removal, Defendant will give written notice of the filing of this Notice of Removal to the Plaintiff and will file a copy of the Notice of Removal with the Clerk of the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County as required by 28 U.S.C. §1446(d).

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884  FAX 305.230.4844
*www.fairlawattorney.com*

## CONCLUSION

WHEREFORE Defendant, Angel Christopher Gomez, notifies that this cause has been removed from the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, to the United States District Court for the Southern District of Florida, Miami Division, pursuant to the provisions of 28 U.S.C. §§1332(a), 1441, and 1446, and the Local Rules of the United States District Court for the Southern District of Florida, Miami Division, and requests that this Court exercise diversity jurisdiction over the matters asserted herein.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing Notice of Removal on this 2nd day of December 2025, through filing in CM/ECF, and by email on Tyler Sims, Esq., and West A. Holden, Esq., tsimms@littler.com, and wholden@littler.com, 111 North Orange Avenue, Suite 1750, Orlando, FL 32801.2366, and Paul Kennedy, Esq., pkennedy@littler.com, 815 Connecticut Avenue, N.W., Suite 400, Washington, DC 20006, LITTLER MENDELSON P.C., as *Counsel for Plaintiffs*.

Respectfully submitted,

s/Brian H. Pollock, Esq.
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
305.230.4884
*Defense Counsel*

Case 1:25-cv-25688-KMW Document 25-9 Entered on FLSD Docket 12/02/2025 Page 10 of 163

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**
**COMPLEX BUSINESS DIVISION**

|  |  |
|---|---|
| CELEBRITY CRUISES, INC., and ROYAL CARIBBEAN CRUISES LTD., d/b/a ROYAL CARIBBEAN GROUP, | |
| Plaintiff, | CASE NO.: _____ |
| v. | |
| ANGEL CHRISTOPHER GOMEZ, | |
| Defendant. | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Celebrity Cruises Inc., ("Celebrity") and Royal Caribbean Cruises Ltd. d/b/a Royal Caribbean Group ("Royal Caribbean") (collectively, "Plaintiffs") by counsel, Littler Mendelson, P.C., file this Verified Complaint against Defendant Angel Christopher Gomez and allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action to stop Defendant, a former Celebrity Assistant Vice President who worked with Plaintiffs for nearly 18 years, from working for a competitor and soliciting Plaintiffs' employees in breach of his contractual obligations.

2.      During his employment with Celebrity, and in exchange for lucrative Restricted Stock Units ("RSUs"), Defendant executed multiple agreements that contain provisions precluding him from sharing Plaintiffs' confidential information, unfairly competing with Plaintiffs, and soliciting Plaintiffs' employees for nine (9) months following the end of his employment.

3.     In May 2025, Defendant resigned and refused to share where he was going with Celebrity, but flatly denied that he was going to work with a competitor.

4.     Defendant later publicly announced his new employment as Senior Vice President of Global Consumer Sales and Service with AmaWaterways, another cruise company (the "New Employer").

5.     Defendant's employment with the New Employer violates his contractual non-compete obligations to Plaintiffs.

6.     Defendant has also contacted Plaintiffs' employees for the purposes of inducing them to leave Plaintiffs and join the New Employer in breach of his contractual non-solicit obligations to Plaintiffs.

7.     Plaintiffs seek temporary and permanent injunctive relief because they have suffered, and will continue to suffer, irreparable harm unless Defendant is immediately enjoined from engaging in the above conduct. Plaintiffs also seek damages arising from Defendant's wrongdoing.

## THE PARTIES

8.     Plaintiff Royal Caribbean Cruises Ltd. is a foreign corporation with its principal place of business at 1050 Caribbean Way, Miami, FL 33132.

9.     Plaintiff Celebrity Cruises, Inc. is a foreign corporation with its principal place of business at 1050 Caribbean Way, Miami, FL 33132.

10.     Defendant is an individual over the age of eighteen and, upon information and belief, is a resident of Coral Springs, Florida.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action because it seeks injunctive relief and damages valued in excess of Seven Hundred and Fifty Thousand Dollars ($750,000.00), exclusive of interest and costs.

12.     Venue is proper in this Court pursuant to Fla. Stat. § 47.011 because the causes of action asserted herein accrued in Miami-Dade County. Defendant worked in Miami-Dade County, and Plaintiffs' principal place of business is in Miami-Dade County.

13.     Moreover, venue is proper in this Court because in the 2022 Non-Compete Agreement and the 2019-2025 RSU Agreements (as defined herein), Defendant expressly agreed to venue and jurisdiction in Miami-Dade County.

14.     This Court has jurisdiction over Defendant as a citizen and resident of Florida. Moreover, the Court has jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1)(a)(1), (7), and (9) (2021) because he resides in this state; operates, conducts, engages in or carries on business or a business venture in this state; entered into contracts in this state that comply with Fla. Stat. § 685.102; and committed breaches of his contracts with Plaintiffs in this state.

15.     In addition, this case is appropriate for the Complex Business Litigation Division of this Circuit because it is a breach of contract case involving complex legal and case management issues requiring extensive judicial management in order to expedite the case, to promote effective decision making by the Court, counsel and parties, and to keep costs reasonable.

## FACTUAL ALLEGATIONS

### I.     Defendant's Employment with Plaintiffs

16.     Royal Caribbean is the ultimate parent company of Celebrity, the entity that employed Defendant at the time of his resignation.

17. Celebrity is a premium global cruise brand renowned for offering sophisticated and innovative cruising experiences

18. Royal Caribbean hired Defendant on or about August 13, 2007 as an inbound specialist, Vacation Planners.

19. Over the next 17 years of his employment, Plaintiffs provided Defendant with extensive training and growth opportunities, which he fully took advantage of by securing several promotions that evinced an upward career trajectory, with accompanying increases in compensation, responsibilities, and access to commercially sensitive business information.

20. On or about May 5, 2008, Defendant was promoted to Specialist, Resolutions.

21. On or about October 27, 2008, Defendant was promoted to Coach, Certified Vacation Planners.

22. On or about October 18, 2010, Defendant was promoted to Manager, Consumer Outreach Inbound.

23. On or about February 8, 2013, Defendant resigned for a brief period, but was rehired on or about July 11, 2013 as Manager, Consumer Outreach Groups & Service.

24. On or about July 14, 2014, Defendant was promoted to Director, Guest Sales & Service.

25. On or about June 18, 2018, Defendant was promoted to Associate Vice President (AVP), Celebrity Guest Sales & Service. This was the first of two AVP roles held by Defendant during his employment. This promotion was contingent on Defendant agreeing to certain restrictive covenants ("2018 Non-Compete Agreement"). A copy of the 2018 Non-Compete Agreement is attached as **Exhibit A** and incorporated herein.

26.     In this first AVP role, Defendant oversaw a business-to-business (indirect) sales call center with over 400 employees.

27.     Over the course of his employment, Defendant developed valuable relationships with third parties that sell cruises for Celebrity, such as travel agencies as well as travel industry trade groups.

28.     Defendant also was privy to highly sensitive information such as confidential guest information, travel advisor information, and terms of travel partner agreements. He also was given access to the structure of how Plaintiffs set up covert and opaque pricing/offers, who Plaintiffs gave them to (and why), in addition to strategies Plaintiffs leveraged on a regional basis based on the health of the third-party agencies in a particular area.

29.     Defendant also had exposure to and regularly worked with a variety of trade secrets and confidential processes, including training for sales staff, sales methodology, commission detail (including tiers, levels, and exceptions), customer dispute resolution as well as technology integration strategies.

30.     Defendant was responsible for identifying and retaining key talent.

31.     He also played a critical role in human capital strategy development and implementation.

32.     Defendant additionally had access to detailed non-public financial information for brand sales, such as the amount of revenue attributable to different revenue streams, and brand strategies for growth in each stream.

33.     Defendant was privy to confidential materials relating to Celebrity's key performance indicators ("KPIs"), along with Celebrity's strategies and plans to successfully

achieve these KPIs. Through participation in regular budget forecasts, Defendant acquired detailed insight into expenditures and financial performance.

34.     In December 2022, Defendant was offered a new role as AVP of Consumer Outreach.

35.     In connection with this offer, Defendant was given a lucrative compensation package that included a base salary of $227,900.00, plus the potential for 50% bonus based on a Sales Incentive Plan, and an annual equity grant of $75,000.00.

36.     This offer was contingent on Defendant agreeing to Royal Caribbean's Employee Nondisclosure and Noncompetition Agreement ("2022 Non-Compete Agreement"). A copy of the 2022 Non-Compete Agreement is attached as **Exhibit B** and incorporated herein.

37.     In his role as AVP of Consumer Outreach, Defendant oversaw a business-to-consumer (direct) sales division of over 400 employees located around the globe.

38.     Defendant was responsible for driving revenue growth through direct sales channels and overseeing strategic growth in this area. Defendant continued to have access to confidential and proprietary business information relating to Plaintiffs' business models and strategies.

39.     Defendant had intimate knowledge regarding the direct sales program, including the compensation and sales/incentive programs for sales employees and detailed information regarding sales strategies, sourcing, and sales training programs.

40.     Defendant routinely participated in leadership meetings involving high-level discussions about business strategies.

41.     Defendant also participated in key annual strategy plan meetings. For example, in July 2023, he attended a three-day, off-site leadership meeting where a 3-to-5-year strategic plan

6

was discussed, including sensitive topics such as succession planning. Highly confidential information regarding top sales partners was shared, including information regarding revenue for top partners. Access to this leadership meeting was limited to approximately 14 Director-level and above employees.

42.     Plaintiffs' confidential information is unique – it is not publicly available or easily ascertainable and would be extremely valuable in the hands of a competitor.

43.     Plaintiffs protect their confidential information through various measures, including, without limitation:

        a.      requiring all employees to comply with confidentiality policies that restrict the use and sharing of confidential information;

        b.      requiring password protection of company devices and systems through which confidential information can be accessed;

        c.      limiting access to certain confidential information to higher-level employees and/or specific employees with a business-related need to know; and

        d.      requiring employees at certain levels to sign restrictive covenant agreements.

44.     Defendant's experience working with Plaintiffs and his access to their confidential business information makes him a valuable employee to any cruise-related business.

## II.     Defendant Signed Multiple Restrictive Covenant Agreements as He Was Promoted into Leadership Roles and Offered Additional Compensation and Equity

### A.     The 2016-2017 Restricted Stock Unit ("RSU") Agreements

45.     In connection with annual stock grants that were offered to Defendant between 2016 and 2025, Defendant entered into multiple Royal Caribbean Group 2008 Equity Incentive

Plan Restricted Stock Unit Agreements (the "RSU Agreements") containing non-compete and non-solicit covenants.

46.  On or about February 9, 2016, Defendant was offered a Royal Caribbean stock grant that is only available to high-level executives as part of their compensation and continued employment. Defendant accepted the grant on March 22, 2016. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2016 RSU Agreement"), a copy of which is attached as **Exhibit C** and incorporated herein.

47.  On or about February 7, 2017, Defendant was offered another Royal Caribbean stock grant. Defendant accepted the grant on March 9, 2017. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2017 RSU Agreement"), a copy of which is attached as **Exhibit D** and incorporated herein.

48.  In the 2016 RSU Agreement and 2017 RSU Agreement (collectively, the "2016-2017 RSU Agreements"), Defendant agreed that for a six-month period following the end of his employment, he would not, directly or indirectly, serve as or be a consultant to or employee, officer, agent, director or owner of any entity engaged in cruises, with a minimum fleet size of 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.[1] *Id*., Schedule A.

49.  In the 2016-2017 RSU Agreements, Defendant also agreed that for a six-month period following the end of his employment, he would not (a) employ or seek to employ anyone employed by Royal Caribbean or its Affiliates, as defined in the agreements, or who was employed within the last six months of Defendant's employment, or (b) solicit, induce, or influence anyone

---

[1] A "berth" on a ship is a sleeping space or space to sleep. For example, a room that sleeps four people is equivalent to four berths. In the cruise industry, the number of passengers accommodated on a ship is equivalent to the number of berths.

employed by Royal Caribbean or its Affiliates to discontinue, reduce, or modify their relationship with Royal Caribbean or its Affiliates. *Id*. at Schedule A.

50. In the 2016-2017 RSU Agreements, Defendant agreed that these restrictive covenants are based on the confidential information provided to him and are necessary for the protection of the business and interests of Royal Caribbean. *Id*., Schedule A.

### B. The 2019-2025 RSU Agreements

51. On or about February 13, 2019, once Defendant was promoted to AVP, Defendant was offered another Royal Caribbean stock grant. Defendant accepted the grant on March 4, 2019. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2019 RSU Agreement"), a copy of which is attached as **Exhibit E** and incorporated herein.

52. On or about February 20, 2020, Defendant was offered another Royal Caribbean stock grant. Defendant accepted the grant on May 24, 2020. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2020 RSU Agreement"), a copy of which is attached as **Exhibit F** and incorporated herein.

53. On or about March 4, 2021, Defendant was offered another Royal Caribbean stock grant. Defendant accepted the grant on May 8, 2021. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2021 RSU Agreement"), a copy of which is attached as **Exhibit G** and incorporated herein.

54. On or about February 7, 2022, Defendant was offered another Royal Caribbean stock grant. Defendant accepted the grant on March 22, 2022. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2022 RSU Agreement"), a copy of which is attached as **Exhibit H** and incorporated herein.

55. On February 9, 2023, Defendant was offered another Royal Caribbean stock grant. Defendant accepted the grant on March 10, 2023. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2023 RSU Agreement"), a copy of which is attached as **Exhibit I** and incorporated herein.

56. On or about February 8, 2024, Defendant was offered another Royal Caribbean stock grant, which he accepted on February 23, 2024. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2024 RSU Agreement"), a copy of which is attached as **Exhibit J** and incorporated herein.

57. On or about February 12, 2025, Defendant was offered another Royal Caribbean stock grant, which he accepted on February 19, 2025. Specifically, Defendant entered into a Royal Caribbean Group 2008 Equity Incentive Plan Restricted Stock Unit Agreement (the "2025 RSU Agreement", a copy of which is attached as **Exhibit K** and incorporated herein.

58. In the 2019 RSU Agreement, 2020 RSU Agreement, 2021 RSU Agreement, 2022 RSU Agreement, 2023 RSU Agreement, 2024 RSU Agreement, and 2025 RSU Agreement (collectively, the "2019-2025 RSU Agreements"), Defendant agreed that during the nine-month period following the end of his employment (the "Restricted Period"), he would not, directly or indirectly, serve as or be a consultant to or employee, officer, agent, director or owner of any entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise-related businesses of any such entity.[2] *Id*. at Schedule A.

59. In the 2019-2025 RSU Agreements, Defendant also agreed that during the Restricted Period, he would not (a) employ or seek to employ anyone employed by Royal

---

[2] The 2024 RSU Agreement and 2025 RSU Agreement non-compete provisions also explicitly prohibit Defendant from working for an entity "preparing to engage in" cruises. *Id*. at Schedule A.

Caribbean or its Affiliates, as defined in the agreements, or who was employed within the last six months of Defendant's employment, or (b) solicit, induce, or influence anyone employed by Royal Caribbean or its Affiliates to discontinue, reduce, or modify their relationship with Royal Caribbean or its Affiliates. *Id.*, Schedule A.

60.     In the 2019-2025 RSU Agreements, Defendant agreed that the restrictive covenants are based on the confidential information provided to him, are fair and reasonable, and are reasonably required for the protection of the interests of Royal Caribbean. *Id.*, Schedule A.

61.     In the 2024 RSU Agreement and 2025 RSU Agreement, Defendant also agreed that the nine month Restricted Period would be tolled during any period that Defendant is in breach of any of the restrictive covenants. *Id.*, Schedule A.

62.     Specifically, the 2024 RSU Agreement and 2025 RSU Agreement state:

> The Restricted Period begins running immediately following the termination of Grantee's employment under any circumstance and shall be tolled during any period that Grantee is in breach of any of the restrictive covenants in this Schedule A so that the Company is provided with the full benefit of the full Restricted Period.

63.     He also agreed in the 2019-2025 RSU Agreements that his "services to be rendered to [Royal Caribbean] and/or its Affiliates [as defined in the 2019-2025 RSU Agreements] were of a special and unusual character that have a unique value to [Royal Caribbean] and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law." *Id.*, Schedule A.

64.     Additionally, Defendant agreed in the 2019-2025 RSU Agreements to the following statement:

> Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of [Royal Caribbean], its officers,

11

> directors, shareholders, and other employees and for the protection of the business of [Royal Caribbean]. Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A. It is the belief of the parties, therefore, that the best protection that can be given to [Royal Caribbean] that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above. In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law.

*Id.*, Schedule A.

65.     As a result of the RSU Agreements, Defendant was awarded 5,059 RSUs and approximately 3,749 RSUs vested prior to his resignation.

### C. The 2018 and 2022 Non-Compete Agreements

66.     On or about June 21, 2018, in connection with Defendant's promotion to AVP, Celebrity Guest Sales & Service, he signed an offer letter containing post-employment restrictive covenants (the "2018 Non-Compete Agreement"), including non-compete and non-solicit obligations.

67.     Under the 2018 Non-Compete Agreement, Defendant agreed that during the nine-month Restricted Period, he would not serve as or be a consultant to or employee, officer, agent, director or owner of any entity engaged in cruises, with a minimum fleet size of 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

68.     He also agreed in the 2018 Non-Compete Agreement that during the Restricted Period, he would not (a) employ or seek to employ anyone employed by Royal Caribbean or its Affiliates, as defined in the agreements, or who was employed within the last nine (9) months of

Defendant's employment, or (b) solicit, induce, or influence anyone employed by Royal Caribbean or its affiliates to discontinue, reduce, or modify their relationship with Royal Caribbean or its subsidiaries.

69.     On or about December 15, 2022, in connection with his acceptance of the role of AVP, Consumer Outreach, Defendant signed an Employee Nondisclosure and Noncompetition Agreement (the "2022 Non-Compete Agreement") containing post-employment restrictive covenants, including confidentiality, non-compete, and non-solicit obligations.

70.     In the 2022 Non-Compete Agreement, Defendant agreed that during the Restricted Period, he would not, directly or indirectly, provide services of the kind he provided during his employment to any other entity engaged in cruises, with a minimum fleet size of 500 berths (including the reasonable estimated berths of ships under construction or publicly announced to be built), or cruise related businesses of any such entity. *See id.*, ¶ 3.A.

71.     In the 2022 Non-Compete Agreement, Defendant agreed not to disclose or use any confidential information of Royal Caribbean or its subsidiaries or affiliates except in the course of his employment and for their benefit. *See id.*, ¶ 1.A.

72.     Defendant also agreed that during the Restricted Period, he would not (a) employ or seek to employ anyone employed by Royal Caribbean or its affiliates or who was employed within the last six (6) months of Defendant's employment, or (b) solicit, induce, or influence anyone employed by Royal Caribbean or its affiliates to discontinue, reduce, or modify their relationship with Royal Caribbean or its subsidiaries. *See Id.*, ¶ 3.B.

73.     In the 2022 Non-Compete Agreement, Defendant acknowledged and agreed that "(i) the Employee's services to be rendered to the Company are of a special and unique character;

13

(ii) that the Employee will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; and (iii) that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the Company." *Id.*, ¶ 4.

74.     In the 2022 Non-Compete Agreement, Defendant further acknowledged that he would "not be subject to undue hardship by reason of [his] full compliance with the terms and conditions of this Agreement or the Company's enforcement thereof." *Id.*

75.     In addition, Defendant agreed in the 2022 Non-Compete Agreement that any "breach or threatened breach by [Defendant] of any restrictive covenant set forth in [the 2022 Non-Compete Agreement] . . . would cause irreparable injury to the Company, and that . . . the Company will be entitled to seek all available civil remedies, at law or in equity, including, without limitation, an injunction without posting a bond, damages, attorneys' fees, and costs." *Id.*, ¶ 5.

76.     The terms of the restrictive covenants in the 2018 Non-Compete Agreement, 2022 Non-Compete Agreement, and the 2019-2025 RSU Agreements are reasonable in both temporal and geographic scope and are necessary to protect Plaintiffs' legitimate business interests.

**III.   Defendant Leaves Celebrity to Join Another Cruise Company and Solicits Royal Caribbean's Employee in Breach of Multiple Agreements with Royal Caribbean**

77.     Defendant resigned on or about April 28, 2025, and announced that his last day of employment would be May 26, 2025.

78.     Defendant refused to tell Celebrity where he would be working following his resignation, stating that he was considering multiple opportunities, but explicitly denied that he was going to work for a competitor.

79.     Defendant was allowed to work during his notice period based on his representations that he was not joining a competitor.

14

80.     Defendant's last day of employment with Celebrity was May 26, 2025.

81.     During his exit interview, Defendant stated only that he was resigning because of a new job opportunity but did not want to disclose details.

82.     Defendant was well aware of his non-compete obligations at the time of his resignation.

83.     The New Employer hired Defendant as SVP Global Consumer Sales and Service, which was publicly announced, including via PAX news, on July 31, 2025.[3]

84.     The New Employer is engaged in cruises and has a fleet size of more than 500 berths.

85.      In his new role as SVP of Global Consumer Sales and Service, Defendant is providing services of the very same kind he provided to the Company during his employment.

86.     Specifically, Defendant oversees global consumer sales, service and reservations operations.[4]

87.     The press release described Defendant's experience at Royal Caribbean as overseeing global sales and service options.

88.     Defendant's employment with the New Employer breaches the non-compete restrictions in the 2018 Non-Compete Agreement, 2022 Non-Compete Agreement, and the RSU Agreements.

89.     After starting his employment with the New Employer, and within six months of leaving Celebrity, Defendant contacted one or more employees of Plaintiffs for the purposes of

---

[3] *See* https://www.paxnews.com/news/appointments-jobs/amawaterways-announces-two-senior-vice-presidents (last visited on October 2, 2025).

[4] *See* https://www.travelweekly.com/River-Cruising/AmaWaterways-announces-new-leadership-for-Its-next-phase-of-growth (last visited on October 2, 2025).

seeking to employ them at the New Employer in breach of the employee non-solicit restrictions in the 2018 Non-Compete Agreement, 2022 Non-Compete Agreement, and RSU Agreements.

90. Shortly after learning that Defendant was breaching his contractual obligations to Plaintiffs, Plaintiffs retained a third-party computer forensics firm, FTI Consulting ("FTI"), to perform a forensic examination of Defendant's company-issued computer and phone. The results of that investigation show that Defendant took a number of suspicious actions, some of which are highlighted below, during his final weeks of employment with Celebrity. The Declaration of Matias Livachof, a computer forensics consultant and Managing Director for FTI, is attached as **Exhibit L** and incorporated herein. Mr. Livachof's declaration summarizes FTI's investigation.

a. On April 11, 2025, from 2:57 p.m. to 3:57 p.m., a USB device named "My Passport 25E2" with the serial number 57584B31453938394C37344B reported in Hexadecimal, WXK1E989L74K when decoded in ASCII, and with the name of ("My Passport") was connected to Defendant's laptop. FTI reviewed the File Listings Report during this time frame and found 155 files were accessed during the hour that the My Passport device was connected to the Defendant's laptop. Most of these files originate from the OneDrive cache, which indicates that OneDrive files and folders were accessed. The files primarily included those with the .r and .p extensions, which are temporary cache files created by OneDrive. Specifically, .r files represent resource files (used to store metadata and content fragments), while .p files are placeholder files that allow the system to display the structure of the OneDrive directory without having to download the full content. Their presence confirms that the user accessed OneDrive-synced content during the connection period.

16

b.     FTI also analyzed a file activity report for Defendant's account M365 activity provided by Royal Caribbean's Security team. Within the time frame that the hard drive was connected, the user interacted with the following files:

| Category | Description |
|----------|-------------|
| Download file | Download file: file https://rccl-my.sharepoint.com/personal/tbolen_celebrity_com/Documents/CEL Sup Stuff/Tyler Bolen CEL/Frontier Agent List.xlsx ("Frontier Agent List") |
| Access file | Access file: file https://rccl.sharepoint.com/sites/CelebrityGlobalCCLeaders/Shared Documents/Leadership Catch-Ups/April 8th/Q2 Leadership Catch up.pptx ("Q2 Leadership Catch Up") |
| Access file | Access file: file https://rccl my.sharepoint.com/personal/angelgomez_celebrity_com/Documents/CO Evolution 2.0.pptx ("CO Evolution 2.0") |

c.     During its examination, FTI also discovered the presence of the Microsoft Windows utility "cleanmgr.exe" (Disk Cleanup) ("Cleanmgr") on Defendant's laptop. This built-in program can be used to remove temporary files, cached internet data, old system files, and items in the recycle bin. Running this tool can delete or overwrite data that might otherwise remain available for forensic review.

d.     Cleanmgr was accessed on Defendant's company-issued laptop on April 23, 2025, at 8:11 a.m. and then again on May 15, 2025, at 1:06 p.m.

e.     FTI analyzed Gomez's laptop's internet browsing history on Google Chrome and Microsoft Edge browsers. The records show that the browsing history for these browsers was cleared on May 15, 2025, at 12:09 p.m. and 12:10 p.m., respectively.

f.    FTI also analyzed whether any cloud service URLs were accessed on Defendant's laptop and determined that Google Drive was accessed multiple times on May 15, 2025.

g.    On the same day, the following files were interacted with according to the M365 audit log for Gomez's account:

| Category | Description |
|---|---|
| Access file | Access file: file https://rccl-my.sharepoint.com/personal/jennifersuarez_rccl_com/Documents/Documents/cVP 2025/2025 Exceptions of Direct to Trade Transfer.xlsx ("VP 2025/2025 Exceptions of Direct to Trade Transfer") |
| Access file | Access file: file https://rccl.sharepoint.com/sites/CelebrityGlobalCCLeaders/Shared Documents/Weekly Stats/Weekly Stats 2.0 NEW 3.3.2025.docx ("Weekly Stats 2.0 NEW 3.3.2025") |
| Access file | Access file: file https://rccl-my.sharepoint.com/personal/gtrujillo_rccl_com/Documents/CO/OBR Monthly Trading Deck_GCC.pptx ("Monthly Trading Deck_GCC") |

h.    FTI reviewed the Recycle Bin to assess whether there had been any mass deletions of files or data; however, the Recycle Bin was empty.

91.    The three files accessed by Defendant on April 11, 2025 (about two weeks before his resignation) in Paragraph 91(a) above contain Plaintiffs' confidential information and trade secrets and would be extremely valuable in the hands of another cruise company.

92.    These are extremely valuable to Plaintiffs, and Plaintiffs take substantial measures to protect their confidential information and trade secrets, including through the use of confidentiality, non-compete, and non-solicit agreements; confidentiality policies; and physical and electronic security measures.

93.    With Plaintiffs' confidential and trade secret information, another cruise company would have the ability to unfairly reap the rewards of Plaintiffs' investment, analysis, and research.

94.    The following paragraphs describe the three files accessed by Defendant on April 11, 2025.

a.    **Frontier Agent List** – This is a confidential list of internal contact center agents Plaintiffs specifically selected to train on river cruises. These agents are Plaintiffs' top talent, and the list is only shared with leaders who had agents on the list. This list is based on collection and analysis of years of confidential internal sales data that is not known or readily ascertainable to others.

b.    **Q2 Leadership Catch Up** – This confidential PowerPoint presentation was shared visually during Celebrity's Global Virtual Townhall and is not widely distributed to employees. The presentation contains Plaintiffs' highly confidential information, including the Annual Operating Plan and information about strategic projects and priorities that Plaintiffs deem critical to deliver the Plan. It also highlights the River operational plan for the contact center teams and lays out quarterly performance updates by department.

c.    **CO Evolution 2.0** – This is a confidential PowerPoint presentation Gomez created for his direct supervisor. It describes the Consumer Outreach short-term priorities within the Annual Plan. It also specifically includes Plaintiffs' plan to optimize technology integration for sales and service delivery in the contact centers.

95.    Like the three files accessed on April 11, 2025 while an external device was plugged into Defendant's company-issued laptop, the files listed in Paragraph 91(g) above that Defendant accessed on May 15, 2025 before the laptop was turned in also contain confidential information and trade secrets extremely valuable to Plaintiffs. Plaintiffs take substantial measures to protect their confidential information and trade secrets, including through the use of

confidentiality, non-compete, and non-solicit agreements; confidentiality policies; and physical and electronic security measures.

96.     With Plaintiffs' confidential and trade secret information, another cruise company would have the ability to unfairly reap the rewards of Plaintiffs' investment, analysis, and research.

97.     The following paragraphs describe the three files accessed by Defendant on May 15, 2025.

a.      **VP 2025/2025 Exceptions of Direct to Trade Transfer** – This confidential Excel file includes information about the transfer of a direct booking to a travel agent. This is a strategic internal document.

b.      **Weekly Stats 2.0 NEW 3.3.2025** – This confidential document is a weekly file containing information on trading performance that Plaintiffs' leaders, including Gomez while he was still employed by Celebrity, use to provide weekly updates to their direct supervisor who, in turn, uses it to update Plaintiffs' top leadership.

c.      **Monthly Trading Deck_GCC** – This confidential PowerPoint presentation is Plaintiffs' monthly trading deck for Onboard Revenue and contains extremely sensitive confidential information about Plaintiffs' Ocean Onboard Revenue pricing and distribution across the fleet.

## CAUSES OF ACTION

## COUNT I: BREACH OF CONTRACT - 2018 NON-COMPETE AGREEMENT

98.     Plaintiffs incorporate by reference their averments in paragraphs 1 through 97 as if the same were set forth at length herein.

99.     On or about June 21, 2018, Defendant entered into the 2018 Non-Compete Agreement in connection with his promotion to AVP, Celebrity Guest Sales & Service.

20

100. The 2018 Non-Compete Agreement is an enforceable contract between Defendant and Royal Caribbean, supported by consideration, including without limitation, continued employment, a promotion, and additional compensation.

101. Celebrity is an intended third-party beneficiary of the 2018 Non-Compete Agreement, as a subsidiary and affiliate of Royal Caribbean.

102. Plaintiffs have satisfied any obligations under the 2018 Non-Compete Agreement.

103. The 2018 Non-Compete Agreement contains valid restrictive covenants that are reasonably necessary to protect Plaintiffs' legitimate business interests justifying the restrictions.

104. In the 2018 Non-Compete Agreement, Defendant agreed that, for a period of nine (9) months following the end of his employment, he would not serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity. Ex. A.

105. Defendant began his employment with the New Employer, another entity engaged in cruises with a minimum fleet size of 1,000 berths, within nine months after his employment with Celebrity ended.

106. Defendant breached the 2018 Non-Compete Agreement by becoming employed by an entity engaged in cruises with a minimum fleet size of 1,000 berths within nine months after his employment with Celebrity ended.

107. In the 2018 Non-Compete Agreement, Defendant also agreed that, for a period of nine (9) months following the end of his employment, he would not employ or seek to employ any of Plaintiffs' employees or solicit, induce, or influence any of Plaintiffs' employees to discontinue, reduce, or modify their relationship with Plaintiffs.

21

108.     Defendant breached the 2018 Non-Compete Agreement by contacting one or more of Plaintiffs' employees within nine months of leaving Celebrity for the purposes of seeking to employ them at the New Employer.

109.     Defendant breached the 2018 Non-Compete Agreement by misappropriating Plaintiffs' confidential information and trade secrets.

110.     As a direct and proximate result of Defendant's breach, Plaintiffs have suffered damages, in an amount to be proven at trial.

111.     Plaintiffs will continue to be directly and proximately damaged and irreparably harmed if Defendant is not enjoined from further violation of his contractual obligations to Plaintiffs.

112.     Plaintiffs do not have an adequate remedy at law and will not be fully compensated for Defendant's breaches without injunctive relief.

## COUNT II: BREACH OF CONTRACT - 2022 NON-COMPETE AGREEMENT

113.     Plaintiffs incorporate by reference their averments in paragraphs 1 through 97 as if the same were set forth at length herein.

114.     On or about December 15, 2022, Defendant entered into the 2022 Non-Compete Agreement in connection with his acceptance of the role of AVP, Consumer Outreach.

115.     The 2022 Non-Compete Agreement is an enforceable contract between Defendant and Royal Caribbean, supported by consideration, including without limitation, continued employment.

116.     Celebrity is an intended third-party beneficiary of the 2022 Non-Compete Agreement, as a subsidiary and affiliate of Royal Caribbean.

117.     Plaintiffs have satisfied any obligations under the 2022 Non-Compete Agreement.

22

118.    The 2022 Non-Compete Agreement contains valid restrictive covenants that are reasonably necessary to protect Plaintiffs' legitimate business interests justifying the restrictions.

119.    In the 2022 Non-Compete Agreement, Defendant agreed that, for a period of nine (9) months following the end of his employment, he would not, directly or indirectly, provide services of the kind he provided during his employment, to any other entity engaged in cruises, with a minimum fleet size of 500 berths (including the reasonable estimated berths of ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

120.    Defendant breached the 2022 Non-Compete Agreement by providing services of the kind he provided to Plaintiffs to an entity engaged in cruises with a minimum fleet size of 500 berths within nine months after his employment with Celebrity ended.

121.    In the 2022 Non-Compete Agreement, Defendant also agreed that, for a period of nine (9) months following the end of his employment, he would not employ or seek to employ any of Plaintiffs' employees or solicit, induce, or influence any of Plaintiffs' employees to discontinue, reduce, or modify their relationship with Plaintiffs.

122.    Defendant breached the 2022 Non-Compete Agreement by contacting one or more of Plaintiffs' employees within nine months of leaving Celebrity for the purposes of seeking to employ them at the New Employer.

123.    Defendant breached the 2022 Non-Compete Agreement by misappropriating Plaintiffs' confidential information and trade secrets.

124.    As a direct and proximate result of Defendant's breach, Plaintiffs have suffered damages, in an amount to be proven at trial.

125.     Plaintiffs will continue to be directly and proximately damaged and irreparably harmed if Defendant is not enjoined from further violation of his contractual obligations to Plaintiffs.

126.     Plaintiffs do not have an adequate remedy at law and will not be fully compensated for Defendant's breaches without injunctive relief.

### COUNT III: BREACH OF CONTRACT – THE RSU AGREEMENTS

127.     Plaintiffs incorporate by reference their averments in paragraphs 1 through 97 as if the same were set forth at length herein.

128.     The RSU Agreements are enforceable contracts between Defendant and Royal Caribbean, supported by consideration, including without limitation, grants of Royal Caribbean stock.

129.     Celebrity is an intended third-party beneficiary of the RSU Agreements because it is a subsidiary and affiliate of Royal Caribbean.

130.     Plaintiffs have satisfied any obligations under the RSU Agreements.

131.     The RSU Agreements contain valid restrictive covenants that are reasonably necessary to protect Plaintiffs' legitimate business interests justifying the restrictions.

132.     Defendant agreed to and accepted the 2016 RSU Agreement in exchange for 359 RSUs.

133.     Defendant agreed to and accepted the 2017 RSU Agreement in exchange for 263 RSUs.

134.     In the 2016-2017 RSU Agreements, Defendant agreed that for a six-month period following the end of his employment, he would not, directly or indirectly, serve as or be a consultant to or employee, officer, agent, director or owner of any entity engaged in cruises, with

24

a minimum fleet size of 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

135.     Defendant breached the 2016-2017 RSU Agreements by becoming employed by an entity engaged in cruises with a minimum fleet size of 1,000 berths within six months after his employment with Celebrity ended.

136.     In the 2016-2017 RSU Agreements, Defendant also agreed that for a six-month period following the end of his employment, he would not (a) employ or seek to employ anyone employed by Royal Caribbean or its Affiliates, as defined in the agreements, or who was employed within the last six months of Defendant's employment, or (b) solicit, induce, or influence anyone employed by Royal Caribbean or its Affiliates to discontinue, reduce, or modify their relationship with Royal Caribbean or its Affiliates.

137.     Defendant breached the 2016-2017 RSU Agreements by contacting one or more of Plaintiffs' employees within six months of leaving Celebrity for the purposes of seeking to employ them at the New Employer.

138.     Defendant agreed to and accepted the 2019 RSU Agreement in exchange for 423 RSUs.

139.     Defendant agreed to and accepted the 2020 RSU Agreement in exchange for 454 RSUs.

140.     Defendant agreed to and accepted the 2021 RSU Agreement in exchange for 589 RSUs.

141.     Defendant agreed to and accepted the 2022 RSU Agreement in exchange for 1054 RSUs.

142. Defendant agreed to and accepted the 2023 RSU Agreement in exchange for 1066 RSUs.

143. Defendant agreed to and accepted the 2024 RSU Agreement in exchange for 620 RSUs.

144. Defendant agreed to and accepted the 2025 RSU Agreement in exchange for 291 RSUs.

145. In the 2019-2025 RSU Agreements, Defendant agreed that during the nine-month Restricted Period, he would not, directly or indirectly, serve as or be a consultant to or employee, officer, agent, director or owner of any entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise-related businesses of any such entity.

146. Defendant breached the 2019-2025 RSU Agreements by becoming employed by an entity engaged in cruises with a minimum fleet size of 500 berths during the Restricted Period.

147. In the 2019-2025 RSU Agreements, Defendant also agreed that during the Restricted Period, he would not (a) employ or seek to employ anyone employed by Royal Caribbean or its Affiliates, as defined in the agreements, or who was employed within the last six months of Defendant's employment, or (b) solicit, induce, or influence anyone employed by Royal Caribbean or its Affiliates to discontinue, reduce, or modify their relationship with Royal Caribbean or its Affiliates.

148. Defendant breached the 2019-2025 RSU Agreements by contacting one or more of Plaintiffs' employees within nine months after leaving Celebrity for the purposes of seeking to employ them at the New Employer.

149.     As a direct and proximate result of Defendant's breach, Plaintiffs have suffered damages, in an amount to be proven at trial.

150.     Plaintiffs will continue to be directly and proximately damaged and irreparably harmed if Defendant is not enjoined from further violations of his contractual obligations to Plaintiffs.

151.     Plaintiffs do not have an adequate remedy at law and will not be fully compensated for Defendant's breaches without injunctive relief.

### COUNT IV: MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS – VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT

152.     Plaintiffs incorporate by reference their averments in paragraphs 1 through 97 as if the same were set forth at length herein.

153.     While employed by Plaintiffs, Defendant obtained access to Plaintiffs' trade secret information.

154.     Plaintiffs have taken reasonable steps to maintain the confidential nature of this information, including, without limitation, through the use of confidentiality, non-compete, and non-solicit agreements; confidentiality policies; and physical and electronic security measures.

155.     Plaintiffs' confidential information and trade secrets are not available to the public and would be valuable to a competitor.

156.     Further, Plaintiffs' trade secrets derive independent economic value from not being readily ascertainable by others in the industry.

157.     Defendant misappropriated Plaintiffs' trade secrets through the wrongful conduct identified above, including by wrongfully acquiring and retaining that information and, upon information and belief, using it for his own or others' benefit.

158.     Defendant's conduct also constitutes a threat to continue misappropriating Plaintiffs' trade secrets.

159.     Upon information and belief, Defendant has and will continue to misappropriate, disclose, and use for his benefit and to Plaintiffs' detriment, Plaintiffs' trade secret information unless he is enjoined from doing so.

160.     Because Plaintiffs' remedy at law is inadequate and they will suffer irreparable harm, Plaintiffs seek—in addition to damages—a temporary injunction and a permanent injunction to protect their confidential and trade secret information and legitimate business interests.  Plaintiffs will continue to suffer irreparable harm absent injunctive relief.

161.     Defendant's misappropriation of Plaintiffs' trade secret information has caused and will continue to cause Plaintiffs substantial injury, including but not limited to actual damages, lost profits, harm to their reputation, and the diminution in value of their trade secrets. Defendant has also been unjustly enriched by his misappropriation of Plaintiffs' trade secrets.

162.     Defendant misappropriated Plaintiffs' trade secrets willfully and maliciously.  Accordingly, Plaintiffs are entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of exemplary damages and attorney's fees.

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

(a)     Temporarily and permanently enjoining Defendant, for a period of nine (9) months from the date of the order, from directly or indirectly serving as or being a consultant to or employee, officer, agent, director, or owner of any entity engaged in (or preparing to engage in) cruises with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity, including the New Employer;

(b)     Temporarily and permanently enjoining Defendant, for a period of nine (9) months from the date of the order, from directly or indirectly employing or seeking to employ any person who is then employed or retained by Plaintiffs (or who was employed or retained at any time within the six (6) month period prior to the last day of Defendant's employment with Celebrity) and from soliciting, inducing, or influencing any of Plaintiffs' employees to discontinue or reduce or modify the extent of their relationship with Plaintiffs;

(c)     Temporarily and permanently enjoining Defendant from using or disclosing or threatening to use or disclose Plaintiffs' confidential and trade secret information and requiring Defendant to divest himself of any access to Plaintiffs' confidential and trade secret information;

(d)     Awarding Plaintiffs damages for Defendant's wrongful conduct, according to proof at trial;

(e)     Awarding disgorgement of any profits, commissions or monies earned by Defendant as a result of his unlawful conduct;

(f)     Awarding compensatory and consequential damages;

(g)     Awarding prejudgment interest;

(h)     Awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses, as well as pre-and post-judgment interest; and

(i)     Granting such other and further relief as the Court may deem just, equitable, and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  October 16, 2025

LITTLER MENDELSON P.C.


/s/ Tyler A. Sims

Tyler A. Sims, Esq.
Florida Bar No. 1048908
tsims@littler.com
West A. Holden, Esq.
Florida Bar No. 0113569
wholden@littler.com
111 North Orange Avenue, Suite 1750
Orlando, FL 32801.2366
Tel: 407.393.2900
Fax: 407.393.2929

Paul J. Kennedy, Esq. (*pro hac vice* to be
filed)
Virginia Bar No. 29802
pkennedy@littler.com
815 Connecticut Avenue, N.W.
Suite 400
Washington, DC 20006
Tel: 202.414.6855

*Attorneys for Plaintiffs*

## VERIFICATION

I, <u>Katina Athanasiou-Soy</u>, verify that I am the

<u>SVP, Sales and Services</u> of <u>Celebrity Cruises</u>, one of the Plaintiffs

in this proceeding, and that the facts set forth in the foregoing Verified Complaint are true and

correct to the best of my knowledge, information, and belief, except (1) where expressly stated to

be based upon information and belief, in which case, I believe them to be true, and (2) legal

conclusions, for which I expressly defer to Plaintiffs' counsel.

I understand that false statements herein are subject to the penalties of 28 U.S.C. § 1746

relating to sworn declarations to authorities.

31

# EXHIBIT A
# to the Verified Complaint

ROYAL CARIBBEAN CRUISES LTD.

June 14, 2018

Mr. Angel Gomez     (PS# 113005)

Dear Angel,

On behalf of Royal Caribbean Cruises Ltd., we are pleased to congratulate you on your new assignment to the position of AVP, CEL Guest Sales & Service effective June 18, 2018 under the direction of Dondra Ritzenthaler. Your new salary is $153,000.00 annually less all taxes, social security payments and other charges required to be deducted by RCL. Your Management Incentive Bonus target is 25%. In addition, you will be eligible to receive an equity award upon approval by the Board of Directors, for the next general equity grant typically in February.

As a reminder, this offer is contingent upon your agreement to our standard non-compete terms which are described below. By signing this letter in the space provided you are accepting the new terms along with these non-compete conditions:

For the nine (9) month period immediately following the voluntary or involuntary termination of your employment for any reason (the "Non-competition Period"), you shall not, for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity. You further agree that during the Non-competition Period, you shall not:  (i) employ or seek to employ any person who is then employed or retained by the Company or its affiliates (or who was so employed or retained at any time within the nine (9) month period prior to the last day of your employment with Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its subsidiaries.

Please take a few moments to review your new job description by logging into your secured PeopleSoft account through Homeport. Once you have successfully logged into PeopleSoft, please click on Employee Self Service > Personal Information > Employee Information > Job Description.

Should you have any questions please feel free to contact me at (305) 539-3936.

Congratulations on your new position!

Sincerely,

Janelle Del Llano
Sr. Human Resources Business Partner

Please acknowledge acceptance of this offer by signing and returning one of the originals to us.

Accepted: _____
            Angel Gomez

Date: _____6/21/18_____

*RCL is a Drug and Smoke free work environment.

NOT AN OFFICIAL COPY - PUBLIC ACCESS

HR

# EXHIBIT B
## to the Verified Complaint

DocuSign Envelope ID: 4A190D6E-B803-4B5D-AA3C-8B8128002E3D

Royal Caribbean Group

January 5, 2023

Angel Gomez
217 NW 80th Terrace
Margate, FL 33063

Dear Angel,

On behalf of Royal Caribbean Group, we are pleased to provide you details of your new position as AVP, Consumer Outreach, effective December 19, 2022. The details are as follows:

- Your annual base salary will remain at ***$227,900*** less all taxes, social security payments and other charges required to be deducted by the Corporation.

- Your annual bonus target will remain at **50%** and be administered in accordance with the Sales Incentive Plan.

- In addition, your annual equity grant value will remain at **$75,000** and will continue to be delivered 100% in RSUs vesting in equal increments over a four-year period, on the anniversary date of the grant. This award will always be subject to the Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan terms and conditions as amended, and if there is any conflict between the terms in this Offer Letter and the 2008 Equity Incentive Plan terms, the Plan terms shall control.

This offer is contingent upon your agreement to our standard non-compete terms which are attached to this offer.  By signing it in the spaces provided you are accepting the new terms along with these non-compete conditions:

Should you have any questions or need any assistance, please contact me.

Congratulations!

Sincerely,

Dondra Ritzenthaler
SVP, Sales Celebrity



Acknowledge Receipt:

_____          1/5/2023
**Angel Gomez**                            Date

cc: Employee File

DocuSign Envelope ID: 4A190D6E-B893-4B5D-A43C-8B8128002F2D



Royal Caribbean Group

## EMPLOYEE NONDISCLOSURE AND NONCOMPETITION AGREEMENT

This Employee Nondisclosure and Noncompetition Agreement is entered into by and between Royal Caribbean Group ("**RCL**" or the "**Company**") and Angel Gomez, ("**Employee**").

In consideration of Employee's at-will employment with RCL and compensation to be paid to Employee now and in the future, Employee agree as follows:

1. **Nondisclosure**. Employee recognizes and acknowledges that he/she will have access to certain confidential information of the Company, its subsidiaries and affiliates, and of corporations with whom the Company does business, and that such information constitutes valuable, special, and unique property of the Company, its subsidiaries, affiliates, and such other corporations.

   A. During the term of this Agreement and subsequent to the termination of this Agreement for any reason, Employee agrees not to disclose or use any confidential information except in the course of Employee's employment by, and for the benefit of the Company or its subsidiaries or affiliates. "**Confidential Information**" includes without limitation, information, observations, procedures, practices, and data, whether written or oral, regarding any of the business, operations or affairs of the Company, its subsidiaries and its affiliates, including, by way of example, strategies, planning, research, developments, product designs or specifications, manufacturing processes, "know-how," prices, suppliers, customers, costs, workflows, software, developments, inventions, formulas, technology, designs, drawings, engineering plans, hardware configuration information, and any knowledge or information with respect to confidential or trade secrets of the Company, its subsidiaries and affiliates, or any information that a reasonable person would conclude is intended to remain confidential due to its nature or the circumstances under which it was learned. Confidential Information does not include information that is publicly available unless such information became publicly available as a result of a breach of this Agreement. Employee acknowledges and agrees that all notes, records, emails, reports, sketches, plans, unpublished memoranda, or other documents belonging to Company, its subsidiaries and affiliates, but held by Employee, concerning any information relating to the business or operations of Company, its subsidiaries and affiliates, whether confidential or not, are the property of Company, its subsidiaries or affiliates and will be promptly delivered to Company upon Employee's leaving the employ of Company or upon the request of Company at any time.

   B. Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**"). Notwithstanding any other provision of this Agreement, Employee cannot be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret as defined thereunder, that (a) is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal. If Employee files a lawsuit for retaliation by Employer for reporting a suspected violation of law, Employee may disclose the trade secret to his or her attorney and use the trade secret information in the court proceeding, if

DocuSign Envelope ID: 4A190DCF-B882-4B5D-AA3C-8B8128002F2D



Royal Caribbean Group

Employee files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

C. <u>Other Permitted Disclosures</u>. Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Prior to any compelled disclosure, Employee will promptly provide written notice of any such order to the Company. Employee understands that nothing in this Agreement prohibits or restricts him/her from initiating communications directly with, responding to an inquiry from, or providing testimony before the Securities and Exchange Commission, the Financial Industry Regulatory Authority, any other self-regulatory organization, or any other federal or state regulatory authority ("**Government Agencies**") regarding this Agreement or its underlying facts or circumstances or a possible securities law violation without prior notice to the Company.

2. **Intellectual Property**.

A. <u>Ownership of Inventions</u>. The Company shall own all right, title, and interest in and to all documentation, manuals, materials, creative works, methods, techniques, compositions, ideas, recipes, creations, improvements, inventions, computer programs and data, system documentation, special hardware, product hardware, related software development, correspondence, letters, notes, notebooks, reports, flowcharts, proposals, know-how and other information, in any medium whatsoever including, without limitation, any Confidential Information, trade secrets, and all software, software code, processes, copyrights, patents, technologies, and inventions (collectively, "**Inventions**"), including, without limitation, new contributions, improvements, ideas and discoveries, whether patentable or not, conceived, developed, invented, or made by Employee during his/her employment with RCL (provided that such Inventions grew out of Employee's work with RCL, are related in any manner to RCL's business, or are conceived or made on RCL's time or with the use of RCL's facilities or materials). Employee acknowledges and agrees that any work product created, produced, or conceived in connection with Employee's association with RCL shall be deemed work for hire and shall be deemed owned exclusively by the Company.

B. <u>Employee Obligations</u>. Employee shall (i) promptly disclose such Inventions to the Company; (ii) assign to the Company, without additional compensation, all patent and other rights to such Inventions for the United States and foreign countries; (iii) execute and deliver all documents required by the Company to document or perfect the Company's proprietary rights in and to the Company's work product; and (iv) give testimony in support of Employee's inventorship. Employee will deliver all Confidential Information, trade secrets and/or Inventions to the Company upon the Company's request, and, in any event, immediately upon termination of his/her employment with the Company.

C. <u>Inventions Retained and Licensed</u>. Employee has attached to this Agreement, as **Exhibit 1**, a list describing all inventions made by Employee prior to his/her employment with the Company, that relate to the Company's proposed business, products, or research and development, and that are not assigned to the Company under this Agreement (collectively,

Royal Caribbean Group

"**Prior Inventions**"). If no list is attached or if no Prior Inventions are listed on Exhibit 1, Employee represents that there are no Prior Inventions. Furthermore, Employee represents and warrants that the inclusion of any Prior Inventions from Exhibit 1 of this Agreement will not materially affect his/her ability to perform all obligations under this Agreement. If in the course of Employee's employment with the Company, Employee incorporates into a Company product, process, or machine an Invention owned by him/her or in which Employee has an interest, the Company is granted a nonexclusive, royalty-free, irrevocable, perpetual, transferrable, worldwide license (with right to sublicense) to make, have made, modify, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit the Invention without restriction of any kind.

D. <u>Employee's Restrictions</u>. Employee acknowledges that the Company's Confidential Information, trade secrets, and/or Inventions constitute valuable intellectual property of the Company. Employee will not infringe or violate any proprietary right of the Company related to the Confidential Information, trade secrets, and/or Inventions, and shall not own, apply for or otherwise attempt to obtain, on behalf of Employee or others, any proprietary right in any Confidential Information, trade secrets, and/or Inventions, which the Company owns or has a right to own, in which the Company has an interest and/or to which the Company has title.

3. **Noncompetition**. Employee acknowledges that the services he/she will render to the Company are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of Employee's services and the Confidential Information to be obtained by or disclosed to Employee as herein above set forth, Employee covenants and agrees that:

A. during Employee's employment with the Company and for the nine (9) months immediately following the termination of Employee's employment for any reason (the "**Restricted Period**"), Employee will not provide services of the kind Employee provides to the Company, directly or indirectly, to any other entity engaged in cruises, with a minimum fleet size of 500 berths (including the reasonable estimated berths of ships under construction or publicly announced to be built), or cruise related businesses of any such entity; or

B. during the Restricted Period, Employee will not: (i) employ or seek to employ any person who is then employed or retained by Company or its affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Employee's employment with Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity that has a business relationship with Company or its affiliates at any time during the Restricted Period, to discontinue or reduce or modify the extent of such relationship with Company or any of its subsidiaries.

4. **Acknowledgment**. The Employee acknowledges and agrees that: (i) the Employee's services to be rendered to the Company are of a special and unique character; (ii) that the Employee will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; and (iii) that the restrictive

DocuSign Envelope ID: 4A190D6E-B893-4B5D-AA3C-8B8128002E2D

**Royal Caribbean Group**

covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the Company.

The Employee further acknowledges that: (i) the amount of the Employee's compensation reflects, in part, the Employee's obligations and the Company's rights under this Agreement; (ii) that the Employee has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) that the Employee will not be subject to undue hardship by reason of the Employee's full compliance with the terms and conditions of this Agreement or the Company's enforcement thereof.

Nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the "at-will" status of the employment relationship between the Company and the Employee.

5. **Breach of Restrictions**. In the event of a breach or threatened breach by the Employee of any restrictive covenant set forth in this Agreement, Employee agrees that such a breach or threatened breach would cause irreparable injury to the Company, and that, if the Company brings legal proceedings against the Employee to enforce any restrictive covenant, the Company will be entitled to seek all available civil remedies, at law or in equity, including, without limitation, an injunction without posting a bond, damages, attorneys' fees, and costs.

6. **Construction, Severability**. If, in any judicial proceeding, a court refuses to enforce any of these separate covenants (or any part of a covenant), then the unenforceable covenant (or part) will be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions) to be enforced. If the provisions of this Agreement are deemed to exceed the time, geographic, or scope limitations permitted by law, then the provisions will be reformed to the maximum time, geographic, or scope limitations permitted by law. Employee further agrees that any such court is expressly authorized to modify any unenforceable provision of this Agreement instead of severing the unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making any other modifications it deems warranted to carry out the intent and agreement of the Parties as embodied in this Agreement to the maximum extent permitted by law.

7. **Entire Agreement**. This Agreement constitutes the entire agreement and understanding between the Company and me relating to the subject matter of this Agreement. No modification of this Agreement or amendment to it, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged.

8. **Beneficiaries, Successors, and Assigns**. It is understood that any affiliated or related entities of RCL are intended third-party beneficiaries of the provisions of this Agreement. RCL may assign this Agreement to a third party without the Employee's consent. This Agreement is not assignable by the Employee.

9. **Headings**. Headings are used in this Agreement for reference only and will not be considered when interpreting this Agreement.

 **Royal Caribbean Group**

10. **Waiver**. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

11. **Survival**. The rights and obligations of the parties will survive termination of Employee's employment with the Company.

12. **Governing Law and Consent to Personal Jurisdiction**. The laws of the State of Florida will govern this Agreement, without regard to the choice of law rules of Florida law. The parties expressly consent to personal jurisdiction in the state and federal courts located in Miami-Dade County, Florida, with regard to any lawsuit arising from or relating to this Agreement.

13. **Counterparts**. This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

   **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on 12/15, 2022.


                                                Angel Gomez

                                                *Angel Gomez*
                                                A84C13E42BC44D4...

                                                **AVP, Consumer Outreach**

# EXHIBIT C
# to the Verified Complaint

---

**ROYAL CARIBBEAN CRUISES LTD.**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

---

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 09-FEB-2016

**NUMBER OF RESTRICTED STOCK UNITS GRANTED** 359

 This Restricted Stock Unit Agreement (the "Agreement") is dated as of 09-FEB-2016, and is entered into between Royal Caribbean Cruises Ltd. (the "Company") and ANGEL GOMEZ, an employee of the Company and/or one of its Affiliates (the "Grantee").

 This Agreement is pursuant to the provisions of the Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>      **Vesting Dates**            **Shares**<br>       09-FEB-17            90<br>       09-FEB-18            90<br>       09-FEB-19            90<br>       09-FEB-20            89 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement.* This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date.* Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares.* Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 09-FEB-2016

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 359

| | |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes*.  U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(b) *U.S. Federal Income Taxes*.  U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(c) *Tax Consequences for Non-U.S. Residents.*  Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares.<br>(d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law.  In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of Schedule A attached hereto (the "Restrictive Covenants").  For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a)  This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time.<br>(b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent.<br>(c)  This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required.<br>(d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida.  Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement.  The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Grant Date specified above.<br><br>Royal Caribbean Cruises Ltd.            Grantee:<br><br><br>By: _____            _____<br>Jason T. Liberty                                     ANGEL GOMEZ<br>Chief Financial Officer |

NOT AN OFFICIAL COPY PLEASE CONSULT NE NOT OFFICIAL COPY PUBLIC ACCESS

## SCHEDULE A

## RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the six-month period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not: (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company. Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A. It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above. In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law. In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

## SCHEDULE B

## ADDITIONAL TERMS AND CONDITIONS

This Schedule B includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this Schedule A without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued

hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

## Exchange Control Restrictions

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBIT D
## to the Verified Complaint

NOT AN OFFICIAL COPY / PUBLIC ACCESS AND NOT AN OFFICIAL COPY / PUBLIC ACCESS

**ROYAL CARIBBEAN CRUISES LTD.**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** February 7, 2017

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 263

This Restricted Stock Unit Agreement (the "Agreement") is dated as of February 7, 2017, and is entered into between Royal Caribbean Cruises Ltd. (the "Company") and ANGEL GOMEZ, an employee of the Company and/or one of its Affiliates (the "Grantee").

This Agreement is pursuant to the provisions of the Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture: |

| Vesting Dates | Shares |
|---|---|
| February 07, 2018 | 66 |
| February 07, 2019 | 66 |
| February 07, 2020 | 66 |
| February 07, 2021 | 65 |

| | |
|---|---|
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement.* This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date. <br><br> (b) *Termination Prior to Vesting Date.* Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest. <br><br> (c) *Issuance of Shares.* Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

NOT AN OFFICIAL COPY PRESS ONLY NOT FOR PUBLIC ACCESS

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** February 7, 2017

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 263

| | |
|---|---|
| Taxes | (a) *FICA/Medicare Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(b) *U.S. Federal Income Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(c) *Tax Consequences for Non-U.S. Residents*. Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares.<br>(d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| Restrictive Covenants | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of <u>Schedule A</u> attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| Miscellaneous | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time.<br>(b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent.<br>(c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required.<br>(d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| Additional Terms for Participants in China | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| Signatures | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Date of Grant specified above.<br><br>Royal Caribbean Cruises Ltd.                      Grantee:<br><br>By: _____<br>      Jason T. Liberty                     _____<br>                                       ANGEL GOMEZ |

EVP, Chief Financial Officer

## SCHEDULE A

## RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the six-month period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 1,000 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not: (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company. Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A. It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above. In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law. In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

# SCHEDULE B

## ADDITIONAL TERMS AND CONDITIONS

This <u>Schedule B</u> includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this <u>Schedule A</u> without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

Exchange Control Restrictions

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

NOT AN OFFICIAL COPY / PUBLIC ACCESS - NOT FOR PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBIT E
# to the Verified Complaint

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

9/4/25, ... Case 1:25-cv-25648-KMW Document 25-1 Entered on FLSD Docket 12/15/2025 Page 55 of 118...

100

NOT AN OFFICIAL COPY / PUBLIC ACCESS · NOT AN OFFICIAL COPY / PUBLIC ACCESS

**ROYAL CARIBBEAN CRUISES LTD.**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 13-FEB-2019

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 423

This Restricted Stock Unit Agreement (the "Agreement") is dated as of 13-FEB-2019, and is entered into between Royal Caribbean Cruises Ltd. (the "Company") and ANGEL GOMEZ, an employee of the Company and/or one of its Affiliates (the "Grantee").

This Agreement is pursuant to the provisions of the Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture: <table><tr><td>**Vesting Dates**</td><td>**Shares**</td></tr><tr><td>13-FEB-2020</td><td>106</td></tr><tr><td>13-FEB-2021</td><td>106</td></tr><tr><td>13-FEB-2022</td><td>106</td></tr><tr><td>13-FEB-2023</td><td>105</td></tr></table> |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement*. This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date*. Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares*. Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 13-FEB-2019

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 423

| | |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date. |
| | (b) *U.S. Federal Income Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date. |
| | (c) *Tax Consequences for Non-U.S. Residents*. Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares. |
| | (d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of <u>Schedule A</u> attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time. |
| | (b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent. |
| | (c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required. |
| | (d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Grant Date specified above. |
| | Royal Caribbean Cruises Ltd.                    Grantee: |
| | By: _____          _____ |

NOT AN OFFICIAL COPY, NOT PRESS, CERTIFIED COPY, NOT COPY PUBLIC ACCESS

Jason T. Liberty        ANGEL GOMEZ
EVP, Chief Financial Officer

## SCHEDULE A
## RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the nine-month period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not: (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company. Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A. It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above. In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law. In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

## SCHEDULE B
## ADDITIONAL TERMS AND CONDITIONS

This Schedule B includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this Schedule A without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial

9/4/25, ... Case 1:25-cv-25648-KMW Document 25-1 Entered on FLSD Docket 12/15/2025 Page 69 of ...4118...

100

Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

## Exchange Control Restrictions

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

# EXHIBIT F
## to the Verified Complaint

NOT AN OFFICIAL COPY PUBLIC ACCESS NOT AN OFFICIAL COPY PUBLIC ACCESS

**ROYAL CARIBBEAN CRUISES LTD.**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 20-FEB-2020

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 454

This Restricted Stock Unit Agreement (the "Agreement") is dated as of 20-FEB-2020, and is entered into between Royal Caribbean Cruises Ltd. (the "Company") and ANGEL GOMEZ, an employee of the Company and/or one of its Affiliates (the "Grantee").

This Agreement is pursuant to the provisions of the Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>    **Vesting Dates**           **Shares**<br>    20-FEB-2021           114<br>    20-FEB-2022           114<br>    20-FEB-2023           113<br>    20-FEB-2024           113 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement*. This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date*. Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares*. Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 20-FEB-2020

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 454

| | |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br><br>(b) *U.S. Federal Income Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br><br>(c) *Tax Consequences for Non-U.S. Residents*. Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares.<br><br>(d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of <u>Schedule A</u> attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time.<br><br>(b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent.<br><br>(c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required.<br><br>(d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Grant Date specified above.<br><br>Royal Caribbean Cruises Ltd. Grantee:<br><br>By: _____ _____<br>Jason T. Liberty ANGEL GOMEZ<br>EVP, Chief Financial Officer |

NOT AN OFFICIAL COPY • PRESS FINANCIAL COPY • PUBLIC ACCESS

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## SCHEDULE A

## RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the nine-month period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not: (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company. Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A. It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above. In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law. In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

## SCHEDULE B

## ADDITIONAL TERMS AND CONDITIONS

This Schedule B includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this Schedule A without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued

hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

## Exchange Control Restrictions

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**EXHIBIT G**
**to the Verified Complaint**

# ROYAL CARIBBEAN CRUISES LTD.
## 2008 EQUITY INCENTIVE PLAN

**RESTRICTED STOCK UNIT AGREEMENT**

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 24-MAR-2021

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 589

This Restricted Stock Unit Agreement (the "Agreement") is dated as of 24-MAR-2021, and is entered into between Royal Caribbean Cruises Ltd. (the "Company") and ANGEL GOMEZ, an employee of the Company and/or one of its Affiliates (the "Grantee").

This Agreement is pursuant to the provisions of the Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>    **Vesting Dates**           **Shares**<br>    24-MAR-2022             148<br>    24-MAR-2023             147<br>    24-MAR-2024             147<br>    24-MAR-2025             147 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement.* This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date.* Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares.* Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

NOT AN OFFICIAL COPY OF PUBLIC RECORD ... FOR PERSONAL USE ONLY ... - PUBLIC ACCESS

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 24-MAR-2021

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 589

| | |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(b) *U.S. Federal Income Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(c) *Tax Consequences for Non-U.S. Residents.* Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares.<br>(d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of Schedule A attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time.<br>(b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent.<br>(c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required.<br>(d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Grant Date specified above.<br><br>Royal Caribbean Cruises Ltd.          Grantee:<br><br><br>by: _____<br>_____          ANGEL GOMEZ<br>Jason T. Liberty<br>EVP, Chief Financial Officer |

9/4/25, 9:... Case 1:25-cv-25648-KMW Document 25-1 Entered on FLSD Docket 12/15/2025 Page 80 of ...4283...

100

## SCHEDULE A

## RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the nine-month period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not:  (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company.  Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A.  It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above. In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law.  In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

## SCHEDULE B

## ADDITIONAL TERMS AND CONDITIONS

This Schedule B includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this Schedule A without definition shall have the meaning ascribed to such term in the Agreement.

9/4/25, ... Case 1:25-cv-25648-KMW Document 25-1 Entered on FLSD Docket 12/15/2025 Page 81 of 4283...

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

**Exchange Control Restrictions**

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

**EXHIBIT H
to the Verified Complaint**

**ROYAL CARIBBEAN GROUP**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

**GRANTEE:** ANGEL        GOMEZ

**DATE OF GRANT:** 07-FEB-2022

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 1045

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Royal Caribbean Group (the "Company") and the employee of the Company and/or one of its Affiliates (the "Grantee") named above.

This Agreement is pursuant to the provisions of the Royal Caribbean Group 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>     **Vesting Dates**         **Shares**<br>     07-FEB-2023        262<br>     07-FEB-2024        261<br>     07-FEB-2025        261<br>     07-FEB-2026        261 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement.* This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date.* Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares.* Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

Page **1** of 4

**GRANTEE:** ANGEL              GOMEZ

**DATE OF GRANT:** 07-FEB-2022

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 1045

| | |
|---|---|
| Taxes | (a) *FICA/Medicare Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(b) *U.S. Federal Income Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(c) *Tax Consequences for Non-U.S. Residents.* Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares.<br>(d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| Restrictive Covenants | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of <u>Schedule A</u> attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| Miscellaneous | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time.<br>(b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent.<br>(c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required.<br>(d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| Additional Terms for Participants in China | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| Signatures | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Date of Grant specified above.<br><br>Royal Caribbean Group                    Grantee:<br><br>By: *Naftali Holtz* _____<br>Naftali Holtz                                 ANGEL              GOMEZ<br>Chief Financial Officer |

## SCHEDULE A

### RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the nine-month period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not:  (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company.  Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A.  It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above.  In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law.  In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

## SCHEDULE B

## ADDITIONAL TERMS AND CONDITIONS

This <u>Schedule B</u> includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this <u>Schedule A</u> without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

**Exchange Control Restrictions**

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

# EXHIBIT I
## to the Verified Complaint

---

**ROYAL CARIBBEAN GROUP**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

---

**GRANTEE:** ANGEL                    GOMEZ

**DATE OF GRANT:** 09-FEB-2023

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 1006

       This Restricted Stock Unit Agreement (the "Agreement") is entered into between Royal Caribbean Group (the "Company") and the employee of the Company and/or one of its Affiliates (the "Grantee") named above.

       This Agreement is pursuant to the provisions of the Royal Caribbean Group 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>    **Vesting Dates**       **Shares**<br>    09-FEB-2024         335<br>    09-FEB-2025         335<br>    09-FEB-2026         336 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement*. This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date*. Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares*. Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

**GRANTEE:** ANGEL                    GOMEZ

**DATE OF GRANT:** 09-FEB-2023

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 1006

| | |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(b) *U.S. Federal Income Taxes*. U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date.<br>(c) *Tax Consequences for Non-U.S. Residents*. Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares.<br>(d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of Schedule A attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time.<br>(b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent.<br>(c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required.<br>(d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Date of Grant specified above.<br><br>Royal Caribbean Group                    Grantee:<br><br><br>By: _Naftali Holtz_ _____<br>Naftali Holtz                    ANGEL                    GOMEZ<br>Chief Financial Officer |

## SCHEDULE A

## RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges for the nine-month (9) period immediately following the termination of Grantee's employment under any circumstances (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

Grantee further agrees that during the Non-competition Period, he or she shall not:  (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company.  Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A.  It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above.  In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law.  In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

## SCHEDULE B

## ADDITIONAL TERMS AND CONDITIONS

This <u>Schedule B</u> includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this <u>Schedule A</u> without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

**Exchange Control Restrictions**

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

# EXHIBIT J
## to the Verified Complaint

## ROYAL CARIBBEAN GROUP
## 2008 EQUITY INCENTIVE PLAN
## RESTRICTED STOCK UNIT AGREEMENT

**GRANTEE:** ANGEL           GOMEZ

**DATE OF GRANT:** 08-FEB-2024

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 620

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Royal Caribbean Group (the "Company") and the employee of the Company and/or one of its Affiliates (the "Grantee") named above.

This Agreement is pursuant to the provisions of the Royal Caribbean Group 2008 Equity Incentive Plan, as amended (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>    **Vesting Dates**          **Shares**<br>    08-FEB-2025            207<br>    08-FEB-2026            207<br>    08-FEB-2027            206 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Settlement of Units** | (a) *Time of Settlement.* This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date.* Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares.* Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 08-FEB-2024

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 620

| | |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes*.  U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date. <br> (b) *U.S. Federal Income Taxes*.  U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date. <br> (c) *Tax Consequences for Non-U.S. Residents*.  Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares. <br> (d) **Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law.  In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of <u>Schedule A</u> attached hereto (the "Restrictive Covenants").  For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time. <br> (b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent. <br> (c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required. <br> (d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida.  Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement.  The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Date of Grant specified above. <br><br> Royal Caribbean Group                                                    Grantee: <br><br><br> By: _____                   _____ <br> Naftali Holtz                                                                    ANGEL            GOMEZ <br> Chief Financial Officer |

## SCHEDULE A - RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities which are traded on a regular basis on recognized securities exchanges), for the period set forth in Table B-1 below corresponding with Grantee's position level as of the Grant Date (the "Non-competition Period"), for any reason, serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in (or preparing to engage in) cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity. The Restricted Period begins running immediately following the termination of Grantee's employment under any circumstance and shall be tolled during any period that Grantee is in breach of any of the restrictive covenants in this Schedule A so that the Company is provided with the full benefit of the full Restricted Period.

Grantee further agrees that during the Non-competition Period, he or she shall not:  (i) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Non-competition Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

During Grantee's employment and following the termination of Grantee's employment for any reason, Grantee shall not, at any time, directly or indirectly, (i) make derogatory or disparaging statements about the Company or its Affiliates, or their officers, directors, board members, employees, agents, or assigns, (ii) publish, provide, or approve any unauthorized statements about or relating to the Company or its Affiliates or their officers, directors, board members, employees, agents, or assigns, or (iii) take any actions that might reasonably be considered to be detrimental to the Company or its Affiliates or their officers, directors, board members, employees, agents, or assigns.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company.  Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A.  It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above.  In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law.  In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

| TABLE A-1 -NON-COMPETITION PERIODS | |
|---|---|
| **Grantee's Position Level** | **Applicable Non-competition Period** |
| Director / Sr. Director | 6 months |
| Associate Vice President | 9 months |
| Vice President and above | 12 months |

## SCHEDULE B - ADDITIONAL TERMS AND CONDITIONS

This <u>Schedule B</u> includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this <u>Schedule B</u> without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

**Exchange Control Restrictions**

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

# EXHIBIT K
## to the Verified Complaint

NOT AN OFFICIAL COPY / PUBLIC ACCESS / NOT AN OFFICIAL / PUBLIC ACCESS

**ROYAL CARIBBEAN GROUP**
**2008 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AGREEMENT**

**GRANTEE:** ANGEL GOMEZ

**DATE OF GRANT:** 12-FEB-2025

**NUMBER OF RESTRICTED STOCK UNITS GRANTED:** 291

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Royal Caribbean Group (the "Company") and the employee of the Company and/or one of its Affiliates (the "Grantee") named above.

This Agreement is pursuant to the provisions of the Royal Caribbean Group 2008 Equity Incentive Plan, as amended and restated (the "Plan"), with respect to the number of Restricted Stock Units ("Units") specified above. Capitalized terms used and not defined in this Agreement shall have the meanings given to them in the Plan. This Agreement consists of this document and the Plan. The obligation of the Company pursuant to this Agreement is that of an unfunded and unsecured pledge to transfer to Grantee, as of the applicable Vesting Date, legal title and ownership of shares of Stock of the Company (the "Shares").

Grantee and the Company agree as follows:

| | |
|---|---|
| **Application of Plan; Administration** | This Agreement and Grantee's rights under this Agreement are subject to all the terms and conditions of the Plan, as it may be amended from time to time, as well as to such rules and regulations as the Committee may adopt. It is expressly understood that the Committee that administers the Plan is authorized to administer, construe and make all determinations necessary or appropriate to the administration of the Plan and this Agreement, all of which shall be binding upon Grantee to the extent permitted by the Plan. Any inconsistency between this Agreement and the Plan shall be resolved in favor of the Plan. |
| **Vesting** | The Vesting Dates for the Units are described below. Unless sooner Vested in accordance with the terms of the Plan, the Units will become Vested Units on the Vesting Dates in the respective amounts set forth below and will no longer be subject to forfeiture:<br><br>              **Vesting Dates**         **Shares**<br>First Vesting Date:    12-FEB-2026        97<br>Second Vesting Date    12-FEB-2027        97<br>Third Vesting Date     12-FEB-2028        97 |
| **Rights as Shareholder** | Grantee will not be entitled to any privileges of ownership of Shares of Stock of the Company underlying Grantee's Units unless and until they actually Vest. |
| **Dividends** | Unless otherwise determined by the Committee, the Units include a right to dividend equivalents equal to the value of any dividends paid on the Shares for which the dividend record date occurs between the Grant Date and the date the Units are settled. Subject to vesting, each dividend equivalent entitles a Grantee to receive the equivalent cash value of any such dividends paid on the number of Shares underlying the Units that are outstanding during such period. Dividend equivalents will be accrued (without interest) and will be subject to the same conditions as the Units to which they are attributable, including, without limitation, the vesting conditions and the provisions governing the time and form of settlement of the Units. |
| **Settlement of Units** | (a) *Time of Settlement*. This Agreement will be settled by the delivery to Grantee of one Share for each Vested Unit as of the Vesting Date.<br>(b) *Termination Prior to Vesting Date.* Unless otherwise specified in the Plan, if Grantee has a Termination of Service prior to the Vesting Date other than by reason of his/her death or Disability, Grantee will forfeit Units that have not Vested. If Grantee has a Termination of Service by reason of his/her death or Disability, all Units that have not Vested shall immediately Vest.<br>(c) *Issuance of Shares*. Shares due and payable to Grantee under the terms of this Agreement shall be issued as of the Vesting Date. |
| **Transferability** | Grantee's Units are not transferable, whether voluntarily or involuntarily, by operation of law or otherwise, except as provided in the Plan. Any assignment, pledge, transfer, or other disposition, voluntary or involuntary, |

| | of Grantee's Units made, or any attachment, execution, garnishment, or lien issued against or placed upon the Units, other than as so permitted, shall be void. |
|---|---|
| **Taxes** | (a) *FICA/Medicare Taxes.* U.S. employees of the Company and/or its Affiliates will be subject to FICA/Medicare tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date. |
| | (b) *U.S. Federal Income Taxes.* U.S. employees of the Company and/or its Affiliates will be subject to U.S. federal income tax on each Vesting Date based on the Fair Market Value of the Shares underlying the Units that Vest on such Vesting Date. |
| | (c) *Tax Consequences for Non-U.S. Residents.* Grantees who are neither citizens nor resident aliens of the U.S. should consult with their financial/tax advisor regarding both the U.S. and non-U.S. tax consequences of the receipt of this award and subsequent settlement/receipt of the Shares. |
| | **(d) Grantee will be solely responsible for the payment of all such taxes, as well as for any other state, local or non-U.S. taxes that may be related to Grantee's receipt of the Units and/or Shares.** |
| **Restrictive Covenants** | The Grantee acknowledges and recognizes that his or her services to be rendered to the Company and/or its Affiliates are of a special and unusual character that have a unique value to Company and the conduct of its business, the loss of which cannot adequately be compensated by damages in an action at law. In view of the unique value to Company of the services of Grantee, and because of the confidential information to be obtained by or disclosed to Grantee, and as a material inducement to Company providing this grant of Units to Grantee, Grantee agrees to the provisions of Schedule A attached hereto (the "Restrictive Covenants"). For the avoidance of doubt, the Restrictive Covenants contained in this Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between Grantee and the Company or any of its Affiliates, including but not limited to, any employment agreement between Grantee and the Company or any of its Affiliates. |
| **Miscellaneous** | (a) This Agreement shall not confer upon an employee any right to continue employment with the Company or any Affiliate, nor shall this Agreement interfere in any way with the Company's or Affiliate's right to terminate such employment at any time. |
| | (b) Subject to the terms of the Plan, the Committee may terminate, amend, or modify the Plan; *provided, however*, that no such termination, amendment, or modification of the Plan may in any way adversely affect Grantee's rights under this Agreement without Grantee's consent. |
| | (c) This Agreement will be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or stock exchanges as may be required. |
| | (d) To the extent not preempted by U.S. federal law, this Agreement shall be governed and interpreted in accordance with the laws of the State of Florida, except that no effect shall be given to any conflicts of laws principles that would require the application of the laws of a state or territory other than Florida. Additionally, the Parties agree that the federal and state courts located in the Southern District of Florida or Miami-Dade County, Florida will have personal jurisdiction over them to hear all disputes regarding, or related to, this Agreement. The Parties further agree that venue will be proper only in the Southern District of Florida or Miami-Dade County, Florida and they waive all objections to that venue. |
| **Additional Terms for Participants in China** | To the extent Grantee (i) is employed by the Company or one of its Affiliates in and (ii) is a citizen of the People's Republic of China, the Units shall be subject to such additional or substitute terms as shall be set forth in Schedule B attached hereto. |
| **Signatures** | By the signatures below, the Grantee and the authorized representative of the Company acknowledge agreement to this Restricted Stock Unit Agreement as of the Date of Grant specified above. |

Royal Caribbean Group                                          Grantee:


By: _____
     Naftali Holtz                                                ANGEL                        GOMEZ
     Chief Financial Officer

## SCHEDULE A - RESTRICTIVE COVENANTS

Grantee hereby covenants and agrees that Grantee will not, directly or indirectly, whether as principal, agent, trustee or through the agency of any corporation, partnership, association or agent (other than as the holder of not more than five percent (5%) of the total outstanding stock of any company the securities of which are traded on a regular basis on recognized securities exchanges), for the period set forth in Table A-1 below corresponding with Grantee's position level as of the Grant Date (the "Restricted Period"):

(1) serve as or be a consultant to or employee, officer, agent, director or owner of another entity engaged in (or preparing to engage in) cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity;

(2) employ or seek to employ any person who is then employed or retained by the Company or its Affiliates (or who was so employed or retained at any time within the six (6) month period prior to the last day of Grantee's employment with the Company); or

(3) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity which has a business relationship with the Company or its Affiliates at any time during the Restricted Period, to discontinue or reduce or modify the extent of such relationship with the Company or any of its Affiliates.

The Restricted Period begins running immediately following the termination of Grantee's employment under any circumstance and shall be tolled during any period that Grantee is in breach of any of the restrictive covenants in this Schedule A so that the Company is provided with the full benefit of the full Restricted Period. The restrictions above do not apply in jurisdictions where prohibited by applicable law.

During Grantee's employment and following the termination of Grantee's employment for any reason, Grantee shall not, at any time, directly or indirectly, (i) make derogatory or disparaging statements about the Company or its Affiliates, or their officers, directors, board members, employees, agents, or assigns, (ii) publish, provide, or approve any unauthorized statements about or relating to the Company or its Affiliates or their officers, directors, board members, employees, agents, or assigns, or (iii) take any actions that might reasonably be considered to be detrimental to the Company or its Affiliates or their officers, directors, board members, employees, agents, or assigns.

Employee has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company, its officers, directors, shareholders, and other employees and for the protection of the business of Company.  Grantee acknowledges that he or she is qualified to engage in businesses other than that described in the first paragraph of this Schedule A.  It is the belief of the parties, therefore, that the best protection that can be given to Company that does not in any way infringe upon the rights of Grantee to engage in any unrelated businesses is to provide for the restrictions described above.  In view of the substantial harm which would result from a breach by Grantee of this Schedule A, the parties agree that the restrictions contained herein shall be enforced to the maximum extent permitted by law.  In the event that any of said restrictions shall be held unenforceable by any court of competent jurisdiction, the parties hereto agree that it is their desire that such court shall substitute a reasonable judicially enforceable limitation in place of any limitation deemed unenforceable and that as so modified, the covenant shall be as fully enforceable as if it had been set forth herein by the parties.

| TABLE A-1 -RESTRICTED PERIODS | |
|---|---|
| **Grantee's Position Level** | **Applicable Restricted Period** |
| Director / Sr. Director | 6 months |
| Associate Vice President | 9 months |
| Vice President and above | 12 months |
| Chief Executive Officer, Royal Caribbean Group<br>Chief Financial Officer, Royal Caribbean Group<br>Brand Presidents<br>Executive Vice President, Maritime | 24 months |

## SCHEDULE B - ADDITIONAL TERMS AND CONDITIONS

This Schedule B includes special terms and conditions applicable to Participants who are employed in and a citizen of the People's Republic of China. These terms and conditions are in addition to or substitute for, as applicable, those set forth in the Agreement. Any capitalized term used in this Schedule B without definition shall have the meaning ascribed to such term in the Agreement.

**Mandatory Sale Restriction**

The Grantee acknowledges and agrees that, due to regulatory requirements in China, the Grantee shall be required to sell any Shares acquired under this Agreement and then owned by the Grantee within 90 days following the date the Grantee has a Termination of Service (the "Sale Cut-off Date"). In this regard, to the extent that any Shares issued hereunder remain in the Grantee's brokerage account established by the Company with E*TRADE Financial Services Inc. or any successor designated broker utilized by the Company from time to time (the "Designated Broker") as of the Sale Cut-Off Date, the Grantee authorizes the Company to instruct the Designated Broker to sell such Shares on the Sale Cut-Off Date or as soon as administratively feasible thereafter. The Grantee acknowledges that neither the Company nor its Designated Broker is obligated to arrange for the sale of the Shares at any particular price, that the Shares may be sold as part of a block trade with other Participants in which all Participants receive an average price and that, upon the sale of the Shares, the proceeds from the sale of the Shares, less any brokerage fees or commissions and subject to any obligation to satisfy any applicable taxes or other tax-related items, will be remitted to the Grantee in accordance with applicable exchange control laws and regulations.

**Exchange Control Restrictions**

The Grantee understands and agrees that, pursuant to local exchange control requirements, the Grantee (i) is not permitted to transfer any Shares acquired under this Agreement out of the account established by the Grantee with the Designated Broker and (ii) will be required to repatriate all cash proceeds resulting from the Grantee's participation in the Plan, including cash dividends paid by the Company on Shares acquired under this Agreement and/or the sale of such Shares (together, the "cash proceeds"). The Grantee further understands that, under local law, such repatriation may need to be effectuated through a special exchange control account established by the Company or one of its subsidiaries and the Grantee hereby consents and agrees that all cash proceeds may be transferred to such special account prior to being delivered to the Grantee and that any interest earned on the cash proceeds prior to distribution to the Grantee will be retained by the Company to partially offset the cost of administering the Plan. The Grantee understands that the cash proceeds may be paid to the Grantee from this special account in U.S. dollars or in local currency, at the Company's discretion. If the cash proceeds are paid in U.S. dollars, the Grantee understands that he or she will be required to establish a U.S. dollar bank account in China so that the cash proceeds may be deposited into this account. If the cash proceeds are converted to local currency, the Grantee acknowledges that the Company is under no obligation to secure any exchange conversion rate, and the Company may face delays in converting the cash proceeds to local currency due to exchange control restrictions in China. The Grantee agrees to bear the risk of any exchange conversion rate fluctuation between the date the cash dividend is paid and/or the

Page **4** of **5**

Shares are sold, as applicable, and the date of conversion of the cash proceeds to local currency. The Grantee further agrees to comply with any other requirements that may be imposed by the Company in the future in order to facilitate compliance with exchange control requirements in China.

# EXHIBIT L
## to the Verified Complaint

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**
**COMPLEX BUSINESS DIVISION**

CELEBRITY CRUISES, INC., and ROYAL
CARIBBEAN CRUISES LTD. d/b/a
ROYAL CARRIBEAN GROUP,

　　　　　　Plaintiffs,

v.

ANGEL CHRISTOPHER GOMEZ,

　　　　　　Defendant.

CASE NO.: _____

## DECLARATION OF MATIAS LIVACHOF

1.　　My name is Matias Livachof, and I am over the age of 18 years, have personal knowledge of the facts set forth herein, unless otherwise stated, and I am competent to testify thereto.

### Background And Qualifications

2.　　I am a computer forensics consultant and Managing Director for FTI Consulting Technology LLC ("FTI"), a firm offering digital forensics services for plaintiffs and defendants in connection with various civil and criminal legal matters.

3.　　Since about 2000, FTI has facilitated digital forensics investigations, electronic discovery consulting and advisory service, incident response to data breaches, and cyber-security services.

4.　　In addition to my experience as a computer forensics consultant with FTI, I have spent approximately four years working with various organizations and attorneys on complex investigative matters involving electronically stored information ("ESI"), including issues related

to the preservation of ESI and its associated metadata, contributing to a total of 19 years of professional experience.

5. Throughout my career, I have routinely assisted corporate clients, outside counsel, and other trusted advisers in managing and engaging in digital forensics investigations, electronic discovery consulting and advisory services, and incident response to data breaches and cyber security services.

6. My work involves conducting digital forensic data collections and analyses across a wide range of sources including cloud platforms, laptops, desktop computers, servers, mobile devices, removable media, network data, and email accounts in connection with civil matters, fraud investigations, corporate inquiries, insurance panel engagements, and cybercrime response.

7. My certifications include GIAC Certified Forensic Examiner (GCFE), GIAC Certified Forensic Analyst (GCFA), and GIAC Advanced Smartphone Forensics (GASF) from the SANS Institute, as well as EnCase Certified Examiner (EnCE) from Guidance Software.

8. A true and accurate copy of my most recent *curriculum vitae,* outlining my background and experience testifying in legal matters such as this is annexed hereto as **Exhibit A.**

9. I submit this declaration in support of Plaintiffs Celebrity Cruises, Inc., ("Celebrity") and Royal Caribbean Cruises Ltd. d/b/a Royal Caribbean Group ("Royal Caribbean") (collectively, "Plaintiffs") Verified Complaint for Injunctive Relief and Damages and their Motion for a Temporary Injunction.

<u>**Engagement, Preservation, and Analysis**</u>

10. FTI was engaged by Plaintiffs and their outside counsel Littler Mendelson, P.C. ("Littler") to forensically preserve and review a laptop computer and cellphone that Plaintiffs issued to former employee Defendant Angel Christopher Gomez ("Gomez").

11. Upon receipt of the laptop and mobile device issued to Gomez, I initiated a chain of custody form. My work was conducted, and all evidence was stored within, a secure digital forensic laboratory.

12. A digital forensic image was created for the laptop that was provided to me, using industry standard practices and tools, in this case, Win FE. Windows Forensic Environment (WinFE) was used to create the forensic image of laptop because it allows us to boot a system in a forensically sound, write-protected environment, ensuring that data can be acquired without altering or contaminating the original evidence. Following industry standard practices, I created copies of each forensic image on at least two storage media for redundancy.

13. Upon receipt of the Gomez's mobile device (iPhone 14 Pro, iOS Version 18.4.1, Serial Number M14JQJPW6P), I observed it was in a factory reset/erased state (reset to factory specifications). To obtain the factory reset date, I performed the most minimal setup possible to proceed past the setup stage, which allowed me to complete a forensic extraction with Cellebrite Inseyets. Cellebrite Inseyets is a digital forensics platform that enables investigators to extract, analyze, and review data from mobile devices   I then processed the image using the forensic tool iLEAPP to extract and parse system logs that confirmed the factory reset date of May 15, 2025, and verified that the device did not contain any user created data. iLEAPP (iOS Logs, Events, and Plists Parser) was used to analyze the data extracted from the iOS device. iLEAPP is a specialized forensic tool that parses system logs, configuration files, and application artifacts from iPhones and iPads. It provides structured reports on user activity, device usage, and system events, allowing investigators to review key evidence such as application usage, location data, Wi-Fi connections, and system settings in a forensically reliable manner.

**Plaintiffs' Devices**

14. I processed the forensic image of the Microsoft Surface laptop (serial number 2038 0F01FHS23053BF), issued by Plaintiffs to Gomez ("Gomez laptop"), using industry-standard practices and tools, including but not limited to Magnet AXIOM version 9.6.0.45737, OpenText EnCase version 22.3.0.124, and USB Detective version 1.6.4, to conduct my review. Magnet AXIOM was used to process and analyze the forensic images. AXIOM is a widely used digital forensics platform that allows investigators to parse structured and unstructured data from a wide range of devices and applications. It provides artifact-focused reporting, keyword searching, and timeline reconstruction, which aids in identifying and interpreting relevant evidence in a forensically reliable manner. OpenText EnCase was also utilized to review and validate the forensic image. EnCase is an industry-recognized forensic software that enables comprehensive examination of digital media, including file system review, recovery of deleted data, and verification of forensic image integrity. It is relied upon across law enforcement and private practice due to its long-standing acceptance in courts as a trusted forensic tool. USB Detective was used to assist in identifying and documenting the connection history of external USB storage devices. This tool provides insight into which removable devices were connected to a computer, when those connections occurred, and how the system recognized them. Such information can be critical in determining whether external devices were used to store, transfer, or potentially exfiltrate data.

15. During the ongoing course of my forensic review, I determined the following:

a. On April 11, 2025, from 2:57 p.m.[1] to 3:57 p.m., a USB device named "My Passport 25E2" with the serial number 57584B31453938394C37344B reported in Hexadecimal, WXK1E989L74K when decoded in ASCII, and with the name of ("My Passport") was connected to the laptop. Attached and incorporated as **Exhibit B** is a printout of the report. I analyzed the File Listings Report for this time frame and found that 155 files were accessed while the My Passport device was connected to the Robert laptop. Most of these files originate from the OneDrive cache, which indicates that OneDrive files and folders were accessed. The files primarily included those with the .r and .p extensions, which are temporary cache files created by OneDrive. Specifically, .r files represent resource files (used to store metadata and content fragments), while .p files are placeholder files that allow the system to display the structure of the OneDrive directory without having to download the full content. Their presence confirms that the user accessed OneDrive-synced content during the connection period. I reviewed a file activity report for Gomez's M365 account, provided by the Royal Caribbean Security team. During the period when the hard drive was connected, the following files were interacted with:

| Category | Description |
|---|---|
| Download file | Download file: file https://rccl-my.sharepoint.com/personal/tbolen_celebrity_com/Documents/CEL Sup Stuff/Tyler Bolen CEL/Frontier Agent List.xlsx |
| Access file | Access file: file https://rccl.sharepoint.com/sites/CelebrityGlobalCCLeaders/Shared Documents/Leadership Catch-Ups/April 8th/Q2 Leadership Catch up.pptx |
| Access file | Access file: file https://rccl my.sharepoint.com/personal/angelgomez_celebrity_com/Documents/CO Evolution 2.0.pptx |

---

[1] In this declaration, all timestamps are provided in the Eastern time zone except where otherwise noted.

b. During my examination, I discovered the presence of the Microsoft Windows utility "cleanmgr.exe" (Disk Cleanup) on the Gomez laptop. This built-in program can be used to remove temporary files, cached internet data, old system files, and items in the recycle bin. Running this tool can delete or overwrite data that might otherwise remain available for forensic review.

c. Cleanmgr was accessed on the Gomez laptop on April 23, 2025, at 8:11 a.m. and then again on May 15, 2025, at 1:06 p.m. This was determined by the last accessed date of LNK files pointing to this tool. Attached and incorporated as **Exhibit C** is a printout of this report.

d. I analyzed Gomez laptop's internet browsing history on Google Chrome and Microsoft Edge browsers. The records show that the browsing histories for these browsers were cleared on May 15, 2025, at 12:09 p.m. and 12:10 p.m., respectively. Attached and incorporated as **Exhibit D** is a printout of this report.

e. I also analyzed whether any cloud service URLs were accessed on the Gomez laptop and determined that Google Drive was accessed multiple times on May 15, 2025. Attached and incorporated as **Exhibit E** is a printout of this report.

f. I reviewed the M365 audit log for Gomez's account. On May 15, 2025, the following files were interacted with:

| Category | Description |
|---|---|
| Access file | Access file: file https://rccl-my.sharepoint.com/personal/jennifersuarez_rccl_com/Documents/Documents/cVP 2025/2025 Exceptions of Direct to Trade Transfer.xlsx |
| Access file | Access file: file https://rccl.sharepoint.com/sites/CelebrityGlobalCCLeaders/Shared Documents/Weekly Stats/Weekly Stats 2.0 NEW 3.3.2025.docx |
| Access file | Access file: file https://rccl-my.sharepoint.com/personal/gtrujillo_rccl_com/Documents/CO/OBR Monthly Trading Deck_GCC.pptx |

g.     I reviewed the Recycle Bin to assess whether there had been any mass deletions of files or data; however, the Recycle Bin was empty. Attached and incorporated as **Exhibit F** is a printout of this report.

I declare under penalty of perjury that the statements set forth above are true and correct.

Executed on October _15_, 2025

By: Matias Livachof

MATIAS LIVACHOF

# EXHIBIT A
## to the Declaration  of Matias Livachof



# Matias Livachof

**Managing Director**
**Technology**

One Biscayne Tower, 2 S Biscayne Blvd #1850, Miami, FL 33131
+1 305 753 4765
matias.livachof@fticonsulting.com

**Education**

Bachelor of Science in
Information Technology
Systems, Universidad Del
Salvador

**Certifications**

EnCE, Guidance Software
EnCEP, Guidance Software
Clearwell Administrator
CEDS, ACEDS.org
GCFE, SANS.org
GCFA, SANS.org
GASF, SANS.org
ACE, AccessData
Nuix Certified eDiscovery
Practitioner
Brainspace Analyst

**Expertise**

Digital Forensics
Ediscovery
Investigations

Matias Livachof is a Managing Director in FTI's Technology segment. He has over 19 years of experience assisting clients with Digital Forensics, eDiscovery and Investigations. He also spent several years working in Information Security roles.

Mr. Livachof has deep experience utilizing industry standard forensic tools and methodologies; Leading end to end Digital Forensic and E-Discovery engagements in accordance with industry bests practices and with the Electronic Discovery Reference Model (EDRM). Mr. Livachof also has experience with encryption tools, password cracking techniques, Windows registry analysis, creation of event timelines, recovering deleted data from unallocated space and creating computer forensic reports.

Matias has provided these services in multiple countries with various complex scenarios and legal requirements. Matias also has experience training teams in computer forensics, digital investigations and e-Discovery.

**Relevant Experience**

Information, Communications & Entertainment: Participated in an information security incident investigation, correlated application audit trails and system log events, rebuilt facts, detected installed malicious software and generated valid evidence to be presented in court.

Automotive: Managed a processing team that handled over 100TB of data over two years. Participated in large-scale collection team which required the acquisition of 5,000 workstations and 2,000 mobile devices.

Energy: Managed an e-discovery matter for one of the biggest oil companies in Argentina that involved efforts from USA and Spain dealing with 50 custodians and 25TB of server data.

Healthcare: Participated in an E-Discovery matter including 80+ custodians collecting 5 different sources per custodian, assisted in the processing, hosting and review of all the electronically stored information within the data EDRM framework.

Services: Managed a 5-year long e-discovery matter for an US company with offices in many countries in LATAM, coordinating collections of 400+ custodians, processing over 40TB of data and assisting several law firms with the different review and data analytics workflows

Government: Developed and implemented a security IT architecture for a joint project between the Argentine government and the United Nations. Used Checkpoint and open source tools such as iptables, Firewall Builder, Syslog-ng, Snort, etc. Collaborated to secure the network perimeter and monitored malicious activities.

**EXPERTS WITH IMPACT™**



MATIAS LIVACHOF

**Expert declarations & Affidavits**

— 2025  -  Pete v. Cooper (1:24-cv-24228) - District Court, S.D. Florida

**Technical Skills**

— Forensic Tools: EnCase Forensic, FTK, Caine, DEFT, Kali Linux, Smart, Paladin, dtSearch, Cellebrite Physical Analyzer and UFED4PC, FTK Imager, AID4MAIL.

— E-Discovery software: Experience with case and user administration, data staging and pre-processing, early case assessment (ECA), data analytics, keyword searching, creation of reviewing sets, exports, productions and redactions with NUIX, Relativity and Clearwell.

— Hardware: Advanced technical knowledge, network architecture design, perimeter security, network segmentation, testing and failure detection.

— Operating systems: Windows NT/2000/2003/XP/Vista/7/8/10, Linux (Debian, Helix, Kali, Backtrack and Ubuntu).

— Databases: MySQL, MS-SQL, MS Access.

— Networking Devices: Firewalls, VPN, Linux, Checkpoint technology.

**Publications and Speaking Engagements**

— Professor at Universidad Nacional de Asuncion (Paraguay), Computer Forensics chapter in the Information Security Masters program

— Presented at Nuix User Exchange 2018, analyzing cellphone data in Nuix

— Presented at Nuix User Exchange 2014, advanced search techniques

— Presented at ACFCS 2013, a Financial Crime Conference in Miami, FL

— Presented at CISI 2011, an Information Security congress in Cartagena, Colombia

— Developed and presented an internal training, "Using Clearwell for Admins" and "Using Clearwell for users and clients" in 2011 and 2012.

— Presented the "Forensic Technology Course" in the KPMG external course "Investigative Techniques" in 2011 and 2012

— Developed and presented a training course, "Introduction to Forensic Technology Services." Trained members of the Buenos Aires Police investigations department twice during 2008

— Presented an introductory Mobile Forensic Services training to existing and prospective clients as well as at the August 2008 Argentine Federal Police Conference



# EXHIBIT B
## to the Declaration  of Matias Livachof

| Serial/UID | Description | First Connected (UTC) | Last Connected (UTC) | Last Disconnected (UTC) | Volume Name/Label | Drive Letter(s) | VSN | Last User |
|---|---|---|---|---|---|---|---|---|
| 058F846BB461 | Generic: SD/MMC USB Device | 3/18/2025 17:13 | 3/18/2025 17:16 | 3/18/2025 19:12 | F:\, E:\ | F: | | |
| 91294911647363125d6 | VendorCo ProductCode USB Device | 3/18/2025 17:13 | 3/18/2025 17:16 | 3/18/2025 17:16 | D:\ | | 3298259B | defaultuser0 |
| 575848314539383934C37344B | My Passport 25E2 | 4/11/2025 18:57 | 4/11/2025 18:57 | 4/11/2025 19:57 | D:\ | | | |
| 0401aB413277ffbf167c63e5b43fd80a/6277861ce0d288ec3e0c373d5cfb95d | USB  SanDisk 3.2Gen1 USB Device | 9/6/2025 20:18 | 9/6/2025 20:18 | | NO NAME | D: | 4E58E477 | |
| 0000814000183959111528D1C | Apple iPhone | 4/23/2025 19:10 | 4/23/2025 19:12 | 4/23/2025 19:48 | Apple iPhone | | | |
| M2&REV_1.08 | GENERIC- MICRO SD | | | | | F:\ | F: | |
| MMC&REV_1.00 | GENERIC- SD | | | | | E:\ | E: | |
| 0401A8413277FFD167C63E5B43FD8DAF6277861CE0D2B8EC3E0C373D5CFB95D42DF9000000000000000000000D8CF2C4100177D18815581D7661281244 | SanDisk 3.2Gen1 | 9/6/2025 20:18 | 9/6/2025 20:18 | | | | | |

# EXHIBIT C
## to the Declaration  of Matias Livachof



# FORENSIC EXAMINATION REPORT

## CASE NUMBER F15128-1-AB1-E001_Decrypted

Case generated Tuesday, September 9, 2025
Report generated Thursday, September 25, 2025

LNK Files

Record 1

| | |
|---|---|
| Tags | Evidence |
| Linked Path | %windir%\system32\cleanmgr.exe |
| Created Date/Time - UTC+00:00 (M/d/yyyy) | 5/7/2022 5:20:03.464 AM |
| Last Modified Date/Time - UTC+00:00 (M/d/yyyy) | 5/7/2022 5:20:03.464 AM |
| Accessed Date/Time - UTC+00:00 (M/d/yyyy) | 4/23/2025 12:11:15.695 PM |
| Show Command | SW_SHOWNORMAL |
| Target File Size (Bytes) | 0 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Windows\WinSxS\a md64_microsoft-windows-cleanmgr_31bf3856ad364e35_10.0.22621.4890_none_4d07bb4ad93af19e\Dis k Cleanup.lnk |
| Location | • n/a |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Recovery method | • Parsing |
| Item ID | 401164 |

Record 2

| | |
|---|---|
| Tags | Evidence |
| Linked Path | %windir%\system32\cleanmgr.exe |
| Created Date/Time - UTC+00:00 (M/d/yyyy) | 5/7/2022 5:20:03.464 AM |
| Last Modified Date/Time - UTC+00:00 (M/d/yyyy) | 5/7/2022 5:20:03.464 AM |
| Accessed Date/Time - UTC+00:00 (M/d/yyyy) | 4/23/2025 12:11:15.695 PM |
| Show Command | SW_SHOWNORMAL |
| Target File Size (Bytes) | 0 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Windows\WinSxS\a md64_microsoft-windows-cleanmgr_31bf3856ad364e35_10.0.22621.5124_none_4d4c0f7ed908e051\Dis k Cleanup.lnk |
| Location | • n/a |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Recovery method | • Parsing |
| Item ID | 401174 |

Record 3

| | |
|---|---|
| Tags | Evidence |
| Linked Path | %windir%\system32\cleanmgr.exe |
| Created Date/Time - UTC+00:00 (M/d/yyyy) | 5/7/2022 5:20:03.464 AM |
| Last Modified Date/Time - UTC+00:00 (M/d/yyyy) | 5/7/2022 5:20:03.464 AM |
| Accessed Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 5:06:44.382 PM |
| Show Command | SW_SHOWNORMAL |
| Target File Size (Bytes) | 0 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\ProgramData\Micr osoft\Windows\Start Menu\Programs\Administrative Tools\Disk Cleanup.lnk |
| Location | • n/a |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Recovery method | • Parsing |
| Item ID | 1022599 |

# EXHIBIT D
## to the Declaration  of Matias Livachof



# FORENSIC EXAMINATION REPORT

## CASE NUMBER F15128-1-AB1-E001_Decrypted

| | |
|---|---|
| Case generated | Tuesday, September 9, 2025 |
| Report generated | Thursday, September 25, 2025 |

Chrome Last Session

Record 1

| | |
|---|---|
| Tags | Evidence, Of interest |
| URL | chrome://settings/clearBrowserData |
| Last Visited Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:09:18.557 PM |
| Title | Settings - Privacy and security |
| Redirect URL | chrome://settings/clearBrowserData |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Google\Chrome\User Data\Default\Sessions\Session_13391798964987211 |
| Location | • File Offset 5489 |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Recovery method | • Parsing |
| Item ID | 1054436 |

Edge Last Session

Record 1

| | |
|---|---|
| Tags | Evidence, Of interest |
| URL | edge://settings/privacy/clearBrowsingData |
| Last Visited Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:10:16.463 PM |
| Title | Settings |
| Redirect URL | edge://settings/clearBrowserData/clear |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Sessions\Session_13391799018634919 |
| Location | • File Offset 1102 |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Recovery method | • Parsing |
| Item ID | 1054540 |

# EXHIBIT E
## to the Declaration of Matias Livachof



# FORENSIC EXAMINATION REPORT

## CASE NUMBER F15128-1-AB1-E001_Decrypted

Case generated    Tuesday, September 9, 2025
Report generated    Thursday, September 25, 2025

Cloud Services URLs

### Record 1

| | |
|---|---|
| Tags | Evidence |
| Site Name | Google Drive |
| URL | https://drive.google.com/file/d/1ddFq3AHm9nCH55eDg27QkxW7mIJmqgXO/view |
| Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:46:29.000 PM |
| Artifact | Edge Web Visits |
| Artifact ID | 1048646 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\History |
| Location | • Table: visits(id: 4)<br>• Table: urls(id: 58) |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Item ID | 1048649 |

### Record 2

| | |
|---|---|
| Tags | Evidence |
| Site Name | Google Drive |
| URL | https://drive.google.com/file/d/1ddFq3AHm9nCH55eDg27QkxW7mIJmqgXO/view?usp=sharing |
| Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:46:28.000 PM |
| Artifact | Edge Web Visits |
| Artifact ID | 1048648 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\History |
| Location | • Table: visits(id: 3)<br>• Table: urls(id: 57) |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Item ID | 1048650 |

### Record 3

| | |
|---|---|
| Tags | Evidence |
| Site Name | Google Drive |
| URL | https://drive.google.com/drive-viewer/AKGpihbAJRTFROiX_L2TzVNbnB2pn3V2i4HQ-WBtA00kwUPwt42k iJF6MeY58vYKswZxmtIle9DNtjWWplrzuC8WWwZWMIRZ2_WNjsA=s1600-rw-v1 |
| Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:46:28.860 PM |
| Artifact | Edge Cache Records |
| Artifact ID | 1058119 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\data_1<br>• F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\data_0<br>• F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\f_000011 |
| Location | • File Offset 36960<br>• File Offset 36864<br>• File Offset 10748<br>• File Offset 0 |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Item ID | 1058120 |

### Record 4

| | |
|---|---|
| Tags | Evidence |
| Site Name | Google Drive |
| URL | https://drive.google.com/drivesharing/clientmodel?id=1ddFq3AHm9nCH55eDg27QkxW7mIJmqgXO&for eignService=texmex&authuser=0&origin=https%3A%2F%2Fdrive.google.com |
| Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:46:29.326 PM |
| Artifact | Edge Cache Records |
| Artifact ID | 1058138 |

Cloud Services URLs

| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\data_1<br>• F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\data_0 |
|---|---|
| Location | • File Offset 43104<br>• File Offset 43008<br>• File Offset 11180 |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Item ID | 1058139 |

Record 5

| Tags | Evidence |
|---|---|
| Site Name | Google Drive |
| URL | https://drive.google.com/drive-viewer/AKGpihbAJRTFROiX_L2TzVNbnB2pn3V2i4HQ-WBtA00kwUPwt42k iJF6MeY58vYKswZxmtIle9DNtjWWplrzuC8WwZWMlRZ2_WNjsA=w1920-h1080-k-rw-v1-pd |
| Date/Time - UTC+00:00 (M/d/yyyy) | 5/15/2025 4:46:29.435 PM |
| Artifact | Edge Cache Records |
| Artifact ID | 1058144 |
| Source | • F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\data_1<br>• F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\data_0<br>• F15128-1-AB1-E001_Decrypted.E01 - Partition 3 (Microsoft NTFS, 237.54 GB)\Users\113005\App Data\Local\Microsoft\Edge\User Data\Default\Cache\Cache_Data\f_000019 |
| Location | • File Offset 46176<br>• File Offset 46080<br>• File Offset 11396<br>• File Offset 0 |
| Evidence number | • F15128-1-AB1-E001_Decrypted.E01 |
| Item ID | 1058168 |

# EXHIBIT F
# to the Declaration  of Matias Livachof

# Affidavit of Process Server

**Court:** In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida

| Celebrity Cruises, Inc and Royal Caribbean Cruises, LTD, d/b/a Royal Caribbean Group | VS | Angel Christopher Gomez | 2025-020399-CA-01 |
|---|---|---|---|
| PLAINTIFF/PETITIONER | | DEFENDANT/RESPONDENT | CASE NUMBER |

I **John A. Romero**_____, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.

**Service:** I served **Angel Christopher Gomez**_____
NAME OF PERSON / ENTITY BEING SERVED
Civ. Act. Sum. (1 pg), Compl. (31 pgs), Exibits: A (2pgs),B (8pgs),C (6pgs),D (8pgs),E (6pgs),F (6pgs),G (6pgs)
with (list documents)H(6pgs), I(5pgs), J(5pgs), K(6pgs),L Decl (8pgs),Exhibits to L Decl:A(6pgs) B(2pgs),C (3pgs),D(4pgs),E4pgs,F(2pgs)

by leaving with **Angel Christopher Gomez**    **Defendant**_____ At
　　　　　　　　　NAME　　　　　　　　　RELATIONSHIP

☐ Residence_____
　　　　　　　　ADDRESS　　　　　　　　　CITY / STATE

☑ Business **4500 Park Granada**　　　　**Calabasas, California**
　　　　　　　ADDRESS　　　　　　　　CITY / STATE

On **November 3, 2025**_____ AT **8:57 am**_____
　　　DATE　　　　　　　　　　　　　TIME

☐ Inquired if subject was a member of the U.S. Military and was informed they are not.

Thereafter copies of the documents were mailed by prepaid, first class mail on_____
　　　　　　　　　　　　　　　　　　　　　　　　　　DATE

from_____
　　　CITY　　　　　STATE　　　　　ZIP

**Manner of Service:**
☑ **Personal:** By personally delivering copies to the person being served.
☐ **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of _____ and explaining the general nature of the papers.
☐ **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person appar **Celebrity Cruises, Inc and Royal Caribbean**
☐ **Posting:** By po **Cruises, LTD, d/b/a Royal Caribbean Group**

**Non-Service:** After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address　☐ Moved, Left no Forwarding　☐ Service Cancelled by Litigant ☐ Unable to Serve in Timely Fashion
☐ Address Does Not Exist ☐ Other_____

**Service Attempts:** Service was attempted on: (1) 4374 Paxton Pl, Calabasas, CA 91302 | 10.29.2025, 5:06pm (2) 4374 Paxton Pl, Calabasas, CA 91302 | 10.30.2025, 7:59 am
　　　　　　　　　　　　　　　　　　　　DATE　　　TIME　　　　　　　　　　DATE　　　TIME
4374 Paxton Pl, Calabasas, CA 91302 | 4374 Paxton Pl, Calabasas, CA 91302 | 4500 Park Granada, Calabasas, CA 91302
(3) 10.30.2025, 7:23 pm (4) 10.31.2025, 2:30 pm (5) 11.3.2025, 8:57am **SERVED**
　　DATE　　　TIME　　　　　DATE　　　TIME　　　　DATE　　　TIME

**Description:.** Age **41** Sex **M** Race **Hisp** Height **6'0"** Weight **240** Hair **Blk** Beard **Yes** Glasses **No**

_John A Romero_
SIGNATURE OF PROCESS SERVER

SUBSCRIBED AND SWORN to before me this _____ day of _____, 20___, by _____,
Proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
SIGNATURE OF NOTARY PUBLIC

NOTARY PUBLIC for the state of_____



FORM 2　　　NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CIVIL ACTION SUMMONS (b) | CASE NUMBER |
|---|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHERS | | Form for Personal Services on a<br>Natural Person | 2025-020939-CA-01 |

| PLAINTIFF(S) | VS | DEFENDANT(S) |
|---|---|---|
| CELEBRITY CRUISES, INC., and<br>ROYAL CARRIBEAN CRUISES LTD.,<br>d/b/a ROYAL CARRIBEAN GROUP | | ANGEL CHRISTOPHER GOMEZ |

*** Endorsed Summons ***
Personal Service 3025-020939-CA-01
Private Investigator CA 28399, Licensed California
John A. Romero on 11.3.2025, 8:57 am.
at 4500 Park Granada, Calabasas, CA
91302 *CLOCK IN*
John A. Romero

**THE STATE OF FLORIDA:**TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s): | Address: |
|---|---|
| Angel Christopher Gomez | 416 NW 118th Terrace, Coral Springs, FL 33071 |

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

### MIAMI-DADE COUNTY COURT LOCATIONS

| ☐ **Dade County Courthouse** (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ **Joseph Caleb Center Court** (20)<br>Suite 103<br>5400 N.W. 22nd Avenue<br>Miami, FL 33142 | ☐ **Hialeah District Court** (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ **North Dade Justice Center** (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ **Coral Gables District Court** (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, Miami, FL 33134 | ☐ **South Dade Justice Center** (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | | **SERVICE** |

| Plaintiff/Plaintiff Attorney Tyler A. Sims, Esq.<br><br>Florida Bar No. 1048908 | Address:<br><br>111 North Orange Avenue, Suite 1750, Orlando, FL 32801.2366 |
|---|---|

| **JUAN FERNANDEZ-BARQUIN**<br>**CLERK OF THE COURT AND COMPTROLLER**<br>**MIAMI-DADE COUNTY**<br>**CIRCUIT AND COUNTY COURTS** | *Welly Alfaro*<br>wasoto<br>DEPUTY CLERK | **DATE ON:**<br><br>10/21/2025 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judici al Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

IN THE ELEVENTH JUDICIAL CIRCUIT COURT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CELEBRITY CRUISES, INC. AND        CIVIL DIVISION
ROYAL CARIBBEAN CRUISES, LTD.,
D/B/A ROYAL CARIBBEAN GROUP,

       Plaintiff,        CASE NO.: 2025-020399-CA-01 (CA 43)

vs.

ANGEL CHRISTOPHER GOMEZ,

       Defendant.

_____/

## ANSWER AND AFFIRMATIVE DEFENSES

Defendant, Angel Christopher Gomez, through his undersigned counsel, responds to the Verified Complaint with the following Answer and Affirmative Defenses as follows:

1. Defendant admits the allegations in ¶1 that this Court has jurisdiction over this dispute, but denies the remaining allegations in ¶1.

2. Defendant admits the allegations in ¶2 the allegations that he signed one or more agreements that contain provisions precluding him from sharing Plaintiffs' confidential information, unfairly competing with Plaintiffs, and soliciting Plaintiffs' employees for nine (9) months following the end of his employment, but denies that Plaintiffs can enforce the restrictions, that he violated them, and the remaining allegations in ¶2.

3. Defendant admits the allegations in ¶3 that he resigned in May 2025 but denies the remaining allegations in ¶3.

4. Defendant admits the allegations in ¶4 that AmaWaterways announced his appointment as its Senior Vice President of Global Consumer Sales and Service, but denies the remaining allegations in ¶4.

1

5.      Defendant denies the allegations in ¶5.

6.      Defendant denies the allegations in ¶6.

7.      Defendant denies the allegations in ¶7.

## THE PARTIES

8.      Defendant admits the allegations in ¶8.

9.      Defendant admits the allegations in ¶9.

10.     Defendant admits that he is over 18 but denies the remaining allegations in ¶10.

## JURISDICTION AND VENUE

11.     Defendant admits the allegations in ¶11.

12.     Defendant admits the allegations in ¶12.

13.     Defendant denies the allegations in ¶13.

14.     Defendant denies the allegations in ¶14.

15.     Defendant admits the allegations in ¶15 that this matter should be adjudicated in the Complex Business Litigation Division but denies the remaining allegations in ¶15.

## FACTUAL ALLEGATIONS

**I.      Defendant's Employment with Plaintiffs.**

16.     Defendant admits the allegations in ¶16.

17.     Defendant admits the allegations in ¶17 that Plaintiff, Celebrity Cruises, Inc., operated and was engaged in the ocean cruise business during his employment, but denies the remaining allegations in ¶17.

18.     Defendant admits the allegations in ¶18.

2

19.     Defendant admits the allegations in ¶19 that he was a hardworking, conscientious employee who dutifully performed the duties and tasks assigned to him, met or exceeded the expectations for the roles he occupied, and had an upward career trajectory based on his work ethic, integrity, intelligence, and perseverance, but denies the remaining allegations in ¶19.

20.     Defendant admits the allegations in ¶20.

21.     Defendant admits the allegations in ¶21.

22.     Defendant admits the allegations in ¶22.

23.     Defendant admits the allegations in ¶23.

24.     Defendant admits the allegations in ¶24.

25.     Defendant admits the allegations in ¶25, in part, but denies that the 2018 Non-Compete Agreement is enforceable, prohibits him from working for an entity that is not engaged in the ocean cruise industry, prohibits him from working for a company whose fleet does not contain a vessel with at least 1,000 berths, or that he engaged in any conduct violative of the 2018 Non-Compete Agreement, and the remaining allegations in ¶25.

26.     Defendant admits the allegations in ¶26.

27.     Defendant admits the allegations in ¶27 that he developed relationships with persons and entities related to the ocean cruise business for Celebrity, but denies the remaining allegations in ¶27.

28.     Defendant admits the allegations in ¶28 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and is without knowledge of and therefore denies the remaining allegations in ¶28.

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

29.     Defendant admits the allegations in ¶29 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and is without knowledge of and therefore denies the remaining allegations in ¶29.

30.     Defendant admits the allegations in ¶30 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and is without knowledge of and therefore denies the remaining allegations in ¶30.

31.     Defendant admits the allegations in ¶31 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and is without knowledge of and therefore denies the remaining allegations in ¶31.

32.     Defendant admits the allegations in ¶32 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and is without knowledge of and therefore denies the remaining allegations in ¶32.

33.     Defendant admits the allegations in ¶33 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and is without knowledge of and therefore denies the remaining allegations in ¶33.

34.     Defendant admits the allegations in ¶34 that he was a hardworking, conscientious employee who dutifully performed the duties and tasks assigned to him, met or exceeded the expectations for the roles he occupied, and had an upward career trajectory based on his work

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

ethic, integrity, intelligence, and perseverance as and as a result was offered the role of AVP of Consumer Outreach in December 2022, but denies the remaining allegations in ¶34.

35.     Defendant admits the allegations in ¶32 that the compensation package offered in connection with the role of AVP of Consumer Outreach in December of 2022 included the items identified in ¶35.

36.     Defendant denies the allegations in ¶36.

37.     Defendant admits the allegations in ¶37 that his role as AVP of Consumer Outreach included overseeing a global workforce of over 400 employees involved in the sale of ocean cruises to consumers but denies the remaining allegations in ¶37.

38.     Defendant admits the allegations in ¶38 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and that he was responsible for succeeding in his role through the growth of sales of ocean cruises, but denies the remaining allegations in ¶38.

39.     Defendant admits the allegations in ¶39 that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and that he was responsible for succeeding in his role through the growth of sales of ocean cruises, but denies the remaining allegations in ¶39.

40.     Defendant admits the allegations in ¶40 that he participated in meetings in which strategies involving the ocean cruise industry and business strategies involving the ocean cruise industries were discussed, and that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and that he was responsible for succeeding in his role through the growth of sales of ocean cruises, but denies the remaining allegations in ¶40.

5

41.     Defendant admits the allegations in ¶41 that he participated in annual strategy and attended a three-day off-site leadership meeting in July 2023 meetings in which strategies involving the ocean cruise industry and business strategies involving the ocean cruise industries were discussed, and that he was exposed to and worked with information and processes, both generally and not generally/publicly known, as focused on the Plaintiffs' business involving the ocean cruise industry, and that he was responsible for succeeding in his role through the growth of sales of ocean cruises, but denies the remaining allegations in ¶41.

42.     Defendant is without knowledge of the allegations in ¶42.

43.     Defendant admits the allegations in ¶43 that it has policies and procedures regarding confidential information, requires password protection, limits access to certain information, and requires employees at certain levels to sign restrictive covenants, but denies that Plaintiffs enforce their policies and/or procedures, that their restrictive covenants are enforceable or are enforceable as to him, or that he violated any enforceable restriction applicable to him, as well as the remaining allegations in ¶43.

44.     Defendant admits the allegations in ¶44 that he would be a valuable asset in any organization, but denies the remaining allegations in ¶44.

## II.     **Defendant Signed Multiple Restrictive Covenant Agreements as He Was Promoted into Leadership Roles and Offered Additional Compensation and Equity**

### A.     *The 2016-2017 Restricted Stock Unit ("RSU") Agreements*

45.     Defendant admits the allegations in ¶45 that he was offered the 2016 RSU Agreement, that he accepted it, and that it is appended to the Verified Complaint as Exhibit C but denies that it is enforceable, that he the remaining allegations in ¶45.

6

46.     Defendant admits the allegations in ¶46 that he was offered the 2016 RSU Agreement and that it is appended to the Verified Complaint as Exhibit C but denies the remaining allegations in ¶46.

47.     Defendant admits the allegations in ¶47 that he was offered the 2017 RSU Agreement and that it is appended to the Verified Complaint as Exhibit D but denies the remaining allegations in ¶47.

48.     Defendant admits the allegations in ¶48 that Exhibits C and D of the Verified Complaint each contained a six-month restrictive period but denies that the restrictions contained therein are enforceable, that he engaged in any conduct violative of the 2016 RSU Agreement or the 2017 RSU Agreement, that they prohibit him from working for an entity that is not engaged in the ocean cruise industry, that they prohibit him from working for a company whose fleet does not contain a vessel with at least 1.000 berths, and the remaining allegations in ¶48.

49.     Defendant admits the allegations in ¶49 that Exhibits C and D of the Verified Complaint contained a six-month restrictive period but denies that the restrictions contained therein are enforceable, denies that he engaged in any conduct violative of the 2016 RSU Agreement or the 2017 RSU Agreement, and denies the remaining allegations in ¶49.

50.     Defendant admits the allegations in ¶50 that Exhibits C and D of the Verified Complaint contained language similar to that alleged but denies that the restriction is enforceable, prohibits him from working for an entity that is not engaged in the ocean cruise industry, prohibits him from working for a company whose fleet does not contain a vessel with at least 1,000 berths, that he engaged in any conduct violative of the 2016 RSU Agreement or the 2017 RSU Agreement, and the remaining allegations in ¶50.

**B.  The 2019-2025 RSU Agreements**

7

51.     Defendant admits the allegations in ¶51 that he was offered the 2019 RSU Agreement and that it is appended to the Verified Complaint as Exhibit E but denies the remaining allegations in ¶51.

52.     Defendant admits the allegations in ¶52 that he was offered the 2020 RSU Agreement and that it is appended to the Verified Complaint as Exhibit F but denies the remaining allegations in ¶52.

53.     Defendant admits the allegations in ¶53 that he was offered the 2021 RSU Agreement and that it is appended to the Verified Complaint as Exhibit G but denies remaining allegations in ¶53.

54.     Defendant admits the allegations in ¶54 that he was offered the 2022 RSU Agreement and that it is appended to the Verified Complaint as Exhibit H but denies the remaining allegations in ¶54.

55.     Defendant admits the allegations in ¶55 that he was offered the 2023 RSU Agreement and that it is appended to the Verified Complaint as Exhibit I but denies the remaining allegations in ¶55.

56.     Defendant admits the allegations in ¶56 that he was offered the 2024 RSU Agreement and that it is appended to the Verified Complaint as Exhibit J but denies the remaining allegations in ¶56.

57.     Defendant admits the allegations in ¶57 that he was offered the 2025 RSU Agreement and that it is appended to the Verified Complaint as Exhibit K but denies the remaining allegations in ¶57.

58.     Defendant admits the allegations in ¶58 that Exhibits E, F, G, H, I, J, and K of the Verified Complaint each contained a nine-month restrictive period but denies that the restrictions

8

contained therein are enforceable, that he engaged in any conduct violative of the 2019 RSU Agreement, 2020 RSU Agreement, 2021 RSU Agreement, 20222 RSU Agreement, 2023 RSU Agreement, 2024 RSU Agreement, or 2025 RSU Agreement, prohibit him from working for an entity that is not engaged in the ocean cruise industry, prohibit him from working for a company whose fleet does not contain a vessel with at least 500 berths, and the remaining allegations in ¶58.

59. Defendant refers to his response to ¶58 for his response to the allegations in ¶59.

60. Defendant refers to his response to ¶58 for his response to the allegations in ¶60.

61. Defendant refers to his response to ¶58 for his response to the allegations in ¶61.

62. Defendant admits that Plaintiffs reproduced language from the 2024 RSU Agreement and the 2025 RSU Agreement (Exhibits J and K to the Verified Complaint) in ¶62.

63. Defendant admits that Plaintiffs reproduced language Exhibits E, F, G, H, I, J, and K of the Verified Complaint in ¶63.

64. Defendant admits that Plaintiffs reproduced language Exhibits E, F, G, H, I, J, and K of the Verified Complaint in ¶64.

65. Defendant admits the allegations in ¶65 that he was awarded 5,059 RSUs but is without knowledge of and therefore denies the remaining allegations in ¶65.

**C. The 2018 and 2022 Non-Compete Agreements**

66. Defendant admits the allegations in ¶66 that he signed the 2018 Non-Compete Agreement appended to the Verified Complaint as Exhibit A and that it contained certain post-employment restrictions but denies that the restrictions are enforceable, that he engaged in any conduct violative of the 2018 Non-Compete Agreement, that it precludes him from working for an entity that is not engaged in the ocean cruise industry, prohibits him from working for a

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

company whose fleet does not contain a vessel with at least 1,000 berths, and the remaining allegations in ¶66.

67.　　Defendant refers to his response to ¶66 for his response to ¶67.

68.　　Defendant refers to his response to ¶66 for his response to ¶68.

69.　　Defendant admits the allegations in ¶69 that he signed the 2022 Non-Compete Agreement appended to the Verified Complaint as Exhibit B and that it contained certain post-employment restrictions but denies that the restrictions are enforceable, that he engaged in any conduct violative of the 2022 Non-Compete Agreement, that it precludes him from working for an entity that is not engaged in the ocean cruise industry, prohibits him from working for a company whose fleet does not contain a vessel with at least 1,000 berths, and the remaining allegations in ¶69.

70.　　Defendant refers to his response to ¶69 for his response to ¶70.

71.　　Defendant refers to his response to ¶69 for his response to ¶71.

72.　　Defendant refers to his response to ¶69 for his response to ¶72.

73.　　Defendant admits that Plaintiffs quoted language from the 2022 Non-Compete Agreement appended to the Verified Complaint as Exhibit B in ¶73 but denies all remaining allegations in ¶73.

74.　　Defendant admits that Plaintiffs quoted language from the 2022 Non-Compete Agreement appended to the Verified Complaint as Exhibit B in ¶74 but denies all remaining allegations in ¶¶74.

75.　　Defendant admits that Plaintiffs quoted language from the 2022 Non-Compete Agreement appended to the Verified Complaint as Exhibit B in ¶75 but denies all remaining allegations in ¶75.

10

76.     Defendant denies the allegations in ¶76

### III.    **Defendant Leaves Celebrity to Join Another Cruise Company and Solicits Royal Caribbean's Employee in Breach of Multiple Agreements with Royal Caribbean**

77.     Defendant admits the allegations in ¶77 that his work situation became intolerable, that he resigned due to his intolerable work situation on or about April 28, 2025, and that his resignation was announced on May 26, 2025, but denies the remaining allegations in ¶77.

78.     Defendant denies the allegations in ¶78.

79.     Defendant admits the allegations in ¶79 that he continued using his best efforts and attention in his work after giving notice of his resignation from employment but denies the remaining allegations in ¶79.

80.     Defendant admits the allegations in ¶80.

81.     Defendant denies the allegations in ¶81.

82.     Defendant is without knowledge of the allegations in ¶82 because it does not identify the restrictive covenants to which ¶82 refers and therefore denies them.

83.     Defendant admits the allegations in ¶83.

84.     Defendant admits the allegations in ¶84 that AmaWaterways is engaged in the river cruise business and that each of the vessels has less than 500 berths, but denies the remaining allegations in ¶84.

85.     Defendant denies the allegations in ¶85.

86.     Defendant admits the allegations in ¶86 that the article identified at footnote 4 of the Verified Complaint stated that at AmaWaterways, "He will oversee global consumer sales, service and reservations operations to improve guest and travel advisor experience," but denies the remaining allegations in ¶86.

11

87. Defendant admits the allegations in ¶87 that the article identified at footnote 3 of the Verified Complaint stated that he "has overseen global sales and service operations and led initiatives to strengthen guest engagement and team development" but denies the remaining allegations in ¶87.

88. Defendant denies the allegations in ¶88.

89. Defendant admits the allegations in ¶89.

90. Defendant is without knowledge of the allegations in ¶90 about Plaintiffs' retention of FTI Consulting ("FTI") or the scope of the services to be provided, but states that the Plaintiffs had implemented security measures on his work laptop that prevented him from copying, downloading, or otherwise moving digital information stored on its SharePoint server to another location or device, making it impossible for him to download, transfer, or keep a copy of is confidential, proprietary, or trade secret information that was created or stored electronically, and further responds to the allegations contained therein as follows:

a. Defendant admits the allegations in ¶90.a. that the Plaintiffs previously provided him with a Western Digital Passport external hard drive (MyPassport) device in connection with his employment and that the device was used solely for his work for the Plaintiffs, that he turned his laptop into Plaintiff's IT department in the spring of 2025 and is unaware of the work performed on it at that time, and that it is likely that the Western Digital Passport external hard drive (My Passport) device connected to his laptop was also likely owned and connected to his laptop by the Plaintiffs, but denies that he owns, used, or supplied a My Passport (or other portable hard drive) device to be connected to his work laptop, denies that he moved, copied, or downloaded any digital information without or by exceeding authorization, and is without knowledge of the remaining allegations in ¶90.a.

12

b.      Defendant admits the allegations in ¶90.b. that the Plaintiffs previously provided him with a Western Digital Passport external hard drive (MyPassport) device in connection with his employment and that the device was used solely for his work for the Plaintiffs, that he turned his laptop into Plaintiff's IT department in the spring of 2025 and is unaware of the work performed on it at that time, and that it is likely that the Western Digital Passport external hard drive (My Passport) device connected to his laptop was also likely owned and connected to his laptop by the Plaintiffs, and that he either accessed specific files for the work he customarily performed or did so at the request of his superiors, but denies that he owns, used, or supplied a My Passport (or other portable hard drive) device to be connected to his work laptop, denies that he moved, copied, or downloaded any digital information he should not have, or accessed any files without or by exceeding authorization, denies that he used Cleanmgr to "cover his tracks," and is without knowledge of the remaining allegations in ¶90.b.

c.      Defendant admits the allegations in ¶90.c. that he turned his laptop into Plaintiff's IT department in the spring of 2025 and is unaware of the work performed on it at that time and was later instructed and/or understood that he was to remove and/or wipe his personal data (such as personal account logins) from the work laptop before turning it in, but denies that he moved, copied, or downloaded any digital information without or by exceeding authorization, denies that he used Cleanmgr to "cover his tracks," and is without knowledge of the remaining allegations in ¶90.c.

d.      Defendant admits the allegations in ¶90.c. that he was instructed and/or understood that he was to remove and/or wipe his personal data (such as personal account logins) from the work laptop before turning it in, but denies that he moved, copied, or downloaded any

13

digital information without or by exceeding authorization, denies that he used Cleanmgr to "cover his tracks," and is without knowledge of the remaining allegations in ¶90.d.

   e.   Defendant admits the allegations in ¶90.e. that he was instructed and/or understood that he was to remove and/or wipe his personal data (such as his browsing history) from the work laptop before turning it in, but denies that he moved, copied, or downloaded any digital information without or by exceeding authorization, denies that he deleted his browsing history to "cover his tracks," and is without knowledge of the remaining allegations in ¶90.e.

   f.   Defendant admits the allegations in ¶90.f. that he may have accessed his Google Drive because he was instructed and/or understood that he was to remove and/or wipe his personal data (such as personal account logins) from the work laptop before turning it in and so unlinked the account from the work laptop, but denies that he moved, copied, or downloaded any digital information without or by exceeding authorization, and is without knowledge of the remaining allegations in ¶90.f.

   g.   Defendant admits that if he interacted with the files identified in in ¶90.g., he did so for the work he customarily performed or at the request of his superiors but denies that he interacted with the files without or by exceeding authorization, and denies the remaining allegations in ¶90.g.

   h.   Defendant is without knowledge of the allegations in ¶90.h.

91.   Defendant is unable to admit or deny the allegations at ¶91 because the Plaintiffs do not identify the three files purportedly accessed on April 11, 2025, and so denies them.

92.   Defendant is without knowledge of the allegations in ¶92 and so denies them.

93.   Defendant denies the allegations in ¶93.

135 San Lorenzo Avenue, Suite 770, Coral Gables, Florida 33146
TEL 305.230.4884   FAX 305.230.4844
www.fairlawattorney.com

94. Defendant admits the allegations in ¶94 that anytime he accessed any of the three files identified therein, he did so in connection with his work for Plaintiffs but denies the remaining allegations in ¶94.

95. Defendant denies the allegations in ¶95.

96. Defendant denies the allegations in ¶96.

97. Defendant admits the allegations in ¶97 that anytime he accessed any of the three files identified, he did so in connection with his work for Plaintiffs but denies the remaining allegations in ¶97.

## CAUSES OF ACTION

## COUNT I: BREACH OF CONTRACT – 2018 NON-COMPETE AGREEMENT

98. Defendant reincorporates his responses to ¶¶1-97 in response to ¶98.

99. Defendant reincorporates his response to ¶66 in response to ¶97.

100. Defendant denies the allegations in ¶100.

101. Defendant denies the allegations in ¶101.

102. Defendant denies the allegations in ¶102.

103. Defendant denies the allegations in ¶103.

104. Defendant reincorporates his response to ¶67 in response to ¶104.

105. Defendant admits the allegations in ¶105 that he began employment with AmaWaterways, and that it is an entity engaged in river cruises, but denies that any vessel in the AmaWaterways fleet has over 1,000 berths, denies that it is in the same line of business as the Plaintiffs, and denies the remaining allegations in ¶105.

106. Defendant reincorporates his response to ¶67 in response to ¶106.

107. Defendant reincorporates his response to ¶67 in response to ¶107.

15

108.    Defendant denies the allegations in ¶108.

109.    Defendant denies the allegations in ¶109.

110.    Defendant denies the allegations in ¶110.

111.    Defendant denies the allegations in ¶111.

112.    Defendant denies the allegations in ¶112.

**COUNT II: BREACH OF CONTRACT – 2022 NON-COMPETE AGREEMENT**

113.    Defendant reincorporates his responses to ¶¶1-97 as his response to ¶113.

114.    Defendant reincorporates his response to ¶69 in response to ¶114.

115.    Defendant reincorporates his response to ¶69 in response to ¶115.

116.    Defendant denies the allegations in ¶116.

117.    Defendant denies the allegations in ¶117.

118.    Defendant denies the allegations in ¶118.

119.    Defendant reincorporates his response to ¶69 in response to ¶119.

120.    Defendant denies the allegations in ¶120.

121.    Defendant reincorporates his response to ¶69 in response to ¶121.

122.    Defendant denies the allegations in ¶122.

123.    Defendant denies the allegations in ¶123.

124.    Defendant denies the allegations in ¶124.

125.    Defendant denies the allegations in ¶125.

126.    Defendant denies the allegations in ¶126.

**COUNT III: BREACH OF CONTRACT – THE RSU AGREEMENTS**

127.    Defendant reincorporates his responses to ¶¶1-97 as his response to ¶127.

128.    Defendant reincorporates his response to ¶¶48 and 58 in response to ¶128.

16

129.     Defendant denies the allegations in ¶129.

130.     Defendant denies the allegations in ¶130.

131.     Defendant denies the allegations in ¶131.

132.     Defendant admits the allegations in ¶132.

133.     Defendant admits the allegations in ¶133.

134.     Defendant reincorporates his response to ¶48 in response to ¶134.

135.     Defendant denies the allegations in ¶135.

136.     Defendant reincorporates his response to ¶48 in response to ¶136.

137.     Defendant denies the allegations in ¶137.

138.     Defendant admits the allegations in ¶138.

139.     Defendant admits the allegations in ¶139.

140.     Defendant admits the allegations in ¶140.

141.     Defendant admits the allegations in ¶141.

142.     Defendant admits the allegations in ¶142.

143.     Defendant admits the allegations in ¶143.

144.     Defendant admits the allegations in ¶144.

145.     Defendant reincorporates his response to ¶48 and 58 in response to ¶145.

146.     Defendant denies the allegations in ¶146.

147.     Defendant reincorporates his response to ¶48 and 58 in response to ¶147.

148.     Defendant denies the allegations in ¶148.

149.     Defendant denies the allegations in ¶149.

150.     Defendant denies the allegations in ¶150.

151.     Defendant denies the allegations in ¶151.

17

## COUNT IV: MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS – VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT

152.    Defendant reincorporates his responses to ¶¶1-97 as his response to ¶152.

153.    Defendant denies the allegations in ¶153.

154.    Defendant denies the allegations in ¶154.

155.    Defendant is without knowledge of the allegations in ¶155.

156.    Defendant is without knowledge of the allegations in ¶156.

157.    Defendant denies the allegations in ¶157.

158.    Defendant denies the allegations in ¶158.

159.    Defendant denies the allegations in ¶159.

160.    Defendant denies the allegations in ¶160.

161.    Defendant denies the allegations in ¶161.

162.    Defendant denies the allegations in ¶162.

Defendant, Angel Christopher Gomez, denies all allegations not specifically responded to above.

### AFFIRMATIVE DEFENSES

#### First Affirmative Defense

Plaintiffs failed to state a claim for which relief can be granted, and as a result, their claims must be dismissed.

#### Second Affirmative Defense

One or both Plaintiffs lack standing to enforce the agreements at issue in this lawsuit, as the agreements appended to the Verified Complaint as Exhibits A through K do not each include both Plaintiffs as contracting parties.

18

### *Third Affirmative Defense*

One or both Plaintiffs lack standing to enforce the agreements at issue in this lawsuit, as the agreements appended to the Verified Complaint as Exhibits A through K are not intended to benefit both Plaintiffs as contracting parties (if not specifically named therein).

### *Fourth Affirmative Defense*

Plaintiffs are not entitled to enforce the contracts and agreements appended to the Verified Complaint at Exhibits A through K because they first breached them before Defendant is alleged to have committed any breach. *See Benemerito & Flores, M.D.'s P.A. vs. Roche*, 751 So. 2d 91 (Fla. 4th DCA 1999); *Bradley v. Health Coal.*, 687 So. 2d 329, 333 (Fla. 3d DCA 1997); and *Cordis Corp. v. Prooslin*, 482 So. 2d 486 (Fla. 3d DCA 1986).

### *Fifth Affirmative Defense*

Plaintiffs cannot enforce the restrictive covenants in Exhibits A through K of the Verified Complaint to prevent Defendant from working and/or soliciting its employees because they are overly broad, not necessary to protect an established or legitimate business interest, and are not reasonable in terms of time, area, or line of business. *But see* Fla. Stat. §542.335.

### Ocean Cruising vs. River Cruising

The ocean cruise industry is separate and distinct from the river cruise industry. Each has different vessel types, configurations, construction standards, fuel use and requirements, and safety standards; ports; terminal infrastructure; operating conditions; customer profiles; and guest experiences. Ocean and river cruise operators target and serve different markets, consumer behaviors, guest profiles, and destinations.

**Ocean cruises.** Ocean cruise vessels are like floating cities: they are large, with hundreds to thousands of berths, have multiple decks above and below the waterline, contain interior cabins

19

without windows, feature deep displacement hulls, are built to different specifications and tolerances to handle larger ports, rougher seas, and more challenging conditions, and must strictly follow the International Convention for the Safety of Life at Sea (SOLAS).

Ocean cruises operate in saltwater oceans and seas, dock at or anchor near seaports, involve longer leg journeys, and have dedicated terminal infrastructure. Ocean cruises focus on the ship and on-board resort experiences, group entertainment, and excursions through operators affiliated with the cruise company

**River cruises.** River cruises utilize much smaller vessels, with hundreds of berths, and lack multiple decks below the waterline. They do not have interior cabins, feature shallow and flat hulls, and generally lack large-venue spaces. These vessels offer dining for a limited number of guests, are designed for easy docking in city centers, and are built to different standards that do not require them to operate in rough seas or challenging open-ocean conditions. They are also not subject to SOLAS regulations. River cruises are more port-intensive; they sail through locks and under bridges, with daily stops, and operate in fresh or brackish water. The focus of river cruises is on destination immersion, encouraging guests to disembark and explore cities and villages—often not owned or operated by the cruise line—for cultural experiences.

The Plaintiffs Operate Ocean Cruises

The Plaintiffs were engaged only in the ocean cruise industry during the Defendant's employment. Royal Caribbean Group states on its website that "Royal Caribbean has been delivering innovation at sea since its launch in 1969."

20

# WHY ROYAL CARIBBEAN

Royal Caribbean has been delivering innovation at sea since its launch in 1969. Each successive class of ships is a record-breaking architectural marvel that revolutionizes vacations. Today, the cruise line continues to dial up the guest experience for adventurous travelers, offering bold onboard thrills, spectacular dining options, breath-taking entertainment and world-class accommodations.

https://www.royalcaribbean.com/about-us. The Plaintiffs' ocean cruise packages include soft drinks, all onboard dining options, alcoholic beverages, and shore excursions, each of which is available for an additional fee. The Plaintiffs did not own or operate, either directly or indirectly, any vessels engaged in river cruising during the Defendant's employment or up to the date specified below. They did not mention any operations related to the river cruise industry in the Earnings Report for the First Quarter of 2025, released on April 29, 2025. At most, they announced the launch of Celebrity River Cruises on January 28, 2025, and stated that bookings for Celebrity River Cruises would begin later in 2025 for sailings scheduled in 2027.

<u>Plaintiffs Did Not Expose Defendant To River Cruise Information</u>

Plaintiffs did not provide the Defendant, as part of his work, with confidential, proprietary, or trade secret information related to the construction or operation of river cruise vessels, the river cruise industry, river cruise customers or markets, river cruise destinations, or shoreside experiences. They also did not train him on these topics. Therefore, the Plaintiffs' claims to restrict the Defendant from working for a subsequent employer who is engaged in a different line of business must fail.

<u>Defendant's Employer Operates River Cruises</u>

AmaWaterways is a preeminent river cruise operator that provides premium to luxury river cruise experiences in Europe, Asia, and Africa. (https://www.amawaterways.com/whyamawaterways). Its ships carry an average of 156 guests.

21

Its pricing structure includes all onboard dining offerings, shore excursions, and soft drinks, beer, wine, and some cocktails, with lunch and dinner.

Due to the distinctions between ocean and river cruises and the Plaintiff's business operations while they employed the Defendant, Plaintiffs' claims against the Defendant must fail.

### Sixth Affirmative Defense

Plaintiffs seek to enforce the restrictive covenants in Exhibits A through K of the Verified Complaint, which are unreasonably over-expansive in terms of time, area, and line of business by relying on overly expansive, vague, and ambiguous language, resulting in a lack of mutual assent on all material terms and preventing enforcement.

### Seventh Affirmative Defense

Plaintiffs are estopped from enforcing the restrictive covenants against Defendant based on their representations that his work for AmaWaterways was not considered competitive, through their actions and/or inactions. Defendant relied on these representations by or on behalf of one or more of the Plaintiffs, and they cannot now attempt to enforce the restrictive covenants they previously agreed not to pursue.

### Eighth Affirmative Defense

Plaintiffs waived the restrictive covenants they seek to enforce because they did not act diligently in seeking to enforce the restrictive covenants against him. Although Plaintiffs allege that Defendant's current employer publicly announced his hiring as its "SVP Global Sales and Service" on July 31, 2025, they took no action to enforce the agreements appended to the Verified Complaint as Exhibits A through K for nearly three months (which is half of the 6-month restrictive period and one-third of the restrictive period at issue herein). Plaintiffs' delay results in their inability to enforce the agreements at issue herein.

22

### Ninth Affirmative Defense

Plaintiffs frustrated the Defendant's ability to continue working for them by discriminating against him and creating a hostile, if not retaliatory, environment in violation of Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act, and Miami-Dade County Ordinance 11A. While acting through their agents and employees, the Plaintiffs engaged in unlawful discrimination against the Defendant by creating and perpetuating a work environment where he was subjected to derogatory remarks that were so severe and pervasive they altered the terms and conditions of his employment and made his workplace intolerable. Plaintiffs' failure or refusal to take proper corrective action in response to the Defendant's complaints and awareness of the discriminatory conduct and involved personnel led to, if not compelled, the Defendant's resignation. Consequently, Plaintiffs are not entitled to any relief based on the agreements attached to the Verified Complaint as Exhibits A through K due to their conduct, actions, and/or inactions.

### Tenth Affirmative Defense

Plaintiffs waived the ability to enforce the restrictive covenants at issue herein against the Defendant by either not enforcing or by agreeing not to enforce the same or similar restrictive covenants to which other former employees agreed after they engaged in work that was or would be violative of those restrictive covenants.

### Eleventh Affirmative Defense

Plaintiffs' claims fail, in whole or in part, to the extent they failed to mitigate their damages and any damages awarded must be reduced accordingly.

### Twelfth Affirmative Defense

23

Defendant is entitled to a set-off for any damages sought by or awarded to Plaintiffs herein for any settlement with, judgment against, and/or payment from any other party, non-party, or collateral source (insurance policy, tax credit, deductions for losses sustained, etc.).

### *Thirteenth Affirmative Defense*

Defendant is entitled to a set-off for any damages sought by or awarded to Plaintiffs herein for all wages (such as accrued but unused paid time off) due to or earned by Defendant but not paid to him.

### *Fourteenth Affirmative Defense*

Plaintiffs' damages, if any, are too speculative to support relief as they cannot be established with reasonable certainty.

### *Fifteenth Affirmative Defense*

Plaintiffs' claims are barred, in whole or in part, based upon intervening and superseding actions of Plaintiffs themselves or third parties.

### *Reservation of Rights*

Defendant reserves the right to assert other viable affirmative defenses as they are revealed through discovery.

WHEREFORE Defendant, Angel Christopher Gomez, having responded to the Complaint, demands the entry of a judgment in his favor and against Plaintiffs, Celebrity Cruises, Inc. and Royal Caribbean Group, Ltd. d/b/a Royal Caribbean Group, entitling him to recover his attorney's fees and costs incurred in defense of Plaintiffs' claims based on the contract between the parties and Fla. Stat. §§57.105 and 542.335, and to award him such other and further relief as the Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was eFiled on this 24th day of November 2025, which will serve Tyler Sims, Esq., and West A. Holden, Esq., tsimms@littler.com, and wholden@littler.com, 111 North Orange Avenue, Suite 1750, Orlando, FL 32801.2366, and Paul Kennedy, Esq., pkennedy@littler.com, 815 Connecticut Avenue, N.W., Suite 400, Washington, DC 20006, LITTLER MENDELSON P.C., as *Counsel for Plaintiffs*, and all others who appeared in this action.

s/Brian H. Pollock, Esq.
Brian H. Pollock, Esq.
Fla. Bar No. 174742
brian@fairlawattorney.com
FAIRLAW FIRM
135 San Lorenzo Avenue
Suite 770
Coral Gables, FL 33146
Tel:     305.230.4884
*Counsel for Defendant*

25

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2025-020399-CA-01
SECTION: CA43
JUDGE: Thomas J. Rebull

**CELEBRITY CRUISES, INC. and ROYAL CARIBBEAN, et al**

Plaintiff(s)

vs.

**ANGEL CHRISTOPHER GOMEZ**

Defendant(s)

_____/

## ORDER SETTING IN-PERSON EVIDENTIARY HEARING

The Court will hold an in-person evidentiary hearing on **December 8, 2025, at 4pm** in room 817 of the Dade County Courthouse on Plaintiffs' Emergency Motion for Temporary Injunction. Anyone wishing to be heard on the Motion must appear in person.

Movant shall have for the Court at the hearing courtesy copies of the complaint with all exhibits, answer and affirmative defenses, and motion with all attached exhibits.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 2nd day of December, 2025.

2025-020399-CA-01 12-02-2025 8:18 AM

2025-020399-CA-01 12-02-2025 8:18 AM
Hon. Thomas J. Rebull

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

- Brian H Pollock: brian@fairlawattorney.com
- Brian H Pollock: juan@fairlawattorney.com
- Brian H Pollock: steffany@fairlawattorney.com
- Patrick Brooks LaRou: brooks@fairlawattorney.com
- Patrick Brooks LaRou: juan@fairlawattorney.com
- Tyler Sims: tsims@littler.com
- Tyler Sims: vlopez@littler.com
- West Holden: wholden@littler.com
- West Holden: evega@littler.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES, LTD.
d/b/a ROYAL CARIBBEAN GROUP,

       Plaintiff,

v.

ANGEL CHRISTOPHER GOMEZ,

       Defendant.

_____/

## DECLARATION PURSUANT TO 28 U.S.C. §1746

    Angel Christopher Gomez, having been duly sworn, deposes and says as follows pursuant to

28 U.S.C. §1746:

1.    My name is Angel Christopher Gomez.

2.    I have personal knowledge of the facts contained in this Declaration.

3.    I have been a resident and citizen of the State of California since July 2025.

4.    I have lived in a townhome at 4374 Paxton Place, Calabasas, California 91302, pursuant to a

     one-year lease, since July 2025.

5.    I have kept my personal property in California, most of which is in the townhome, since I

     moved there.

6.    I have paid for utilities for the townhome since moving in, and true and correct redacted

     copies of my Southern California Edison utility bills for July and November 2025 are attached

     as Exhibit "1."

7.    I have maintained social memberships in California, including at the City of Calabasas Tennis

     and Swim Center.

1

8.  I currently work for AmaWaterways, and my role is based out of the company's Calabasas, California office.

9.  It is my present and ongoing intent to remain a resident of the State of California.

10. I intend to continue making California my permanent home, and none of my actions since relocating have been taken with the intent to live elsewhere.

11. Further Declarant sayeth naught.

## DECLARATION

I, Angel Christopher Gomez, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
ANGEL CHRISTOPHER GOMEZ

DATE: 12/02/25
_____

2

# EXHIBIT

## "1"

### EXHIBIT "1"





SOUTHERN CALIFORNIA
**EDISON** ®
*An EDISON INTERNATIONAL® Company*

For billing and service inquiries
1-800-684-8123
www.sce.com

## Your electricity bill

**GOMEZ, ANGEL C** / Page 1 of 8

Go paperless at **www.sce.com/ebilling.** It's fast, easy and secure.

**Customer Account**
▇▇6710

4374 PAXTON PL
CALABASAS, CA 91302-3843

**Date bill prepared**
07/22/25

**Amount due $**▇▇▇
**Due by 08/11/25**

## Your account summary

| | |
|---|---|
| Previous Balance | $0.00 |
| Balance forward | $0.00 |
| Your new charges | |
| Service Connection Fee | ▇▇▇ |
| **Total amount you owe by 08/11/25** | |

## Summary of your billing detail

| Service account | Service address | Billing period | Your rate | New charges |
|---|---|---|---|---|
| ▇▇▇ | 4374 PAXTON PL CALABASAS, CA | 07/01/25 to 07/17/25 | DOMESTIC (SCE) | ▇▇ |
| ▇▇▇ | 4374 PAXTON PL CALABASAS, CA | 07/01/25 to 07/17/25 | DOMESTIC | ▇▇ |
| | | | | ▇▇ |

Please return the payment stub below with your payment and make your check payable to Southern California Edison.
If you want to pay in person, call 1-800-747-8908 for locations, or you can pay online at www.sce.com.

(14-574)     Tear here                                                                                          Tear here



SOUTHERN CALIFORNIA
**EDISON**
*An EDISON INTERNATIONAL® Company*

**Customer account** ▇▇▇6710
Please write this number on the memo
line of your check. Make your check payable to
Southern California Edison.

**Amount due by 08/11/25**          $▇▇

Amount enclosed          $ _____

STMT 07222025 P

GOMEZ, ANGEL C
4374 PAXTON PL
CALABASAS CA   91302-3843

P.O. BOX 600
ROSEMEAD, CA  91771-0002

▇▇▇ 6710 ▇▇▇▇▇▇



Go paperless at **www.sce.com/ebilling.** It's fast, easy and secure.

For billing and service inquiries
1-800-684-8123
www.sce.com

# Your electricity bill

**GOMEZ, ANGEL C** / Page 1 of 6

| | | |
|---|---|---|
| **Customer Account** | **Date bill prepared** | |
| ■■6710 | 11/19/25 | |

4374 PAXTON PL
CALABASAS, CA 91302-3843

**Amount due** ■■■■
**Due by 12/09/25**

## Your account summary

Previous Balance
Payment Received 10/22/25
Balance forward
Your new charges

 **Total amount you owe by 12/09/25**

## Summary of your billing detail

| Service account | Service address | Billing period | Your rate | New charges |
|---|---|---|---|---|
| 8020497506 | 4374 PAXTON PL CALABASAS, CA | 10/16/25 to 11/16/25 | DOMESTIC (SCE) | ■■ |
| 8020497506 | 4374 PAXTON PL CALABASAS, CA | 10/16/25 to 11/16/25 | DOMESTIC | ■■ |
| | | | | ■■ |

---

(14-574)      Tear here

Please return the payment stub below with your payment and make your check payable to Southern California Edison.
If you want to pay in person, call 1-800-747-8908 for locations, or you can pay online at www.sce.com.

Tear here



| | |
|---|---|
| Customer account ■■6710 | **Amount due by 12/09/25** $■■ |
| Please write this number on the memo line of your check. Make your check payable to Southern California Edison. | Amount enclosed $ |

STMT 11192025 P

GOMEZ, ANGEL C
4374 PAXTON PL
CALABASAS CA  91302-3843

P.O. BOX 600
ROSEMEAD, CA  91771-0002

6710