# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:25-cv-25648-KMW-EAL

CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES LTD.,
d/b/a ROYAL CARIBBEAN GROUP,

       Plaintiffs,

  v.

ANGEL CHRISTOPHER GOMEZ,

       Defendant.

_____/

## [PROPOSED] REPORT AND RECOMMENDATION GRANTING PLAINTIFFS' EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER

This matter was referred to this Court by District Judge Kathleen M. Williams for a report and recommendation on the Expedited Motion for Temporary Restraining Order filed by Plaintiffs ("Motion for TRO") [ECF No. 4]. Defendant responded in opposition to the Motion for TRO [ECF No. 15] and Plaintiffs subsequently replied [ECF No. 21]. On December 12, 2025, the Court held an evidentiary hearing on the Motion for TRO. [ECF No. 23]. Hearing Exhibits[1] were submitted by both parties and incorporated into the record. [ECF No. 27].

After careful consideration of the parties' filings, the record, and the relevant legal authorities, the Court recommends that the District Court grant the Motion for TRO.

I.      BACKGROUND

      A.      PROCEDURAL HISTORY

Plaintiffs Celebrity Cruises Inc. ("Celebrity") and Royal Caribbean Cruises Ltd. ("RCCL") initially filed this action against Defendant Angel Christopher Gomez in the Complex Business Division of the Eleventh Judicial Circuit Court in and for Miami-Dade, County Florida on October 16, 2025. Plaintiffs filed an emergency motion for a temporary injunction with the state court on November 11, 2025, based on Defendant's breaches of his non-competition and non-solicitation obligations in his agreements with Plaintiffs. On December 2, 2025, the state court set the state

---

[1] Referred to herein as "Ex."

court emergency motion for a temporary injunction for hearing on December 8, 2025. On December 2, 2025, Defendant filed a notice of removal, removing the case to this Court based on diversity jurisdiction. [ECF No. 1]. On December 4, 2025, Plaintiffs filed the Motion for TRO with this Court. [ECF No. 4]. On December 5, 2025, District Judge Kathleen M. Williams set the Motion for a hearing on December 12, 2025. [ECF No. 12]. On December 11, 2025, District Judge Kathleen M. Williams referred the Motion for TRO to Magistrate Judge Enjolique A. Lett for a report and recommendation. [ECF No. 19].

### B. FACTUAL BACKGROUND

#### i. Plaintiffs' Business

RCCL is a publicly traded company, and Celebrity is a wholly owned subsidiary of RCCL. [Tr.[2] 34:15-25]. RCCL operates with a global fleet of 68 cruise ships across its five brands traveling to all seven continents. [Ex. D-AA]. With a mission to deliver the best vacations responsibly, RCCL serves millions of guests each year through its brands, including Royal Caribbean, Celebrity, and Silversea. [Ex. D-AA]. As part of RCCL's portfolio of product offerings, Celebrity also has an expedition ship that has 50 cabins and operates in the Galapagos year-round. [Tr. 44:14-19].

#### ii. Defendant's Employment with Celebrity and Access to Confidential Information

Defendant worked for Celebrity for 18 years, most recently as an Assistant Vice President Consumer Outreach. [Tr. 20:23-25]. Defendant was a member of the sales leadership team for Celebrity. [Tr. 21:1-17]. In this role, Defendant was responsible for leading the direct-to-consumer sales channel. [Tr. 20:23-25 and Tr. 22:18-25]. He supervised approximately 400 employees globally. [Tr. 21:18-23]. Defendant previously had leadership responsibilities over a business-to-business sales channel, in which he worked directly with Celebrity's travel agency partners. [Tr. 23:25-24:20].

It is undisputed that Defendant had access to Plaintiffs' confidential business information regarding financial metrics, revenue history, guest sourcing, the types of products and destinations offered, strategic plans, and annual operating plans. [Tr. 27:2-15; 28:2-24]. Defendant attended leadership meetings, including sales leadership team meetings, that were limited to individuals in leadership roles at Celebrity. [Tr. 28:25-32:3]. Defendant himself acknowledged that he had access

---

[2] "Tr." refers to the December 12, 2025, hearing transcript. [ECF No. 26].

to confidential, non-public information about Plaintiffs' strategies and operations:

> Q. And you don't dispute that you had access to confidential non-public information about ocean cruising. Right?
> A. I would agree with that.

[Tr. 113:18-20].

Defendant argues that he did not have access to confidential information specifically related to river products. Given Defendant's access to confidential information about Plaintiffs' operations and strategies during his nearly 18 years of employment with Celebrity, Plaintiffs need not prove that Defendant received confidential information specific to river products. Nevertheless, the evidence establishes that Defendant received confidential information about the river product, its rollout, and sales strategies for selling river cruises. For example, he attended multiple meetings about the river cruise product, worked with an external consulting group about the river cruise product, had access to PowerPoint presentations about the river cruise product, was given access to other documents about the river cruise product, provided information about call volume and guest questions about the river cruise product, assisted in drafting frequently asked questions (FAQs) about the river cruise product, and was responsible for updating documents related to the river cruise product. [Tr. 42:21-44:4; 115:13- 119:4; 132:4-18; 138:9-16]. A March 2025 email between Defendant and the external consulting group retained by Celebrity to advise on strategies related to the river cruise product (Ex. P-4) demonstrates that Defendant was substantively engaged in drafting external-facing company documents. Defendant testified that he resigned in the "middle" of the deployment of the river cruise training of his contact center team. [Tr. 137:15-22].

### iii.       The Agreements with Plaintiffs

Plaintiffs have their employees who hold director level and above positions enter into restrictive covenant agreements – some in the form of RCCL restricted stock unit agreements ("RSU Agreements") and some in the form of separate employment agreements. [Tr. 49:8-24, Tr. 52:4-22, Ex. P-5, P-6].

Since about 2014, Defendant entered into multiple RSU Agreements during his employment with Celebrity, including his most recent RSU Agreement – the 2025 RSU Agreement. [Tr. 122:6-17]. He testified that he logged into his E-trade account and electronically accepted the terms of the 2025 RSU Agreement because he "wanted the money." [Tr. 52:4-22, 122:18-123:15, Tr. 122:10-123:3]. Defendant accepted the terms, received shares granted in the

RSU Agreements, and sold some of those shares. [Tr. 123:20-124:6].

Based on review of the 2025 RSU Agreement [Ex. P-5] and the evidence presented, this Court finds that Defendant is subject to non-compete and non-solicit obligations contained therein.

The 2025 RSU Agreement contains a non-compete covenant prohibiting employment with any "entity engaged in (or preparing to engage in) cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built) or cruise related businesses of any such entity." [Ex. P-5]. The 2025 RSU Agreement contains a non-solicitation covenant prohibiting Defendant from "employ[ing] or seek[ing] to employ" any employee of Plaintiffs, and from soliciting, inducing, or influencing, any employee to "discontinue or reduce or modify" their relationship with Plaintiffs. [Ex. P-5]. The 2025 RSU Agreement specifically provides for tolling in for any period where Defendant was in breach of any of the restrictive covenants:

> The Restricted Period…shall be tolled during any period that Grantee is in breach of any of the restrictive covenants in this Schedule A so that Company is provided with the full benefit of the full Restricted Period.

[Ex. P-5].

In addition to his multiple RSU agreements, including without limitation the 2025 RSU Agreement, Defendant entered into the Employee Nondisclosure and Noncompetition Agreement (the "2022 Non-Compete Agreement" with the 2025 RSU Agreement, the "Agreements"). [Ex. P-6; Tr. 12:5-14; ECF No. 18, ¶ 69]. The 2022 Non-Compete Agreement contains a non-compete covenant that is limited based on the competitor's fleet size, specifically "any other entity engaged in cruises, with a minimum fleet size of 500 berths (including the reasonable estimated berths of ships under construction or publicly announced to be built), or cruise related business of any such entity." [Ex. P-6, § 3(A)]. The 2022 Non-Compete Agreement also prohibits Defendant from soliciting any employee of the Company in a manner substantially similar to the 2025 RSU Agreement. [Ex. P-6, § 3(B)].

### iv.         Defendant's Breaches of his Non-Compete Restrictions

In April 2025, Defendant notified Celebrity that he was resigning. [Tr. 103:23-24]. After giving notice of his resignation, he continued working through May 26, 2025 [Tr. 104:1]. He did not inform Celebrity of his plans to join AmaWaterways ("Ama") as Senior Vice President, Global Consumer Sales. [Tr. 126:11-13]. Defendant accepted employment with Ama and holds a senior leadership role and oversees the business-to-consumer sales channel. [Tr. 126:9-10]. Ama is a cruise company that has more than 30 ships with up to 150 berths per ship and, therefore, has a

fleet greater than 500 berths. [Tr. 121:16-122:3, 126:9-10, 142:25]. Based on the evidence, including Defendant's admissions that he is employed by Ama and Ama has a fleet size greater than 500 berths, this Court finds Defendant is in breach of his non-compete restrictions.

### v.        Defendant's Breaches of his Non-Solicit Restrictions

On May 15, 2025, which was Defendant's last day of employment with Celebrity, Defendant and "Mr. Santelices" exchanged text messages, saving one another's contact information. [Ex. D-Q]. It is undisputed that Defendant communicated with Jason Santelices ("Mr. Santelices") who is a current Royal Caribbean employee about employment opportunities with Ama. Mr. Santelices has been employed with Royal Caribbean for 21 years and currently holds the position of Senior Manager of Global Corporate Meetings and Incentives. [Tr 170:23-171:1]. It is undisputed that Defendant and Mr. Santelices did not have any communications between Defendant's last day of employment with Celebrity on May 15, 2025 and September 5, 2025 when Defendant texted Mr. Santelices. [Tr. 173:15-174:5, 110:16-23; Ex. D-Q].

Defendant sent a text to Mr. Santelices on September 5, 2025. [Ex. D-Q]. On September 6, 2025, after Mr. Santelices did not immediately respond to the September 5th text, Defendant reached out to Mr. Santelices's wife on Facebook and asked her to have Mr. Santelices call him. [Tr. 109:10-13; Ex. P-6]. Defendant describes the communication as personal check-in and denies discussing any opportunities at Ama. [Tr. 110:20-11:9]. Mr. Santelices describes the conversations as being about potential employment opportunities with Ama. [Tr. 174:18-175:17]. The testimony and exhibits demonstrate that there were communications about employment opportunities with Ama. The September 2025 communications included Defendant telling Mr. Santelices that the salary at Ama would be more than he was making at Royal Caribbean. [*Id.*] Following these conversations, Mr. Santelices texted Defendant:

> Angel, I want to thank you for your time and consideration. I truly appreciate you looking out for my career growth and understanding as I do some some searching to figure out what's best for me moving forward. Please know my conversation with you was a lot more open and honest given our relationship and even considering me for such an important role within your organization. While the timing isn't perfect at the moment do keep me in mind and maybe our paths will cross again.

[Ex. D-Q (sic)]. Defendant responded to this text message with a heart emoji. [Tr. 176:15-25, Ex. D-Q]. In subsequent text messages, Defendant and Mr. Santelices communicated about other individuals that may be open to employment with Ama. [Ex. D-Q].

Defendant argues that he did not breach his non-solicit restriction because he did not initiate communications with Mr. Santelices about employment opportunities with Ama. [Tr. 110:24-111:6]. In support of his initiation argument, Defendant points to two conversations in 2024 while he was still employed by Celebrity. The first conversation took place in June 2024, and the second conversation took place in August 2024. [Tr. 171:5-173:10]. Moreover, the two 2024 conversations related to careers and opportunities for Mr. Santelices within Defendant's department at Celebrity. [Tr. 181:10-16]. The Court finds that the two 2024 conversations that took place while Defendant was still employed with Celebrity are unrelated to the current non-solicitation analysis. The Court finds that the conversations while Defendant was still employed with Celebrity are not relevant. The relevant communications took place in September 2025, beginning the September 5, 2025 text message from Defendant to Mr. Santelices. There were subsequently multiple communications and, regardless of who initiated the various calls or messages, Defendant is prohibited by the Agreements from engaging in these communications about employment opportunities with Ama.

## II.      ANALYSIS

To obtain a TRO, a movant must show: "(1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) the injury to the movant outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the public interest." *Superior Consulting Servs. v. Shaklee Corp.*, 710 F. App'x 850, 853 (11th Cir. 2017). "Likelihood of success on the merits is generally the most important of the four factors." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (internal citations omitted).

### A.      LIKELIHOOD OF SUCCESS ON MERITS

The first prong of the analysis is likelihood of success on the merits. Section 542.335, Florida Statutes, provides for enforcement of restrictive covenants when they are (a) reasonably related to the protection of "legitimate business interests" and (b) not unreasonable in terms of time, geographic scope, and line of business. *Leighton v. First Universal Lending, LLC*, 925 So. 2d 462, 464 (4th DCA 2006) ("Non-compete clauses are valid so long as the contracts are reasonable in time, area, and line of business.") (citing Fla. Stat. § 542.335(1)).

Section 542.335(1)(b) provides a non-exhaustive list of "legitimate business interests," which include, without limitation, trade secrets, valuable confidential business or professional

information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers or clients, goodwill, and specialized training. *See, e.g.*, *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004) (citing Fla. Stat. § 542.335(1)(b)); *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 (11th Cir. 2009) ("When an employee has access to confidential business information crucial to the success of an employer's business, that employer has a strong interest in enforcing a covenant not to compete.").

### i.      Plaintiffs' Legitimate Business Interests

Section 542.335(1)(b) enumerates multiple legitimate business interests that may support restrictive covenants, and a plaintiff need only establish one legitimate business interest to justify the restrictive covenant. *Proudfoot Consulting*, 576 F.3d at 1233; *AutoNation*, 347 F. Supp. 2d at 1304 (citing Fla. Stat. § 542.335(1)(b)).

It is undisputed that Defendant had access to confidential business information regarding the cruise industry and sales strategies as part of his role at Celebrity. This is sufficient to support the restrictive covenants in the Agreements. Defendant also had access to confidential business information regarding Celebrity's different products including the river cruise products when he resigned in May 2025. Celebrity planned to "go live" with sales for the river cruises in April or early May of 2025, and had been building the internal operations process during Defendant's employment. [Tr. 64:11-21]. Defendant admits the Company was in the "middle" of rolling out training to his organization. [Tr. 137:15-22]. Defendant testified that he attended multiple meetings dedicated to the river cruise rollout. He also attended numerous additional high-level meetings that were limited to Director-level and above employees. During those meetings, Celebrity shared confidential information such as 3-5-year annual operating plans, financial metrics, KPIs, expectations, new product innovations, guest demographics, segmentation of the consumer, global distribution, employee talent, and brand strategy. [Tr. 28:5-29:25]. Defendant testified that he was presented non-public confidential information in at least one of those meetings and attendees were specifically told not to share the information they learned with the general public or any other Celebrity employees. [Tr. 30:11-19, 38:16-39:16]. In addition to confidentiality, Defendant has substantial relationships with Celebrity trade partners and over 400 direct reports, which provide additional legitimate business interests supporting the restrictive covenants. The Court finds that Plaintiffs have established legitimate business interests sufficient to support restrictive covenants.

ii.        **The Restrictions are Reasonable**

The 9-month restricted period is reasonable under Florida law. Fla. Stat. § 542.335(2)(1) (presume reasonable 6 months or less and unreasonable 2 years or more); *see Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1277 (M.D. Fla. 2020) ("the Agreement is limited to one-year post-termination, which many courts have found reasonable"); *Alonso-Llamazares v. Int'l Dermatology Rsch., Inc.*, 339 So. 3d 385, 390 (Fla. 3d DCA 2022) (two-year non-compete reasonable); *Spine v. Moulton*, 346 So. 3d 154, 159 n.3 (Fla. 2nd DCA 2022) ("two-year time period, geographic area, and line of business restricted appear to be reasonable based upon Florida caselaw"). Defendant has not argued that a 9-month restricted period is unreasonable.

The global scope is reasonable under Florida law. *Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009) (enforcing non-solicitation agreement despite lack of *any* geographic limitation because it did not prohibit all competition); *see also AutoNation*, 347 F. Supp. 2d at 1307 (finding geographic scope reasonable where former employee was "prohibited from working in any geographic space in which AutoNation operates"); *Head Kandy, LLC v. McNeill*, No. 23-CV-60345, 2023 U.S. Dist. LEXIS 162474, at *25 (S.D. Fla. Sep. 12, 2023) (holding that worldwide non-compete was reasonable under Florida law based on need to protect customer relationships and goodwill). Defendant does not argue that the Agreements are overbroad in terms of their geographic scope. Here, because Defendant's duties as an Assistant Vice President with Celebrity included international responsibilities and sales for an international organization at an international company, a global non-compete is appropriate.

The scope of the non-compete restriction is also reasonable. The restriction is specifically tailored to companies engaged in cruising based on fleet size, and the fleet size is specifically measured by the fleet's total berth count (i.e., total sleeping spaces). Cruise, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/cruise (last accessed Dec. 16, 2025) ("to sail about touching at a series of ports" and "a tour by ship"). Defendant argues the non-compete restriction should only apply to companies that sell ocean cruises, but that argument is factually inconsistent with the plain language of the Agreements. The Agreements do not mention "ocean" cruising or "river" cruising or any other specific type of cruising. The Agreements speak specifically to a cruise company's fleet size. "When the terms of a noncompete agreement are clear and unambiguous, the contracting parties are bound by its terms." *GFA Int'l, Inc. v. Trillas*, 327

So. 3d 872, 878 (Fla. 3d DCA 2021) (internal citation omitted) (holding the plain language of agreement clearly prohibited conduct at issue).

### iii.        Defendant has Breached the Agreements

With respect to the non-compete restrictions, Defendant worked for Celebrity for approximately 18 years, most recently as an Assistant Vice President Consumer Outreach. [Tr. 20:23-25]. He was a member of the sales leadership team for Celebrity. [Tr. 21:1-17]. In his most recent role with Celebrity, he was responsible for leading the direct-to-consumer sales channel. [Tr. 20:23-25 and Tr. 22:18-25]. He supervised approximately 400 Celebrity employees globally. [Tr. 21:18-23]. In addition, Defendant previously had leadership responsibilities over a business-to-business sales channel, in which he worked directly with travel agency partners. [Tr. 23:25-24:20]. Defendant is currently employed by Ama as Senior Vice President, Global Consumer Sales. [Tr. 126:11-13]. He is involved in sales strategies and oversees consumer sales, including training, globally. [Tr. 153:22-154:22]. Ama is engaged in cruising, and its fleet exceeds 500 berths. [Tr. 121:16- 122:3, 126:9-10, 142:25].

Based on the plain language of the non-compete restrictions and review of the record, the Court finds that Plaintiffs have established a substantial likelihood of success on the claims against Defendant for breach of the non-competition restrictions under the 2025 RSU Agreement. In addition, given his senor sales role as Senior Vice President, Global Consumer Sales, the Court finds that Plaintiffs have established a substantial likelihood of success on the claims against Defendant for breach of the non-compete restrictions under the 2022 Non-Compete Agreement.

With respect to the non-solicitation restrictions, Defendant – after not communicating with Mr. Santelices for nearly four (4) months following his resignation from Celebrity – reached out to Mr. Santelices via text message and engaged in texts and conversations about other employment opportunities. Under the language in his Agreements, Defendant was expressly prohibited from soliciting, inducing, or influencing, any employee of the Company to "discontinue or reduce or modify" their relationship with the Company. [Ex. P-5, P-6]. Based on the language of the non-solicit restrictions and review of the record, Plaintiffs have met the burden of establishing likelihood of success on the claims against Defendant for breach of non-solicit restrictions under the Agreements.

### B.      IRREPARABLE HARM

The second step of the analysis relates to irreparable harm. A "violation of an enforceable restrictive covenant creates a presumption of irreparable injury." Fla. Stat. § 542.335(1)(j); *see TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) (explaining that Fla. Stat. § 542.335(1)(j) is "the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake"); *Proudfoot Consulting*, 576 F.3d at 1231 (applying presumption of Fla. Stat. § 542.335(1)(j)). Defendant has not presented case law or facts to rebut this presumption. Even so, this Court finds that Defendant had access to confidential information throughout his employment with Celebrity, including confidential information about the sales and rollout plans for Celebrity's river cruises. Defendant also picked up "best practices" "along the way" at Celebrity and is able to apply them at the senior level in his employment at Ama, including "impacting how a brand feels day-to-day and how you're able to, you know, penetrate a new market and make a difference. Can you use some of the information you know, yes…." [Tr. 152:17-22]. Defendant had no experience in the cruise industry prior to joining Celebrity. [Tr. 125:2-4]. Defendant cannot rebut the presumption of irreparable harm and continues to work in a senior leadership role with Ama. Accordingly, the Court finds Plaintiffs have demonstrated substantial irreparable harm.

### C.      BALANCE OF HARMS

The third consideration in the analysis is balance of harms. The Court must weigh the injury to the Plaintiffs to any potential harm claimed by the Defendant. "In the context of non-competition agreements and in other contexts, courts have held that enjoinment from something that one has no right to is not a hardship." *Transunion Risk & Alt. Data Sols., Inc. v. Maclachlan*, 2015 U.S. Dist. LEXIS 190948, at *7 (S.D. Fla. Oct. 29, 2015) ("In the context of non-competition agreements and in other contexts, courts have held that enjoinment from something that one has no right to is not a hardship"); *see also Mainsail Parent, LLC v. Jewell*, , No. 24-22875- CIV, 2024 U.S. Dist. LEXIS 152480, at *12 (S.D. Fla. Aug. 26, 2024) (harm analysis decisively favors former employer when employees are merely required to "comply with covenants they voluntarily signed and by which they are already bound").

Here, in connection with his employment with Celebrity and his acceptance of compensation and restricted stock units, Defendant agreed to contractual obligations, including non-compete and

non-solicit restrictions. Requiring Defendant to adhere to his contractual obligations is not an undue harm, whereas denying Plaintiffs the benefit of their contractual rights does constitute harm. Additionally, while employed with Celebrity, Defendant explored other employment opportunities and had "different options on the table." [Tr. 156:25]. Defendant testified that his skills and experience learned during his nearly 18 years of employment with Celebrity are transferable to other companies outside the cruise industry could be applied "anywhere." [Tr. 142:14-20].

Defendant testified that he had extensive sales experience and other career options outside of the cruise industry, mitigating any risk of harm to Defendant associated with refraining from working in the cruise industry for a company with a fleet size of more than 500 berths for a period of nine (9) months. The Court finds that the Plaintiffs have satisfied this prong.

### D.   PUBLIC INTEREST

The fourth and final factor to consider is the public interest in issuing the injunction. By statute, Florida favors enforcement of reasonable covenants not to compete. Fla. Stat. § 542.335; *see Autonation*, 347 F. Supp. 2d at 1308 (holding that non-compete "will further the public interest by assisting [plaintiff] in protecting its investment in confidential and proprietary business information that it uses to become a more profitable and efficient business enterprise"); *Autonation, Inc. v. Mulleavey*, 2019 U.S. Dist. LEXIS 170466, at *15 (S.D. Fla. Aug. 22, 2019) ("The Florida Legislature has determined that injunctions to protect trade secrets and restrictive covenants serve the public interest . . . ."). Public interest is also served by ensuring parties receive the benefit of their contractual rights. The Court finds that Plaintiffs have satisfied their burden under the public interest prong.

### E.   TOLLING

The 2025 RSU Agreement explicitly tolls the 9-month restricted period "during any period that [Defendant] is in breach of any of the restrictive covenants" so that Plaintiffs are "provided with the full benefit of the full Restricted Period." [Ex. P-5]. Courts routinely enforce tolling provisions to extend the duration of non-competes for periods where the former employee is in breach of the non-compete. *See Proudfoot Consulting*, 576 F.3d at 1241; *Fla. Digestive Health Specialists, Ltd. Liab. P'ship v. Colina*, 202 So. 3d 94, 97 (Fla. 2d DCA 2016) (where the company has yet to receive benefit of bargain, the injunction should be for the full duration of the restricted period). The Court finds that tolling the 9-month restricted period here is appropriate since Defendant has been violating his non-compete since he started working for Ama several months

11

ago. Moreover, tolling is appropriate and reasonable because Defendant has skills that are transferable to other industries.

### F.      BOND

Federal Rule of Civil Procedure 65(c) allows a court to issue a temporary restraining order, provided the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The Court has broad discretion regarding the amount of an injunction bond and may elect to require no security at all. *See Title v. Omega Nat'l Title Ag., LLC*, 2023 U.S. Dist. LEXIS 90467, at *7 (N.D. Fla. Apr. 14, 2023) (requiring $1,000.00 bond).

Here, the Court determines that a bond of $10,000 is appropriate because RCCL is a publicly traded entity with sufficient assets to satisfy any award of damages, attorneys' fees, and costs to which Defendant could reasonably be entitled should the Court determine the temporary restraining order was improperly granted.

### III.     CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that the District Court **GRANT** Plaintiffs' Motion for TRO and enter a temporary restraining order as follows:

A.      For a period of nine (9) months from the date of this Order, Defendant and anyone acting in concert with him shall not, directly or indirectly, serve as or be a consultant to or employee, officer, agent, director, or owner, in any capacity, of any entity engaged in (or preparing to engage in) cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), including without limitation, AmaWaterways, or cruise-related businesses of any such entity.

B.      For a period of nine (9) months from the date of this Order, Defendant and anyone acting in concert with him shall not employ or seek to employ any person who is then employed or retained by either of Plaintiffs or their affiliates (or who was employed within the last six (6) months of Defendant's employment with Celebrity).

C.      For a period of nine (9) months from the date of this Order, Defendant and anyone acting in concert with him shall not directly or indirectly solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity that has a business relationship with Plaintiffs or their affiliates to discontinue or reduce or modify the extent of such

relationship with Royal Caribbean or any of its subsidiaries, including Celebrity.

D.      Defendant and anyone acting in concert with him shall not directly or indirectly use, disclose, or otherwise misappropriate any of Plaintiffs' Confidential Information or trade secrets. For purposes of this Order, "Confidential Information" is defined as set forth in Section 1(A) of the 2022 Non-Compete Agreement, and includes, but is not limited to, information, observations, procedures, practices, and data, whether written or oral, regarding any of the business, operations or affairs of the Company, its subsidiaries and its affiliates, including, by way of example, strategies, planning, research, developments, product designs or specifications, manufacturing processes, "know-how," prices, suppliers, customers, costs, workflows, software, developments, inventions, formulas, technology, designs, drawings, engineering plans, hardware configuration information, and any knowledge or information with respect to confidential or trade secrets of Royal Caribbean, its subsidiaries and affiliates, including Celebrity, or any information that a reasonable person would conclude is intended to remain confidential due to its nature or the circumstances under which it was learned.

E.      Defendant shall preserve all documents, electronically stored information, and other information potentially relevant to the factual allegations and claims contained within the Verified Complaint, including, without limitation, any documents (hard copy or electronic) containing Plaintiffs' information; any files that were transferred from or originated from any of Plaintiffs' devices or systems; and any communications (including, without limitation, text messages, WhatsApp messages, and emails) with any of Plaintiffs' current or former employees, current or former customers, potential customers, vendors, or partners, whether stored on personal electronic devices (such as cellular phones, tablets, or laptops) or in email or other cloud storage accounts.

F.      Defendant shall return all copies of all of Plaintiffs' documents in his possession, custody, or control, and submit to a forensic examination of Defendant's devices (including personal laptops, cell phones, USB devices, and tablets) and accounts (including email and cloud storage accounts, such as Google Drive). Defendant shall, at Defendant's expense: (i) stipulate to and agree with Plaintiffs on a non-party forensic vendor; (ii) jointly with Plaintiffs, submit to the Court a forensic protocol to accomplish the return and remediation of Plaintiffs' documents from the Defendant's possession (i.e., to permanently remove the documents from the Defendant's possession), and disclosure of communications that are potentially relevant to the factual

allegations and claims contained within the Verified Complaint, with Defendant bearing all costs of the return and remediation; and (iii) submit sworn declarations from Defendant and the non-party forensic vendor attesting to the return and remediation of all of Plaintiffs' documents and potentially relevant communications.

G.      Under Fed. R. Civ. P. 65(c), Plaintiffs shall deposit a bond in the amount of $10,000.00 within 14 days of this Order.

H.      A hearing on Plaintiffs' Expedited Motion for a Preliminary Injunction shall be set for _____, 2025, at _____ __.

Within **seven** days after being served with a copy of this **Report and Recommendation**, any party may serve and file written objections to any of the above findings and recommendations. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(a). The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this **Report and Recommendation**. 11th Cir. R. 3-1.

        **DONE and ORDERED** in Chambers in Miami, Florida on this __ day of December, 2025.


_____
HONORABLE ENJOLIQUÉ A. LETT
UNITED STATES MAGISTRATE JUDGE