**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 1:25-cv-25648-WILLIAMS/LETT**

**CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES LTD.,
d/b/a ROYAL CARIBBEAN GROUP**,

        Plaintiffs,

v.

**ANGEL CHRISTOPHER GOMEZ**,

        Defendant.

_____/

## REPORT AND RECOMMENDATION ON PLAINTIFF'S EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court pursuant to a referral from District Judge Kathleen M. Williams [ECF No. 7] of Plaintiffs Celebrity Cruises, Inc. ("Celebrity") and Royal Caribbean Cruises, Ltd.'s ("RCCL") Expedited Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") [ECF No. 4]. Defendant responded in opposition to the Temporary Restraining Order and Preliminary Injunction [ECF No. 15], and Plaintiffs subsequently replied [ECF No. 21]. An evidentiary hearing on the Motion was held on December 12, 2025. [ECF No. 20].

After careful consideration of the parties' filings, the record, and the relevant legal authorities, the Court recommends that the District Court grant, in its entirety, Plaintiffs' Motion for Temporary Restraining Order.

## I.   PROCEDURAL HISTORY

Plaintiffs Celebrity and RCCL initially filed this action against Defendant Angel Christopher Gomez in the Complex Business Division of the Eleventh Judicial Circuit Court in and for Miami-Dade, County Florida on October 16, 2025 ("State Court Action"). ECF No. 1. Plaintiffs filed an emergency motion for a temporary injunction in the State Court Action on November 11, 2025, based on Defendant's alleged breaches of his non-competition and non-solicitation obligations in his agreements with Plaintiffs. *Id.* On December 2, 2025, the state court set the state court emergency motion for a temporary injunction for hearing on December 8, 2025. ECF No. 1, Ex. D ("Order") at 1.

On December 2, 2025, Defendant filed a notice of removal, removing the case to this Court based on diversity jurisdiction. *Id.* On December 4, 2025, Plaintiffs filed the Motion. ECF No. 4. On December 5, 2025, District Judge Kathleen M. Williams set the Motion for a hearing on December 12, 2025. ECF No. 12. However, on December 11, 2025, District Judge Kathleen M. Williams referred the Motion to the undersigned for a report and recommendation. ECF No. 19. The following day, on December 12, 2025, the Motion's evidentiary hearing was held. ECF No. 23.

## II.   BACKGROUND

### A. Plaintiffs' Business

Plaintiffs Celebrity and RCCL are publicly traded, and Celebrity is RCCL's wholly owned subsidiary. *See* Tr.[1] 34:15-25; Mot. at 2. RCCL operates with a global

---

[1] "Tr." refers to the December 12, 2025, hearing transcript [ECF No. 26].

fleet of 68 cruise ships across its five brands traveling to all seven continents. *See* Joint Not. of Filings Exs., Ex. D-AA at 11, ECF No. 27-9. Plaintiff RCCL serves millions of guests each year through its brands, including Royal Caribbean, Celebrity, and Silversea. *Id*.

### B.   Defendant's Employment with Celebrity

Plaintiffs employed Defendant for approximately eighteen years, most recently as a senior executive and recipient of equity awards under RCCL's equity incentive plan. *See* Verified Compl. ¶¶ 1, 25, ECF No. 1-1.  During his tenure, Defendant held a high-level role. *Id*. ¶¶ 19-26, 34. He possessed responsibility over key sales, contact center, and partner relationships, managed hundreds of employees. *Id*. ¶¶ 27-33. Defendant also and regularly participated in strategic planning, financial, and operations meetings where non-public information concerning Plaintiffs' business, metrics, and forward-looking strategies was discussed. *See Id*. He supervised approximately 400 employees globally. *See* Tr. 21:18-23. Furthermore, Defendant worked directly with Celebrity's travel agency partners while he had leadership responsibilities over a business-to-business sales channel. *See id*. ¶ 26; Tr. 23:25-24:20.

### C. Agreements between Defendant and Celebrity

Between 2019 and 2025, Defendant executed multiple agreements containing restrictive covenants collectively referred to as "RSU Agreements". *See* Verified Compl. *Id*. ¶¶ 66-76 *see also* Compl., Exs. A-B. The RSU Agreements include a nine (9) month restricted period after employment, a non-compete against entities engaged in cruises with a minimum fleet, and confidentiality restrictions. *See*

Verified Compl. *Id.* ¶¶ 58-64.

For example, the 2025 RSU Agreement contains both a non-compete and non-solitation provision. *See id*. Its non-compete covenant prohibits employment with any "entity engaged in (or preparing to engage in) cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built) or cruise related businesses of any such entity." *See* Joint Not. of Filings Exs., Ex. P-5 at 4, ECF No. 27-3. While its non-solicitation covenant prohibits Defendant from "employ[ing] or seek[ing] to employ" any employee of Plaintiffs, and from soliciting, inducing, or influencing, any employee to "discontinue or reduce or modify" their relationship with Plaintiffs, *see id.*, this agreement also expressly provides for tolling for any period where Defendant breached any of the restrictive covenants:

> The Restricted Period…shall be tolled during any period that Grantee is in breach of any of the restrictive covenants in this Schedule A so that Company is provided with the full benefit of the full Restricted Period.

*See id*.

### D. Defendant's Resignation from Celebrity and Subsequent Breach of his Non-Compete and Non-Solicit Restrictions

In April 2025, Defendant notified Celebrity that he was resigning. *See* Tr. 103:23-24. After giving notice of his resignation, he was permitted to continue working through May 26, 2025. *See* Tr. 53:19-22; 104:1. He did not inform Celebrity of his plans to join AmaWaterways ("Ama") as Senior Vice President, Global Consumer Sales. *See* Tr. 53:25-54:3; 126:11-13. Defendant accepted employment with Ama and holds a senior leadership role and oversees the business-to-consumer sales channel. *See* Tr. 126:9-10. Ama is a cruise company that has more than 30 ships with

4

up to 150 berths per ship and, therefore, has a fleet greater than 500 berths. *See* Tr. 121:16-122:3, 126:9-10, 142:25.

On May 26, 2025, which was Defendant's last day of employment with Celebrity, Defendant and Mr. Santelices exchanged text messages, saving one another's contact information. *See* Joint Not. of Filings Exs., Ex. D-Q at 2, ECF No. 27-7. It is undisputed that Defendant communicated with Jason Santelices ("Mr. Santelices"), who is a current Royal Caribbean employee, about employment opportunities with Ama. Mr. Santelices has been employed with Royal Caribbean for 21 years and currently holds the position of Senior Manager of Global Corporate Meetings and Incentives. *See* Tr 170:23-171:1. Further, it is also undisputed that Defendant and Mr. Santelices did not have any communications between Defendant's last day of employment with Celebrity on May 26, 2025 and September 5, 2025 when Defendant texted Mr. Santelices. *See* Tr. 173:15-174:5, 110:16-23; *see also* Joint Not. of Filings Exs., Ex. D-Q at 2.

On September 6, 2025, after Mr. Santelices did not immediately respond to the September 5th text, Defendant reached out to Mr. Santelices' wife on Facebook and asked her to have Mr. Santelices call him. *See* Tr. 109:10-13; Joint Not. of Filings Exs., Ex. P-8, ECF No. 27-5. Defendant describes the communication as a personal check-in and denies discussing any opportunities at Ama. *See* Tr. 110:20-11:9. While Mr. Santelices describes the conversations as being about potential employment opportunities with Ama, *see* Tr. 174:18-175:17, the testimony and exhibits demonstrate that there were communications about employment opportunities with

5

Ama. The September 2025 communications included Defendant telling Mr. Santelices that the salary at Ama would be more than he was making at Royal Caribbean. *See id*. Following these conversations, Mr. Santelices texted Defendant:

> Angel, I want to thank you for your time and consideration. I truly appreciate you looking out for my career growth and understanding as I do some some [sic] searching to figure out what's best for me moving forward. Please know my conversation with you was a lot more open and honest given our relationship and even considering me for such an important role within your organization. While the timing isn't perfect at the moment do keep me in mind and maybe our paths will cross again.

*See* Joint Not. of Filings Exs., Ex. D-Q . Defendant responded to this text message with a heart emoji. *See* Tr. 176:15-25, Joint Not. of Filings Exs., Ex. D-Q. In subsequent text messages, Defendant and Mr. Santelices communicated about other individuals that may be open to employment with Ama. *See* Ex. D-Q.

### III.   <u>LEGAL STANDARD</u>

The decision to grant or deny a preliminary injunction is within the sound discretion of the district court. *See* Fed. R. Civ. P. 65; *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 332 (5th Cir. 1981).

A temporary restraining order and preliminary injunction are extraordinary remedies. *Superior Consulting Servs. v. Shaklee Corp.*, 710 F. App'x 850, 853 (11th Cir. 2017). To obtain such relief, a movant must establish: "(1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) the injury to the movant outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the public interest."  *Id*. "Likelihood of success on the merits is generally the most important of the four factors." *Speech First, Inc. v.*

*Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (internal citations omitted).

IV.   **ARGUMENT**

   A. **Enforceability of Agreement**

As a threshold matter, Plaintiffs must show that the restrictive covenants they seek to enforce are part of a valid agreement that is binding on and signed by Mr. Gomez. *See* Fla. Stat. § 542.335(1)(a) ("A court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought.") Plaintiffs rely on two stand-alone Agreements Mr. Gomez signed: the 2022 Employee Nondisclosure And Noncompetition Agreement and the 2025 RSU Agreement. *See* Exs. A, B, and K to Verified Compl., ECF No. 1-1 at 37.

The record establishes, and Defendant agrees, that he executed the 2022 Non-Compete Agreement and the pertinent RSU Agreements containing post-employment non-compete, non-solicitation, and confidentiality restrictions. *See* Tr. 120: 5-14. Since Mr. Gomez admitted to signing these agreements during the hearing, the Court finds that Plaintiffs have satisfied Florida Statute Section 542.335(1)(a) insofar as it requires restrictive covenants to be enforced to be "set forth in a writing signed by the person against whom enforcement is sought." *See* § 542.335(1)(a).

   B. **Likelihood of Success on Merits**

To be granted injunctive relief, Plaintiffs must first demonstrate a likelihood of success on the merits. *Speech First, Inc.*, 32 F.4th at 1124. Section 542.335, Florida Statutes, provides for enforcement of restrictive covenants when they are (a) reasonably related to the protection of "legitimate business interests" and (b) not

unreasonable in terms of time, geographic scope, and line of business. *Leighton v. First Universal Lending, LLC*, 925 So. 2d 462, 464 (4th DCA 2006) ("non-compete clauses are valid so long as the contracts are reasonable in time, area, and line of business.") (citing Fla. Stat. § 542.335(1)). Section 542.335(c), Florida Statutes provides a burden-shifting framework to be used in enforcement proceedings involving restrictive covenants:

> A person seeking enforcement of a restrictive covenant also shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction. If a person seeking enforcement of the restrictive covenant establishes prima facie that the restraint is reasonably necessary, the person opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests. If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests. Fla. Stat. § 542.335(c).

Section 542.335(1)(b) provides a non-exhaustive list of "legitimate business interests," which include, without limitation, trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers or clients, goodwill, and specialized training. Fla. Stat. § 542.335(1)(b); *see also AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004); *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 (11th Cir. 2009) ("When an employee has access to confidential business information crucial to the success of an employer's business,

that employer has a strong interest in enforcing a covenant not to compete.").

### a. Plaintiffs Have a Legitimate Business Interest.

Even a written, signed non-compete agreement must protect one or more legitimate business interests to be valid under Florida law. Fla. Stat. § 542.335(1)(b); *Proudfoot*, 576 F.3d at 1228 ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant.").

Here, Plaintiffs demonstrated that the restrictive covenants within the Agreements between Plaintiffs and Defendant serve to protect multiple recognized legitimate business interests, including:

1. Access to trade secrets and valuable confidential business information, such as non-public financial metrics, pricing, revenue and passenger sourcing data, internal forecasts, strategic plans, and competitive intelligence.
2. Substantial relationships and goodwill with key travel agencies, corporate partners, and other intermediaries with whom Defendant worked directly and about whom he possessed detailed knowledge.
3. Goodwill associated with Plaintiffs' brand and customer relationships, particularly high value repeat guests and travel partners cultivated over many years.

*See* Verified Compl. ¶¶ 26-33, 37-41.

Plaintiffs' verified pleadings were sufficient to support the restrictive covenants in the Agreements. Nevertheless, Plaintiffs' corporate representative, Katina Athanasiou-Soy ("Ms. Athanasiou-Soy"), showed Defendant also had access to confidential business information regarding Celebrity's different products including the river cruise products when he resigned in May 2025. *See, e.g.,* Tr. 26:25-24:15; 28:2-30:4; Tr. 40:20-43:22; 44: 5-23. Ms. Athanasiou-Soy credibly testified that Mr. Gomez regularly participated in confidential strategic planning meetings, including

sessions regarding "Project Frontier," Plaintiffs' planned river cruise offering, where multi-year plans, financial targets, and rollout strategies were discussed. *See* Tr. 40:20-43:22; 44: 5-23. Ms. Athanasiou-Soy's testimony, coupled with the documentary record, supports a finding that Plaintiffs have at least one legitimate business interest sufficient to justify enforcement of the restrictive covenants.

### b. Defendant's Access to Confidential Information

Clearly, Mr. Gomez had access to Plaintiffs' confidential business information regarding financial metrics, revenue history, guest sourcing, the types of products and destinations offered, strategic plans, and annual operating plans. *See* Tr. 27:2-15; 28:2-24. Mr. Gomez attended leadership meetings, including sales leadership team meetings, that were limited to individuals in leadership roles at Celebrity. *See* Tr. 28:25-32:3. For example, Ms. Athanasiou-Soy testified that Mr. Gomez regularly participated in confidential strategic meetings. *See* Tr. 40:20-43:22; 44: 5-23. She further explained that these materials were not publicly available, and that Plaintiffs took consistent steps to treat them as confidential, reinforcing to executives, including Mr. Gomez, the need to maintain confidentiality. *See* Tr. 64:16-23; 39:1-9. Further, Defendant himself acknowledged that he had access to confidential, non-public information about Plaintiffs' strategies and operations:

> Q. And you don't dispute that you had access to confidential non-public information about ocean cruising. Right?
> A. I would agree with that.

*See* Tr. 113:18-20.

On this record, the Court finds that Plaintiffs have made a strong showing that the covenants protect recognized legitimate business interests, including confidential

information and business relationships both in the ocean and evolving river cruise segments.

### c. *The Agreements are Reasonable in Scope, Duration, and Line of Business.*

The nine (9) month restricted period is reasonable under Florida law. *See* Fla. Stat. § 542.335(2)(1) (presume reasonable 6 months or less and unreasonable 2 years or more); *see Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1277 (M.D. Fla. 2020) ("the Agreement is limited to one-year post-termination, which many courts have found reasonable"); *Alonso-Llamazares v. Int'l Dermatology Rsch., Inc.*, 339 So. 3d 385, 390 (Fla. 3d DCA 2022) (two-year non-compete reasonable); *Spine v. Moulton*, 346 So. 3d 154, 159 n.3 (Fla. 2nd DCA 2022) ("two-year time period, geographic area, and line of business restricted appear to be reasonable based upon Florida caselaw"). Additionally, Defendant has not argued that a 9-month restricted period is unreasonable.

The global scope is also reasonable under Florida law. *See Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009) (enforcing non-solicitation agreement despite lack of *any* geographic limitation because it did not prohibit all competition); *see also AutoNation*, 347 F. Supp. 2d at 1307 (finding geographic scope reasonable where former employee was "prohibited from working in any geographic space in which AutoNation operates"); *Head Kandy, LLC v. McNeill*, No. 23-CV-60345, 2023 U.S. Dist. LEXIS 162474, at *25 (S.D. Fla. Sep. 12, 2023) (holding that worldwide non-compete was reasonable under Florida law based on need to protect customer relationships and goodwill). Here, Defendant also does not argue that the Agreements

are overbroad in terms of their geographic scope. Even if contested, a global non-compete is appropriate because Defendant's duties as an Assistant Vice President with Celebrity included international responsibilities and sales for an international organization at an international company.

Lastly, the scope of the non-compete restriction is also reasonable. The restriction is specifically tailored to companies engaged in cruising based on fleet size, and the fleet size is specifically measured by the fleet's total berth count (i.e., total sleeping spaces). *Cruise*, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/cruise, (last accessed Dec. 16, 2025) ("to sail about touching at a series of ports" and "a tour by ship").

While Defendant argues the non-compete restriction should only apply to companies that sell ocean cruises, that argument is factually inconsistent with the plain language of the Agreements to which Mr. Gomez agreed. The Agreements do not mention "ocean" cruising or "river" cruising or any other specific type of cruising. The Agreements speak specifically to a cruise company's fleet size.

Further, because the term in "ocean" in the Agreements is plain and unambiguous, the Court will not add to it or take it away as Defendant proposed. *See generally AmSpec, LLC v. Calhoun*, 649 F. Supp. 3d 1345, 1354 (S.D. Ga. 2022); (citing *Walker v. Virtual Packaging, LLC*, 229 Ga. App. 124, 493 S.E.2d 551, 554 (1997)). "When the terms of a noncompete agreement are clear and unambiguous, the contracting parties are bound by its terms." *GFA Int'l, Inc. v. Trillas*, 327 So. 3d 872, 878 (Fla. 3d DCA 2021) (internal citation omitted) (holding the plain language of

12

agreement clearly prohibited conduct at issue). The Court concludes that Plaintiffs have shown the agreements are reasonable.

> ### d. *Evidence of Defendant's Breach of the Non-Compete and Non-Solicit Restrictions*

With respect to the non-compete restrictions, Mr. Gomez worked for Celebrity for approximately 18 years, most recently as an Assistant Vice President Consumer Outreach. *See* Tr. 20:23-25. He was a member of the sales leadership team for Celebrity. *See* Tr. 21:1-17. In his most recent role with Celebrity, he was responsible for leading the direct-to-consumer sales channel. *See* Tr. 20:23-25 and Tr. 22:18-25. Mr. Gomez is currently employed by Ama as Senior Vice President, Global Consumer Sales. *See* Tr. 126:11-13. He is involved in sales strategies and oversees consumer sales, including training, globally. *See* Tr. 153:22-154:22. Ama is engaged in cruising, and its fleet exceeds 500 berths. *See* Tr. 121:16- 122:3, 126:9-10, 142:25. Thus, based on the plain language of the non-compete restrictions and review of the record, the Court finds that Plaintiffs have established a substantial likelihood of success on the claims against Defendant for breach of the non-competition restrictions under the 2025 RSU Agreement. In addition, given his senor sales role as Senior Vice President, Global Consumer Sales, the Court finds that Plaintiffs have established a substantial likelihood of success on the claims against Defendant for breach of the non-compete restrictions under the 2022 Non-Compete Agreement.

With respect to the non-solicitation restrictions, the evidence shows that Mr. Gomez – after not communicating with Mr. Santelices for nearly four (4) months following his resignation from Celebrity – reached out to Mr. Santelices via text

message and engaged in texts and conversations about other employment opportunities. Under the language in his Agreements, Mr. Gomez was expressly prohibited from soliciting, inducing, or influencing, any employee of the Company to "discontinue or reduce or modify" their relationship with the Company. *See* Joint Not. of Filings Exs., Ex. P-5, P-6 [ECF Nos. 27-3, 27-4]. Based on the language of the non-solicit restrictions and review of the record, the Court finds that Plaintiffs met the burden of establishing likelihood of success on the claims against Defendant for breach of non-solicit restrictions under the Agreements.

### C. <u>Irreparable Harm</u>

The second step of the analysis relates to irreparable harm. A "violation of an enforceable restrictive covenant creates a presumption of irreparable injury." Fla. Stat. § 542.335(1)(j); *see TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) (explaining that Fla. Stat. § 542.335(1)(j) is "the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake"); *Proudfoot Consulting*, 576 F.3d at 1231 (applying presumption of Fla. Stat. § 542.335(1)(j)).

Defendant has not presented case law or facts to rebut this presumption. Moreover, the Court finds that Mr. Gomez had access to confidential information throughout his employment with Celebrity, including confidential information about the sales and rollout plans for Celebrity's River cruises. Mr. Gomez also picked up "best practices" "along the way" at Celebrity and is able to apply them at the senior level in his employment at Ama, including "impacting how a brand feels day-to-day

and how you're able to, you know, penetrate a new market and make a difference. Can you use some of the information you know, yes…." *See* Tr. 152:17-22. This "information" derived from Mr. Gomez's extensive experience at Celebrity because he had no experience in the cruise industry prior to joining Celebrity. *See* Tr. 125:2-4. Additionally, Ms. Athanasiou-Soy detailed the type of current and anticipated harm that Celebrity suffers, which is the type of harm the statutory presumption recognizes is at stake. *See* Tr. 90:7-91:24. Defendant cannot rebut the presumption of irreparable harm and continues to work in a senior leadership role with Ama. Accordingly, the Court finds Plaintiffs have demonstrated substantial irreparable harm.

### D. <u>Balance of Harms</u>

The third consideration in the analysis is balance of harms. The Court must weigh the injury to the Plaintiffs to any potential harm claimed by the Defendant. "In the context of non-competition agreements and in other contexts, courts have held that enjoinment from something that one has no right to is not a hardship." *Transunion Risk & Alt. Data Sols., Inc. v. Maclachlan*, 2015 U.S. Dist. LEXIS 190948, at *7 (S.D. Fla. Oct. 29, 2015); *see also Mainsail Parent, LLC v. Jewell,* , No. 24-22875-CIV, 2024 U.S. Dist. LEXIS 152480, at *12 (S.D. Fla. Aug. 26, 2024) (harm analysis decisively favors former employer when employees are merely required to "comply with covenants they voluntarily signed and by which they are already bound").

Here, in connection with his employment with Celebrity and his acceptance of compensation and restricted stock units, Mr. Gomez agreed to contractual obligations, including non-compete and non-solicit restrictions. Requiring Mr. Gomez to adhere to his contractual obligations is not an undue harm, whereas denying

Plaintiffs the benefit of their contractual rights does constitute harm. Additionally, while employed with Celebrity, Mr. Gomez explored other employment opportunities and had "different options on the table." *See* Tr. 156:25. He testified that his skills and experience learned during his nearly 18 years of employment with Celebrity are transferable to other companies outside the cruise industry could be applied "anywhere." *See* Tr. 142:14-20. Therefore, Defendant suffers no comparable harm where he can employ those skills with another company that does not violate the terms of the agreement he voluntarily entered – to wit, any non-cruise company or any cruise company with a fleet size of less than 500 berths. Mr. Gomez testified that he had extensive sales experience and other career options outside of the cruise industry, mitigating any risk of harm to Defendant associated with refraining from working in the cruise industry for a company with a fleet size of more than 500 berths for a period of nine (9) months.

Therefore, the Court concludes the restrictions for the limited nine (9) month period imposes no undue hardship on Defendant, whereas denying enforcement would significantly harm Plaintiffs' contractual and business interest. Accordingly, the Court finds that finds that the Plaintiffs satisfied this prong.

### E. <u>Public Interest</u>

The fourth and final factor to consider is the public interest in issuing the injunction. By statute, Florida favors enforcement of reasonable covenants not to compete. Fla. Stat. § 542.335; *see Autonation*, 347 F. Supp. 2d at 1308 (holding that non-compete "will further the public interest by assisting [plaintiff] in protecting its investment in confidential and proprietary business information that it uses to

become a more profitable and efficient business enterprise"); *Autonation, Inc. v. Mulleavey*, 2019 U.S. Dist. LEXIS 170466, at \*15 (S.D. Fla. Aug. 22, 2019) ("The Florida Legislature has determined that injunctions to protect trade secrets and restrictive covenants serve the public interest . . . ."). Public interest is also served by ensuring parties receive the benefit of their contractual rights. The Court finds that Plaintiffs have satisfied their burden under the public interest prong.

Accordingly, all four factors – likelihood of success, irreparable harm, balance of harms, and public interest – support entry of a temporary restraining order and parallel preliminary injunctive relief.

### F. Tolling

The 2025 RSU Agreement explicitly tolls the nine (9) month restricted period "during any period that [Defendant] is in breach of any of the restrictive covenants" so that Plaintiffs are "provided with the full benefit of the full Restricted Period." *See* Joint Not. of Filings Exs., Ex. P-5. Courts routinely enforce tolling provisions to extend the duration of non-competes for periods where the former employee is in breach of the non-compete. *See Proudfoot Consulting*, 576 F.3d at 1241; *Fla. Digestive Health Specialists, Ltd. Liab. P'ship v. Colina*, 202 So. 3d 94, 97 (Fla. 2d DCA 2016) (where the company has yet to receive benefit of bargain, the injunction should be for the full duration of the restricted period). The Court finds that tolling the 9-month restricted period here is appropriate since Defendant has been violating his non-compete since he started working for Ama several months ago. Moreover, tolling is appropriate and reasonable because Defendant, by his own admission, has skills that are transferable to other industries.

### G. **Bond**

Federal Rule of Civil Procedure 65(c) allows a court to issue a temporary restraining order, provided the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. "However, the Eleventh Circuit has established that 'the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all.'" *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1360 (N.D. Ga. 2022) (quoting *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005)); *see also Title v. Omega Nat'l Title Ag., LLC*, 2023 U.S. Dist. LEXIS 90467, at *7 (N.D. Fla. Apr. 14, 2023) (requiring $1,000.00 bond).

Here, the Court determines that a bond of $100,000 is appropriate because although RCCL is a publicly traded entity with sufficient assets to satisfy any award of damages, attorneys' fees, and costs to which Defendant could reasonably be entitled should the Court determine the temporary restraining order was improperly granted, this injunction nevertheless interferes with the Defendant's employment and arguably restrains Defendant's ability to work and earn a living. *See Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-CV-868-J-34MCR, 2020 WL 5369087, at *16 (M.D. Fla. Sept. 8, 2020) ("Although [defendant] maintains that only a minimal bond is necessary under the circumstances, the Court is convinced that given a potential harm this injunction poses to [plaintiff's] economic well-being, a substantial bond is warranted.")

## V.    RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that the District Court **GRANT** Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 4] and enter a preliminary injunction as follows:

A.    For a period of nine (9) months from the date of this Order, Defendant shall not, directly or indirectly, serve as or be a consultant to or employee, officer, agent, director, or owner, in any capacity, of any entity engaged in (or preparing to engage in) cruises, with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), including without limitation, AmaWaterways, or cruise-related businesses of any such entity.

B.    For a period of nine (9) months from the date of this Order, Defendant and anyone acting in concert with him shall not employ or seek to employ any person who is then employed or retained by either of Plaintiffs or their affiliates (or who was employed within the last six (6) months of Defendant's employment with Celebrity).

C.    For a period of nine (9) months from the date of this Order, Defendant and anyone acting in concert with him shall not directly or indirectly solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or any other person or entity that has a business relationship with Plaintiffs or their affiliates to discontinue or reduce or modify the extent of such relationship with Royal Caribbean or any of its subsidiaries, including Celebrity.

D.    Defendant and anyone acting in concert with him shall not directly or indirectly use, disclose, or otherwise misappropriate any of Plaintiffs' Confidential

Information or trade secrets. For purposes of this Order, "Confidential Information" is defined as set forth in Section 1(A) of the 2022 Non-Compete Agreement, and includes, but is not limited to, information, observations, procedures, practices, and data, whether written or oral, regarding any of the business, operations or affairs of the Company, its subsidiaries and its affiliates, including, by way of example, strategies, planning, research, developments, product designs or specifications, manufacturing processes, "know-how," prices, suppliers, customers, costs, workflows, software, developments, inventions, formulas, technology, designs, drawings, engineering plans, hardware configuration information, and any knowledge or information with respect to confidential or trade secrets of Royal Caribbean, its subsidiaries and affiliates, including Celebrity, or any information that a reasonable person would conclude is intended to remain confidential due to its nature or the circumstances under which it was learned.

      E.     Defendant shall preserve all documents, electronically stored information, and other information potentially relevant to the factual allegations and claims contained within the Verified Complaint, including, without limitation, any documents (hard copy or electronic) containing Plaintiffs' information; any files that were transferred from or originated from any of Plaintiffs' devices or systems; and any communications (including, without limitation, text messages, WhatsApp messages, and emails) with any of Plaintiffs' current or former employees, current or former customers, potential customers, vendors, or partners, whether stored on

personal electronic devices (such as cellular phones, tablets, or laptops) or in email or other cloud storage accounts.

F.     Defendant shall return all copies of all of Plaintiffs' documents in his possession, custody, or control, and submit to a forensic examination of Defendant's devices (including personal laptops, cell phones, USB devices, and tablets) and accounts (including email and cloud storage accounts, such as Google Drive). Defendant shall: (i) stipulate to and agree with Plaintiffs on a non-party forensic vendor; (ii) jointly with Plaintiffs, submit to the Court a forensic protocol to accomplish the return and remediation of Plaintiffs' documents, if any, from the Defendant's possession (i.e., to permanently remove the documents from the Defendant's possession), and disclosure of communications that are potentially relevant to the factual allegations and claims contained within the Verified Complaint; and (iii) submit sworn declarations from Defendant and the non-party forensic vendor attesting to the return and remediation of all of Plaintiffs' documents and potentially relevant communications.

G.     Under Fed. R. Civ. P. 65(c), Plaintiffs shall deposit a bond in the amount of $100,000.00 within fourteen (14) days of this Order.

Within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(a). The parties are hereby notified that a failure to timely object waives the right to challenge

on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3-1.

      **DONE and ORDERED** in Chambers in Miami, Florida on this 24th day of December 2025.

**ENJOLIQUÉ A. LETT**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record