UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-25648-WILLIAMS/LETT

CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES, LTD.
d/b/a ROYAL CARIBBEAN GROUP,

      Plaintiff,

v.

ANGEL CHRISTOPHER GOMEZ,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON PLAINTIFFS' EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**THIS CAUSE** is before the Court pursuant to a referral from District Judge Kathleen M. Williams [ECF No. 7] of Plaintiffs Celebrity Cruises, Inc. ("Celebrity") and Royal Caribbean Cruises, Ltd.'s ("RCCL") Expedited Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") [ECF No. 4]. Defendant responded in opposition to the Temporary Restraining Order and Preliminary Injunction [ECF No. 15], and Plaintiffs subsequently replied [ECF No. 21]. An evidentiary hearing on the Motion was held on December 12, 2025. [ECF No. 20].

For the reasons mentioned below, the Court **recommends** that the District Court **deny** Plaintiffs' Motion in its entirety.

## I.  BACKGROUND

RCCL owns and operates three international, open-ocean cruise lines, including Celebrity, all of which operate large, ocean-going vessels carrying thousands of passengers and subject to international maritime regulations. [ECF No. 15 at 5]. Defendant Angel Gomez ("Mr. Gomez"), was employed by Celebrity for approximately eighteen years, from August 2007 until his

resignation in April 2025, working through his notice period until May 26, 2025. [ECF No. 1-1 at ¶¶ 3, 16, 17]. Throughout Mr. Gomez's employment with Celebrity, Celebrity's ships were exclusively ocean-going with all but one having at least 2,100 berths.

    During his tenue, Mr. Gomez held various roles within Celebrity's consumer sales and service operations, ultimately serving as Associate Vice President of Consumer Outreach. [*Id.* at ¶ 25]. The evidentiary hearing further established that his responsibilities focused on contact-center management, including staffing, customer service performance, and operational KPIs within the call centers. Mr. Gomez did not have responsibilities related to fleet deployment, itinerary planning, ship design, vessel acquisition, revenue management, or strategic product development. [ECF No. 15 at 7].

    In January 2025, Plaintiffs publicly announced an intention to enter the river cruise market, with projected sailings beginning in 2027. [ECF No. 15-1 at 4]. At the time of Mr. Gomez's employment and resignation, Plaintiffs had no active river cruise operations, no river vessels, no finalized itineraries, and no river cruises available for sale. [ECF No. 15 at 12-13]. Testimony from Celebrity's corporate representative at the evidentiary hearing confirmed that any internal discussions regarding river cruising were preliminary and forward-looking. Mr. Gomez's limited involvement consisted of assisting with customer-facing FAQs reflecting publicly available information.

    Mr. Gomez resigned voluntarily and was allowed to continue working through May 26, 2025, based on decisions made by his superiors. The record and evidentiary testimony reflects that Plaintiffs did not place him on administrative leave, restrict his access, or accuse him of misconduct prior to his departure because they did not consider his working for a river boat company as competitive at this time. [ECF No. 1-1 at ¶¶ 77-80]. Mr. Gomez returned all company devices and credentials upon leaving, and Plaintiffs' testimony at the evidentiary hearing showed that a

subsequent forensic review identified no evidence that he retained, transferred, or misappropriated confidential information.

In July 2025, AmaWaterways, LLC ("Ama") – a company that operates river boats exclusively on inland waterways – publicly announced that Mr. Gomez had joined the company as its Senior Vice President of Global Customer Sales and Service. [ECF No. 1-1 at ¶ 83]. Ama does not operate ocean cruise ships and has been in the river boat business for more than twenty years. Mr. Gomez testified in the evidentiary hearing that his role at Ama involves oversight of call-center and customer service operations for Ama's existing river business, and that he performs different job functions than those performed for Celebrity.

Upon learning of Mr. Gomez's new employment, his former direct supervisor at Celebrity sent him a congratulatory text message acknowledging his new role and did not flag for Mr. Gomez the possibility that his new role could be interpreted as a breach of his employment agreement which was confirmed multiple times through the evidentiary hearing. Plaintiffs did not send a cease-and-desist letter, assert a breach, or otherwise object to Mr. Gomez's employment with Ama at the time, and Plaintiffs took no action for more than two months after Ama's public announcement of Mr. Gomez's position. [ECF No. 15 at 2].

Plaintiffs first initiated legal action in October 2025, approximately three months after learning of Mr. Gomez's employment at Ama, in the Circuit Court for Miami-Dade County. *Id.* The case was subsequently removed to this Court based on diversity of citizenship. 28 U.S.C. §1332. [ECF No. 1]. Plaintiffs have offered no contemporaneous explanation for this delay. The record and testimony at the evidentiary hearing reflects that during this period, Mr. Gomez continued working openly at Ama, and Plaintiffs continued operating their business without any identified disruption, loss of customers, or competitive harm.

## II. <u>LEGAL STANDARD</u>

### A. Preliminary Injunction

Federal Rule of Civil Procedure 65 allows a district court to grant a preliminary injunction. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020). The decision to grant or deny a preliminary injunction is within the sound discretion of the district court. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 332 (5th Cir. 1981). As this Court previously summarized:

> Succeeding on a motion for a preliminary injunction requires that the moving party demonstrate: a substantial likelihood to succeed on the merits, irreparable harm will be suffered if the relief is not granted, the threatened injury outweighs the harm that the relief would inflict on the responding party, and entry of the relief would serve the public interest. A plaintiff must meet all four prerequisites for the issuance of a preliminary injunction. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

*Access.Ninja, Inc. v. PassNinja, Inc.*, 2025 U.S. Dist. LEXIS 256998, at *8 (S.D. Fla. Oct. 2, 2025) (Lett, M.J.) "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.* (11th Cir. 1989)); *TransUnion Risk & Alt. Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 405 (11th Cir. 2015) ("We consider preliminary injunctions "extraordinary" and "drastic" remedies that should not be issued unless the moving party clearly establishes each of the four prerequisites."). "Indeed, the grant of a preliminary injunction is 'the exception rather than the rule.'" *Hayes v. Gov. Ronald Dion DeSantis*, 561 F. Supp. 3d 1187, 1196 (S.D. Fla. 2021) (quoting *Brown v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021)). An injunction cannot be issued unless the moving party "establishes the substantial likelihood of success criterion." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005). The

moving party must "clearly establish" each prerequisite. *TransUnion*, 625 F. App'x at 405 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)); *but see Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 340 (1999) (Ginsburg, J., concurring) ("Plaintiffs with questionable claims would not meet the likelihood of success criterion."). Failing to establish just one element precludes the grant of a preliminary injunction. *Keister v. Bell*, 879 F.3d 1282, 1297 (11th Cir. 2018).

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is reserved for those situations in which the moving party has clearly established entitlement. *TransUnion*, 625 F. App'x at 405 (quoting *Siegel*, 234 F.3d at 1176 (11th Cir. 2000)); *ACLU of Fla., Inc.*, 557 F.3d at 1198. Preliminary injunctions are granted only where the movant establishes an enforceable restraint, tailored to an established and legitimate business interest, a material breach, and an imminent, irreparable injury requiring immediate judicial intervention. Fla. Stat. § 542.335(b) (2025); *Wreal*, 840 F.3d at 1248.

Requests for entry of temporary restraining orders are treated similar to applications for temporary injunctions:

> Temporary restraining orders should be granted "only under exceptional circumstances." *Cheng Ke Chen v. Holder*, 783 F. Supp. 2d 1183, 1186 (N.D. Ala. 2011) (citing *Sampson v. Murray*, 415 U.S. 61, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)). Obtaining a temporary restraining order requires the moving party to satisfy the same four factors required by a preliminary injunction. S*ee Rumfish Y Vino v. Fortune Hotels*, Inc., 403 F. Supp. 3d 1227, 1231 (M.D. Fla. 2019).

*Gatlin v. Ecapital Freight Factoring Corp.*, 2025 U.S. Dist. LEXIS 201282, at *4 (S.D. Fla. Apr. 13, 2025).

The Court is guided by Florida law in its evaluation and enforcement of restrictive covenants. *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230-31 (11th Cir. 2009); and Fla. Stat. § 542.335. "For a restrictive covenant to be valid, the person seeking enforcement of the restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying

the restrictive covenant." *Proudfoot*, 576 F.3d at 1226.

Section 542.335(c), Florida Statutes provides a burden-shifting framework to be used in enforcement proceedings involving restrictive covenants:

> A person seeking enforcement of a restrictive covenant also shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction. If a person seeking enforcement of the restrictive covenant establishes prima facie that the restraint is reasonably necessary, the person opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests. If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests.

Unlike in a Florida state court, which can presume irreparable injury upon the violation of an enforceable restrictive covenant, federal courts exercising diversity jurisdiction apply "traditional equitable principles" and consider whether the threatened injury to Plaintiffs outweighs the damage the injunction may cause to Mr. Gomez—"giving full consideration to the hardship [the defendant] would suffer should the injunction issue." *TransUnion*, 625 F. App'x at 407; *see also Vital Pharms. Inc. v. Alfieri*, 23 F.4th 1282, 1293-99 (11th Cir. 2022). In his concurring opinion in *Vital Pharms.*, the Honorable William H. Pryor, Jr., Chief Judge of the Eleventh Circuit Court of Appeals, has summarized this requirement as follows:

> [U]nder *Erie*, the Florida standard for obtaining a preliminary injunction is a matter of procedure, not of substance. Federal courts must apply the federal standard in cases involving Florida law. And under the federal standard, a plaintiff must prove irreparable harm without the presumption afforded by Florida law.

*Vital Pharms.*, 23 F.4th at 1299; *see Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (rejecting a presumption of irreparable harm as "contrary to traditional equitable principles"); *see also Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990) ("The plaintiff's success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm." (internal quotation marks omitted)).

Whether the violation of a restrictive covenant creates a presumption of irreparable injury under Fla. Stat. § 542.335 in federal diversity jurisdiction cases "raises a knotty choice-of-law question" which Eleventh Circuit's majority opinion in *Vital Pharms.* chose not to resolve. *Vital Pharms.*, 23 F.4th at 1292 ("we need not resolve that question here because Vital has not proved its entitlement to the statutory presumption in any event."). Even if the Court were to find that Plaintiffs satisfied their burden to establish a violation of an enforceable restrictive covenant and apply the state law presumption of irreparable harm, "[t]his presumption, however, is rebuttable." *Proudfoot*, 576 F.3d at 1231 (citing *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. 4th DCA 2006)).

Under Florida law, "contracts in restraint of trade are generally unlawful." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 785 (Fla. 2017) (citing Fla. Stat. § 542.18) ("[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful"). Florida Statute § 542.335 creates a limited exception to this general rule. It provides that "enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited." Fla. Stat. § 542.335(1) (2025). "The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." Fla. Stat. § 542.335(1)(b). "Section 542.335 commands courts to modify, or blue pencil, a non-competition agreement that is 'overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest,' instructing courts to 'grant only the relief reasonably necessary to protect such interest.'" *White*, 226 So. 3d at 785.

> The person seeking enforcement must also "plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." Fla. Stat. § 542.335(1)(c). Legitimate business interests include, but are not limited to: (1) trade secrets; (2) other valuable confidential business information; (3) substantial relationships with specific prospective or existing customers,

patients, or clients; (4) customer, patient, or client goodwill; and (5) extraordinary or specialized training. Fla. Stat. § 542.335(1)(b). To be enforceable, restrictive covenants must also "be reasonable with regard to time, area and *line of business*."

*Proudfoot*, 576 F.3d at 1231 [*emphasis added*]. Against this legal backdrop, the Court turns to whether Plaintiffs have satisfied their burden under Rule 65 based on the evidence presented and Mr. Gomez's defenses.

## IV. <u>ANALYSIS</u>

### A. **Likelihood of Success on the Merits**

To succeed on their breach of contract claims against Mr. Gomez, Plaintiffs must prove 1) a valid contract, 2) a material breach, and 3) damages. *Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021). Applying these principles to Plaintiffs' breach of contract claims requires them to prove that Mr. Gomez entered into valid and enforceable contracts, and that the restrictions contained therein were not only triggered, but materially breached. Where a plaintiff fails to establish a substantial likelihood of success on the merits, the Court need not consider the remaining preliminary injunction factors. *Fla. Preborn Rescue, Inc. v. City of Clearwater*, 2025 U.S. App. LEXIS 31666, at *7 (11th Cir. Dec. 4, 2025) ("The first factor is the most important, and '[w]here a court concludes that the movant fails to establish a substantial likelihood of success on the merits,' it needn't reach the remaining considerations.") (quoting *Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023)). The Court addresses each of these aspects in turn.

#### i. **Validity of the Agreements**

As a threshold matter, Plaintiffs must show that the restrictive covenants they seek to enforce are part of a valid agreement that is binding on and signed by Mr. Gomez. *See* Fla. Stat. § 542.335(1)(a) ("A court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought.") At the hearing, Plaintiffs relied on two

stand-alone Agreements Mr. Gomez signed: the 2022 Employee Nondisclosure And Noncompetition Agreement [ECF No. 1-1 at 37 (2022 Agreement)] and the 2025 RSU Agreement [ECF No. 1.1 at 90 (RSU Agreement)]. Since Mr. Gomez admitted to signing these agreements during the hearing, the Court finds that Plaintiffs satisfied the portion of § 542.335(1)(a) that requires the restrictive covenants to be enforced are "set forth in a writing signed by the person against whom enforcement is sought."

The Court's inquiry does not end here, since Mr. Gomez raised as a defense that Plaintiffs breached their Agreement(s) with him before he violated any of the restrictive covenants contained therein, thereby preventing Plaintiffs from enforcing those covenants. [ECF No. 18 at 21]. He reiterated this defense during the hearing as well. The Court's review of the 2022 Agreement reveals that it provides: "The Employee's compensation reflects, in part, the Employee's obligations and the Company's rights under this Agreement." [ECF No. 1-1 at 40]. The doctrine of first or antecedent breach is a defense to enforcement of an otherwise valid restrictive covenant which the Court must consider before determining the validity of the restrictions contained therein. *Benemerito & Flores, M.D.'s P.A. vs. Roche*, 751 So. 2d 91 (Fla. 4th DCA 1999); *Bradley v. Health Coal.*, 687 So. 2d 329, 333 (Fla. 3d DCA 1997); and *Cordis Corp. v. Prooslin*, 482 So. 2d 486 (Fla. 3d DCA 1986). At the hearing, Mr. Gomez gave unrebutted testimony that his receipt of paid time off (PTO) was part of his compensation to be paid by Plaintiffs. He explained how Plaintiffs did not pay him the PTO he accrued but did not use upon his resignation, the basis for why he was entitled to be paid for his accrued but unused PTO, and that Plaintiffs' failure to pay him the value of his unused PTO amounted to a material breach of the Agreement(s). Although Plaintiffs addressed this defense in their closing remarks at the hearing, they did not offer any conflicting evidence during the hearing to refute this defense by Mr. Gomez. When considered as a defense to enforcement of an agreement containing restrictive covenants,

> [M]aterial breach of an employment contract does not rest upon value of the amount underpaid; it rests squarely on whether the full amount due was withheld and whether it was withheld wrongfully. If both questions are answered in the affirmative then the breach was material.

*S. Wine & Spirits of Am., Inc. v. Simpkins*, 2011 U.S. Dist. LEXIS 5762, at *20-21 (S.D. Fla. Jan. 14, 2011). Mr. Gomez established that Plaintiffs breached the Agreement by not paying him the PTO he accrued but did not use. Plaintiffs neglected to address this evidence offered by Mr. Gomez, compelling the Court to find that Plaintiffs are not substantially likely to prove that they did not breach the Agreements. *Id.,* at *21 ("Since Southern Wine fails to address both of the necessary arguments for materiality, it is not substantially likely that Southern Wine will prove that it did not materially breach the employee contract.) Stated differently, Plaintiffs are not substantially like to prove that they can enforce the Agreements due to their antecedent breach.

### ii.    Legitimate Business Interest(s) Needing Protection

Even a written, signed non-compete agreement must protect one or more legitimate business interests to be valid under Florida law. Fla. Stat. § 542.335(1)(b); *Proudfoot*, 576 F.3d at 1228 ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."). Section 542.335(1)(b) provides a non-exhaustive list of potential legitimate interests, including trade secrets, valuable confidential information, substantial relationships with specific customers, client or customer goodwill associated with "an ongoing business" or "specific marketing or trade area," and specialized training. The Florida Supreme Court explained that a "legitimate business interest" essentially means a business asset that, if misused or taken by a competitor, would give that competitor an unfair advantage over the employer in the marketplace. *White*, 226 So.3d at 784. If the restriction is not supported by a legitimate interest, it is void and unenforceable – Florida courts will not enforce a non-compete merely to insulate a company from routine competition or

to prevent an employee from using general skills. Plaintiffs "cannot simply claim the non-compete and non-solicitation clauses are reasonably necessary to protect its business interest − it must also prove that connection." *NuVasive, Inc. v. LeDuff*, 2019 U.S. Dist. LEXIS 196544, at *13 (M.D. Fla. Nov. 13, 2019).

In their motion, Plaintiffs assert that Mr. Gomez's covenants are necessary to protect several purported legitimate interests: (1) non-public customer information, business development plans, marketing strategies, compensation data, and other confidential or trade secret information; (2) goodwill and valuable relationships with employees that Mr. Gomez supervised or trained (and about whom he received confidential information); and (3) goodwill and relationships with business partners such as travel agencies and trade groups. [ECF No. 4, at 2]. Mr. Gomez, on the other hand, argues that none of these interests are implicated by his new role at Ama, primarily because Celebrity's business does not encompass river cruises and Mr. Gomez was not privy to any confidential information that could competitively harm Plaintiffs in either their existing ocean cruise business or their fledgling river business.

Plaintiffs identified no customers, trade partners, or employees they lost because of Mr. Gomez in their Verified Complaint or Motion [ECF Nos. 1-1 and 4]. During the hearing, Plaintiffs offered Ms. Soy as their corporate representative, and she testified that Plaintiffs have not yet identified any customer or trade partner they lost because of any actions Mr. Gomez took after leaving his employment with Plaintiffs. Consequently, the Court finds that Plaintiffs have no protectable interest in any identifiable past or future customers or trade partners. The evidence at the hearing established that Mr. Gomez did not access any digitally stored information other than in connection with his job duties, did not copy, and did not retain any information belonging to Plaintiffs after his employment ceased. Likewise, they did not offer any evidence to indicate that he utilized any unauthorized devices to transfer or retain any digital information belonging to the

Plaintiffs.

Plaintiffs' sole remaining claim of breach at the hearing was that Mr. Gomez "solicited" one employee – Mr. Santelices (and the Court will address this issue in more detail below). Although the Court finds that Plaintiffs have a protectable interest in the employment and continued employment of Mr. Santelices, the Court finds they do not need protection or enforcement in the absence of any breach or solicitation, as explained in more detail below.

Plaintiffs also generally claim that Mr. Gomez had confidential information regarding their strategies, customers, employees, business models, talent acquisition strategies, process improvement, and business partners during his tenure. [ECF No. 4 at 6]. Other than making unspecific references to the various types of information shared, Plaintiffs did not specifically identify any of the information provided to Mr. Gomez in their Motion or at the hearing. Of course, "[g]eneralized statements of concern cannot substitute for proof." *Gould & Lamb, LLC v. D'Alusio*, 949 So. 2d 1212, 1214 (Fla. 2d DCA 2007).

While Ms. Soy offered generalized statements about the types of information Plaintiffs claim to be privileged, proprietary, and non-public at the hearing, she did not do so with the requisite level of specificity necessary to support the Court's grant of the "extraordinary" relief requested. The generalized nature of her testimony falls short of meeting the requirements that Plaintiffs identify the "specific information" at issue and the steps taken to protect its secrecy to obtain post-employment relief against Mr. Gomez. *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). Given how extensive Plaintiffs and Ms. Soy categorized Mr. Gomez's receipt of non-public information, the Court considers their failure to present any documents, presentations, slides, or emails containing the damaging information they categorized as not public and not ultimately made public to preclude a finding that a protectable, legitimate business interest exists. Providing the Court evidence of the specific, non-public information and

materials Mr. Gomez received, under the facts and circumstances presented, is necessary to restrict him in future employment, and Plaintiffs' inability to point to specific materials or information precludes the Court from finding a protectable business interest or breach relating thereto. *Compare AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1305 (S.D. Fla. 2004) (specifying confidential and proprietary business information employee accessed during employment, and the significance of each, as basis for enforcing post-employment restrictions). "A blanket assertion that [Mr. Gomez] is in possession of confidential information is not enough." *WellCare Health Plans, Inc. v. Preitauer*, 2012 U.S. Dist. LEXIS 76920, at *11 (M.D. Fla. May 23, 2012).

Mr. Gomez testified that what he learned while working for his first post-college employer (Celebrity), where he worked for nearly eighteen years after August 2007, was equally applicable to any other employer that operates call/contact centers. The record does not reveal that Mr. Gomez received any extraordinary or specialized training. Instead, the evidence at the hearing was that his experience and skills were not particularized to cruise industry, but transferrable to businesses beyond even the larger vacation experience industry – especially given Ms. Soy's testimony that anyone with a "vacation experience is considered a competitor." Mr. Gomez testified as to the differences between the ocean and river cruise businesses (such as onboard sales as a revenue stream for ocean cruises versus the all-inclusive nature of river cruises). He explained that much of the information he learned while working for Plaintiffs was irrelevant to his employment at Ama.

The unrefuted evidence at the hearing showed that, although the Plaintiffs established themselves as actively engaged in the ocean cruise line of business, the same could not be said for their river business. Plaintiffs initially announced their "entry into the river cruise market" on January 28, 2025. [ECF No. 15-1 at 4]. Ms. Soy testified that the river cruise project was referred to internally as "Project Frontier" because it represented a new destination experience as a new

product to be offered from within their portfolio, i.e. a new frontier. This testimony aligns with how Plaintiffs have publicly categorized their forthcoming river cruise offerings as "new experiences" that were scheduled to commence in 2027—but as of July 29, 2025, were "still a ways away..." *Id.* While Plaintiffs offered generalized evidence about their plans for entering the "river cruise market," they did not identify any specific, protectable interest in that line of business.

Mr. Gomez notified his direct supervisor, Michelle Johnson-Sharma, of his intention to resign on April 28, 2025. Ms. Johnson-Sharma knew that Mr. Gomez could be leaving to work for a river boat company (not necessarily Ama) and decided that a river company was not a direct competitor. Ms. Soy relied on Ms. Johnson-Sharma's investigation and judgment, as well as other direct reports, each of whom stated Mr. Gomez was not leaving to work for a competitor. Based on the collective judgment of those reporting directly to her, Ms. Soy decided to allow Mr. Gomez to work throughout his notice period. Without any evidence of how Ama is in direct competition with Plaintiffs and their startup river business, and based on the testimony that neither Mr. Gomez, his boss, nor Ama considers Celebrity competitors, the Court certainly cannot.

Throughout Mr. Gomez's employment, Plaintiffs did not offer or market any river cruises whatsoever. At present, Plaintiffs will not even begin river cruise operations until 2027, and that future venture remains in early stages. Mr. Gomez, during his time at Celebrity, worked exclusively on the ocean cruise side and had no role in any river cruise product (which did not yet exist). He did not service river cruise customers (there were none), did not cultivate goodwill with river cruise travel agencies or partners on Celebrity's behalf, and did not possess any proprietary market data about river cruise consumers. In short, Mr. Gomez's employment at Ama – a company in a different line of business (river cruising) – does not threaten any of the specific interests Plaintiffs enumerate.

To the extent Plaintiffs cite confidential information as an interest, they failed to show that

Mr. Gomez had access to any confidential information that is both competitively significant and pertinent to Ama's business, while detrimental in its hands to Plaintiffs. For example, Mr. Gomez was not involved in Plaintiffs' pricing strategy, marketing strategy, or product development for any ocean cruises in a way that could translate into an advantage for a river cruise company. Nor did he possess trade secrets; there was no evidence of any secret formula, algorithm, or process that Mr. Gomez took with him. Plaintiffs' vague references to "business development information" or "compensation information" are not tied to any proof that Mr. Gomez knows something that could harm Celebrity. Moreover, any general knowledge Mr. Gomez acquired about managing a sales team or running a call center is not a protectable interest under Florida law – Florida statute expressly forbids using a non-compete to prevent ordinary competition or to restrain an employee from utilizing general skills and knowledge acquired during employment. *See* Fla. Stat. § 542.335(1)(b) (legitimate interests do not include factors like general knowledge or an "ordinary competition" rationale).

Perhaps most critically, Plaintiffs' claimed interest in protecting goodwill or customer relationships does not apply here because Mr. Gomez is not working in a capacity that targets Plaintiffs' customers or employees, nor have Plaintiffs offered evidence of this. To the contrary, the evidence at the hearing was that Plaintiffs have captured part of Ama's customer base, not the other way around.

After careful consideration, the Court finds that Plaintiffs have not demonstrated a legitimate business interest sufficient to justify enforcing a restrictive covenant against Mr. Gomez to prevent him from working for his current employer, Ama. Plaintiffs identified no specific or identifiable confidential information, goodwill, customer lists, or relationships with clients that are capable of being protected by a non-compete.

### iii.    Reasonableness of Restrictions

The Court must next determine whether the restrictive covenants are enforceable and reasonable with respect to time, area, and line of business. Fla. Stat. §542.335(1). The statute requires the Court to "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." Fla. Stat. §542.335(1)(h). When it encounters a restriction that is not tailored to protect established business interests, the Court is given "fairly wide discretion to fashion the appropriate context-dependent remedy" because "Section 542.335 commands courts to modify, or blue pencil, a non-competition agreement that is 'overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest,' instructing courts to 'grant only the relief reasonably necessary to protect such interest.'" *White*, 226 So. 3d at 785; quoting Fla. Stat. § 542.335(1)(c).

Mr. Gomez does not dispute that the Agreements are reasonable in time and area, but does dispute that the restrictions are reasonably related to Plaintiffs' "line of business." The Court agrees with Mr. Gomez that, as measured during his employment, Plaintiffs did not have a protectable interest in the river cruise industry, and that "river" is a "distinct line of business" from ocean cruising. [ECF No. 15, at 3]. Based on the evidence adduced at the hearing, the restrictions imposed by Plaintiffs are too ambiguous and overly ambitious by seeking to prevent him from working for:

> another entity engaged in (or preparing to engage in) cruises, with a with a minimum fleet size of 500 berths (including ships under construction or publicly announced to be built), or cruise related businesses of any such entity; or

> any other entity engaged in cruises, with a minimum fleet size of 500 berths (including the reasonable estimated berths of ships under construction or publicly announced to be built), or cruise related businesses of any such entity.

[ECF 1-1 - Exhibits A and B]. *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, No. 8:11-cv-1883-30AEP, 2011 U.S. Dist. LEXIS 127336, at *25 (M.D. Fla. Sep. 26, 2011) (finding restrictive

covenant unenforceable as "ambiguous as to the geographic area and line of business restrictions").

Completely barring Mr. Gomez from working in any capacity for a company in the cruise industry (broadly defined) for a period of nine months, regardless of whether that company competes with Plaintiffs, would overshoot any actual need to protect against an unfair competitive advantage. *Semper Foods, LLC v. Ouellette*, 2024 U.S. Dist. LEXIS 81902, at *29 (S.D. Fla. May 6, 2024) (discussing the significance of preventing an unfair competitive advantage). Mr. Gomez's role at Ama poses little to no competitive threat to Plaintiffs, as evidenced by their inability to identify any injury suffered since he started working for Ama.

In sum, Plaintiffs have not met their burden to show that the 2022 Non-Compete Agreement protects a legitimate business interest under these circumstances. Given that failure, the non-compete (to the extent it would prohibit Mr. Gomez's employment with Ama) is unenforceable under Florida law. This weighs heavily against Plaintiffs' likelihood of success on the merits.

### iv.   Material Breach

Plaintiffs must also establish that Mr. Gomez's conduct breached those covenants. The three covenants at issue are the non-compete, non-solicitation, and nondisclosure provisions. A failure to establish a material breach at this phase makes it unlikely Plaintiffs will have success on the merits later. *See, e.g., Avisena Inc v. Santalo*, 65 So. 3d 14, 16 (Fla. 3d DCA 2011).

#### a.  Non-Compete

The threshold dispute concerning the non-compete centers on the contractual definition of a "competing business," which Plaintiffs broadly define as entities operating passenger-ship vessels with a minimum fleet size of 500 berths or engaged in the cruise business. Plaintiffs contend that this definition permits aggregation of berths across multiple vessels and therefore captures Ama's river operations within the covenant's scope. Even assuming, without deciding, that Plaintiff's

interpretation of the fleet-size language is correct, enforcement of the non-compete still fails because it extends beyond Plaintiff's actual line of business during Mr. Gomez's employment and is not reasonably necessary to protect any legitimate business interest under Florida law.

The evidence plainly and clearly establishes that Plaintiffs were not actively engaged in the river cruise business during Mr. Gomez's employment. During the Q2 investor call held on July 29, 2025, Plaintiffs described river cruises as "new experiences" that would begin in 2027 and acknowledged that such operations were "still a ways away." [ECF No. 15-2, at 3, 23]. Under Florida law, a non-compete may not extend beyond the employer's actual line of business during the period of employment. *See White*, 226 So. 3d at 787. Where, as here, Plaintiff's existing business was distinct from Mr. Gomez's subsequent employment, enforcing a broad, industry-wide restraint exceeds what is reasonably necessary or permissible to protect any legitimate business interest. *See Cap., L.P. v. Heyden Enters., LLC,* 2024 U.S. Dist. LEXIS 127628, *35 (S.D. Fla. Jul. 19, 2024) (distinguishing cases involving "indistinguishable" products and narrowing restraints to the employer's actual line of business).

Furthermore, even if Ama were deemed a competitor, the record does not establish a material breach that threatens Plaintiffs' competitive interests. Mr. Gomez's role at Ama is in call-center operations, not in high-level strategy or product development that could exploit any overlap with Plaintiffs' business. He is not leading a new ocean cruise venture or targeting Plaintiffs' customers but working with an existing river boat company. Plaintiffs have not demonstrated that Mr. Gomez engaged in competitive activities that the non-compete was designed to prevent. For all the reasons discussed in the legitimate business interest analysis, any theoretical breach here is technical and hypothetical at best and does not equate to the kind of conduct a non-compete is meant to proscribe.

Federal courts applying Fla. Stat. § 542.335 refuse to enforce non-competes that effectively

bar a former employee from working in an entire industry rather than the specific line of business in which the former employer engaged. *See Lincare, Inc. v. Tinklenberg*, 2020 U.S. Dist. LEXIS 257078, at *11 (M.D. Fla. June 26, 2020) (modifying overbroad restraint that would preclude employment in the healthcare industry supply field and limiting it to the specific business segment at issue). Any restraint must be confined to the segment of Celebrity's business in which Mr. Gomez actually worked and cannot be expanded to a segment of the industry Celebrity had not yet entered. *See Proudfoot*, 576 F.3d at 1231-32. Federal courts require that injunctive relief be tied to actual competitive risk, not speculative harm. *See TransUnion*, 676 F. App'x at 825-27 (rejecting injunction where the employee's new role did not threaten the employer's legitimate interests).

### b. Non-Solicitation

The 2022 Agreement also contains a covenant barring Mr. Gomez from soliciting Plaintiffs' employees or customers for a certain period. Plaintiffs' solicitation claim is extremely narrow: they contend Mr. Gomez "breached" this covenant by communicating with Jason Santelices, an RCCL employee, about potential opportunities at Ama. The Court finds that Plaintiffs have not shown a substantial likelihood of proving a violation of the non-solicitation provision.

Where the operative covenant/agreement fails to define what constitutes "solicitation," such as here, Florida courts look to the common meaning attributed to the word. *Scarbrough v. Liberty Nat'l Life Ins. Co.*, 872 So. 2d 283, 285 (Fla. 1st DCA 2004); *accord Massey Servs. v. Sanders*, 312 So. 3d 209, 215 (Fla. 5th DCA 2021); *accord Envtl. Servs. v. Carter*, 9 So. 3d 1258, 1266 (Fla. 5th DCA 2009). In *Scarbrough*, the Florida First District Court of Appeal turned to Black's Law Dictionary which defines the term as "the act or an instance of requesting or seeking to obtain something; a request or petition." *Scarbrough*, 872 So. 2d at 285. Based on that definition and interpreting past precedent in non-solicitation cases, the *Scarbrough* court held that "[t]he active involvement of a

former employee in enticing a customer away from the prior employer" constitutes solicitation. *Id.*; *Massey Servs.*, 312 So. 3d at 215 (defining "solicitation" as proactively seeking "to entice any employee to leave" the defendant's former employer); *see also Envtl. Servs.*, 9 So. 3d at 1266 (finding evidence of solicitation where the defendant "actively enticed existing customers away from ESI.")

The uncontroverted evidence is that Mr. Santelices reached out to Mr. Gomez seeking career advice, not that Mr. Gomez initiated contact to recruit Mr. Santelices. Moreover, Mr. Gomez's advice to his friend was to stay with RCCL, not to leave or join Ama. He did not offer Mr. Santelices a job or encourage him to resign. While future employment was discussed, the talk involved nothing more than mere notions of future possibilities without any dates, salaries, or positions. It could hardly be said that this discussion could reasonably be expected to cause Mr. Santelices to quit, move cross-country, and leave his family and extended family, all of whom live in South Florida. Plaintiffs have not identified any other employee or any customer that Mr. Gomez supposedly solicited.

Courts distinguish sharply between "solicitation" and "mere communication." "Solicitation" requires affirmative, initiatory efforts to persuade or recruit; responding to inquires or providing neutral information does not suffice. *Partylite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213 (M.D. Fla. 2012) (finding solicitation only where the defendant initiated contact, promoted the competing business, discussed benefits of joining, and offered to arrange meetings, and contrasting such conduct with merely responding to inquiries or providing generic information, which does not constitute solicitation). There is simply no evidence of a breach of the non-solicitation covenant. At most, Plaintiffs have shown that an RCCL employee (Santelices) was exploring his options and spoke with Mr. Gomez as a friend. That falls far short of demonstrating that Mr. Gomez actively solicited or enticed someone away from Plaintiffs' company.

### c. Nondisclosure

Plaintiffs also claim Mr. Gomez breached his obligation to not disclose or use confidential information belonging to Celebrity/RCCL. Yet, they fail to articulate what specific confidential or proprietary information Mr. Gomez has supposedly misappropriated or disclosed. During the hearing, Plaintiffs did not point to a single document, customer list, or piece of data that Mr. Gomez took and gave to Ama. In fact, as noted, Celebrity's forensic analysis turned up no evidence of any information transfer. Likewise, there is no evidence Ama has in its possession any of Plaintiffs' confidential materials (and Ama, as a seasoned river cruise company, would have little use for information about an ocean cruise line's call center metrics in any event). Ms. Soy admitted that any concern in this realm was speculative. On this record, Plaintiffs have not demonstrated any actual or likely breach of the confidentiality covenant. Mr. Gomez appears to have scrupulously honored his obligations regarding company information by returning all materials and refraining from any disclosure.

### v. Damages

Finally, as part of their contract claim, Plaintiffs would eventually need to prove they have suffered damages (or will suffer damages) as a result of the alleged breaches. At the preliminary injunction stage, the "damages" element overlaps with the irreparable harm inquiry. For purposes of likelihood of success on the merits, it is sufficient to note that Plaintiffs have not identified any tangible loss attributable to Mr. Gomez's conduct. They have not lost employees to Ama; Mr. Santelices remained at RCCL (and no one else left). They have not lost customers or bookings; to the contrary, their sales remain strong. There is no evidence of lost revenue or lost business opportunities linked to Mr. Gomez. In short, Plaintiffs have not demonstrated any actual damage from the alleged breaches − a fact that not only undercuts this element of their contract claim, but also highlights the absence of irreparable harm, as discussed below.

In sum, based on the current record, the Court finds that Plaintiffs have low likelihood of success on the merits of their claims. Serious questions exist as to the enforceability of the non-compete (due to lack of a legitimate interest in preventing Mr. Gomez's employment in a distinct industry), and even if enforceable, Plaintiffs have not shown that Mr. Gomez breached the covenants in any material way. This first prerequisite for injunctive relief thus weighs strongly against issuing an injunction.

### B.  Irreparable Harm

Irreparable harm is the second prong that the Plaintiffs must satisfy for a temporary restraining order and a preliminary injunction. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)).

> The key word in this consideration is "irreparable." Mere injuries, however substantial, in terms of money, time, and injury necessarily expended in the absences of a stay are not enough. The possibility of adequate compensatory or [that] other corrective relief will be available at a later date, in the course of litigation, weighs heavily against a claim of irreparable harm.

*Loans of Am. Fla., Ltd. Liab. Co. v. Rapid Auto Loans, Ltd. Liab. Co.*, 2010 U.S. Dist. LEXIS 78466, at *13 (S.D. Fla. July 12, 2010) (quoting *U.S. v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983)).

Plaintiffs did not dispute delaying nearly three months since Ama announced Mr. Gomez as its SVP Global Sales and Service on July 31, 2025. [ECF No. 1-1 at ¶ 83]. When Mr. Gomez asked Ms. Soy about the reason for the delay, she testified that the delay resulted from Plaintiffs conducting a pre-suit investigation, but could not explain what that investigation entailed or why it could not have been done within the ten-day timeframe within which it acted in the *Matias Lira* matter. *Royal Caribbean Cruises Ltd. v. Lira*, No. 2022-016210-CA-01, Dkt. No. 3, (Fla. 11th Cir. Ct. Aug. 31, 2022); *see Hernandez v. Stingray Grp. Inc.*, 2025 U.S. Dist. LEXIS 170783, at *29 (S.D. Fla. Mar. 10, 2025) ("Plaintiffs' dilatory prosecution of their legal rights… fully negates any showing of

irreparable harm.") This delay does not support Plaintiffs' likelihood of success on the merits, since "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248 (denying preliminary injunction due to delay in seeking a preliminary injunction). Expanding on this point, the Court in *Customplay v. Amazon, Inc.*, denied a preliminary injunction based on the delay between learning of the alleged violation and seeking relief. 2017 U.S. Dist. LEXIS 231337, at *5-6 (S.D. Fla. Nov. 21, 2017) ("It is the delay from the time the movant becomes aware of the alleged injury to the time injunctive relief is sought that is controlling, not the time between initiating litigation and seeking injunctive relief in the ongoing litigation.") Plaintiffs' inability to justify their approximate three-month delay in seeking to enforce the restrictive covenants against Mr. Gomez does not bode in their favor.

At the outset, Plaintiffs' delay in seeking enforcement undercuts any claim of irreparable harm, as it indicates a lack of urgency and an ability to endure the status quo. *See Wreal*, 840 F.3d at 1248 (affirming denial of injunction where a five-month delay in seeking relief "militates against a finding of irreparable harm"); *Customplay*, 2017 U.S. Dist. LEXIS 231337 at *5-6 ("It is the delay from the time the movant becomes aware of the alleged injury to the time injunctive relief is sought that is controlling, not the time between initiating litigation and seeking injunctive relief in the ongoing litigation."); *Cheng Ke Chen*, 783 F. Supp. 2d at 1187 ("Delay in seeking a temporary restraining order, especially when the need for such relief is apparent well before the request is made, undermines any argument that absent immediate relief the plaintiff will suffer irreparable harm."); and *Hernandez v. Stingray Grp. Inc.*, 2025 U.S. Dist. LEXIS 170783, at *29 (S.D. Fla. Mar. 10, 2025) ("Plaintiffs' dilatory prosecution of their legal rights … fully negates any showing of irreparable harm.") This Court follows it sister courts who "typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Poker Unicorns LLC v. Lively*,

2024 U.S. Dist. LEXIS 37924, at *6 (M.D. Fla. Mar. 5, 2024) (*quoting Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 U.S. Dist. LEXIS 18567, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (citations and internal quotation marks omitted).

Here, Plaintiffs' own conduct belies the notion that they face imminent irreparable injury. Mr. Gomez's new employment was announced in July 2025, yet Plaintiffs waited until October 2025 to take legal action, and until December 2025 to press for a preliminary injunction. This unexplained delay of nearly three months is inconsistent with a claim of urgent, irreparable harm. If Mr. Gomez's presence at Ama truly posed a grave threat to Plaintiffs, one would have expected an immediate cease-and-desist letter or a prompt motion for a TRO in July 2025, as they did when encountering the situation detailed in the *Matias Lira* matter filed in the Circuit Court for Miami-Dade County just ten days after he started working for a competing ocean cruise line. Instead of taking immediate action, Mr. Gomez's direct supervisor congratulated him on his accomplishment, and Plaintiffs allowed him to work undisturbed for nearly a full fiscal quarter. Such a delay suggests that any potential future harm is not irreparable or even material at the time, but hypothetical at best. Courts routinely delay injunctive relief where plaintiffs delay enforcement while alleged harm remains speculative. *See Wreal*, 840 F.3d at 1249.

Issuing a preliminary injunction based only on a possibility of irreparable harm at some indeterminate time in the future is inconsistent with the extraordinary nature of injunctive relief, which requires a clear showing of entitlement. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375-76 (2008). As detailed in above, Plaintiffs have not suffered any concrete harm, nor shown that any irreparable harm is likely to occur in the near future. They offered no evidence of lost sales, customers, or goodwill. Plaintiffs continue to post strong financial results and have publicly celebrated the successful pre-sales of their upcoming river cruises setting sail in 2027. In other words, the market is telling us that Celebrity's business is doing just fine. Plaintiffs' assertions of

harm are entirely speculative and hypothetical: they theorize that Mr. Gomez *might* misuse information or *might* help Ama in some way that *could* disadvantage Celebrity in the future.

> [Plaintiffs'] detail-free, evidence-free theory of damages is simply a hypothetical guess at what might happen. This is inadequate to generate adequate support for a mandatory injunction to compel enforcement of a restrictive covenant.

*Delivery.com Franchising, LLC v. Moore*, 2020 U.S. Dist. LEXIS 108359, at *29 n.14 (S.D. Fla. June 19, 2020). Speculation, supposition, and conjecture, even when combined, still cannot justify the Court granting the extraordinary remedy of an injunction. *See Siegel*, 234 F.3d at 1176 (en banc) (irreparable harm must be "neither remote nor speculative, but actual and imminent"). At best, the Court categorizes Plaintiffs' concerns as involving "remote [and] speculative" future injury, which are insufficient as a matter of law. *Vital Pharms.*, 23 F.4th at 1282 (quoting *Siegel*, 234 F.3d at 1176).

Plaintiffs' own corporate representative admitted that any alleged injury is forward-looking and hypothetical, indicating that Plaintiffs would not know of any "potential harm" until after their river cruises started sailing (in 2027). For instance, Plaintiffs worry that Mr. Gomez knows their customer service strategies or staffing models. But regardless, they provided no evidence that such knowledge has been or will be used to poach customers or gain competitive advantage, especially given that Plaintiffs are mining their own customer database without interference by Ama.

Ama, as a long-established river cruise company, has presumably developed its own methods of customer acquisition and retention, without any evidence of a change in its practices after Mr. Gomez's employment. Plaintiffs also fear loss of employee goodwill or relationships, yet no employees have departed for Ama or been lost to Plaintiffs. In short, Plaintiffs have identified no injury that is occurring or impending that money could not fix if it ever were to occur. If, hypothetically, Mr. Gomez were to breach his confidentiality covenant and divulge some secret, the appropriate remedy could be damages or perhaps a targeted injunction at that time. But at

present, there is nothing to enjoin – no misappropriation or solicitation is happening. The hearing testimony confirmed that Plaintiffs had not yet suffered any injury and could not identify when or whether any injury would occur, underscoring the speculative nature of the claimed harm. *See Ne. Fla. Ch. of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)).

Finally, because the Court has found that Plaintiffs failed to establish a legitimate business interest in restricting Mr. Gomez's current employment, it follows that preventing him from working at Ama would not serve to protect any legitimate interest. Federal law does not permit an irreparable harm presumption in this case. Plaintiffs also failed to "articulate how any alleged confidential information is unique or proprietary", or how Mr. Gomez could "unfairly use that information to compete" against them, further undermining any claim of irreparable harm. *See Lucky Cousins Trucking, Inc. v. QC Energy Res. Tex., LLC*, 223 F. Supp. 3d 1221, 1226 (M.D. Fla. 2016). Thus, the Court must find actual irreparable injury, and it cannot do so on this record. The absence of evidence of concrete harm, combined with Plaintiffs' delay and acquiescence, compels the conclusion that no irreparable harm has been shown.

### C. Balance of Hardships (Comparable Harm)

The third prong requires the Court to weigh the harm that Plaintiffs would suffer in the absence of an injunction against the harm Mr. Gomez would suffer if an injunction were issued. This is essentially a balance of hardships or equities. In performing this balancing, the Court must give full consideration to the hardship an injunction would impose on Mr. Gomez, while also considering the nature of the injury claimed by Plaintiffs. Often when courts have granted preliminary injunctions in breach of contract cases, it is because the harms involved are more than monetary and drastically disproportionate to a particular party. *See, e.g. Lepper v. Franks*, 2019 U.S. Dist. LEXIS 5468, at *2 (M.D. Fla. Jan. 11, 2019).

On Plaintiffs' side of the scale, the potential harm is insubstantial and largely speculative. As discussed, Plaintiffs have not identified any ongoing injury, and the future harms they posit—such as the potential misuse of confidential information, loss of employees, or competitive disadvantage in a market where they have yet to operate—are contingent, unproven, and capable of being addressed through compensatory damages should they ever materialize. Where a plaintiff's asserted injuries are hypothetical or dependent on future contingencies, and where monetary damages would provide an adequate remedy, equitable relief is inappropriate and the balance of hardships weighs decisively against an injunction. *See Ferrero*, 923 F.2d at 1449 ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."); *Siegel*, 234 F.3d at 1176-77 (requiring irreparable harm to be actual and imminent, not speculative).

Moreover, Plaintiffs' theory of harm presupposes a future breach of contractual obligations that has not occurred. Federal courts do not issue injunctions to guard against conjectural wrongdoing where existing legal remedies—including damages for breach of contract or misappropriation—are available and sufficient. If Plaintiffs were to suffer a future, quantifiable loss arising from any proven breach, compensatory damages would be an adequate and complete remedy. In the absence of evidence of actual injury or imminent misuse of protected information, Plaintiffs have not demonstrated irreparable harm. Granting no injunction therefore preserves the status quo that has existed since July 2025—a period during which Plaintiffs have continued to perform strongly and advance their anticipated river cruise operations without any discernible disruption attributable to Mr. Gomez's employment with Ama.

On Mr. Gomez's side of the scale, the harm from an injunction would be immediate, concrete, and substantial. An injunction preventing Mr. Gomez from working in the river cruise industry sideline him, depriving him of his livelihood and professional opportunities. Depriving a person of the ability to work in their chosen profession constitutes an extreme hardship that weighs

heavily against injunctive relief. *See Unisource Worldwide, Inc. v. S. Cent. Ala. Supply, LLC*, 199 F. Supp. 2d 1194, 1201-01 (M.D. Ala. 2001) (finding undue hardship where restriction impairs employee's ability to work in his trade and support dependents and recognizing hardship on the employee as a major factor in the injunction analysis). In reliance on his lawful employment with Ama, Mr. Gomez uprooted his life and relocated from Miami, Florida to Calabasas, California to assume his current role. Enjoining his employment would therefore not only eliminate his salary and benefits, but also undo a significant personal and professional relocation undertaken in good faith. Mr. Gomez would further suffer reputational harm by being barred from an industry in which he has more than eighteen years of experience. The hardship is amplified by the duration of the restraint Plaintiffs seek to enforce, which would require Mr. Gomez to remain sidelined for months and potentially to abandon his chosen field altogether. Plaintiffs themselves argued that Mr. Gomez's skills are transferable to other industries, effectively conceding that an injunction would force him to attempt to rebuild his career elsewhere – a burden that constitutes a substantial and inequitable hardship.

In contrast, the harm to Plaintiffs if no injunction issues appears minimal. They remain free to compete vigorously, to recruit and retain their employees (who have shown no mass exodus), and to protect any truly sensitive information through existing confidentiality agreements (backed by the threat of damages for any breach). If down the road Mr. Gomez were to engage in some clearly wrongful act causing tangible harm, Plaintiffs could seek legal recourse at that time. But enjoining him now, when he has done nothing beyond lawfully taking a job in a different segment of the industry, would impose a hardship on him far out of proportion to any harm Plaintiffs have demonstrated.

The balance of equities tilts decidedly in Mr. Gomez's favor. The Court is mindful that enforcing a covenant not to compete is intended to prevent unfair competition, not to punish a

former employee or hand a competitive windfall to an employer in the absence of actual jeopardy to its interests. Given the lack of evidence that Plaintiffs will suffer more than perhaps minor or theoretical harm without an injunction, versus the clear and substantial harm Mr. Gomez would suffer with an injunction, this factor weighs against granting relief. An injunction here would do far more harm to Mr. Gomez than its absence would do to Plaintiffs.

### D. Public Interest

The fourth and final prong necessary for a preliminary injunction or temporary restraining order asks whether entry of the relief would serve the public interest. "The public interest is generally advanced by enforcing valid contracts." *Evans v. FACCO USA, Inc.*, 2016 U.S. Dist. LEXIS 8978, 2016 WL 304565, at *12 (N.D. Ala. Jan. 26, 2016). However, the key word is "valid." The public has no interest in enforcing an invalid or overbroad non-compete that serves no legitimate purpose other than stifling fair competition or restricting employee mobility. Florida's public policy, as codified in § 542.18, disapproves of restraints of trade except to the extent necessary to protect specified interests. Restrictive covenants are not intended to be instruments of economic oppression or market exclusion, and courts caution against granting injunctions that would substantially limit competition or impair employee mobility beyond what legitimate business interests require. *See Blue-Grace Logistics LLC v. Fahey*, 653 F. Supp. 3d 1172, 1179 (M.D. Fla. 2023) (explaining that restrictive covenants are presumptively unlawful restraints of trade and that covenants aimed at merely preventing competition are void against public policy – reflecting Florida's strong public interest in avoiding overbroad restraints on employee mobility).

In this case, issuing an injunction would disserve the public interest for several reasons. First, it would undermine Florida's policy of requiring a legitimate business interest to support any post-employment restraint. *See* Fla. Stat. § 542.18. Granting injunctive relief absent such an interest (or absent proof that it is genuinely threatened) would effectively broaden the reach of non-compete

agreements in a manner not sanctioned by law. The public interest is not served by removing a productive individual from the workforce where there has been no showing of misappropriation or unfair competition. To do so would discourage the free movement of labor and the benefits of competition that generally accrue to consumers (in this case, cruise passengers who benefit from healthy competition between companies and from employees bringing their expertise to different enterprises).

Second, the public has an interest in the integrity of the judicial system and the consistent application of the correct legal standards. Because federal law in this Circuit requires proof of irreparable harm and balancing of hardships even in non-compete cases, granting an injunction on the thin showing made here could signal a misapplication of the law. That would not be in the public's interest. By contrast, denying an injunction where the legal prerequisites are not met reinforces the rule of law and the carefully crafted standards for extraordinary relief.

Finally, while the public does benefit when courts enforce legitimate contracts, it also benefits when courts refuse to enforce contracts that go beyond what the law permits. Here, preventing Mr. Gomez from working in a field where his former employer does not yet even compete would confer an unwarranted monopoly to Plaintiffs over an employee's labor. Such a result would harm the public interest in competition and in individuals being able to earn a living in their chosen field (absent a countervailing legal interest of an employer). On balance, the Court finds that the public interest favors denial of the requested injunction. Enforcing overbroad covenants without a demonstrated need would have a chilling effect on employee mobility and competition, which runs contrary to public policy.

### E.  Surety Bond Amount

Federal Rule of Civil Procedure 65(c) requires a movant to post security "in an amount that the court considers proper" to compensate a defendant for the real and foreseeable economic

harm sustained if an injunction is later determined to have been wrongfully issued. Although the Court recommends denial of Plaintiffs' Expedited Motion, the adequacy of the proposed bond warrants brief discussion because Plaintiffs have requested injunctive relief that would restrain Defendant's ability to work and earn a living.

Courts in this Circuit consistently recognize that where injunctive relief would interfere with a defendant's employment, a meaningful bond is required to account for lost wages, professional disruption, relocation costs, and other unrecoverable interim harms. In *Osborne Assocs., Inc. v. Cangemi*, the court required a $200,000 bond, emphasizing that an injunction affecting a defendant's livelihood presents concrete and foreseeable economic risks that must be secured. 2017 U.S. Dist. LEXIS 187862, at *46-47 (M.D. Fla. Nov. 14, 2017). Similarly, in *Veterinary Orthopedic Implants, Inc. v. Haas*, the court imposed a $150,000 bond after concluding that enjoining continued employment posed a serious economic hardship, even where the plaintiff demonstrated some likelihood of success on the merits. 2020 U.S. Dist. LEXIS 163271, at *52-54 (M.D. Fla. Sept. 8, 2020). These cases reflect a consistent principle: when an injunction threatens a defendant's income stream, Rule 65(c) requires security commensurate with that risk.

That principle was reaffirmed in *Onaxis Franchising Group, Ltd. Liability Co. v. Harod*, where the court rejected a request for no bond and instead ordered a $100,000 surety bond because the injunction would "result in the cessation of Defendant's ability to earn a living," notwithstanding the grant of injunctive relief. 2023 U.S. Dist. LEXIS 243197, at *47–48 (N.D. Ga. Dec. 28, 2023). Notably, the court imposed that bond even though the defendants had not provided a precise damages calculation, underscoring that Rule 65(c) does not require mathematical certainty—only a reasonable estimate of foreseeable harm.

Against this backdrop, Plaintiffs' proposed bond of $10,000 bears no rational relationship to the magnitude of the economic harm Defendant would foreseeably suffer if wrongfully enjoined

from employment. Plaintiffs are a large, publicly traded international corporation with substantial resources, yet they propose a bond amount that is an order of magnitude lower than the amounts courts routinely require in employment-restrictive injunction cases involving far smaller enterprises. Were injunctive relief otherwise appropriate—which it is not—the Court would find Plaintiffs' proposed bond grossly inadequate to satisfy Rule 65(c).

## V.  **CONCLUSION**

In summary, Plaintiffs have failed to satisfy any of the four required elements for obtaining a temporary restraining order or preliminary injunction. First, they have not shown a substantial likelihood of success on the merits of their claims – the restrictive covenants at issue are of doubtful enforceability in this context and, even if enforceable, Plaintiffs presented no persuasive evidence of an actual breach by Mr. Gomez. Second, Plaintiffs have not demonstrated irreparable harm, as any potential injury is speculative at best, and their prolonged delay in seeking relief indicates a lack of imminent threat. Third, the balance of hardships strongly favors Mr. Gomez; the harm to him from an injunction (loss of employment and career setback) would far outweigh any negligible harm to Plaintiffs from his continued work at Ama. Fourth and finally, an injunction would not serve the public interest, given the absence of a legitimate business interest to protect and the public's interest in open competition and lawful employment mobility.

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 4] be **DENIED** in its entirety.

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(b). The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to

factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

       DONE AND ORDERED in Chambers on this \_\_\_\_\_ day of December 2025.

_____
ENJOLIQUÉ A. LETT
UNITED STATES MAGISTRATE JUDGE

Copies to:
*Designated U.S. District Judge*
*Counsel of record by CM/ECF*