UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:25-CV-25648-WILLIAMS/LETT

CELEBRITY CRUISES, INC. and
ROYAL CARIBBEAN CRUISES, LTD.
d/b/a ROYAL CARIBBEAN GROUP,

       Plaintiffs,

vs.

ANGEL CHRISTOPHER GOMEZ,

       Defendant.

_____/

### DEFENDANT'S OBJECTION TO
### REPORT AND RECOMMENDATION ON
### PLAINTIFFS' EXPEDITED MOTION FOR
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

       Defendant, Angel Christopher Gomez, pursuant to 28 U.S.C. §636(b)(1), Fed. R. Civ. P. 72(b)(3), Local Rule S.D. Fla. Mag. J. R. 4(a), and other applicable Rules and laws, Objects to the Report and Recommendation on Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction, and requests the Court to conduct a *de novo* review, sustain his objections, and enter an Order in accordance therewith, based on the following:

## I. SUMMARY OF OBJECTION(S)

The Report and Recommendation (the "Report") is predicated on a flawed factual and legal basis that cannot be accepted.[1] The Report ignored the facts of record and the relevant legal authorities to recommend an impermissibly broad preliminary injunction be issued to restrict Mr. Gomez from working for his current employer, to prohibit more than just solicitation of Plaintiffs' current or former employees, to prohibit the use of non-public information, to require him to return information, and to provide his personal devices for a forensic review. The Report impermissibly found that Plaintiffs were likely to succeed without first addressing whether the injunctive relief sought was mandatory or prohibitive, as determinative of the standard of proof required. The Report did not find that Plaintiffs were substantially likely to succeed on the merits against this heightened burden. Equally objectionable is that the Report summarily found Plaintiffs could restrict Mr. Gomez from working in the "cruise" industry without first finding that Plaintiffs had a legitimate business interest through being established in the river cruise line of business when Mr. Gomez signed any restrictive covenant and before his resignation. The Report neither addressed these distinctions nor blue-penciled the restrictive covenants to be "narrowly tailored" to the Plaintiffs' established ocean cruising business. After conducting its *de novo* review, Mr. Gomez's objections to the Report should be sustained, with the Court determining that no preliminary injunction can be issued based on the facts and law.

## II. RELEVANT FACTS[2]

Celebrity is known for "on ocean" cruising. [ECF No. 27-11 at 3]. Most of Plaintiffs' Celebrity's ships operate on international open oceans and seas. [Tr. 60: 2-11]. Their full-size 14

---

[1]     The Court referred the Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction [ECF No. 4] to the Magistrate Judge to issue a Report and Recommendation [ECF No. 19]. The evidentiary hearing occurred on December 12, 2025. [ECF No. 20]. The Magistrate Judge considered the written submissions by the parties, the testimony of the Plaintiffs' witnesses, the testimony of Mr. Gomez, and the parties' evidentiary submissions. [ECF Nos. 15, 21, 23, 27]. The Magistrate Judge did not rule at the conclusion of the hearing, instead requiring that "the parties each submit a proposed findings of facts and conclusions of law," further directing that the parties could "cite to the hearing testimony from whatever witness it is." [Tr. 211: 1-7; 213: 1-8]. Each party submitted a proposed Report and Recommendation. [ECF Nos. 29, 32]. The Report was issued on December 24, 2025 [ECF No. 31], a nearly verbatim adoption of the Report submitted by the Plaintiffs. [*Compare* ECF Nos. 29, 31].

[2]     Mr. Gomez offers these facts that the Report did not address, did not consider, and did not distinguish as supportive of and a basis for his objections to the Report and to trigger the Court's *de novo* review of the hearing transcript and matters of record. He objects to the factual findings in the Report that do not consider, address, or weigh the facts he offers herein and those of record that undermine any legitimate basis for the Report's factual findings.

ships hold between 1,500 to 2,000 people. [Tr. 83: 11-17]. These ships are akin to floating cities, with medical facilities, sewage treatment, casinos, and large entertainment venues and utilize international crews. [Tr. 67: 20-25; 85-86: 14-14; 146-147: 1-3]. None of the ships in Plaintiffs' current fleet can sail down any of the rivers that Celebrity River is going to utilize. [Tr. 60-61: 18-3]. Their ships are the destination, and Plaintiffs rely on onboard sales for a significant part of their revenues. [Tr. 143-145: 11-1]. The Report did not address these pertinent facts.

The Report recognized <u>no</u> distinction between the river and ocean cruise businesses, despite the record evidence painting them as drastically different businesses that rely on distinct vessels, personnel, target markets, revenue models, and applicable regulations. Ama operates exclusively river vessels on inland waterways, not ocean-going cruise ships. [Tr. 13: 5-8]. River cruise companies cannot be operated by foreign companies, unlike ocean cruise lines. [Tr. 145: 5-21]. River cruise boats do not have all the facilities and capabilities of ocean cruise vessels, and they are held to different regulatory standards. [Tr. 147-148: 21-13]. Ama's target market is typically a more affluent demographic than the Plaintiffs' ocean-going guests. [Tr. 147: 4-20]. Ama derives its revenue from selling all-inclusive products, with little to no onboard revenue, which is a distinct model from that of Plaintiffs, who rely on onboard revenue as a significant income stream. [Tr. 142-145].

Since 2023, Mr. Gomez's job has focused on contact center operations for direct-to-consumer sales, including staffing, customer service performance, and operational metrics. [Tr. 20: 23-25; 21: 1-23]. He learned non-public information about Plaintiffs' ocean cruise business in his work. [Tr. 113: 18-20]. However, his role involved managing contact center performance, such as call center metrics, conversion rates, call volume, KPI compliance, guest data, and guest sourcing. [Tr. 39: 11-16]. He had no responsibility for fleet deployment, itinerary planning, ship design, pricing strategy, revenue management, or long-term product development. [Tr. 22: 18-25; 153-54: 22-22]. As the only job he held since graduating from college, Mr. Gomez learned transferrable skills applicable to other vacation experience companies that went beyond the non-public information he learned about Plaintiffs' ocean cruise business. [Tr. 142-143: 14-1]. Mr. Gomez's compensation package included paid time off ("PTO"), and he was to be paid for his accrued but unused PTO upon separation of employment. [Tr. 161-162: 20-24].

In January 2025, Plaintiffs announced their "<u>entry</u> into the <u>river cruise market </u>through our Celebrity Cruises premium travel brand." [ECF No. 15-1]. Although the Report credits the Plaintiffs

for engaging in the River cruise business, the Plaintiffs considered river cruises as a "new experience" for Celebrity in 2025. [ECF No. 27-8 at 4]. Even internally, Plaintiffs referred to it as "Project Frontier," in recognition of river cruising as a "new destination and experience" and a "new product offering" within their portfolio. [Tr. 44: 5-19].

Mr. Gomez was not privy to any river-related strategy or high-level information but merely reported about the insignificant call volume related to river (70 out of 5,000 calls) and the questions received about the forthcoming river cruises. [Tr. 113-14: 25-10; 168: 1-19]. In Plaintiffs' large, compartmentalized organization, sensitive river-specific strategy, financial metrics, pricing, marketing, and deployment decisions were handled by specialized departments to which Mr. Gomez had no access. [Tr. 32-32: 11-9]. Mr. Gomez's involvement was limited to his functional role in overseeing contact-center operations. Following Plaintiffs' public announcement of a potential future river product, his team received sporadic customer inquiries, and Mr. Gomez was informed on a need-to-know of the non-committal responses to give regarding possible 2027 sailings. [Tr. 114-15: 17-9]. He did not receive, and was not involved in, business development, financial modeling, marketing strategy, pricing, or customer acquisition decisions related to river cruising. [*Id.*; Tr. 136: 20-25].

The discriminatory nature of Mr. Gomez's work environment became increasingly intolerable due to the rampant gender discrimination he suffered at work, despite reporting the bigoted comments from his soon-to-be direct boss, leading to desires for alternative employment. [Tr. 134-135: 4-19]. Mr. Gomez submitted his resignation on April 24, 2025, and worked until May 26, 2025. [Tr. 103-104: 21-1]. After submitting his resignation, with Plaintiffs' approval, Mr. Gomez worked through his notice. [Tr. 53: 19-22; 103-104: 23-1]. He engaged in no illicit activities before his resignation became effective and remained loyal to Plaintiffs. [Tr. 133: 5-12].

The Report failed to consider that the Plaintiffs knew Mr. Gomez was leaving to work at a river cruise company, which they did not consider a competitor at the time. [Tr. 53-54: 16-16]. Mr. Gomez told his direct supervisor, Ms. Johnson Sharma, who told Ms. Athanasiou-Soy that Mr. Gomez was not going to work for a competitor. [Tr. 53: 14-3; 71: 19-22; 156-157: 5-12]. Others who directly reported to Ms. Athanasiou-Soy confirmed that "he was not going to a direct competitor." [Tr. 71-72: 23-8]. If Plaintiffs believed that Mr. Gomez's subsequent work for Ama would violate his restrictive covenants, "We restrict access immediately the moment that we are notified." [Tr. 54-16.]

They gave him no indication at the time that his working for a river cruise company would be competitive with Celebrity's business or should be restricted in any way in April or May of 2025. [Tr. 157-158: 13-12].

After submitting his resignation, Mr. Gomez did not engage in any corporate espionage; instead, he removed himself from "anything that was brand strategy." [Tr. 114: 11-16]. He then worked to facilitate a smooth transition of his day-to-day job duties, as he was replaced before he ceased working for Plaintiffs. [Tr. 148-149: 25-13]. He requested but was not paid the PTO he accrued but did not use, with Plaintiffs breaching their agreement with him to pay him for his unused PTO, but which facts the Report ignored. [Tr. 161-162: 20-24].

The Report did not consider that Mr. Gomez's role at Ama is "completely different" from the role he held and the duties he performed for Plaintiffs. [Tr. 151-153: 12-21]. The roles are "95 percent different." [Tr. 156: 1-4]. The Report identified no evidence to support a finding that Mr. Gomez disclosed non-public information to Ama. Even if Mr. Gomez was present when "confidential nonpublic intelligence that was discussed" during his employment at Celebrity, the record reflects that Mr. Gomez simply "store[d] it away... in his head." [Tr. 88: 13-15].

Mr. Gomez did not contact any of the Plaintiffs' trade partners, customers, or investors to work with Ama. [Tr. 159: 9-16]. He returned all company devices and credentials, and Plaintiffs' forensic review confirmed there was no evidence he retained, copied, or transferred any confidential or proprietary information. [Tr. 92: 7-24]. Plaintiffs' witnesses could not identify any instance in which Mr. Gomez used non-public information to benefit his subsequent employer. [Tr. 82: 4-7]. When asked if Plaintiffs could "identify any information Mr. Gomez took from Celebrity or Royal Caribbean over to AmaWaterways that would give it some type of competitive advantage," Ms. Athanasiou-Soy could not identify any. [Tr. 82: 3-7: "That he explicitly shared, I don't know."] Likewise, there is no evidence that Mr. Gomez diverted any of the Plaintiffs' clients. [Tr. 70: 7-17]. The evidence is that the Plaintiffs seek a temporary injunction merely out of "respect of the agreed-upon documents that were execute[d]," not because of any harm. [Tr. 88: 3-9].

The Report erroneously found that the communications between Mr. Gomez and Mr. Santelices amounted to impermissible solicitation. [ECF No. 31 at 14-15]. However, the two agreed that they never discussed any job offer, concrete terms of employment, salary, role, position, start date, nor was there any request, suggestion, or expectation for Mr. Santelices to leave Plaintiffs'

employment at any time. [Tr. 109: 14-17; 174-75: 18-17; 180-81: 24-5]. There was no job offer, available role, or solicitation for employment with Ama. [Tr. 111: 1-11]. Mr. Santelices did not apply for any position with Ama, did not resign, and remains employed by Royal Caribbean. [Tr. 177: 4-5]. Plaintiffs identified no other employee or customer allegedly solicited by Mr. Gomez and presented no evidence of lost business, lost employees, or competitive harm attributable to his conduct. [Tr. 90:1-25]. The Report focused on the message Mr. Santelices sent to Mr. Gomez, finding the two had no communications in the previous four months, despite Mr. Gomez's testimony to the contrary about their intervening calls and face-to-face discussions. [Tr. 109-110: 18-1].

The Report also ignored what occurred (or did not occur) immediately after Ama publicly announced Mr. Gomez's employment at the end of July 2025. [ECF No. 1-1 at ¶83; Tr. 73: 20-21; 126: 9-10]. Plaintiffs did not promptly send a cease-and-desist letter, assert a breach, or object to Mr. Gomez's employment at that time. Instead, Ms. Johnson-Sharma sent Mr. Gomez a text message congratulating him on his role, again indicating the Plaintiffs did not consider his working for a river cruise company as violative of any restrictive covenant. [ECF No. 27-6 at 18, 23; and Tr. 136: 14-19; 205: 14-20]. For almost three months, Plaintiffs did nothing to enforce any restrictive covenant. [Tr. 199: 2-10]. It was only after learning about the discussions between Mr. Gomez and Mr. Santelices that Plaintiffs filed a lawsuit against Mr. Gomez in the Circuit Court for Miami-Dade County on October 16, 2025, claiming he breached the restrictive covenants. [ECF No. 1-1]. Plaintiffs waited for nearly another month before they first sought to enforce their restrictive covenants by filing their Emergency Motion for Temporary Injunction in the State Court action on November 11, 2025, nearly four months after learning Mr. Gomez started work for Ama. [ECF No. 25-5]. The Report did not consider Plaintiffs' delayed response to Mr. Gomez's working for Ama as opposed to the speed with which they previously enforced the restrictive covenants in the *Lira* case they referenced in their opening remarks, filing a lawsuit against Mr. Lira within ten days of his departure. [Tr. 7: 13-15; 9-19].

The Report somehow concluded that Plaintiffs suffered and will suffer irreparable harm, despite undisputed evidence that Plaintiffs' business flourished following Mr. Gomez's departure to Ama. Plaintiffs sold out of their available "priority access" slots in six minutes after allowing guests to obtain "priority access" to book a future cruise. [Tr. 48-49: 8-7]. Plaintiffs do not claim they would have sold out in less time, or that presales were adversely affected by Mr. Gomez's employment with

Ama. [Tr. 68: 13-23]. Plus, their revenues increased each quarter thereafter. [ECF Nos. 15-2, 15-3]. In fact, the vast majority of those who booked were "loyalty customers" of the Plaintiffs, and many of them had sailed on Ama before. [Tr. 68-70: 24-6]. Thus, while the evidence is that Plaintiffs' river cruise business took Ama's customers, the record lacks any evidence that Mr. Gomez helped Ama impede Plaintiffs' river cruise sales. [Tr. 48: 8-21; 68: 9-23]. Furthermore, Report ignored the testimonial evidence that Plaintiffs have not suffered any damages and would know if they suffered any damages until at least 2027. [Tr. 90: 11-25: "Truthfully, we don't know the full extent of the harm until we are actually operating some of the river vessels]. And crucially, the Report did not consider that Plaintiffs uncovered <u>no evidence</u> that Mr. Gomez inappropriately accessed any materials in the months before his resignation, downloaded or took any electronic information, used any non-public information he learned, or shared any non-public information in the nearly 7 months between Mr. Gomez's resignation and the evidentiary hearing. [Tr. 74-78: 1-17; 82: 4-7].

## III. THE LAW

### A.   Standard of Review.

The Court must conduct a *de novo* review of the portions of the Report to which Mr. Gomez specifically objects. 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b)(3). De novo review requires consideration of the actual testimony, which may be accomplished by reviewing the transcript or recording. *Jeffrey S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990); *Stokes v. Singletary*, 952 F.2d 1567, 1576 (11th Cir. 1992). Legal conclusions are reviewed *de novo*, while unobjected-to portions are reviewed for "clear error." *Cooper-Houston v. S. Ry.*, 37 F.3d 603, 604 (11th Cir. 1994); *Macort v. Prem. Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).

### B.   Requirements For A Preliminary Injunction.

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.* (11th Cir. 1989)). "Importantly, failure to meet even one of the elements of the test dooms the request for a preliminary injunction." *Zachman v. Markel Am. Ins. Co.*, 2025 U.S. Dist. LEXIS 258081, at *9 (S.D. Fla. Oct. 7, 2025) (citing *Wreal LLC, v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2018)). Injunctive relief that would disrupt the *status quo* by requiring Mr. Gomez to cease working for his current employer requires a "heightened

standard" to be met. *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014).

## IV. ARGUMENT

The Report recommended interfering with Mr. Gomez's employment with Ama, an established river cruise company, because of the generalized knowledge he learned during his lengthy employment tenure with Plaintiffs' ocean cruise company, his exposure to unidentified (non-public) information, his vague discussions with Mr. Santelices, and the absence of any harm. [ECF No. 31]. The Report would enforce the restrictive covenants contained the 2022 Non-Compete Agreement and the 2025 RSU Agreement, notwithstanding the evidence compelling the denial of the Plaintiffs' motion and the law precluding the grant of relief based on the record evidence. [ECF Nos. 27-3, 27-4; *see generally,* Tr.].

Totally ignored was the fact that the Plaintiffs' ocean cruise business coexisted with Ama's river cruise business for over twenty years. The Report recommended the issuance of an injunction without any evidence that Mr. Gomez gave Ama any unfair advantage over Plaintiffs. *But see Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 116 (Fla. 5th DCA 2015) ("protection of an employer from ordinary competition is not a legitimate business interest, and a covenant designed solely for that purpose will not be enforced.") Despite the evidentiary record establishing that any harm identified was speculative, at best, and not imminent, the Report would have a preliminary injunction issued, despite the law requiring it be based on evidence of <u>actual and imminent</u> irreparable injury, not "potential harm" at some future indeterminate time. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (irreparable injury must be "actual and imminent").

Also problematic is that the Report did not address – let alone distinguish – *Vital Pharms. v. Alvieri*, 23 F.4th 1282 (11th Cir. 2022), a factually analogous controlling Eleventh Circuit decision. Likewise, the Report ignored the evidence that Mr. Gomez's superiors did not consider his working for a river cruise company as directly competitive with the Plaintiffs at or after his resignation, or Plaintiffs' unexplained, four-month delay in seeking enforcement. Because the Report disregarded controlling Eleventh Circuit precedent and the undisputed facts adduced at the hearing, Mr. Gomez's objections must be sustained, and Plaintiffs' Motion denied.

## A.   The Report Could Not Have Determined That Plaintiffs Are Substantially Likely To Succeed If It Analyzed The Record Evidence Against The Law.

The Report erroneously determined that Plaintiffs were likely to succeed on their claims that Mr. Gomez violated enforceable restrictive covenants, as contained in the 2022 Non-Compete Agreement or the 2025 RSU Agreement. Although Fla. Stat. §542.335(1)(a) requires a restrictive covenant to be signed by the party against whom it is to be enforced, the 2025 RSU Agreement lacks Mr. Gomez's signature, and there is no testimony that he signed it. [ECF No. 27-3; Tr. 52: 9-19]. Nonetheless, the Report finds the 2025 RSU Agreement was executed and enforceable against Mr. Gomez. The Report also ignored Mr. Gomez's evidence that the Plaintiffs committed a first breach of the 2022 Non-Compete Agreement when they did not pay him the compensation (PTO) that he earned but did not use upon the separation of employment, precluding enforcement of the restrictive covenants therein. *See Benemerito & Flores, M.D.'s P.A. vs. Roche*, 751 So. 2d 91 (Fla. 4th DCA 1999); *Bradley v. Health Coal.*, 687 So. 2d 329, 333 (Fla. 3d DCA 1997); and *Cordis Corp. v. Prooslin*, 482 So. 2d 486 (Fla. 3d DCA 1986). Due to the doctrine of first breach and the lack of any clause indicating that the restrictive covenants were independent of any other covenants contained therein, and the undisputed evidence that Plaintiffs did not pay Mr. Gomez the compensation he earned, the Plaintiffs are not likely to succeed on their contract claims.

The Report did not indicate that it applied anything more than a simple balancing test to find a "substantial likelihood of success on the merits," despite the law requiring more: "if the legal rights of the parties are in dispute, a temporary injunction should not be issued." *Colucci v. Kar Kare Auto. Grp., Inc.*, 918 So. 2d 431, 440 (Fla. 4th DCA 2006). The Report lacks any indication of how it weighed the facts from the evidentiary hearing to arrive at its erroneous findings. The Report drew conclusions seemingly out of thin air and without addressing how or why it found any facts or factors "clearly" outweighed those to the contrary, as necessary to support the type of mandatory preliminary injunction at issue. *Smallwood v. Carlton*, 2025 U.S. Dist. LEXIS 256251, at *2-3 (M.D. Fla. Dec. 11, 2025) (discussing heightened standard necessary for mandatory injunction altering the *status quo*). The Report did not address the mandatory nature of the injunction, determine that the facts and law were "clearly" in the Plaintiffs' favor, or find that Plaintiffs had "clearly established" each element necessary to obtain a preliminary injunction and disrupt the *status quo. Gayle v. Meade*, 2020 U.S. Dist. LEXIS 71953, at *64 (S.D. Fla. Apr. 22, 2020) ("The Eleventh Circuit standard for a mandatory injunction is a 'heightened standard' where the party seeking the relief must make a 'clear' showing on each of the four elements of the injunction (instead of proceeding under a

preponderance of the evidence standard)"); and *Jeremiah's Int'l Trading Co. v. Ren Media Grp. USA, Inc.*, 2017 U.S. Dist. LEXIS 195942, at *14 (M.D. Fla. Nov. 14, 2017) (collecting cases). The Report identified no "clear" evidence of overlapping lines of business, actual or imminent injury, any actual solicitation, or harm, relying instead on speculation to recommend the grant of extraordinary preliminary injunctive relief. *But see Siegel* 234 F.3d at 1176. The Report did not even conduct a balancing test, but simply utilized vague references to generalized information involving ocean cruising, non-specific testimony about business operations, relationships with unidentified persons and entities, and generalized good to support injunctive relief. *But see Finkelstein v. Mount Sinai Med. Ctr. of Fla.*, 2023 U.S. Dist. LEXIS 166723, at *21 (S.D. Fla. Sep. 19, 2023) (discussing heightened burden applicable to mandatory injunctions). The Report's failure to cite record evidence to support a finding that Plaintiffs satisfied their heightened burden on each element requires Mr. Gomez's objection be sustained. *Dotson v. Dixon,* 2025 U.S. Dist. LEXIS 114840, at *3 (M.D. Fla. June 17, 2025).

**B.**     **The Report Mistakenly Found Plaintiffs Had Established Legitimate Business Interests In River Cruising To Support The Grant Of Broad Injunctive Relief Despite.**

Florida law strictly limits enforcement of restrictive covenants to those necessarily protective of a narrowly defined, existing line of business in a specific market, not abstract industry participation or future-facing strategy, directing that "The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." Fla. Stat. § 542.335(1)(b). The Plaintiffs must also be engaged in the business the covenant seeks to protect. *Wolf v. James G. Barrie, P.A.*, 858 So. 2d 1083, 1085 (Fla. 2d DCA 2003).

Despite these constraints, the Report recommended Mr. Gomez be prohibited from working for an entity "engaged in cruising" with a fleet size of at least 500 berths for nine months. [ECF No. 31 at 19]. The Report disregarded the cases where the Eleventh Ciruit Court of Appeals and from its constituent District Courts refused to enforce similarly overbroad restraints in analogous situations where the movant and the former employee's new employer operate in materially different lines of business, finding that they are unlikely to succeed on the merits, such as in the following:

- *Vital Pharms,* 23 F.4th at 1282 (vacating preliminary injunction where alleged harm was speculative, plaintiff could not identify any actual misuse of confidential information, and the evidence showed the information at issue would provide little or no competitive

advantage to the alleged competitor who was involved in a different sector of the beverage business);

- *WellCare Health Plans, Inc. v. Preitauer*, 2012 U.S. Dist. LEXIS 76920, at *19 (M.D. Fla. May 23, 2012) (refusing to enter injunction because "the parties are not in competition within the same markets; hence, WellCare's claims of a material breach are unconvincing. Likewise, its assertion that it has or will suffer damages is unpersuasive. This makes injunction relief all the more inappropriate");

- *S. Wine & Spirits of Am., Inc. v. Simpkins*, 2011 U.S. Dist. LEXIS 5762, at *18 (S.D. Fla. Jan. 14, 2011) (denying injunctive relief for reasons that include, "business practices of Southern Wine vary from state to state; the markets are different, the customers are different, and each market's critical information is different").

Considered against these authorities, the conclusion that Plaintiffs established a legitimate business interest in the entire cruise industry was legally and factually flawed. *Compare All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, 2022 U.S. Dist. LEXIS 66558, at *42 (S.D. Fla. Apr. 8, 2022) (enforcing restrictive covenant "specifically limited to Plaintiff's 'business'").

    1.   <u>The Plaintiffs Identified No Persons Or Entities With Whom They Had Substantial Business Relationships – Let Alone Any Related To Their River Cruise Business.</u>

The Report relied on vague references to "Plaintiffs' verified pleadings" and generalized assertions of relationships to find that Plaintiffs had substantial business relationships with unidentified persons and entities. The facts identified in the Report are not close to meeting the requirements for preliminary injunctive relief. *Compare Vital Pharms*, 23 F.4th at 1291 (finding no legitimate business interest established without identifying the clients and the nature of the relationship) (*citing Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 117-118 (Fla. 5th DCA 2015); and *Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. 4th DCA 2003)). Accordingly, the Report's failure to cite any evidence in the record that names specific clients, businesses, or entities with Plaintiffs had "substantial business relationships," coupled with the failure to cite any evidence about the nature of each "business relationship" renders the Report's finding(s) erroneous. *See Passalacqua*, 844 So. 2d at 796.

    2.   <u>Mr. Gomez Never Violated Any Non-Solicitation Provision Because He Never Solicited Mr. Santelices.</u>

The Report erroneously found that Mr. Gomez breached the non-solicitation provision based on Ms. Athanasiou-Soy's testimony that Mr. Gomez "solicited" one employee, Mr. Santelices. [Tr. 89: 1-8]. The Report credits the testimony of Ms. Athanasiou-Soy that Mr. Gomez "solicited"

Mr. Santelices while ignoring the testimony of the two individuals involved: Mr. Gomez and Mr. Santelices, who testified that no solicitation occurred. The Report compounds this error by failing to analyze whether the conduct described satisfies the legal definition of "solicitation" under Florida law, instead presuming a breach based on casual conversations between longtime professional acquaintances in a mentor/mentee professional relationship. It then grants more restrictions than provided in the restrictive covenants at issue. *But see Advantage Dig. Sys. v. Dig. Imaging Servs.,* 870 So. 2d 111, 115 (Fla. 2d DCA 2003)

 "Solicitation is defined in BLACK'S LAW DICTIONARY 1398 (7th ed. 1999), as 'the act or an instance of requesting or seeking to obtain something; a request or petition.'" *Scarbrough v. Liberty Nat'l Life Ins. Co.,* 872 So. 2d 283, 285 (Fla. 1st DCA 2004). Florida courts require an affirmative act intended to induce departure from current employment, and passive discussions, networking, or speculative references to potential future opportunities are insufficient as a matter of law. *See Partylite Gifts, Inc. v. MacMillan,* 895 F. Supp. 2d 1213 (M.D. Fla. 2012) (recognizing that "solicit" denotes "more than simple contact" and requires "an attempt to obtain something by persuasion," not merely engaging in generalized discussions).

 The evidence at the hearing was that Mr. Gomez did not "solicit" Mr. Santelices to work at Ama because Mr. Gomez did not do or say anything to prompt Mr. Santelices to leave his employment with Plaintiffs in the near or foreseeable future, never discussed any opportunities that were available at Ama with Mr. Santelices, nor discuss any title, role, salary, start date, or any terms or conditions of potential employment with Ama. [Tr. 111: 1-11]. Mr. Gomez never tried to convince Mr. Santelices to cease working for the Plaintiffs. [Tr. 160-161: 20-19]. Mr. Santelices's testimony corroborated Mr. Gomez's account in every material respect, describing their conversation as involving high-level discussions of hypothetical future possibilities, subject to a formal application and interview process, and not an offer of employment. [Tr. 174-175: 18-13]. He viewed the discussions as a "networking opportunity," not a job offer. [Tr. 180: 1-9]. Mr. Santelices denied discussing any current openings at Ama and confirmed that there was no "time horizon as to when those opportunities would present themselves." [Tr. 180-181: 24-5]. Mr. Santelices confirmed that Mr. Gomez never offered him a job or attempted to lure him away from his employment with the Plaintiffs. Accordingly, "There is no evidence in the record reflecting that Sanders proactively sought

to entice any employee to leave Massey, as is required for 'solicitation.'" *Massey Servs. v. Sanders*, 312 So. 3d 209, 215 (Fla. 5th DCA 2021). The Report erred in finding solicitation.[3]

      3.   <u>The Report Improperly Presumed Vague References To Stale Information Supposedly Shared With Mr. Gomez Were Sufficient To Support The Issuance Of A Temporary Injunction.</u>

The Report did not "articulate how any activity, method or technique utilized... was unique or proprietary in any way." *Passalacqua*, 844 So. 2d at 796. Equally problematic, the Report does not identify – much less define with specificity – what information it considered "confidential business information," instead relying on generalized and conclusory characterizations. *Colucci v. Kar Kare Auto. Grp., Inc.*, 918 So. 2d 431, 439 (Fla. 4th DCA 2006) (Reversing temporary injunction, finding "There simply is no testimony in the record that would indicate what the trial court considered to be confidential business information.") Ms. Athanasiou-Soy testified that considered the competitive landscape to include a broad range of vacation and travel providers offering substitute leisure products, rather than cruise operators alone and that nearly all the training Mr. Gomez received would be relevant to the anyone working in the "vacation space," not just entities operating cruise ships. [Tr. 56-59]. "[B]asic on-the-job training... is not protectable." *Resoluna 4840, LCC v. Palceski*, 2019 U.S. Dist. LEXIS 224147, at *11 (M.D. Fla. Sep. 5, 2019); and *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1342 (S.D. Fla. 2016). The Report erroneously conflated ordinary, portable skills with protectable confidential business information.

    The Plaintiffs did not identify any specific, non-public information they disclosed to Mr. Gomez that was both relevant and would give the recipient an unfair competitive advantage. [Tr. 82: 4-7]. Instead, their proof rested on the abstract premise that Mr. Gomez "knows things," disconnected from any identified nonpublic fact, dataset, customer-specific strategy, pricing, or operational metric capable of being deployed in Ama's business to Plaintiffs' detriment. The

---

[3]    Equally problematic, the Report conflated testimony regarding discussions that occurred in 2024 – while Mr. Gomez was still employed by Plaintiffs – with alleged post-separation conduct in 2025. Mr. Santelices clarified his testimony by confirming any discussion about potential opportunities with Mr. Gomez's organization occurred "when he was at Royal Caribbean back in 2024 when we were in Naples" further clarifying that "conversations about opportunities with his organization" occurred "while [Mr. Gomez] was with Celebrity." [Tr. 179: 22-25; 180: 10-17]. This misattribution of timing and context further undermines the Report's faulty foundation. Discussions about internal mobility while Mr. Gomez was still employed by Plaintiffs cannot, as a matter of law, support a finding that he later solicited an employee on behalf of Ama and another example of the erroneous factual foundation for the recommendation that Mr. Gomez be enjoined from working for Ama.

evidence established that the Plaintiffs' purpose of having the restrictive covenants is to prevent an employee from going to a "direct competitor" and using the information they learned while working for the Plaintiffs. [Tr. 61-62: 20-8]. But Fla. Stat. § 542.335 requires a showing of a concrete, protectable category of information and a credible nexus between the restriction imposed and the harm threatened. The nine-month restrictive period was because of the relevancy of the information, since it would likely go stale within nine months, depending "on the person and their role and the information that they received." [Tr. 62: 5-8].  That concession is fatal to Plaintiffs' burden here: where the alleged "confidential information" is inherently time-sensitive and quickly becomes obsolete, Plaintiffs must identify what the information is and show how it remains competitively meaningful in the alleged competitor's market during the restraint period – something they did not do. *See Passalacqua*, 844 So. 2d at 796 (requiring identification of nonpublic information with continuing competitive value capable of conferring an unfair market advantage).

Plaintiffs could not specifically identify any of their information that Mr. Gomez shared with Ama that would give it some type of competitive advantage. [Tr. 82: 4-7: "That he explicitly shared, I do not know."]. The Report did not specifically identify any confidential information that Mr. Gomez learned or knew, or that he shared with Ama, because Plaintiffs did not identify any. [Tr. 89: 10-15] In fact, Plaintiffs could not identify anything that Mr. Gomez learned or knew that would give Ama an unfair advantage. [Tr. 88: 3-9].

The hearing testimony confirmed that Plaintiffs had not suffered any injury and would not suffer any injury in the immediate future, underscoring the speculative nature of the harm the Report found. *See Ne. Fla. Ch. of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)). On this record, the asserted harm depends on a chain of contingencies (that Mr. Gomez possesses specific nonpublic information, that it remains current, that it is usable in his Ama role, and that it will be used to Plaintiffs' detriment), which is insufficient to support the extraordinary remedy of a temporary injunction.

Further, Ms. Athanasiou-Soy testified that although Mr. Gomez was privy to the 2023 strategic plan, there was no mention of river cruise during that meeting. [Tr. 62-63: 9-2]. Thus, even accepting Plaintiffs' "strategic plan" framing, the evidence does not support the Report's assumption that Mr. Gomez possessed nonpublic river-cruise competitive information – much less information

capable of conferring an unfair competitive advantage to an established river operator in his current call-center role.

    4.    <u>There Is No Need For Injunctive Relief Based On The Evidence.</u>

The Report disregarded the evidence at the hearing by recommending the issuance of a preliminary injunction despite Mr. Gomez indicating that he would agree to not work for an ocean cruising company [Tr. 210: 3-7] or solicit any of the Plaintiffs' employees for the remainder of the restrictive period. [Tr. 209: 9-17]. Thus, there is no need for any injunction.

**C.**    **<u>The Report Erroneously Determined Plaintiffs Would Suffer Irreparable Harm Despite The Evidence Establishing That Plaintiffs Neither Suffered Nor Will Suffer Any (Irreparable) Harm.</u>**

The Report indicated that Mr. Gomez breached the restrictive covenants by soliciting employees and by working for a competing cruise company. [ECF No. 31 at 13-14]. The Report concluded that Plaintiffs were entitled to injunctive relief based on a presumption of irreparable harm under Fla. Stat. § 542.335(1)(j), reasoning that "Defendant has not presented case law or facts to rebut this presumption." [ECF No. 31 at 14]. The Report then found that "Defendant cannot rebut the presumption of irreparable harm." [*Id.* at 15]. The Report's findings are not supported by the facts or law, such that Mr. Gomez's objection(s) should be sustained, as explained in more detail below.

The Report disregarded the requirement that Plaintiffs prove irreparable harm with evidence of concrete past or imminent irreparable injury, since "the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). "Without a finding of a substantial likelihood of an 'actual and imminent' irreparable injury, preliminary injunctive relief is improper." *Cap., L.P. v. Heyden Enters., LLC*, 2024 U.S. Dist. LEXIS 127628, at *42 (S.D. Fla. July 19, 2024). "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176 (collecting cases).

    1.    <u>The Report Erroneously Afforded Plaintiffs The Presumption Of Irreparable Harm From Fla. Stat. §542.335(1)(J) Despite The Applicable Law.</u>

The Report cited *Proudfoot Consulting*, 576 F.3d at 1231, as justification for applying the presumption of irreparable harm that applies in Florida state court actions once the moving party

establishes the breach of an enforceable restrictive covenant. Fla. Stat. §542.335(1)(j). [ECF No. 31 at 14]. The Report did not analyze whether the presumption applied to require a federal court exercising diversity jurisdiction to apply the presumption, nor did it reconcile the application of the presumption with governing federal equitable principles. [*Also see* Tr. 191-193: "how do I not just presume the harm in favor of plaintiffs?"]. Instead, the Report cited *Proudfoot Consulting*, 576 F3d at 1231, to support its erroneous conclusion that the presumption of irreparable harm applied.

The majority opinion in *Vital Pharms* recognized that applying §542.335's presumption in federal court "raises a knotty choice-of-law question," but did not resolve the issue because the plaintiff failed to establish entitlement to the presumption in the first place. 23 F.4th at 1292. However, Chief Judge Pryor's concurring opinion in *Vital Pharms* was that "under the federal standard, a plaintiff must prove irreparable harm without the presumptions afforded by Florida law." 23 F.4th at 1293-99. Courts continue to decline applying the statutory presumption of irreparable harm in diversity cases, holding that federal law requires affirmative proof of irreparable harm for preliminary injunctions. *See e.g., Miller v. Glob. Elec. Testing Servs.*, 2026 U.S. Dist. LEXIS 1088, at *4-5 (M.D. Fla. Jan. 6, 2026) ("Florida's presumption of irreparable harm for breach of covenants not to compete, codified by § 542.335(1)(j), 'conflicts with traditional federal equity practice' because it 'lifts the burden of establishing irreparable harm from the movant's shoulders and [*5] shifts it to the nonmovant.'") (quoting Blue-Grace Logistics LLC v. Fahey, 340 F.R.D. 460, 466 (M.D. Fla. 2022); *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1257 (S.D. Fla. 2025) (collecting cases); and *Pro. Servs., Inc. v. Corrugated*, 2024 U.S. Dist. LEXIS 119218, at *18 (S.D. Fla. July 5, 2024) ("the Florida presumption does not apply to motions seeking a preliminary injunction in federal court in cases where Florida law governs the substantive issues") (collecting cases). The Report's application of a rebuttable presumption of irreparable harm, even if it correctly found the breach of an enforceable restrictive covenant, was an error that infected the recommendation that an injunction be issued.

2.   <u>Mr. Gomez Successfully Rebutted Any Presumption By Establishing Plaintiffs Suffered No Harm and At Best Identified Speculative, Potential Future Injury.</u>

The Report credited the testimony from Ms. Athanasiou-Soy as a basis for finding Plaintiffs suffered irreparable harm. [ECF No. 31 at 15; *citing* Tr. 90-91: 7-24]. It also found that Mr. Gomez's testimony about the "best practices" and general knowledge Mr. Gomez learned during his

employment with Plaintiffs supported a finding of irreparable harm. [ECF No. 31 at 14-15]. It then determined that Ms. Athanasiou-Soy detailed the type of "current and anticipated harm" necessary to support a temporary injunction. *Id.*, at 15. Legally and factually, the Report is clearly wrong and cannot withstand *de novo* review.

Respecting the issue of Mr. Gomez's experiential knowledge gained from his years of work for the Plaintiffs, the Eleventh Circuit specifically stated that, "an employer may not preclude its former employee from, 'utilizing contacts and expertise gained during his former employment.'" *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). Yet, the Report disregarded this legal authority. And, although the Report cited portions of Mr. Gomez's testimony [Tr. 152: 17-22; 125: 2-4] as a basis for his "use" of information he learned during his employment with Plaintiffs, it impermissibly presumed that the information he learned was non-public, without any evidentiary support. Plus, Mr. Gomez testified that the information was not specific to an ocean cruise line or cruising, but that "it could have been applied anywhere," confirming the information was not proprietary or damaging. [Tr. 142-143: 14-1]. Yet another problem with the factual basis for the Report is that Ms. Athanasiou-Soy testified at the hearing that she "did not know" if what, if any, information Angel has used from Royal Caribbean or Celebrity in his new employment at Ama. [Tr. 81: 5-8]. In fact, there is no evidence in the record that Mr. Gomez used or disclosed any information from Plaintiffs in his employment with Ama. Consequently, the facts cited in the Report do not support a finding of irreparable harm.

The Report's reliance on the testimony of Ms. Athanasiou-Soy to find irreparable harm was equally misplaced. She testified that besides the "solicitation" of Mr. Santelices, Plaintiffs had <u>not</u> suffered any harm and <u>would not know</u> the extent of any harm caused Mr. Gomez's employment with Ama would cause until after they started river cruising (*i.e.*, after August 2027). *Id.* Mr. Gomez, on the other hand, testified that he did not use any of Plaintiffs' information at Ama and would not do so in the future. [Tr. 132: 7-13; 148: 14-19]. The Report ignored binding precedent which instructs that "As we have emphasized on many occasions, the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel*, 234 F.3d at 1176 (citing *City of Jacksonville*, 896 F.2d at [*1177] 1285 (*quoting Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)); and *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). When Mr.

Gomez elicited testimony from Athanasiou-Soy that Plaintiffs had not suffered and will not suffer any immediate or irreparable harm, he successfully rebutted any presumption of irreparable harm that could have applied. *Int'l-USA v. United States Army Corps of Eng'rs*, 2025 U.S. Dist. LEXIS 17820, at *7-9 (S.D. Fla. Jan. 31, 2025) (finding speculative harm inadequate to support temporary injunctive relief). Her testimony required denial of injunctive relief as establishing that Plaintiffs suffered and will suffer no irreparable harm, as the Court found in *WellCare Health Plans, Inc. v. Preitauer*, 2012 U.S. Dist. LEXIS 76920, at *21 (M.D. Fla. May 23, 2012), when it determined the same type of "speculative" evidence insufficient to satisfy the requirement that a party "suffers, or has suffered, any actual or imminent harm." Also s*ee Siegel*, 234 F.3d at 1177 (no irreparable harm where the injury "remains speculative"). It also ignored that Ms. Athanasiou-Soy identified <u>no confidential information</u> Mr. Gomez used, any competitive advantage Ama obtained, or any measurable injury Plaintiffs suffered by Mr. Gomez working for Ama. [Tr. 90-93: 11-2]; *but se Pro. Servs*, U.S. Dist. LEXIS 119218, at *18. The finding that Mr. Gomez did not rebut the presumption of irreparable harm cannot be reconciled with the facts of record or the law.

**D.**     <u>The Report Erroneously Failed To Blue Pencil The Restriction On Future Employment Plaintiffs To Ocean Cruising Because Plaintiffs Had No Protectable Business Interest In Any Other Cruise Business.</u>

The Report determined that Mr. Gomez could not work in the cruise business for a company with a fleet of ships with more than 500 berths. It made this finding without analyzing Plaintiffs' line of business when the agreements containing the restrictive covenants were offered, during Mr. Gomez's employment, and without tailoring the restriction(s) to the legitimate business interests – if any – supported by the record. The Report did not provide for a "narrowly tailored" restriction, as permitted by Fla. Stat. §542.335. Florida law requires courts to modify – or blue pencil – restrictive covenants that are broader than necessary and to "grant only the relief reasonably necessary to protect such interests." *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 785 (Fla. 2017). The Report lacked the necessary finding that Plaintiffs had overlapping lines of business with Ama during Mr. Gomez's employment to support the recommendation that an injunction be entered. *Lincare, Inc. v. Tinklenberg*, 2020 U.S. Dist. LEXIS 257078, at *5 (M.D. Fla. June 26, 2020). The undisputed evidence was that Ama is a mature, fully operational river cruise company that does not operate ocean cruises, while Plaintiffs did not have an operational river cruise

line of business and operated only ocean cruises during the times material to this case. This distinction is dispositive as Mr. Gomez's role was overwhelmingly devoted to ocean-cruise contact-center operations, and incidental awareness of a future, non-operational initiative did not alter the nature of his job or create a present river-cruise line of business. Ama is not planning a future river product rollout – it has operated river cruises for decades – and nothing Mr. Gomez learned to address speculative customer inquiries has any competitive relevance to his role at Ama. [Tr. 169: 10-12].

  Where an employee's authority and access are limited to a specific operational line of business, courts require restrictive covenants to be narrowed accordingly. *See Lincare, Inc.*, 2020 U.S. Dist. LEXIS 257078, at *11 (modifying the restrictive covenant by blue-pencil "to the two specific lines of business for which she had management authority"). By imposing a blanket prohibition on employment in the cruise industry, the Report failed to blue-pencil the restriction to Plaintiffs' actual line of business and converted a role-specific covenant into an impermissible industry-wide restraint untethered to any proven legitimate business interest. The restriction, if enforced at all, must be limited to the only line of business Mr. Gomez actually worked in: contact center operations supporting ocean cruising.

## E. The Report Erroneously Ignored The Plaintiffs' Delayed Enforcement.

  The Report does not address the Plaintiffs' delay in seeking injunctive relief nor the delay's impact on the restrictive covenants. "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355 (S.D. Fla. 2002) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).) "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016); *cited with approval in Powers v. Nielsen*, 806 F. App'x 958, 959 (11th Cir. 2020). The Plaintiffs knew Mr. Gomez was leaving to work for a river cruise company in May 2025. [Tr. 136: 6-19; 156: 5-21]. Plaintiffs first sought to enforce their restrictive covenants by filing their Emergency Motion for Temporary Injunction in the State Court action on November 11, 2025. [ECF No. 25-5]. This delay precludes enforcement.

Courts within the Eleventh Circuit have found similar periods—or shorter ones—sufficient delay to defeat an assertion of irreparable harm. See, e.g., *Wreal*, 840 F.3d at 1248 (five-month delay); *Car Body Lab Inc. v. Lithia Motors, Inc.*, No. 21-cv-21484, 2021 U.S. Dist. LEXIS 115493, 2021 WL 2652774, at *9-10 (S.D. Fla. June 21, 2021), *report and recommendation adopted*, No. 21-cv-21484, 2021 U.S. Dist. LEXIS 145667, 2021 WL 3404040 (S.D. Fla. Aug. 4, 2021) (Moreno, J.) (collecting cases showing that a delay of four or five months is often fatal); *Hi-Tech Pharms., Inc. v. Herbal Health Prods., Inc.*, 311 F. Supp. 2d 1353, 1355 (N.D. Ga. 2004), *aff'd*, 132 F. App'x 348 (11th Cir. 2005) (four-month delay); *Seiko Kabushiki Kaisha v. Swiss Watch* [*469] *Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) (Lenard, J.) (three-month delay).

*Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 468-69 (M.D. Fla. 2022). Just like in *Fahey*, the information Ms. Athanasiou-Soy testified that Mr. Gomez learned related to "information that grew more stale with each passing month." 340 F.R.D. at 469. The Report erroneously failed to consider the impact of the Plaintiffs' delay on their claim of irreparable harm and the relevance of any non-public information shared with Mr. Gomez, given the Plaintiffs' strides in rolling out their river cruise business since his departure.

## F.    The Report Errs in Concluding The Balance Of Harms Favors Plaintiffs.

The Report concludes that the balance of harms favors Plaintiffs because "enjoinment from something that one has no right to is not a hardship," and because Mr. Gomez's skills are "transferable" to other industries. [ECF No. 31at 15-16]. That reasoning is circular and assumes – rather than proves – that the restrictive covenants are enforceable as applied and that Mr. Gomez's employment with Ama is properly restrained. The balance-of-harms inquiry cannot presume Plaintiffs' success on the merits and then discount hardship on that basis: federal equitable principles require an independent assessment of the burden imposed on the restrained party. *See TransUnion Risk & Alt. Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 407 (11th Cir. 2015).

The Report also materially understates the concrete and immediate harm the recommended injunction would impose on Mr. Gomez. The proposed relief would function as an employment-ending order, barring him from working for Ama for nine months, without regard for its impact on Mr. Gomez or his family. [ECF No. 31 at 17-18]. This substantial hardship weighs against injunctive relief, particularly when the plaintiff's alleged harm is speculative, but was not considered. *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

The Report did not identify any lost customers or revenue, nor any unfair competitive advantage, while the evidentiary record reflects Plaintiffs continued to experience growth and

customer acquisition in their new river cruise endeavors. [Tr. 48-49: 8-7; 92: 11-14]. It ignored the competitive advantage Plaintiffs gained after analyzing Ama's confidential information for purchase and placed an unsupported weight on generalized, stale information attributable to Mr. Gomez. The Report's faulty balancing of the harms constitutes error.

**G.      The Public Interest Would Not Be Served By Enjoining Mr. Gomez.**

The Report did not address how the 2022 Non-Compete Agreement would serve the public interest through enforcement against Mr. Gomez, as a resident and citizen of California. [ECF No. 1-5]. Nor did it address the 2022 Non-Compete Agreement's caveat that "The restrictions above do not apply in jurisdictions where prohibited by applicable law." [ECF No. 27-3 at 4]. California is a jurisdiction that prohibits the enforcement of restrictive covenants, such as noncompete and non-solicitation, agreements. Cal. Bus. & Prof. Code § 16600. Consequently, the Report is erroneous by applying a global restriction on Mr. Gomez's employment that is prohibited by and unenforceable under California law. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 266 Cal. Rptr. 3d 665, 470 P.3d 571 (2020).

**H.      Any Applicable Injunctive Period Was Not Tolled.**

The Report inappropriately found the 9-month restrictive period tolled based on the 2024 RSU Agreement. The Report failed to consider the requirement imposed by Fla. Stat. §542.335(1)(a) that the restrictive covenant be signed by Mr. Gomez and identify evidence in the record that he signed the 2025 RSU Agreement. Although Mr. Gomez did not dispute that he Docusigned the 2022 Non-Compete Agreement [ECF No. 27-4], he did not agree to signing the 2025 RSU Agreement. In the colloquy on pages 122-132 of the transcript, Mr. Gomez was not asked whether he signed (or e-signed) the 2025 RSU Agreement and did not acknowledge signing it. He agreed it was offered to him and described the procedure but did not admit to signing (or e-signing) it. [Tr. 122-123]. Consequently, without a signed agreement containing a tolling provision, the restrictive period continues to run. *See Proudfoot Consulting*, 576 F.3d at 1232.

**I.      The Report Recommended Inappropriate And Unavailable Relief.**

The Report recommended six categories of relief, several of which go beyond the restrictive covenants contained in the 2022 Non-Compete Agreement and the 2025 RSU Agreement, without justification. Specifically, neither Agreement contains any requirement or restriction similar to that which the Report would impose at paragraphs E. or F. [*Compare* ECF Nos. 27-3 and 27-4 with 31

at 20-21]. The Report impermissibly compelled preservation, return of materials, and inspection of personal devices without first finding any records were taken, lost, could become unavailable. *See GTO Access Sys., LLC v. Ghost Controls, LLC*, 2016 U.S. Dist. LEXIS 98199, at *8 (N.D. Fla. June 20, 2016). Likewise, it conducted no analysis of the rights to personal privacy contained in the Article I, Section 23 of the Florida Constitution or Article I, Section I of the California Constitution. *Also see* Cal Civ Code § 1798.1.

## V. CONCLUSION

**WHEREFORE**, Defendant, Angel Christopher Gomez, respectfully requests that this Court, after conducting its *de novo* review pursuant to 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(3), sustain his objections, decline to adopt the Report, and deny the Plaintiffs' requested relief.

Respectfully submitted this 7th day of January 2026,

s/Brian H. Pollock, Esq.
Brian H. Pollock, Esq. (174742)
brian@fairlawattorney.com
**FAIRLAW FIRM**
135 San Lorenzo Avenue
Suite 770
Coral Gables, Florida 33146
305.230.4884
*Counsel for Defendant*
