UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 1:25-cv-25648-KMW-EAL

**CELEBRITY CRUISES, INC.** and
**ROYAL CARIBBEAN CRUISES LTD.,**
d/b/a **ROYAL CARIBBEAN GROUP**,

      Plaintiffs,

v.

**ANGEL CHRISTOPHER GOMEZ**,

      Defendant.
_____/

**PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION ON PLAINTIFFS' EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

In his Objections to the Magistrate Judge's Report and Recommendation [ECF No. 31] (the "Report"), Defendant Angel Christopher Gomez disturbingly claims that the Magistrate Judge "did not address, consider, or distinguish" all the facts of record and "drew conclusions seemingly out of thin air." Objections, n.2, p. 8. To the contrary, the Magistrate Judge conducted a full-day evidentiary hearing and considered the Parties' fulsome pre-hearing briefing and post-hearing proposed orders in issuing the Report. Based on applicable law and the evidence presented, Plaintiffs Celebrity Cruises, Inc. ("Celebrity") and Royal Caribbean Cruises Ltd., d/b/a Royal Caribbean Group respectfully request this Court adopt the Report in its entirety.

**I.    BACKGROUND FACTS**

For purposes of Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction, (ECF No. 4), the facts are straightforward, and the record fully supports the Report.

Defendant worked for Plaintiffs for nearly 18 years and held the position of Associate Vice President at the time of his resignation. Hearing Transcript ("Tr.") 11:10-13. In his role, Defendant admittedly had access to Plaintiffs' sensitive and confidential information. Tr. 113:6-20. During his employment, he entered into several agreements that included nine-month non-compete and non-solicit obligations. Tr. 123:10-15. The plain language of the non-compete restrictions prohibit

1

Defendant from working for a cruise company with a fleet size of 500 berths or more for a period of nine (9) months. Hearing Exs. P-5 at p. 4, P-1 at 40. Defendant is currently working as a Senior Vice President for AmaWaterways ("Ama"), which is a cruise company with a fleet size far greater than 500 berths. Tr. 122:1-3, 126:11-13. Defendant solicited a current Celebrity employee who has been with Celebrity for over 20 years for employment with Ama. Tr. 174:18-176:19; ECF No. 4 p. 17.

Faced with the overwhelming evidence supporting the Report, Defendant goes to great lengths to rehash arguments, reframe testimony, and raise new arguments not raised at the full-day evidentiary hearing or prior briefings.

## II.     STANDARD OF REVIEW FOR OBJECTIONS

Objections to a report and recommendation must be specific and not vague, conclusory, or general. A party seeking to challenge the findings in a report and recommendation of a United States Magistrate Judge must file "written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.*, 208 F. App'x 781, 783 (11th Cir. 2006) (quoting *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)). "It is critical that the objection be sufficiently specific and not a general objection to the report." *Id.* at 784 (citing *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984)). When a proper objection is made, the District Court conducts a *de novo* review of the report and recommendation of the Magistrate Judge. 28 U.S.C.S. § 636. In doing so, "[a]n objecting party may not submit papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a Report." *Toyota Lease Tr. v. 310 Motor Grp. LLC*, No. 23-21476-CV-WILLIAMS, 2023 U.S. Dist. LEXIS 132495, at *1 (S.D. Fla. July 31, 2023) (cleaned up) (citing *Marlite, Inc. v. Eckenrod*, 2012 U.S. Dist. LEXIS 117862, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012)).

## III.    STANDARD FOR PRELIMINARY INJUNCTION

The Magistrate Judge properly applied the preliminary injunction standard set forth in *Superior Consulting Servs. v. Shaklee Corp.*, 710 F. App'x 850, 853 (11th Cir. 2017). Defendant attempts to argue that a "heightened standard" applies because the Report recommends a *mandatory injunction*. A mandatory injunction, however, is an injunction that requires a party to take action.

Here, the Magistrate Judge recommends a *prohibitory injunction*, specifically, an injunction *prohibiting* Defendant from violating his restrictive covenants. *See Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014) (enjoining violations of non-compete was prohibitory injunction but injunction requiring audit was mandatory). Defendant appears to argue that preserving the *status quo* means permitting him to work for Ama, but the relevant *status quo* for preliminary injunction purposes is the *status quo* before any breach occurred (i.e., before he began working for Ama). Defendant provides no legal support for his self-serving interpretation. The Magistrate Judge applied the proper standard for a prohibitory injunction in directing Defendant to *refrain* from breaching his Agreements, including refraining from working for Ama and refraining from soliciting Plaintiffs' employees.

A.  **Enforceability of Agreement - Acceptance of RSU Agreements**

The Magistrate Judge properly concluded "Plaintiffs have satisfied Florida Statute Section 542.335(1)(a) in so far as it requires restrictive covenants to be enforced to be 'set forth in a writing signed by the person against whom enforcement is sought." Report at 7.

As part of his Objections related to enforceability, Defendant incredibly argues there is no evidence he signed the 2025 RSU Agreement. To the contrary, the record includes evidence confirming Defendant entered into multiple RSU Agreements during his employment with Celebrity, including his most recent RSU Agreement – the 2025 RSU Agreement. Tr. 122:6-17. Defendant specifically testified that he logged into his E-trade account and electronically accepted the terms of the 2025 RSU Agreement because he "wanted the money." Tr. 52:4-22, 122:18-123:15, Tr. 122:10-123:3.[1] Defendant accepted the terms, received shares granted in the RSU Agreements, and sold some of those shares. Tr. 123:20-124:6. Defendant does not dispute that he electronically accepted the terms of the RSU Agreement but now attempts, as a last-ditch effort, to argue that because there is no wet-ink signature, it is somehow unenforceable. This argument carries no legal merit.

"Under Florida's Electronic Signature Act, 'an electronic signature may be used to sign a writing and shall have the same force and effect as a written signature.'" *BrewFab, LLC v. 3 Delta,*

---

[1] In addition to Gomez's testimony admitting to accepting the RSU Agreements, the Verified Complaint was introduced into evidence, which includes verified allegations that Gomez was offered a stock grant on February 12, 2025, which he accepted on February 19, 2025. Hearing Ex., P-1, ¶ 56.

3

*Inc.*, No. 22-11003, 2022 U.S. App. LEXIS 28429 at *5 (11th Cir. Oct. 13, 2022) (citing Fla. Stat. § 668.004). Courts routinely hold that "click to accept" is a valid signature under Florida law. *See Simon v. Nat'l Passenger Corp.*, No. 8:24-cv-2586-TPB-CPT, 2025 U.S. Dist. LEXIS 15392, at *6 (M.D. Fla. Jan. 29, 2025); *Tucker v. Nat'l R.R. Passenger Corp.,* No. 25-CV-80300-ROSENBERG, 2025 U.S. Dist. LEXIS 151957, at *10 (S.D. Fla. Aug. 7, 2025). Additionally, courts have interpreted the requirement that restrictive covenants be signed to be akin to the statute of frauds, meaning that the signed requirement can be satisfied by any writing adopting the contract. *See K3 Enters. v. Sasowski*, No. 20-24441-CIV-CAN, 2022 U.S. Dist. LEXIS 140000, at *21 (S.D. Fla. Aug. 7, 2022). Defendant fails to cite any evidence or legal authority for the misguided argument that his undisputed electronic acceptance of the terms of the RSU Agreements does not suffice to make the RSU Agreements enforceable contracts. Therefore, the Court did not err in holding that the 2025 RSU Agreement was an enforceable contract.

  **B.**  **Likelihood of Success on the Merits**

    *1)*  *Scope of Non-Compete and Legitimate Business Interests*

In determining that the scope was reasonable, the Magistrate Judge applied the definition of "cruise" from Merriam-Webster's Dictionary and concluded "the scope of the non-compete restriction is also reasonable . . . [because] the restriction is specifically tailored to companies engaged in cruising based on fleet size, and the fleet size is specifically measured by the fleet's total berth count (i.e., total sleeping spaces)." Defendant now seeks to rehash the argument that "cruises" does not really mean "cruises" and that there is no legitimate business interest in river cruises. Defendant's argument was raised multiple times in his prior briefings and at the evidentiary hearing and was rejected by the Magistrate Judge because it contradicts the plain language of the Agreements. Hearing Exs., P-5 at 4, P-1 p. 40. This "objection" is nothing more than an improper "second bite at the apple" and should be rejected.[2]

The Magistrate Judge also determined that the need to protect confidential information was a legitimate business interest. Contrary to Defendant's "objection," the Report specifies the types

---

[2] Regardless, the evidence includes testimony from a senior vice president who testified that Plaintiffs' customers purchase ocean and river products (Tr. 48:18-49:7), which supports the legitimate business interest in river products and undermines any argument by Defendant that there is no "overlapping line of business." Defendant's "objection" is even more nonsensical given his admission to being involved in confidential meetings and development of training related to sales of river cruise products during his employment with Celebrity. Tr. 46:5-47:11, 94:22-95:8.

of confidential information at issue. The Report notes that Defendant "clearly, had access to Plaintiffs' confidential business information regarding financial metrics, revenue history, guest sourcing, the types of products and destinations offered, strategic plans, and annual operating plans." Report at 10 (citing Tr. 27:2-15; 28:2-24). Defendant admitted at the hearing he had access to confidential information. He participated in meetings and worked on trainings specifically related to Celebrity's river product. Tr. 114:11-25, 63:3-25. He also attended meetings, including sales leadership team meetings, that were limited to individuals in leadership roles, and which included confidential information. *See* Tr. 28:25-32:3; 31:5-37:4; 40:20-43:22; 44: 5-23; 64:16-23; 39:1-9. During those meetings, confidential information was shared, including information related to 3-5-year annual operating plans, financial metrics, KPIs, expectations, new product innovations, guest demographics, segmentation of the consumer, global distribution, employee talent, and brand strategy. Tr. 28:5-29:25. Defendant testified that he received non-public confidential information in at least one of those meetings and attendees were specifically told not to share the information they learned with the public or even with other Celebrity employees. Tr. 30:11-19, 38:16-39:16.

Defendant's cited case law is inapposite. *Vital Pharm., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) (employer did not even claim that the employee had violated the non-disclosure obligation); *WellCare Health Plans, Inc. v. Preitauer*, No. 8:12-cv-713-T-30MAP, 2012 U.S. Dist. LEXIS 76920, at *18 (M.D. Fla. May 23, 2012) (no legitimate business interest where employee did not have access to confidential information at former employer and bulk of employee's specialized knowledge and experience was from prior to employment with former employer, and former employer was no longer competing in states restricted by non-compete); *S. Wine & Spirits of Am., Inc. v. Simpkins*, No. 10-21136-Civ-COOKE/B, 2011 U.S. Dist. LEXIS 5762, at *18 (S.D. Fla. Jan. 14, 2011) (declining to enforce a 5-year nationwide non-compete when there was no evidence of relevant confidential information, and where employee only had responsibilities over one state).[3]

Again, Defendant was involved in confidential meetings and training related to Celebrity's global rollout of the river product at the time of his resignation, and the actual rollout came shortly

---

[3] As noted in the Report, Defendant did not contest the geographic scope of the Agreements, nor do they do so in the Objections. Therefore, case law that held that restrictive covenants were not reasonable in geographic scope are wholly distinguishable, as Defendant has waived any objection

after his resignation. Tr. 46:5-47:11. He cannot credibly claim that he did not have relevant confidential information.[4] Here, the non-compete is only nine (9) months[5] in length, which is presumptively reasonable under Florida law, and the undisputed evidence showed that Defendant had access to highly relevant confidential information while working for Plaintiffs.

The Agreements are supported by legitimate business interests, and there is no basis to blue-pencil or modify the Agreements as requested by Defendant.

### 2) *Evidence of Defendant's Breach – Employment with Ama and Solicitation of Plaintiffs' Employee*

Based on the evidence presented, including the plain language of the restrictions, live testimony, Facebook messages, and text messages, the Magistrate Judge correctly found that Plaintiffs met the burden of establishing a substantial likelihood of success. The Magistrate Judge found that Ama falls within the non-compete restriction, and Defendant communicated with Plaintiffs' employee Jason Santelices about employment opportunities with Ama.

With respect to the non-compete restriction, it is undisputed that Defendant is employed by Ama, and Ama is a cruise company with a fleet size far greater than 500 berths. Tr. 122:1-3, 126:11-13. As set forth above, Defendant's argument that Ama is not covered by the non-compete restriction contradicts the plain language of the Agreements and was considered and rejected by the Magistrate Judge.

With respect to the non-solicit restriction, Defendant's own testimony severely undercuts his credibility. Defendant testified that he never discussed any Ama opportunities with Mr. Santelices. Tr. 111:7-11. Yet, he admitted that his repeated outreach to Mr. Santelices via phone call, text messages, and Facebook in September 2025—which he disingenuously characterized as a "personal check in"—came *after 4 months of no communication*. Tr. 110:16-25.

Mr. Santelices testified that Defendant reached out to him in September 2025 to discuss potential openings at Ama, specifically in the corporate meetings and incentives channels. Tr.

---

to the reasonableness of the geographic or temporal scope of the Agreements.

[4] While Defendant "objects" that the Report does not identify what confidential information Defendant has shared with Ama, the whole point of injunctive relief is to *prevent* Plaintiffs' confidential information from being used or shared. Under Florida law, his access to Plaintiffs' confidential information and employment by Ama supports the need for a preliminary injunction.

[5] The Report properly tolled the 9-month restricted period during the time Defendant was in breach according to the tolling provision in the RSU Agreement. Hearing Ex. P-4 at 4.

174:18-175:2. Mr. Santelices testified that Defendant discussed ranges of potential salary, and how it would be more than Mr. Santelices earned in his current employment. Tr. 175:3-13. Mr. Santelices' testimony is confirmed by the contemporaneous text messages between Defendant and Mr. Santelices, where, following multiple phone conversations, Mr. Santelices texted Defendant:

> Angel, I want to thank you for your time and consideration. I truly appreciate you looking out for my career growth and understanding as I do some some [sic] searching to figure out what's best for me moving forward. Please know my conversation with you was a lot more open and honest given our relationship and *even considering me for such an important role within your organization*. While the timing isn't perfect at the moment do keep me in mind and maybe our paths will cross again.

Hearing Ex. D-Q (emphasis added). Defendant responded to this text message with a heart emoji. Tr. 176:15-25, Hearing Ex. D-Q. The written evidence – sent by Mr. Santelices and adopted by Defendant – clearly demonstrates that Defendant was discussing a role for Mr. Santelices at Ama. In addition to Defendant's solicitation of Mr. Santelices, subsequent text messages between Defendant and Mr. Santelices specifically mention other individuals that may be open to employment with Ama. Hearing Ex., D-Q. Therefore, the Magistrate Judge's finding that Plaintiffs met the burden of establishing a substantial likelihood of success on Plaintiffs' breach of the non-solicitation claim is supported by the record evidence.[6]

In sharp contrast to the evidence presented, Defendant takes the position that Mr. Santelices "testified that no solicitation occurred," and that Defendant and Mr. Santelices' testimony agreed in "every material respect." Objections p. 11. This is a blatant misrepresentation. Defendant denied any conversation with Mr. Santelices about job opportunities in September 2025, while Mr. Santelices testified that Gomez specifically reached out regarding job opportunities with Ama and even discussed the department, salary range, and location of the opportunity. Tr. 174:1-176:25.

As he did in prior briefings, Defendant conflates 2024 communications (while Defendant was still with Celebrity) and 2025 communications (while Defendant was already with Ama). The 2025 communications are the relevant communications for purposes of Plaintiffs' non-solicitation claim. Everything from 2024, including what Mr. Santelices' described as an internal "networking opportunity" is irrelevant. Tr. 179:22-180:24 ("yes, when he was at Royal Caribbean back in 2024 when we were in Naples."). Defendant misquotes this testimony in his Objections, claiming that

---

[6] Additionally, Defendant's constantly evolving story severely undercuts his credibility.

Mr. Santelices testified the conversation in **September 2025** was merely networking. Objections p. 11. This is false. Notably, the Magistrate Judge clarified the dates with Mr. Santelices on the witness stand, and Mr. Santelices confirmed that the 2024 communication with Defendant was when Defendant was *still employed with Plaintiffs* and was about employment opportunities *with Plaintiffs*. Tr. 181:10-17.

Despite Defendant's efforts, the factual findings of the Report are clearly supported by the factual record: Defendant solicited Mr. Santelices in September 2025 when he reached out to him (by phone, Facebook, and text messages) regarding employment opportunities at Ama. Defendant's actions in reaching out to Mr. Santelices, discussing opportunities at Ama, including the department and salary range, are solicitation as defined in the Agreements, which prohibited Defendant from "employ[ing] or seek[ing] to employ" any employee of Plaintiffs, and from soliciting, inducing, or influencing, any employee to "discontinue or reduce or modify" their relationship with Plaintiffs. Hearing Ex., P-5 at 4.

Reinforcing concerns about Defendant's lack of credibility is the fact that Defendant has taken a different position regarding his interactions with Mr. Santelices. Initially, in response to the Motion for TRO, Defendant stated:

> Jason Santelices approached Mr. Gomez in person in **September 2025** in Naples, Florida, complaining about being frustrated with RCCL after being denied a promotion. Mr. Santelices then initiated another conversation with Mr. Gomez afterwards, while both were aboard a ship. As the complete text message conversation reflects, Mr. Santelices approached Mr. Gomez, inquired about opportunities, and Mr. Gomez merely responded.

ECF No. 15, p. 8 (emphasis added). Later, at the hearing, Defendant contradicted this narrative, testifying that his in-person conversations with Mr. Santelices actually occurred in 2024 – when both were employed by Plaintiffs. Tr. 101:23-102:17. The text and Facebook messages clearly show – as the Magistrate Judge accurately included in the Report – that Defendant initiated contact in September 2025, after not having communicated with Mr. Santelices since Defendant's employment with Plaintiffs ended in May of 2025. Hearing Exs. D-Q, P-8.

Notwithstanding his prior representations, in Defendant's proposed order following the evidentiary hearing and now in his Objections, Defendant acknowledges that he and Mr. Santelices did, in fact, discuss future employment with Ama:

> ***While future employment was discussed***, the talk involved nothing more than mere notions of future possibilities without any dates,

> salaries, or positions. It could hardly be said that this discussion could reasonably be expected to cause Mr. Santelices to quit, move cross-country, and leave his family and extended family, all of whom live in South Florida.

ECF No. 32-1, p. 20 (emphasis added). So Defendant first flatly denied any discussions with Mr. Santelices about job opportunities at Ama and later admitted to discussing employment opportunities. Tr. 111:7-11. Mr. Santelices then testified about the salary range, department, and location of the Ama position about which Defendant reached out. Tr. 174:18-175:13. Because Mr. Santelices' testimony is also supported by the contemporaneous written communications, the Magistrate Judge did not err in crediting his testimony and finding that Defendant solicited Mr. Santelices in breach of the Agreements. Hearing Exs., D-Q, P-8.

The Magistrate Judge weighed the evidence and found a substantial likelihood of success on the breach of contract claims.

### C. **<u>Presumption of Irreparable Harm</u>**

The finding of a substantial likelihood of success on the breach claims alone warrants injunctive relief. Defendant breached his non-compete and non-solicit obligations, and Plaintiffs require injunctive relief to enjoin continued breaches. *See e.g., Mainsail Parent, LLC v. Jewell*, No. 24-22875-CIV-ALTONAGA/Reid, 2024 U.S. Dist. LEXIS 187698, at *12 (S.D. Fla. July 31, 2024) (temporary restraining order appropriate where defendant had violated non-solicit to prevent irreparable harm of future threatened breaches).

In the Report, the Magistrate Judge properly found that a violation of an enforceable covenant creates a presumption of irreparable injury. The Magistrate Judge relied upon Eleventh Circuit authority, including *TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 406 (11th Cir. 2015) and *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009), both of which applied Florida law as it "prescribes how irreparable injury is established in the restrictive covenant context." *TransUnion Risk,* at 406. In *TransUnion Risk*, the court explained:

> Federal courts sitting in diversity in Florida can and should apply Rule 65 and section 542.335 in a similarly harmonious fashion. . . . Indeed, the presumption of irreparable harm found in section 542.335(1)(j)—and its broader statutory context—works in tandem with Rule 65. A presumption of irreparable harm is not arbitrarily granted by Florida's statute, but is the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests

9

> at stake. *See, e.g., DePuy Orthopaedics, Inc. v. Waxman*, 95 So. 3d 928, 939 (Fla. Dist. Ct. App. 2012) ("[Petitioner] presented a prima facie case . . . [s]imply stated, [petitioner] established the presumption . . . of irreparable injury created by section 542.335(1)(j).") (emphasis added). Put another way, section 542.335(1)(j) does not relieve [a party] of its procedural burden of establishing that "irreparable injury will be suffered unless the injunction issues," *Siegel v. LePore,* 234 F.3d at 1176; rather, it prescribes how irreparable injury is established in the restrictive covenant context. We do not interpret the Florida statute to be "contrary" to Rule 65, and, accordingly, there need be no "exclusion" in its governance of this issue.

625 F. App'x at 406.

The Report is correct insofar as it did precisely what *TransUnion Risk* dictates: it analyzed irreparable harm through the statutory mechanism to prove irreparable harm. District Courts frequently apply this presumption of irreparable harm based on the analysis in *TransUnion. See e.g. Nationsbenefits, LLC v. Brady*, No. 25-61411-CIV-DIMITROULEAS/HUNT, 2025 U.S. Dist. LEXIS 152108, at *12 (S.D. Fla. Aug. 8, 2025); *Mktg. Partner Servs. LLC v. Sciortino*, No. 24-61567-CIV-DIMITROULEAS/HUNT, 2025 U.S. Dist. LEXIS 13883, at *45 (S.D. Fla. Jan. 27, 2025) *Mainsail Parent, LLC v. Jewell*, No. 24-22875-CIV-ALTONAGA/Reid, 2024 U.S. Dist. LEXIS 152480, at *12 (S.D. Fla. Aug. 26, 2024); *KOVA Commercial of Naples, LLC v. Sabin*, No. 2:23-cv-614-JES-KCD, 2023 U.S. Dist. LEXIS 178703, at *24 (M.D. Fla. Oct. 4, 2023). Plaintiffs proved that Defendant breached his enforceable restrictive covenants and therefore is entitled to a presumption of irreparable harm.

Defendant takes issue with the Report because the Magistrate Judge does not cite Defendant's preferred authority,[7] *Vital Pharm., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022). However, the fact that the Report did not cite *Vital Pharm.* does not mean that the

---

[7] Defendant – eschewing the clear framework for showing irreparable harm in non-compete cases – instead directs the Court to wholly irrelevant case law where economic injury was found to be speculative. *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990) (addressing an injunction precluding enforcement of a city ordinance allocating funds to minority business enterprises without a plaintiff that could show any harm from the ordinance). In the present case, a high-ranking leader with Plaintiffs – after years of access to confidential information – went to work as a senior leader for a direct competitor using the confidential information and best practices he "picked up along the way" Tr. 152:17-23. This is direct and actual harm.

Magistrate Judge refused to consider it. Indeed, the Magistrate Judge asked Defendant's counsel at hearing for the citation to *Vital Pharm.*, which demonstrates that case was considered by the Magistrate Judge. Tr. 195:1-17. Further, *Vital Pharm.* is entirely distinguishable from the factual record here. Specifically, in *Vital Pharm.*, the Eleventh Circuit reviewed portions of the injunction that prohibited the solicitation of customers, about whom the defendant had confidential information and was using the company's confidential and proprietary information. 23 F.4th at 1291. The *Vital Pharm.* court expressly declined to address whether Florida's statutory presumption of harm applied, because the employer failed to make a prima facia case as required under Florida law, including because the employer did not even claim that the employee had violated the non-disclosure obligation. 23 F.4th at 1292. Therefore, *Vital Pharm.* stands for the proposition that when an employer does not plead or prove that an employee has breached a restrictive covenant, it is not entitled to a presumption solely because that employee has breached other restrictive covenants. *Id.*

Putting the presumption aside, Defendant did not, and cannot, rebut Plaintiffs' actual showing of substantial irreparable harm.[8] Defendant admittedly picked up "best practices" "along the way" at Celebrity, including "impacting how a brand feels day-to-day and how you're able to, you know, penetrate a new market and make a difference. Can you use some of the information

---

[8] There is no evidence of an unreasonable delay that would overcome the presumption of irreparable harm. In fact, Defendant's solicitation of Jason Santelices occurred in September 2025, and Plaintiffs did not learn about it until shortly before the scheduled hearing in the state court action which was removed by Defendant to this Court at the eleventh hour. Defendant attempts to blur the cases about lengthy delays in filing suit with cases where parties delayed seeking injunctive relief **after** they had filed a complaint. *See e.g. Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244, 1247 (11th Cir. 2016) (plaintiff waited five months **after filing suit** to move for a preliminary injunction); *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 468-69 (M.D. Fla. 2022) (denying request for injunctive relief when operative motion for preliminary injunction was made **after 12 months of litigation**). Plaintiffs promptly moved for a preliminary injunction in state court, and renewed that request within days of Defendant's removal of this action to this Court. *See Sexual MD Sols., LLC v. Wolff*, No. 20-20824-CIV- O'SULLIVAN, 2020 U.S. Dist. LEXIS 79581, at *67 (S.D. Fla. May 6, 2020) (seven-month delay not unreasonable prior to filing suit asserting breach of contract and trade secret misappropriation claims); *see also Bellsouth Advert. & Pub. Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991) ("Plaintiff's delay of seven to eight months is not an unreasonable amount of delay, and does not necessitate the preclusion of a finding of irreparable injury") (citing *Ameritech, Inc. v. American Inf. Technologies Corp.*, 811 F.2d 960, 963 (6th Cir. 1987) ("Plaintiff is entitled to some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue").

you know, yes….." Tr. 152:17-22. Defendant had no experience in the cruise industry prior to joining Celebrity. Tr. 125:2-4. Defendant received substantial confidential information during his employment with Celebrity, including about Celebrity's brand-new river cruise line, and is now working as a senior executive for a competitor in breach of the Agreements, which constitutes irreparable harm. *See e.g. Office Depot, Inc. v. Babb*, No. 20-cv-80407-SINGHAL, 2020 U.S. Dist. LEXIS 48012, at *11 (S.D. Fla. Mar. 19, 2020) (competing with confidential information constituted adequate showing of irreparable harm, even absent proof of loss of specific customers); *AutoNation, Inc. v. Peters*, No. 16-60010-CIV-COHN/SELTZER, 2016 U.S. Dist. LEXIS 57373, at *15 (S.D. Fla. Apr. 29, 2016) (competing with trade secrets constitutes irreparable harm).

### D. Plaintiffs Did Not Breach the 2022 Agreement

Defendant again raises the argument that Plaintiffs breached the 2022 Non-Compete Agreement first because he did not receive a payout for allegedly accrued paid time off ("PTO") upon separation from the Company. Objections, p. 8. This argument is without any legal or factual basis and was previously raised in filings and at the evidentiary hearing. Nothing in the 2022 Non-Compete Agreement references PTO, much less any entitlement to PTO. *See* Verified Compl., Ex. B. In cases where Florida courts have declined to enforce restrictive covenants based on first breach, there was a breach of ***the actual provisions*** of the contract at issue. *See e.g. Benemerito & Flores, P.A. v. Roche*, 751 So. 2d 91, 92 (Fla. 4th DCA 1999) (where contract contained terms requiring set bonus, reduction of bonus was a breach that precluded enforcement of noncompete). Defendant cannot establish any contractual right to a payout of PTO in the 2022 Non-Compete Agreement and therefore cannot establish first breach that precludes enforcement of its restrictive covenants.[9]

## IV. CONCLUSION

The Magistrate Judge applied the proper standard, fully considered the Parties' respective positions and weighed the evidence presented in the filings and at the full-day evidentiary hearing. Defendant's "objections" do not warrant consideration as they are either vague, irrelevant, or fully addressed in the legal arguments raised in the Parties' pre-hearing submissions. Defendant seeks an impermissible "second bite at the apple," merely regurgitating each and every possible argument. As the Magistrate Judge concluded, "all four factors – likelihood of success, irreparable

---

[9] Defendant's "first breach" argument is limited to the 2022 Non-Compete Agreement. Objections, p. 8.

harm, balance of harms, and public interest – support entry of a temporary restraining order and parallel preliminary injunctive relief." Report at 17.

Dated: January 22, 2026

Respectfully submitted,

*/s/ Tyler A. Sims*
Tyler A. Sims
Florida Bar No. 1048908
tsims@littler.com
West A. Holden
Florida Bar No. 0113569
wholden@littler.com
111 North Orange Avenue, Suite 1750
Orlando, FL 32801.2366
Tel: 407.393.2900

Paul J. Kennedy (*pro hac vice* to be filed)
Virginia Bar No. 29802
pkennedy@littler.com
815 Connecticut Avenue, N.W., Suite 400
Washington, DC 20006
Tel: 202.414.6855

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 22nd day of January 2026, a true and correct copy of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on Defendant's counsel of record.

*/s/ Tyler A. Sims*
Tyler A. Sims